UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXANDRA MARCHUK,              :

             Plaintiff,         :

       - against -         :

FARUQI & FARUQI, LLP and      :
JUAN E. MONTEVERDE,        :

            Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FARUQI & FARUQI, LLP and      :
JUAN E. MONTEVERDE,        :     13 CV 1669 (AKH)

        Counterclaim Plaintiffs, :    **ANSWER AND**
       - against -          :    **COUNTERCLAIMS**

ALEXANDRA MARCHUK,            :

            Counterclaim    :
            Defendant,     :

         and            :

JOHN and JANE DOE 1-10, who caused  :
and/or assisted with the publication of the complaint,  :

            Defendants on the   :
            Counterclaim.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Defendants/Counterclaim Plaintiffs Faruqi & Faruqi, LLP and Juan E. Monteverde, by

their counsel, Epstein Becker & Green, P.C., for their Answer to the Complaint and for their

Counterclaims against Plaintiff Alexandra Marchuk and John and Jane Doe 1-10, respectfully

state as follows:

## NATURE OF THE CASE

1.     This action was maliciously brought by Alexandra Marchuk ("Marchuk") to extort money from her former employer, Faruqi & Faruqi, LLP ("F&F" or the "Firm"), a prominent class action law firm headed by sister and brother Lubna M. Faruqi and Nadeem Faruqi – the sole equity partners and 100% owners of F&F – and to defame and damage the Firm's reputation and business, as well as the reputation of Juan Monteverde ("Monteverde"), a non-equity partner with whom she was obsessed.

2.     On December 22, 2011, Marchuk, a first-year associate who had been at the Firm for 3½ months, sent an email to Lubna and Nadeem Faruqi, stating that she was resigning and had seen an employment attorney whom she did not identify.  Marchuk directed them not to contact her.  She did not state why she was resigning or allege that she had been sexually harassed.  Lubna and Nadeem Faruqi did not hear another word from Marchuk or anyone acting on her behalf for more than nine months.  It was not until October 1, 2012, when they received a letter from Marchuk's counsel, did they learn of Marchuk's spurious allegations.  On March 13, 2013, almost 15 months after her resignation, Marchuk commenced this scurrilous lawsuit.

3.     While Marchuk was an F&F first-year associate, she was admittedly deeply in debt and preoccupied with her finances.  She had also been obsessed with Monteverde (then a 32-year old junior partner).  Marchuk now alleges that Monteverde forcibly had sexual intercourse with her and sexually harassed her at other times, and that Lubna and Nadeem Faruqi, as well as another F&F female partner, did nothing when she complained.  In fact, however, there was no sexual intercourse, forced or otherwise; there was no sexual harassment, and there were no complaints.  Marchuk's claims are false.  And as evidence of her malicious intent to damage the Firm's and Monteverde's business and reputations, Marchuk and/or her agents emailed copies of her complaint to F&F clients, opposing counsel in F&F cases,

Monteverde's wife, and certain media outlets on the same day that her complaint was filed with this Court.

4.     Marchuk's malicious actions, which are nothing short of a perversion of the judicial process, have left F&F and Monteverde with no choice but to seek affirmative judicial relief.   Accordingly, F&F and Monteverde file this Answer, deny all of Marchuk's material allegations of wrongdoing, and file the Counterclaims that follow.

## PARTIES

5.     Faruqi & Faruqi, LLP is a law firm specializing in class action litigation, including securities, anti-trust, wage and hour, and consumer litigation, and is located at 369 Lexington Avenue, New York, New York.   F&F was founded by Nadeem Faruqi and Lubna M. Faruqi, and it currently maintains offices in New York, California, Delaware and Pennsylvania.

6.     Juan E. Monteverde is an individual residing in New York, New York. He was hired as an associate by F&F in July 2010 and is currently a partner in mergers and acquisitions litigation.

7.     Alexandra Marchuk is an individual who, upon information and belief, resides in Omaha, Nebraska.   She was employed as a summer associate at F&F in 2010 and was later hired as a full-time associate in September 2011.   She resigned from her employment at F&F 3½ months later on December 22, 2011.

8.     John and Jane Doe 1-10 are persons whose identities are unknown at this time who, upon information and belief, assisted Marchuk with the publication and dissemination of the false allegations contained in the complaint to F&F clients, opposing counsel to F&F, Monteverde's wife, and the media.  Upon information and belief, one or more John or Jane Does are former F&F employees who wrongfully obtained and misappropriated F&F's client

information, and one or more John or Jane Does assisted Marchuk and/or acted as her agent(s) to use this information to widely disseminate the complaint via email. Once the identities of John or Jane Doe 1-10 become known, Defendants/Counterclaim Plaintiffs will amend their counterclaims.

**FACTUAL BACKGROUND**

**A.     The F&F Law Firm**

9.      Lubna and Nadeem Faruqi, first-generation immigrants, founded the Firm in 1995. Its primary area of practice is class action litigation. The Firm began and remains a family business, which was founded on the principles of integrity, excellence, honesty and respect for individuals. Lubna Faruqi personally reminds each employee that if they do not receive respectful treatment by anyone at F&F, "my door is open to you."

10.     F&F's core values have served it well. Today the Firm has 42 attorneys. The Firm embraces diversity by employing a substantial number of women and minorities. It has 12 female attorneys, five of whom are partners. F&F is certified as a woman-owned law firm by the Women's Business Enterprise National Council, the largest third-party certifier of business owned, controlled, and operated by women in the United States. F&F has never been sued for discrimination or harassment.

11.     As the Firm has grown, Lubna and Nadeem Faruqi have continued to manage its day-to-day operations. They decide salary, bonus and benefits for all partners, associates, financial analysts, paralegals, administrators, and support staff. They alone decide employee issues relating to termination.

12.     The Firm today, as was its practice during the time period alleged in the complaint, holds bi-weekly meetings with its attorneys and staff. The purpose of these meetings

is to review case loads, case development, new matters, new hires and personnel issues. F&F employees are often reminded at these meetings that if anyone is not being respected within the Firm, they may address the issue personally with Lubna, Nadeem or Office Manager Olive Alston. The Firm's Employee Handbook serves as a guide: it states that there is "zero tolerance for any form of harassment or discrimination." Each employee knows that a harassment complaint can be brought straight to Lubna, Nadeem or Olive Alston.

**B.    Marchuk Becomes a Summer Associate**

13.    On June 7, 2010, Marchuk started at F&F as a summer associate. The Firm hired Marchuk at the request and recommendation of David H. Leventhal, then an F&F senior partner. Leventhal's then girlfriend and now wife, Victoria Lyndon Schact, nicknamed Tori, was best friends with Marchuk.

14.    During the summer of 2010, Marchuk met Monteverde, who was an F&F associate at the time. On one occasion, Monteverde joined Leventhal, Tori Schact, and Marchuk for dinner. Although Marchuk alleges in the complaint that Monteverde made sexually offensive and unwelcome remarks to her during that dinner, neither she nor senior partner Leventhal reported such remarks to Nadeem or Lubna Faruqi as required by F&F's sexual harassment prevention policy. Likewise, while Marchuk alleges that Monteverde made other inappropriate sexually-charged remarks in her presence from time to time that summer, she never complained to Nadeem or Lubna Faruqi or anyone else.

15.    On August 12, 2010, Marchuk sent an email to all F&F personnel, stating:

> **"Tomorrow is the last day of my internship, and I want to say thank you for a wonderful summer. I learned a great deal working at Faruqi, and I am very grateful to all of you for the work experience and advice.**

> **Thank you for helping me learn, giving me the opportunity to work on your projects and for treating me like a member of the team.**" [emphasis added]

## C.   Marchuk's First Two Weeks as a First-Year Associate

16.    On September 6, 2011, after taking the New York bar exam that summer, Marchuk became a first-year associate at F&F. Once again, she was hired based on Leventhal's request and recommendation. Before she started at the Firm, Nadeem Faruqi sent an employment letter to Marchuk confirming her $75,000 annual salary and stating that she would first become eligible for a bonus at the end of 2012.

17.    On September 6, 2011, Lubna Faruqi met with Marchuk – just as she did with other first-year associates. During their meeting, among other things, Lubna: (a) welcomed Marchuk to the Firm, (b) discussed her expectations of a first-year associate in terms of assignments and work product, (c) confirmed that her annual salary was $75,000, (d) informed Marchuk that she and Nadeem Faruqi would give her a performance review in six months, (e) stated that she would not be eligible for a salary increase or a performance bonus until December 2012, and (f) asked if Marchuk had received and read the Firm's Employee Handbook. Marchuk acknowledged that she had read it.

18.    The Firm's sexual harassment prevention policy, which is contained in the Employee Handbook, states:

> "Sexual harassment of an employee will not be tolerated. Violations of this policy may result in disciplinary action, up to and including discharge. ...
>
> Any employee who believes that (s)he is a victim of sexual harassment or has been retaliated against for complaining of sexual harassment, should report the situation immediately to one of the following members of management who have been designated to receive such complaints: Lubna M. Faruqi ..., Olive Alston, Office Manager ... or Nadeem Faruqi...."

19.     The only question that Lubna Faruqi recalls that Marchuk asked at their meeting was whether she would be eligible for a salary increase and bonus in December 2011. Lubna responded no, stating that Marchuk had just joined the Firm. Lubna ended the meeting by telling Marchuk that her door was always open if she ever wanted to speak with her about any concerns.

20.     First-year associates, like Marchuk, were not assigned to work with any one partner. Marchuk admits in her complaint that she worked with various partners during her time at the Firm.

21.     On September 8, 2011, Marchuk accompanied Monteverde to Chancery Court in Delaware. On September 7, Marchuk came to Nadeem Faruqi's office and stated that the Honorable Leo E. Strine, Jr., Chancellor of the Delaware Chancery Court, had been her professor during her last semester in law school. She said that she had heard that Monteverde had a settlement hearing the next day in Delaware before Chancellor Strine, and asked Nadeem if she could go to court with Monteverde. Nadeem said yes, and he told Monteverde that Marchuk had asked to accompany him. In court, Monteverde introduced Marchuk to Chancellor Strine as follows:

> "And if I may, Your Honor, if Your Honor will indulge me, I want to make a brief introduction to the Court this afternoon. Miss Alexandra Marchuk is at plaintiff's counsel's table. She joins the firm after just finishing Vanderbilt Law where I think she had the pleasure to have Your Honor teach one of her courses last spring."

22.     That afternoon, after being successful in court, Monteverde and Marchuk went back to F&F's office in New York to report the success. Both, as observed by many at F&F, were euphoric. Marchuk praised Monteverde to Nadeem Faruqi and others, referring to Monteverde as "amazing." Given that it was late in the day, approximately 5:15 p.m., Monteverde announced to a group of F&F employees that he wanted to celebrate at LexBar,

which is a five-minute walk from the office.  Marchuk immediately said that she wanted to go. No one else did.

23.     Once at LexBar, both Marchuk and Monteverde drank.  After some time at the bar and several drinks, both engaged in consensual kissing and fondling, which was witnessed by the LexBar waitress who served them.  When Marchuk and Monteverde left LexBar, they continued their consensual conduct on the sidewalk.  Marchuk volunteered that if Monteverde wanted to have sex with her, she would not say no.  But Monteverde said no and hailed a taxi for Marchuk, at which point they parted ways.  The next day, Monteverde told Marchuk that they both had too much to drink and it could not happen again.

24.     It is worth noting that while Marchuk and Monteverde were at LexBar on September 8, Marchuk exchanged emails with Nadeem Faruqi between 5:30 p.m. and 6:30 p.m. to set up a job interview for her friend, Michelle Bholan, a fellow Vanderbilt Law graduate.  It is highly unlikely that Marchuk would recommend a female friend for employment at F&F if she felt that she was being sexually harassed.  While her friend's candidacy was pending, Marchuk did not report any sexual harassment and her friend did not withdraw her candidacy.  In fact, when Marchuk was told the following week that F&F had decided to hire a different candidate, Marchuk was very disappointed.

25.     Marchuk next alleges in the complaint that during the following few days at F&F, Monteverde sexually harassed her by "stroking her stomach and side" in an elevator and asking her to have sexual relations with him, to which she responded by telling him that his conduct was inappropriate and she was not interested in him.  These events did not occur.  Indeed, on September 12, 2011, an F&F paralegal observed Marchuk asking Monteverde to go out for drinks with her, and Monteverde responding that he had a previous engagement.

26.     Marchuk alleges in the complaint that on September 16, 2011, she told an F&F female partner that Monteverde had sexually harassed her, and that the female partner discouraged her from complaining to Lubna and Nadeem Faruqi. In truth, Marchuk did not advise that partner that Monteverde had sexually harassed her, and the partner, who has since left F&F, did not tell Marchuk not to complain to the Faruqis.

27.     On Friday, September 16, Marchuk accompanied this female F&F partner to dinner after work. They sat at the bar of a local restaurant, Rossini's, where the partner often dined when she was in New York. While conversing with the bartender, the partner mentioned that Monteverde's wife was pregnant. Upon hearing this, Marchuk burst into tears. When asked why she was crying, Marchuk replied that Monteverde had kissed her and touched her breasts the week before at LexBar. Upon information and belief, the F&F partner asked if Monteverde was out of line with her, and Marchuk said no.

28.     After the September 16 Friday night dinner, the female partner called Nadeem Faruqi and stated that she wanted Nadeem to know what Marchuk had told her. There was no mention of sexual harassment. Nadeem immediately spoke with Monteverde, who told Nadeem about the consensual conduct between Marchuk and himself the week before at LexBar, which he labeled a mistake. Nadeem emphatically ordered Monteverde to make sure it did not happen again.

29.     On Monday morning, September 19, 2011, Marchuk came to Nadeem Faruqi and asked if she could accompany Monteverde to Chancery Court in Delaware, telling him that her prior trip to court with Monteverde had been a great learning experience. Marchuk's request confirmed to Nadeem that whatever happened previously between Monteverde and Marchuk was consensual, and that Marchuk was completely comfortable working with Monteverde. Thus,

Nadeem agreed to Marchuk's request and told Monteverde that Marchuk asked to accompany him to court, which Monteverde agreed was not a problem.  Marchuk absurdly alleges in her complaint that Monteverde wanted her to accompany him to court and to dress provocatively so that she could be "eye candy" for the Honorable J. Travis Laster, Vice Chancellor of the Delaware Court of Chancery.  Her allegation is false.

30.     On September 20, 2011, further belying her allegations that the Firm's environment was hostile, she sent an email to a partner at F&F, recommending that the Firm hire another one of her friends.  Less than three hours after she returned from Delaware with Monteverde, Marchuk wrote: "My friend Patrick Hely should have contacted you today with a resume and cover letter.  I have told him about the work we do here and I think he would be an excellent addition to the Firm.  Hopefully you can meet with him soon."

**D.     Additional Events Prior to F&F's 2011 Holiday Dinner Party**

31.     Marchuk alleges that during the next three months, Monteverde made several comments to her and to others in her presence that were unwelcome and harassing in nature.  Those comments were either not made or have been taken wildly out of context.  Others at F&F, who were witnesses, will take issue with Marchuk's allegations.

32.     On November 2, 2011, Marchuk sent an email to Nadeem Faruqi and Monteverde announcing that she had passed the bar.  That evening an F&F paralegal observed and heard Marchuk telling Monteverde that she could not believe that he would not go out for drinks with her to celebrate.

33.     On November 9, 2011, as Monteverde was leaving the office, Marchuk asked him if he was going to LexBar and wanted company.  Monteverde replied that although he was going to LexBar, he did not want company.  This exchange was witnessed by Olive Alston, the Firm's office manager.

34.     Around Thanksgiving 2011, Marchuk told Monteverde that her mother was making a sculpture for him similar to the one in her office, which he had complimented. Monteverde thanked her, but said that her mother should not go to the trouble.

35.     David Leventhal, Marchuk's best friend's husband, was Marchuk's mentor at F&F.  He was a senior partner at F&F when he recommended Marchuk for a summer position, and again for full-time employment.  Leventhal, his wife Tori and Marchuk often socialized together.  Leventhal never told Lubna Faruqi, Nadeem Faruqi or Olive Alston that Marchuk had complained to him or Tori about Monteverde or sexual harassment.  Leventhal also socialized with Monteverde outside of work during this time period, and at no point did he talk to Monteverde about allegedly harassing Marchuk.

36.     Marchuk alleges in the complaint, without providing a date or context, that Nadeem Faruqi once told other Firm attorneys that he "was concerned that someday Mr. Monteverde's inappropriate behavior would cost the Firm a lot of money."  Nadeem Faruqi did not make this statement.  Rather, on September 15, 2011, Nadeem handed Monteverde a check for his portion of a fee awarded in an F&F litigation.  Monteverde, like other partners, receive a percentage of the business that they bring to the Firm.  Upon receiving the check, Monteverde told Nadeem and several other F&F attorneys present that he had more potential business opportunities.  Nadeem jokingly responded that he knew that Monteverde "would cost him a lot of money," referring to compensation he would pay to Monteverde based on the revenues that he generated in the future.

**E.     Marchuk was Told the Amount of Her Holiday Gift Before the Holiday Dinner Party; She Knew that She Would Not be Receiving A Year-End Bonus; and Monteverde had No Authority to Terminate Her Employment.**

37.     On December 12 and 13, 2011, the Firm distributed annual bonuses to associates, except first-year associates who had only started in September 2011.  First-year associates,

including Marchuk, were not given performance reviews and bonuses in December 2011 because of the brevity of their employment. Nadeem Faruqi had advised Marchuk in writing before she was hired that she was not eligible for a bonus until December 2012. Lubna Faruqi told Marchuk the same thing on Marchuk's first day as a first-year associate.

38.     Lubna and Nadeem Faruqi decided, however, to give each first-year associate a $1,000 holiday gift. Marchuk was informed on the afternoon of December 13, 2011 that she would be receiving a $1,000 holiday gift.

39.     Marchuk alleges in the complaint that she went back to the Firm's offices with Monteverde after the holiday dinner party because she was afraid that he would fire her and to ensure that she would receive a good year-end bonus. As further addressed *infra*, however, Monteverde had no authority to terminate anyone in the Firm. Only Nadeem Faruqi and Lubna Faruqi have such authority. Marchuk also knew that she would not be receiving a year-end bonus, and had been informed of her first-year associate $1,000 gift two days earlier. In fact, Marchuk did not have a reason to go back to F&F's offices with Monteverde after the holiday dinner party, other than consensual sexual relations.

**F.    The Night of the December 15, 2011 Holiday Dinner Party**

40.     The Firm's holiday party was held at Valbella Restaurant in New York's Meatpacking District. The party started at 6:00 p.m. with a cocktail hour including appetizers, followed by a sit-down dinner that began at approximately 8:00 p.m. More than 70 people attended the party. Lubna and Nadeem Faruqi sat at a family table that included their parents and their respective spouses and children. While there was no assigned seating, Marchuk sat at the same table as Monteverde.

41.     At approximately 8:30 p.m., Monteverde left his table and took his food over to the Faruqi family table to eat with them. A few minutes later, Marchuk sat down next to

Monteverde at the family's table. She did not bring her food with her. While she laughed at the jokes and stories that Monteverde and others told, she hardly participated in the conversation. About 30 minutes later, when Monteverde got up and left the table, Marchuk got up and followed Monteverde. As several persons at the party observed, Marchuk virtually shadowed Monteverde for the remainder of the party.

42.     As the dinner party began to wind down at approximately 11:30 p.m., and contrary to Marchuk's complaint in this lawsuit, Marchuk and Monteverde did not immediately leave the Valbella restaurant and head to LexBar with other F&F employees. Rather, a group of F&F employees, including Monteverde, had decided to go to the Ginger Man, a midtown bar. As Monteverde attempted to leave with the group heading to the Ginger Man, Marchuk pulled Monteverde aside and asked to speak with him. Monteverde told the group that he would catch up with them after speaking with Marchuk. Monteverde and Marchuk stayed behind at Valbella because Marchuk asked Monteverde to explain why her mentor and close friend David Leventhal had resigned the day before from F&F.

43.     At approximately 12:20 a.m., Marchuk received an email from an F&F attorney, who was already at the Ginger Man, asking where she and Monteverde were. A minute or two later, Monteverde and Marchuk took a taxi together to the Ginger Man. During the cab ride, Marchuk took Monteverde's hand and started kissing him. Monteverde did not resist. Both had been drinking at the party.

44.     Marchuk and Monteverde arrived together at the Ginger Man, a sports bar, at approximately 12:30 a.m. A few minutes after arriving, Monteverde said that he would rather go to LexBar. Although 10 other F&F employees remained at the Ginger Man, Marchuk decided to

leave with Monteverde.  They were joined by David Bower, an F&F partner.  Numerous F&F employees saw them leave together.

45.     Marchuk, Monteverde and Bower walked to LexBar.  Throughout the four-block walk, Marchuk and Monteverde held hands and kissed.  Bower will attest that Marchuk was a very willing participant.  They arrived at LexBar, which is on the ground floor of the St. Giles Court Hotel, at approximately 12:45 a.m.  Marchuk and Monteverde sat on a couch in the bar area, and Bower, feeling that he was "a third wheel," moved to the bar.  While at the bar, Bower occasionally turned around and observed Marchuk and Monteverde making out on the couch.

46.     Jerry Wells, another F&F attorney, later walked into LexBar.  He walked past Monteverde and Marchuk on the couch because he saw that they were "cozy with each other."  He spied Bower at the bar and walked over to him.  Bower and Wells had one or two drinks and then both left at approximately 2:30 a.m.

47.     As LexBar was about to close at approximately 2:45 a.m., Marchuk asked Monteverde if he had booked a hotel room upstairs at the St. Giles Court Hotel, where many out-of-town F&F employees were staying.  When Monteverde replied that he had not, Marchuk responded that they should go to F&F's offices, which were just a five-minute walk away.  During that walk, they continued to make out at each street corner.

48.     At approximately 3:00 a.m., approximately 3½ hours after the holiday dinner party had ended, Marchuk and Monteverde arrived at F&F's offices.  Upon arriving at F&F, they walked to Monteverde's office.  He entered his office first and then turned his back to Marchuk to hang up his overcoat and suit jacket on a hanger and hook behind his office door.  When he turned around, less than 10 seconds later, Marchuk was standing near his desk – naked with only

a long necklace around her neck.  Her overcoat and cocktail dress were on the carpet.  She apparently had not worn a bra or panties.

49.     Marchuk laid down on the carpet and motioned Monteverde to come to her. Monteverde, who was inebriated, got on top of her with his clothes still on and his pants around his ankles.  He could not get an erection.  After 15-20 seconds, and with no penetration, Monteverde rolled off of her.  Marchuk then told Monteverde to sit on the couch where she performed oral sex on him.  Monteverde did not resist.

50.     Marchuk and Monteverde soon left the Firm's offices together.  Monteverde told Marchuk that he would get her a cab, but Marchuk said that she wanted to take the subway. Monteverde walked her to the subway turnstile inside Grand Central Station, and they said good night.  Marchuk certainly did not complain that she was a victim of sexual harassment.

**G.     Marchuk's Last Week at the Firm**

51.     The next day, December 16, 2011, at approximately 8:30 a.m., Office Manager Alston placed a fax on Monteverde's desk.  Neither Monteverde nor Marchuk had arrived yet. Alston did not see any blood stains on Monteverde's light gray carpet in his office, as alleged in the complaint.

52.     At 9:36 a.m. on December 16, Marchuk emailed Monteverde that he should call her at work, which he did.  Marchuk told him that there were blood stains on his carpet and that she had closed his office door so that no one could see them.  Marchuk asked Monteverde to come to the office as soon as possible.  Monteverde asked how there could be blood on the carpet because she was not having her period.  In any case, when Monteverde arrived at his office approximately 20 minutes later, he found three stains, one very large and two smaller ones.

53.     Marchuk told Monteverde that she had been injured when they tried to have sexual intercourse. Monteverde replied that she had never said that she was hurt, that he did not remember any blood, that there were no blood stains on his underwear or pants, and, most importantly, they were unable to have intercourse the night before. Marchuk commented that he must have been too drunk to remember. Monteverde replied that he could not forget what happened. Monteverde inquired whether she had gone to the emergency room considering the size of the stains, and Marchuk answered that she had just gone home.

54.     Marchuk then asked Monteverde what people would say when they saw the stains on the carpet. Monteverde responded that he would spill coffee on the stains, which he did. In fact, Monteverde did not know whether the stains were blood; their color was red and not brown, the color of dried blood.

55.     Later that day, Monteverde went to Marchuk's office and said that he was sorry about last night and that it could never happen again. He said that they should either tell Lubna and Nadeem Faruqi about what happened or they should forget about the whole event. Marchuk said that she did not want the Faruqis to know and asked him not to tell them.

56.     Also on December 16, Nadeem Faruqi called a Firm meeting, thanked everyone for attending the holiday party, and announced that he was dividing everyone into seven teams based on practice areas, such as M&A Litigation, Derivative Litigation, etc. Each team would have a team leader and have two, one or no junior associates. Nadeem assigned Monteverde to lead the M&A team and Marchuk to be a member of this team. Following this announcement, Monteverde said that it was not fair that only one junior associate was assigned to his team. As an acknowledgement to Marchuk's work, Nadeem responded, "I gave you Alexandra." Everyone, including Marchuk, laughed.

57.     After the meeting, Nadeem Faruqi stopped in front of Marchuk's office and asked Marchuk if she liked being placed on the M&A team.  She responded that she loved M&A litigation and thought that Monteverde was the best attorney she had ever seen.

58.     Several days later, on December 19, 2011, Marchuk told another associate, Sarah Westby, that she was not happy with her $1,000 holiday gift, which might not even cover the cost of holiday gifts.  She did not say anything about Monteverde or sexual harassment, nor did she mention that she was thinking about leaving the Firm.

59.     On or about December 20, 2011, Marchuk received her $1,000 holiday gift.  On December 21, she came to work and seemed fine.  On December 22, however, she did not come to work and sent the following email to Nadeem and Lubna Faruqi:

> **"I am writing to let you know that yesterday was my last day at the firm, and I will not be returning.  I have spoken to an employment lawyer, and you can expect to be contacted by someone on my behalf.  Please do not contact me, unless it is regarding my insurance coverage under COBRA and in writing."** [emphasis added]

60.     Lubna and Nadeem Faruqi could not contact Marchuk because of her instruction not to do so.  They also did not contact her counsel because Marchuk did not identify her counsel.  Upon receiving this email, however, F&F consulted with its own counsel. They immediately commenced an internal investigation to try to ascertain what had happened. Nadeem Faruqi spoke with Monteverde to see if he knew why Marchuk had resigned. Monteverde told Nadeem about his post-holiday party encounter with Marchuk.  He apologized to Nadeem, referred to himself as an "idiot," but insisted that the encounter was completely consensual.  Monteverde further told Nadeem that other F&F employees witnessed certain of their consensual behavior.  Nadeem contacted F&F partner David Bower, among others, who confirmed that based on his observations, the conduct was consensual.

61.     The Faruqis were extremely angry that Monteverde had engaged in such conduct in the Firm's offices and disciplined him.  They further informed him that any romantic conduct with a Firm employee either at or outside the office, in the future, would result in his immediate termination.  After the investigation and lengthy deliberation, the Faruqis concluded that there was no evidence that Monteverde had sexually harassed Marchuk.

62.     The Faruqis did not know any specifics about Marchuk's allegations until they received a letter from Marchuk's attorney on October 1, 2012.  They were stunned by the allegations in the letter, but they did not believe her account.  Given the letter's allegations concerning what had occurred after the holiday party, they thought that Marchuk would have promptly filed a complaint against Monteverde and complained to them if the allegations were true.

## H.     Marchuk Disseminates Her False Allegations

63.     On March 13, 2013, immediately after her action was filed, Marchuk and/or John or Jane Doe emailed a copy of the complaint under the pseudonym "John Smith" from email account "js832408@gmail.com" to a list of "undisclosed recipients."  F&F clients, opposing counsel in F&F cases, Monteverde's wife, and, upon information and belief, several media outlets – including The New York Times and Thomson Reuters – received it.

64.     Marchuk and John or Jane Doe knew the identities of F&F's and Monteverde's clients by virtue of their prior employment at F&F or connection to former F&F employees.  A number of these clients – including individuals, public entities and private entities – contacted the Faruqis in the hours after the complaint was filed, and distributed to them, to express their shock.  Clients inquired about the status of the Firm, how these scurrilous allegations would affect the Firm, and the impact the allegations would have on the clients' ability to continue doing business with the Firm.

65.     As a result of Marchuk's false allegations and dissemination of the complaint, Defendants have experienced a chilling effect on their business and ability to attract new clients and business.  Defendants are having difficulty marketing their legal services to public entities, which account for over 50% of the Firm's business.  Just before this complaint was filed, F&F had substantially invested in a new public sector practice area and hired attorneys to bring in and generate business as a significant segment of the Firm's practice.  This initiative is on hold, indefinitely.  F&F and Monteverde have lost and will lose substantial business because of the fabrications alleged in the complaint.

## DEFENDANTS' COUNTERCLAIMS

## JURISDICTION AND VENUE

66.     This Court has supplemental jurisdiction over Defendants' counterclaims pursuant to 28 U.S.C. § 1367 because the counterclaims are so related to the complaint that they form part of the same case and controversy.

67.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because F&F's principle place of business is located in New York County, Monteverde resides in New York County, and a substantial part of the events giving rise to Defendants' counterclaims occurred in New York County.

## FIRST COUNTERCLAIM BROUGHT BY F&F
### (Defamation)

68.     F&F repeats and realleges each and every allegation set forth in Paragraphs 1 through 65 of Defendants' Answer and Counterclaims as if fully set forth at length herein.

69.     The complaint contains the following false and defamatory statements, among others, concerning F&F:

     a.    "Despite knowing of Mr. Monteverde's improper and abusive treatment of Ms. Marchuk, as well his notorious propensity for such behavior towards

others, neither F&F nor either of its managing partners took any action to prevent or put an end to it." (Complaint, ¶ 3)

b.  "Though it was obvious that Mr. Monteverde had harassed Ms. Marchuk out of her job, F&F took no action, deciding that sacrificing the employment rights of a first-year associate like Ms. Marchuk was a small price to pay to keep one of F&F's most important partners happy." (Complaint, ¶ 4)

c.  One of F&F's senior partners told Marchuk "it was not a good idea for Ms. Marchuk to complain about [Monteverde] to other senior partners in the Firm, including Mr. Faruqi and his sister, Lubna Faruqi." (Complaint, ¶ 28)

d.  F&F "took no other action to prevent Mr. Monteverde from further harassing Ms. Marchuk." (Complaint, ¶ 29)

e.  "Mr. Faruqi even told other F&F attorneys that he was concerned that someday Mr. Monteverde's inappropriate behavior would cost the Firm a lot of money."  (Complaint, ¶ 71)

f.  "F&F had actual notice that Monteverde was subjecting Marchuk to inappropriate sexual harassment in the workplace, but made no effort to prevent or remedy it." (Complaint, ¶ 72)

70.    Marchuk makes these allegations in the complaint against F&F for the sole, malicious purpose of defaming F&F, ruining its professional reputation, and interfering with its client relationships.

71.    Marchuk published these false and defamatory statements, or caused them to be published by John or Jane Doe, by emailing the complaint to F&F clients,[1] opposing counsel in F&F cases, Monteverde's wife, and the media.  On the same day that the complaint was filed, and for days thereafter, F&F and Monteverde were contacted by F&F clients and opposing counsel in F&F cases to inquire about the communication.  F&F was also contacted by The New York Times and Thomson Reuters, among others, about the complaint.

---

[1] The identities of the F&F clients that received the complaint by email are highly confidential. F&F will disclose their names *in camera* upon request of the Court.

72.    The false and defamatory statements were intentionally published by email to F&F clients, opposing counsel in F&F cases, Monteverde's wife, and the media within hours of filing the complaint. Marchuk and John or Jane Doe made these statements for the sole and malicious purpose of disseminating them outside of this judicial proceeding and throughout Defendants' industry.

73.    These false and defamatory statements are not privileged because: (a) they were made in the complaint for the sole and malicious purpose of spreading false accusations to defame Defendants; and (b) this wide dissemination was neither essential nor relevant to these proceedings. The publication did not and will not aid Marchuk's case before this Court in any way, and has no purpose other than to injure Defendants personally and professionally out of malice, spite and ill will.

74.    Marchuk's and/or John or Jane Doe's intentional publication of these false and defamatory statements about Defendants has significantly damaged their reputations in the legal industry and substantially interfered with F&F's business. As a result, Marchuk is liable to F&F in an amount to be determined at trial, which F&F believes exceeds Fifteen Million Dollars ($15,000,000).

## SECOND COUNTERCLAIM BROUGHT BY MONTEVERDE
### (Defamation)

75.    Monteverde repeats and realleges each and every allegation set forth in Paragraphs 1 through 65 of Defendants' Answer and Counterclaims as if fully set forth at length herein.

76.    Marchuk's complaint contains the following false and defamatory statements concerning Monteverde:

a.  "Monteverde coerced and threatened [Marchuk] that if she did not have sex with him he could not recommend her for a year-end bonus and likely would terminate her employment at F&F.  Thus Mr. Monteverde induced Ms. Marchuk to go back to F&F's offices with him where he quickly and forcefully had sex with her." (Complaint, ¶ 2)

b.  "Monteverde aggressively grabbed and kissed Ms. Marchuk and attempted to fondle her breasts.  Ms. Marchuk physically rebuffed Mr. Monteverde's advances.  Mr. Monteverde then asked Ms. Marchuk to go back to F&F's offices with him to have sex." (Complaint, ¶ 18)

c.  Monteverde "took Ms. Marchuk to lunch and told her that he wanted her to be his mistress. As a married man, Mr. Monteverde attempted to justify his actions by explaining that his father has 'a wife, a girlfriend, and a mistress.'  Mr. Monteverde further explained that he married his wife only to obtain a United States Green Card." (Complaint, ¶ 19)

d.  Monteverde "inappropriately stroked Ms. Marchuk's stomach and side in the elevator." (Complaint, ¶ 21)

e.  With respect to Marchuk's attendance at a hearing in Delaware Chancery Court, Monteverde "wanted Ms. Marchuk to appear with him because her good looks would influence the judge in favor of F&F. Mr. Monteverde told Ms. Marchuk to wear her hair down, wear a low-cut shirt, and try to look as alluring as possible during the hearing."  The next day, "Mr. Monteverde again told Ms. Marchuk to try to look as attractive as possible in order to get the judge's attention during the hearing … her sole function was to serve as 'eye candy' for Vice Chancellor Laster." (Complaint, ¶¶ 25, 30)

f.  That Monteverde "explained that since she had started working at F&F he had been testing Ms. Marchuk's loyalty and toughness, and that she was failing miserably.  He expressed disappointment in Ms. Marchuk for 'betraying' him by complaining" to a senior F&F partner. (Complaint, ¶ 62)

g.  Marchuk's description of the events of December 15, 2011 falsely states: "After entering his office, Mr. Monteverde pushed Ms. Marchuk to the floor and quickly, forcefully, and painfully had sex with her.  Suffering discomfort and not wanting to continue having sex with him, Ms. Marchuk implored Mr. Monteverde to stop, but he disregarded her pleas and continued having sex with her. After he finished, Ms. Marchuk had left a large bloodstain on Mr. Monteverde's carpet.  Seeing that Ms. Marchuk was emotionally and physically traumatized by his aggressive conduct, Mr. Monteverde immediately directed her not to tell anyone what he had done.  He then quickly escorted Ms. Marchuk from F&F's office and down the street, obviously concerned that they might be discovered by

F&F employees. Mr. Monteverde advised Ms. Marchuk to forget what had just happened." (Complaint, ¶ 65)

77.     The above statements are among the other false and defamatory statements in the complaint, which are contained in the complaint's following paragraphs: 1, 11, 12, 26, 32, 33, 35, 37-39, 41, 42, 44, 46-51, 53, 55, 60, 61, and 62.

78.     Marchuk makes these allegations against Monteverde in the complaint for the sole, malicious purpose of defaming Monteverde, ruining his personal and professional reputation, and causing him severe emotional distress and mental anguish.

79.     Marchuk published these false and defamatory statements, or caused them to be published by John or Jane Doe, by emailing a copy of the complaint to F&F clients, opposing counsel in F&F cases, Monteverde's wife, and members of the media.   Just hours after the complaint was filed in this Court, Monteverde's wife received an email from "John Smith" whose email account is stated as "js832408@gmail.com".   Marchuk and/or John or Jane Doe created this email account for the purpose of maliciously disseminating the false allegations in the complaint.   This email states that it was sent to a list of "undisclosed recipients."   On the same day that the complaint was filed, and for days thereafter, Defendants were contacted by F&F clients, opposing counsel in F&F cases, and members of the press to inquire about the communication, confirming that the list of "undisclosed recipients" included, among others, F&F clients.

80.     The false and defamatory statements were intentionally published by email to F&F clients, opposing counsel in F&F cases, Monteverde's wife, and the media within hours of filing the complaint.   Marchuk and John or Jane Doe made these statements for the sole and malicious purpose of disseminating them outside of this judicial proceeding, throughout Defendants' industry and to Monteverde's wife.

81.     These false and defamatory statements are not privileged because (a) they were made in the complaint for the sole and malicious purpose of spreading false accusations to defame Defendants; and (b) this wide dissemination was neither essential nor relevant to these proceedings. The publication did not and will not aid Marchuk's case before this Court in any way, and has no purpose other than to injure Monteverde personally and professionally out of malice, spite and ill will.

82.     Marchuk's and/or John or Jane Doe's intentional publication of these false and defamatory statements about Monteverde constitutes defamation *per se* because they imply depraved and criminal conduct. Marchuk has maliciously caused Monteverde to suffer humiliation, mental anguish, emotional distress and injury to his reputation in both the community and his profession. Marchuk is liable to Monteverde in an amount to be determined at trial, which Monteverde believes exceeds Fifteen Million Dollars ($15,000,000).

### THIRD COUNTERCLAIM BROUGHT BY F&F AND MONTEVERDE
### (Tortious Interference with Prospective Business Advantage)

83.     Defendants repeat and reallege each and every allegation set forth in Paragraphs 1 through 65 of their Answer and Counterclaims as if fully set forth at length herein.

84.     F&F and Monteverde maintained valuable business relationships with clients by providing legal services and representing those clients in litigation. These clients include individuals, public entities and private entities. Marchuk and/or John or Jane Doe knew that F&F and Monteverde had business relationships with these clients by virtue of their prior employment at F&F.

85.     In a deliberate attempt to damage Defendants' business relationships, Marchuk and/or John or Jane Doe maliciously and without justification emailed a copy of the complaint to F&F clients immediately after it was filed in Court for the sole purpose of injuring the Firm's

and Monteverde's reputations, to induce clients to cease doing business with F&F and/or Monteverde, and convince these clients not to enter into future business dealings with F&F and/or Monteverde.

86.     Marchuk and/or John or Jane Doe published the defamatory statements for the sole purpose of interfering with Defendants' business relationships.  The complaint contains false and defamatory statements about F&F and Monteverde that have been made out of spite, ill will and malice.

87.     Marchuk and/or John or Jane Doe also emailed the complaint to the media and to attorneys who are opposing counsel in pending litigation that is being handled by F&F.  Media representatives from The New York Times and Thomson Reuters, among others, contacted F&F about the complaint.

88.     Marchuk's conduct has significantly interfered and injured Defendants' relationships with clients.  Numerous clients contacted Defendants in the hours after the complaint was filed, and distributed to them, to express shock.  Clients inquired about the status of the Firm, how these scurrilous allegations would affect the Firm, and the impact the allegations would have on the clients' ability to continue to do business with Defendants.  F&F and Monteverde will lose clients and/or the opportunity to retain new business from these clients as a direct and proximate result of Marchuk's and/or John or Jane Doe's conduct.

89.     In addition to the false depiction of events described in the complaint and planted in the minds of current clients, Marchuk's and/or John or Jane Doe's conduct has had a chilling effect on Defendants' ability to attract new clients.  F&F and Monteverde are having difficulty marketing their legal services to public entities, which account for over 50% of the Firm's business.  Just before this complaint was filed, F&F had substantially invested in a new public

sector practice area and hired attorneys to bring in and generate business as a significant segment of the Firm's practice.  As a result of Marchuk's and/or John or Jane Doe's malicious conduct, Defendants have lost and will lose substantial business.

90.     Based on the foregoing, F&F and Monteverde have been damaged in an amount to be determined at trial, which Defendants believe exceeds Fifteen Million Dollars ($15,000,000).

## FOURTH COUNTERCLAIM BROUGHT BY MONTEVERDE
### (Intentional Infliction of Emotional Distress)

91.     Monteverde repeats and realleges each and every allegation set forth in Paragraphs 1 through 65 of Defendants' Answer and Counterclaims as if fully set forth at length herein.

92.     Marchuk's false and defamatory allegations in the complaint, exacerbated by Marchuk's and/or John or Jane Doe's malicious publication to Monteverde's wife, F&F clients, opposing counsels in F&F cases and the media, constitutes conduct so extreme and outrageous that it is intolerable by a civilized society.

93.     Marchuk and/or John or Jane Doe, by emailing the complaint to Monteverde's wife, F&F's clients, opposing counsels in F&F cases and the media, knew or should have known that their actions would cause Monteverde to suffer severe emotional distress and anguish as a result of their publication of the false and defamatory claims asserted therein.  Marchuk and/or John or Jane Doe emailed the complaint to these persons and entities with the intention of causing Monteverde to suffer severe emotional distress.

94.     As a result of Marchuk's unjustifiable, defamatory statements, and Marchuk's and/or John or Jane Doe's publication thereof, Monteverde has suffered serious psychological and emotional injuries and distress, mental anguish, and damage to his personal and professional

reputation.  These injuries would not have been suffered but for Marchuk's and/or John or Jane Doe's conduct.

95.     As a result of Marchuk's and/or John or Jane Doe's conduct, Monteverde has been damaged in an amount to be determined at trial, which Monteverde believes exceeds Fifteen Million Dollars ($15,000,000).

## FIFTH COUNTERCLAIM BROUGHT BY F&F
### (Misappropriation of Confidential Information)

96.     F&F repeats and realleges each and every allegation set forth in Paragraphs 1 through 65 of Defendants' Answer and Counterclaims as if fully set forth at length herein.

97.     In the course of its business, F&F maintains client information that is privileged and highly confidential.  The identities of these clients, their contact information – including email addresses and names of representatives – and notes pertaining to the representation are all highly confidential and proprietary to F&F.

98.     F&F's client contact list and client information is not readily ascertainable through proper means.  F&F's Employee Handbook requires each employee to "maintain the highest degree of confidentiality when handling client matters.  To maintain this professional confidence, no employee shall disclose client information to other clients, friends, or members of one's own family." Access to F&F's computer system is protected by usernames and passwords, and restricts access to client files and client contact information to business purposes.

99.     Marchuk signed an acknowledgment that she read the Employee Handbook.

100.     Upon information and belief, Marchuk and/or John or Jane Doe misappropriated F&F's confidential and proprietary client information without F&F's consent by taking or otherwise obtaining F&F's client list, with contact and other case information.  Marchuk and/or John or Jane Doe used that information to send the complaint to F&F's clients.

101.    Marchuk knew that F&F's client information was confidential and that she was not authorized to access, take, obtain or use F&F's client information following her resignation from F&F.

102.    F&F has been damaged by Marchuk's and/or John or Jane Doe's conduct.  By using F&F's client information to disseminate the false allegations in the complaint by email to F&F clients, Marchuk and/or John or Jane Doe have harmed F&F's reputation in the industry. F&F's ability to retain, market and generate business from these clients has been irreparably harmed.

103.    Marchuk's and/or John or Jane Doe's misappropriation of F&F's confidential client information was malicious, willful and motivated by spite and ill will.  F&F has been damaged as a result in an amount to be determined at trial, which F&F believes exceeds Fifteen Million Dollars ($15,000,000).

## SIXTH COUNTERCLAIM BROUGHT BY F&F AND MONTEVERDE
### (*Prima Facie* Tort)

104.    Defendants repeat and reallege each and every allegation set forth in Paragraphs 1 through 65 of their Answer and Counterclaims as if fully set forth at length herein.

105.    By making false and defamatory statements in the complaint and publishing the statements or causing such statements to be published to F&F's clients, opposing counsel in F&F cases, Monteverde's wife and the media by email, Marchuk and/or John or Jane Doe intentionally inflicted harm on F&F and Monteverde.

106.    Marchuk and/or John or Jane Doe have no excuse or justification for this conduct.

107.    As a result, F&F and Monteverde have sustained special damages in the form of lost business advantage and damage to their reputations.

108.     Marchuk and/or John or Jane Doe are liable to F&F and Monteverde in an amount of special damages to be determined at trial, which Defendants believe exceeds Fifteen Million Dollars ($15,000,000).

## DEFENDANTS' ANSWER TO THE COMPLAINT

## NATURE OF THE ACTION

109.     Deny the allegations set forth in Paragraph 1 of the Complaint.

110.     Deny the allegations set forth in Paragraph 2 of the Complaint, except admit that Marchuk resigned.

111.     Deny the allegations set forth in Paragraph 3 of the Complaint, except admit that Nadeem Faruqi is one of F&F's managing partners.

112.     Deny the allegations set forth in Paragraph 4 of the Complaint, except admit that Marchuk informed F&F's managing partners that she had consulted an employment attorney and was resigning her employment.

## PARTIES

113.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Complaint.

114.     Admit the allegations set forth in Paragraph 6 of the Complaint.

115.     Admit the allegations set forth in Paragraph 7 of the Complaint, except deny that Monteverde was a senior partner at F&F.

## JURISDICTION AND VENUE

116.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Complaint, except admit that Defendants are citizens of the State of New York and that the amount in controversy exceeds $75,000, exclusive of interests and costs.

117.   Admit the allegations set forth in Paragraph 9 of the Complaint.

## FACTUAL ALLEGATIONS

118.   Admit the allegations set forth in Paragraph 10 of the Complaint.

119.   Deny the allegations set forth in Paragraph 11 of the Complaint, except admit that Marchuk was a summer associate at F&F.

120.   Deny the allegations set forth in Paragraph 12 of the Complaint, except admit that on one occasion, Marchuk accompanied some F&F lawyers, including Monteverde, to network with other class-action plaintiffs' attorneys and that afterwards she went to a restaurant for dinner with Monteverde and another F&F partner and his girlfriend, who had been at the event earlier.

121.   Deny the allegations set forth in Paragraph 13 of the Complaint.

122.   Deny the allegations set forth in Paragraph 14 of the Complaint, except admit that Marchuk graduated from law school in the spring of 2011 and that she accepted a position as a full-time associate at F&F with a starting salary of $75,000, and further deny knowledge or information sufficient to form a belief as to the truth of the allegations that Marchuk was excited to secure the associate position and had large student loans.

123.   Deny the allegations set forth in Paragraph 15 of the Complaint, except admit that on September 6, 2011, Marchuk became a first-year associate at F&F.

124.   Deny the allegations set forth in Paragraph 16 of the Complaint.

125.   Deny the allegations set forth in Paragraph 17 of the Complaint, except admit that Marchuk joined Monteverde at Lex Bar, which was near F&F's office.

126.   Deny the allegations set forth in Paragraph 18 of the Complaint.

127.   Deny the allegations set forth in Paragraph 19 of the Complaint, except admit that Monteverde and Marchuk went to lunch.

128.   Deny the allegations set forth in Paragraph 20 of the Complaint.

129.   Deny the allegations set forth in Paragraph 21 of the Complaint.

130.   Deny the allegations set forth in Paragraph 22 of the Complaint.

131.   Deny the allegations set forth in Paragraph 23 of the Complaint.

132.   Deny the allegations set forth in Paragraph 24 of the Complaint.

133.   Deny the allegations set forth in Paragraph 25 of the Complaint.

134.   Deny the allegations set forth in Paragraph 26 of the Complaint.

135.   Deny the allegations set forth in Paragraph 27 of the Complaint.

136.   Deny the allegations set forth in Paragraph 28 of the Complaint.

137.   Deny the allegations set forth in Paragraph 29 of the Complaint.

138.   Deny the allegations set forth in Paragraph 30 of the Complaint, except admit that Marchuk appeared in court in Delaware with Monteverde on September 20, 2011.

139.   Deny the allegations set forth in Paragraph 31 of the Complaint.

140.   Deny the allegations set forth in Paragraph 32 of the Complaint.

141.   Deny the allegations set forth in Paragraph 33 of the Complaint.

142.   Deny the allegations set forth in Paragraph 34 of the Complaint, except admit that Marchuk never invited Monteverde to her apartment and never introduced him to her cousin.

143.   Deny the allegations set forth in Paragraph 35 of the Complaint.

144.   Deny the allegations set forth in Paragraph 36 of the Complaint.

145.   Deny the allegations set forth in Paragraph 37 of the Complaint.

146.   Deny the allegations set forth in Paragraph 38 of the Complaint.

147.   Deny the allegations set forth in Paragraph 39 of the Complaint.

148.   Deny the allegations set forth in Paragraph 40 of the Complaint.

149.   Deny the allegations set forth in Paragraph 41 of the Complaint.

150.   Deny the allegations set forth in Paragraph 42 of the Complaint.

151.   Deny the allegations set forth in Paragraph 43 of the Complaint.

152.   Deny the allegations set forth in Paragraph 44 of the Complaint.

153.   Deny the allegations set forth in Paragraph 45 of the Complaint.

154.   Deny the allegations set forth in Paragraph 46 of the Complaint.

155.   Deny the allegations set forth in Paragraph 47 of the Complaint.

156.   Deny the allegations set forth in Paragraph 48 of the Complaint.

157.   Deny the allegations set forth in Paragraph 49 of the Complaint.

158.   Deny the allegations set forth in Paragraph 50 of the Complaint.

159.   Deny the allegations set forth in Paragraph 51 of the Complaint.

160.   Deny the allegations set forth in Paragraph 52 of the Complaint.

161.   Deny the allegations set forth in Paragraph 53 of the Complaint.

162.   Deny the allegations set forth in Paragraph 54 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that Marchuk owed a substantial amount of money for college and law school loans.

163.   Deny the allegations set forth in Paragraph 55 of the Complaint.

164.   Deny the allegations set forth in Paragraph 56 of the Complaint.

165.   Deny the allegations set forth in Paragraph 57 of the Complaint.

166.   Deny the allegations set forth in Paragraph 58 of the Complaint.

167.   Deny the allegations set forth in Paragraph 59 of the Complaint.

168.   Deny the allegations set forth in Paragraph 60 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that Marchuk was counting on at least a small bonus to cover necessary expenses.

169.  Deny the allegations set forth in Paragraph 61 of the Complaint.

170.  Deny the allegations set forth in Paragraph 62 of the Complaint.

171.  Deny the allegations set forth in Paragraph 63 of the Complaint.

172.  Deny the allegations set forth in Paragraph 64 of the Complaint, except admit that Marchuk and Monteverde walked back to F&F's office.

173.  Deny the allegations set forth in Paragraph 65 of the Complaint.

174.  Deny the allegations set forth in Paragraph 66 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations that Marchuk visited her gynecologist and an employment attorney.

175.  Deny the allegations set forth in Paragraph 67 of the Complaint, except admit that Marchuk sent an email to Nadeem Faruqi and Lubna Faruqi (his sister and the other name partner), stating that she had consulted with an employment attorney and was resigning her employment at F&F.

176.  Deny the allegations set forth in Paragraph 68 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that nobody from F&F ever contacted Marchuk to determine the reason for her resignation.

177.  Deny the allegations set forth in Paragraph 69 of the Complaint.

178.  Deny the allegations set forth in Paragraph 70 of the Complaint.

179.  Deny the allegations set forth in Paragraph 71 of the Complaint.

180.  Deny the allegations set forth in Paragraph 72 of the Complaint.

181.  Deny the allegations set forth in Paragraph 73 of the Complaint.

182.    Deny the allegations set forth in Paragraph 74 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegation that Marchuk obtained treatment from a clinical psychologist.

183.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 75 of the Complaint.

184.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 76 of the Complaint.

185.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 77 of the Complaint.

## FIRST CLAIM
### (Hostile Work Environment under the NYC Human Rights Law)

186.    With respect to Paragraph 78 of the Complaint, Defendants repeat and reallege their responses to the allegations set forth in Paragraphs 1 through 77 of the Complaint with the same force and effect as if fully set forth at length herein.

187.    Deny the allegations set forth in Paragraph 79 of the Complaint.

188.    Deny the allegations set forth in Paragraph 80 of the Complaint.

189.    Admit the allegations set forth in Paragraph 81 of the Complaint.

190.    Deny the allegations set forth in Paragraph 82 of the Complaint.

191.    Deny the allegations set forth in Paragraph 83 of the Complaint.

## SECOND CLAIM
### (Hostile Work Environment under the NYS Human Rights Law)

192.    With respect to Paragraph 84 of the Complaint, Defendants repeat and reallege their responses to the allegations set forth in Paragraphs 1 through 83 of the Complaint with the same force and effect as if fully set forth at length herein.

193.    Deny the allegations set forth in Paragraph 85 of the Complaint.

194.    Deny the allegations set forth in Paragraph 86 of the Complaint, except admit that F&F was Marchuk's employer.

195.    Deny the allegations set forth in Paragraph 87 of the Complaint.

## DEFENSES TO THE COMPLAINT

### FIRST DEFENSE

196.    The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

197.    Defendants' treatment of Marchuk was based on reasonable, legitimate business factors, was non-discriminatory and non-harassing in nature, and was consistent with and in compliance with the New York State Human Rights Law, N.Y.S. Exec. Law § 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Adm. Code § 8-107 *et seq.* ("NYCHRL"), and all other applicable law.

### THIRD DEFENSE

198.    To the extent that there was a physical relationship between Marchuk and Monteverde, it was completely consensual and welcomed.

### FOURTH DEFENSE

199.    Assuming, *arguendo*, that the relationship between Marchuk and Monteverde was not consensual and welcomed, Marchuk's sexual harassment claim against Defendants should nonetheless be dismissed because Defendants' conduct did not render her overall working environment sexually hostile.

### FIFTH DEFENSE

200.    Assuming, *arguendo*, that the relationship between Marchuk and Monteverde was not consensual and welcomed, Marchuk's sexual harassment claim against Defendants should be

dismissed because she failed to complain internally to Lubna Faruqi, Nadeem Faruqi or Olive Alston pursuant to the sexual harassment prevention policy set forth in F&F's Employee Handbook.

### SIXTH DEFENSE

201.    Assuming, *arguendo,* that Defendants violated the NYSHRL, Plaintiff's request for an award of punitive damages and attorneys' fees pursuant to the statute should be denied as a matter of law because punitive damages and attorneys' fees are not available under the NYSHRL.

WHEREFORE, Defendants respectfully request that the Court: (a) deny the relief sought by Marchuk in her complaint, (b) dismiss the complaint with prejudice in its entirety, (c) grant Defendants' counterclaims and order Marchuk and John or Jane Doe to pay Defendants the sum of Fifteen Million Dollars ($15,000,000) for lost business, damage to their reputations, emotional distress, and other compensatory damages and punitive damages, (d) award Defendants costs, disbursements and reasonable attorneys' fees, and (e) grant Defendants such other and further relief that it deems just and proper.

Dated: April 2, 2013

EPSTEIN, BECKER & GREEN, P.C.

By:    _____
Ronald M. Green
Barry Asen
Victoria M. Sloan
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
rgreen@ebglaw.com
basen@ebglaw.com
vsloan@ebglaw.com
ATTORNEYS FOR DEFENDANTS
and COUNTERCLAIM PLAINTIFFS