UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

ALEXANDRA MARCHUK,                                          :        13 CV 1669 (AKH)

                             Plaintiff,      :        **FIRST AMENDED**
                                        :        **COMPLAINT**

       -against-                                            :

                                        :        **JURY TRIAL DEMANDED**

FARUQI & FARUQI, LLP,                                       :
JUAN E. MONTEVERDE, NADEEM FARUQI                          :
and LUBNA FARUQI,                                           :

                        Defendants.     :

------------------------------------------------------------------ X

RECEIVED APR 2 3 2013 U.S.D.C. S.D.N.Y. CASHIERS

       Plaintiff, Alexandra Marchuk ("Ms. Marchuk"), as and for her first amended

complaint against defendants, Faruqi & Faruqi, LLP ("F&F" or the "Firm"), Juan E. Monteverde

("Mr. Monteverde"), Nadeem Faruqi ("Mr. Faruqi") and Lubna Faruqi ("Ms. Faruqi" and,

together with the other defendants, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

       1.      This action concerns Defendants' outrageous and illegal mistreatment of

Ms. Marchuk starting from her first day as a first-year litigation associate in F&F's Manhattan

office.  Mr. Monteverde, as a senior partner at F&F and as Ms. Marchuk's direct supervisor,

subjected Ms. Marchuk to a barrage of improper, explicit, and unwanted sexual advances.

Incredibly, when Ms. Marchuk complained about Mr. Monteverde's improper advances to F&F

and Mr. Monteverde learned of Ms. Marchuk's complaint, Ms. Marchuk's situation got <u>worse</u>, not

better.  Mr. Monteverde retaliated against Ms. Marchuk for complaining about him and spurning

his advances by publicly and baselessly demeaning her legal abilities and threatening to terminate

her employment – all while continuing improperly to proposition Ms. Marchuk. Despite being aware of Mr. Monteverde's outrageous conduct, F&F did nothing.

2.   Unrestrained, Mr. Monteverde intensified his improper actions on the evening of F&F's December 15, 2011 holiday party. That evening, Mr. Monteverde, knowing how much Ms. Marchuk needed a bonus and her job, coerced and threatened her that if she did not have sex with him he could not recommend her for a year-end bonus and likely would terminate her employment at F&F. Thus Mr. Monteverde induced Ms. Marchuk to go back to F&F's offices with him where he quickly and forcefully had sex with her. Devastated and shamed by Mr. Monteverde's abusive treatment of her, Ms. Marchuk resigned her employment at F&F shortly thereafter.

3.   Despite knowing of Mr. Monteverde's improper and abusive treatment of Ms. Marchuk, as well as his notorious propensity for such behavior towards others, neither F&F, Mr. Faruqi nor Ms. Faruqi took any action to prevent or put an end to it. Mr. Monteverde was (and still is) one of F&F's most important rainmakers. Indeed, Mr. Faruqi acquiesced to Mr. Monteverde's request for Ms. Marchuk to be assigned to work exclusively for Mr. Monteverde. Despite suspecting Mr. Monteverde's lascivious designs, Mr. Faruqi, mindful of Mr. Monteverde's importance in the Firm, acceded to the demand.

4.   Tellingly, after Ms. Marchuk informed F&F and its managing partners that she had consulted an employment attorney and was abruptly resigning her employment – without a new a job and in the worst legal job market in a generation – no one from F&F attempted to contact Ms. Marchuk to address the reasons for her departure. Though it was obvious that Mr. Monteverde had harassed Ms. Marchuk out of her job, F&F took no action, deciding that

sacrificing the employment rights of a first-year associate like Ms. Marchuk was a small price to pay to keep one of F&F's most important partners happy.

5.     On April 2, 2013, Defendants responded to Ms. Marchuk's original complaint in this action (the "Complaint") by filing an answer that includes baseless and retaliatory counterclaims against Ms. Marchuk (the "Counterclaims"). The Counterclaims, layered with verifiably false allegations, constitute blatant attempts to (1) retaliate against Ms. Marchuk for asserting her legal rights against Defendants and (2) intimidate other current or former F&F employees from filing similar claims.

6.     The Counterclaims brazenly misrepresent even those matters for which the documentary record is indisputable. For example, the Counterclaims falsely allege that Ms. Marchuk was ineligible for a bonus in 2011 because F&F has an established policy against paying bonuses to first year attorneys. Defendants make this assertion in an attempt to discredit Ms. Marchuk's allegation that Mr. Monteverde coerced her into accompanying him to his office after the Firm's holiday part by threatening not to pay her a year-end bonus. Ms. Marchuk is making all this up, Defendants argue, because Mr. Monteverde could not have threatened to withhold a bonus for which Ms. Marchuk was ineligible. Defendants' claim, however, is directly refuted by Defendants' letter to Ms. Marchuk on August 4, 2011 offering her full-time employment at the Firm. Defendants' offer letter explicitly assures Ms. Marchuk that **"at the end of 2011 you will be eligible for a bonus based on your performance."** See Ex. A.

7.     Amazingly, Defendants' Counterclaims otherwise admit many of Ms. Marchuk's material allegations, including that (1) Mr. Monteverde twice drunkenly propositioned Ms. Marchuk (including on her third day of employment at F&F); (2) Ms. Marchuk reluctantly

- 3 -

complained about Mr. Monteverde's conduct to F&F shortly after beginning her employment at the Firm (admittedly bursting into tears while recounting Mr. Monteverde's behavior to an F&F partner); and (3) Defendants themselves recognized that Mr. Monteverde's actions were wildly inappropriate, with Mr. Monteverde twice apologizing to F&F for his actions, and F&F twice reprimanding him for his actions.

8.      Nevertheless, in attempt both to retaliate against Ms. Marchuk for asserting her legal rights against Defendants and to deter other female F&F attorneys from doing the same, Defendants filed frivolous Counterclaims against Ms. Marchuk.

## PARTIES

9.      Ms. Marchuk maintains her primary residence in Omaha, Nebraska. While employed at F&F, Ms. Marchuk lived in Manhattan, New York. In November 2012, Ms. Marchuk re-located to Omaha, Nebraska to take an in-house legal job at an insurance company.

10.      F&F is a limited liability partnership organized under the laws of the State of New York. F&F maintains its principal business office at 369 Lexington Avenue, New York, New York. F&F is a law firm that specializes in representing plaintiffs in class action and shareholder rights litigation.

11.      Mr. Monteverde is a senior partner at F&F and is described on F&F's website as "Chair of the firm's Shareholder Merger and Transactional Litigation Department." On information and belief, Mr. Monteverde is married, has at least one child, and maintains his primary residence in Manhattan, New York.

12.     Mr. Faruqi is a senior partner at F&F and is described on F&F's website as "Co-founder and Managing Partner of the Firm." On information and belief, Mr. Faruqi maintains his primary residence in the State of New York.

13.     Ms. Faruqi is a senior partner at F&F and is described on F&F's website as both a "Co-Founder" and as "Managing Partner" of F&F. On information and belief, Ms. Faruqi maintains her primary residence in the State of New York.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, by virtue of the fact that (1) F&F, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi are citizens of the State of New York, and Ms. Marchuk is a citizen of the State of Nebraska; and (2) the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (1) F&F and Mr. Monteverde reside in this district, and (2) a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## FACTUAL ALLEGATIONS

16.     Ms. Marchuk attended Vanderbilt University Law School. During her second year of law school she applied for and obtained a summer associate position at F&F for the summer of 2010.

17.     While a summer associate at F&F, Ms. Marchuk worked with a number of different F&F attorneys, including Mr. Monteverde. While working together, Mr. Monteverde was very friendly and flirtatious with Ms. Marchuk and from time to time made inappropriate, sexually charged comments in Ms. Marchuk's presence.

18.     On one occasion, Ms. Marchuk accompanied some F&F lawyers, including Mr. Monteverde, to a "happy hour" to network with other class-action plaintiffs' lawyers. Afterwards, Ms. Marchuk went to dinner at an upscale restaurant for dinner with Mr. Monteverde, another F&F partner who had been with them at the event earlier, and his girlfriend. Mr. Monteverde drank heavily at the dinner and, seeing that Ms. Marchuk had drunk only a half glass of wine, urged her to drink more, which she did not do. Mr. Monteverde further commented that Ms. Marchuk was an "expensive date" and that she was "lucky" that he was married because he otherwise would expect a "blow job" for the expensive meal that he had purchased for her.

19.     Ms. Marchuk was shocked by Mr. Monteverde's comment, which was offensive, demeaning and entirely unwelcome. She hoped, however, that it was an isolated incident.

20.     Ms. Marchuk graduated from law school in the spring of 2011 and accepted a position as a full-time litigation associate at F&F. Upon graduation, Ms. Marchuk had large student loans and was excited to secure a job that would permit her to start paying down her loans. Ms. Marchuk's starting salary at F&F was $75,000, which came with the representation that, depending on her performance and the performance of F&F, she was eligible for significant year-end bonuses.

21.     On September 6, 2011, Ms. Marchuk joined F&F as a first-year associate. On her first day at work, she was surprised to learn from Mr. Monteverde that he had arranged for her to work exclusively for him. Mr. Monteverde further informed Ms. Marchuk that he needed her to attend a hearing with him in Delaware two days later, on September 8, 2011.

22.    Ms. Marchuk was excited to attend a court hearing but it quickly became clear that her primary role was not as an attorney but Mr. Monteverde's female companion. Mr. Monteverde asked her to do minimal preparation with him for the hearing, she did not participate in the hearing in any way, and Mr. Monteverde did not discuss with her in any meaningful way the legal issues addressed at the hearing.

23.    On the train ride back to New York after the hearing, Mr. Monteverde drank heavily. After arriving in New York, he asked Ms. Marchuk to join him at Lex Bar, near F&F's office, where his drinking continued.

24.    After several more drinks at Lex Bar, Mr. Monteverde aggressively grabbed and kissed Ms. Marchuk and attempted to fondle her breasts. Ms. Marchuk physically rebuffed Mr. Monteverde's advances. Mr. Monteverde then asked Ms. Marchuk to go back to F&F's offices with him to have sex. Ms. Marchuk rejected the offer and went home. She had no romantic interest in Mr. Monteverde and was greatly troubled that her sole supervising attorney was making wildly inappropriate sexual advances to her on only her third day of full time employment at F&F.

25.    On Ms. Marchuk's fourth day of employment at F&F, Mr. Monteverde's advances continued. He took Ms. Marchuk to lunch and told her that he wanted her to be his mistress. As a married man, Mr. Monteverde attempted to justify his actions by explaining that his father has "a wife, a girlfriend, and a mistress." Mr. Monteverde further explained that he married his wife only to obtain a United States green card.

26.    After lunch, Mr. Monteverde sensed Ms. Marchuk's obvious discomfort with him and his actions. In the elevator ride up to F&F's office, Mr. Monteverde asked Ms. Marchuk if they needed to talk about what had happened the night before at Lex Bar. Hoping to

put the event behind her, and having made her disinterest in Mr. Monteverde clear, Ms. Marchuk said they did not need to discuss the prior evening.

27.     Mr. Monteverde then inappropriately stroked Ms. Marchuk's stomach and side in the elevator and joked that the next time that he took her out they would go to dinner <u>before</u> having drinks. Mr. Monteverde's inappropriate physical contact in the confined space of the elevator made Ms. Marchuk extremely uncomfortable.  She was further troubled by Mr. Monteverde's suggestion that they would go out in the future, when she clearly had failed to respond to Mr. Monteverde's advances towards her.  When the doors opened, Ms. Marchuk quickly exited the elevator and walked to her office to get away from Mr. Monteverde.

28.     Mr. Monteverde's inappropriate comments and touching were wholly unsolicited and unwelcomed by Ms. Marchuk.  She had no interest in Mr. Monteverde and found his unwanted advances to be offensive, demeaning and entirely inappropriate in a professional environment. Ms. Marchuk, however, had (and still has) crushing student loans, and was reluctant to be seen as overly resistant, or a troublemaker, by immediately accusing one of F&F's most important partners of sexual harassment during her first week of employment at the Firm.

29.     Later on September 9, 2011, Mr. Monteverde stopped by Ms. Marchuk's office, closed her door, and asked her to go out with him that night.  She shook her head no, and he responded "OK, not tonight," indicating that he would not be deterred by her refusals and would ask her out again another night.

30.     On Monday, September 12, 2011 (Ms. Marchuk's fifth day of employment at F&F), Mr. Monteverde again asked Ms. Marchuk to go out with him for dinner or drinks after work.  Again, Ms. Marchuk rejected Mr. Monteverde's request.

31.     On or about September 15, 2011 (Ms. Marchuk's eighth day of employment at F&F), Mr. Monteverde told Ms. Marchuk that she again needed to accompany him to a class-action settlement-confirmation hearing before Vice Chancellor Travis Laster of the Delaware Chancery Court on Tuesday, September 20, 2011.  Mr. Monteverde explained that Judge Laster was partial to good-looking female lawyers, but F&F's female local counsel was ugly; so Mr. Monteverde wanted Ms. Marchuk to appear with him because her good looks would influence the judge in favor of F&F.  Mr. Monteverde told Ms. Marchuk to wear her hair down, wear a low-cut shirt, and to try to look as alluring as possible during the hearing.

32.     Mr. Monteverde, moreover, demeaned and embarrassed Ms. Marchuk by making it obvious to other F&F attorneys that he valued Ms. Marchuk only for her looks, not her legal ability.  When another associate commented that Ms. Marchuk would be attending her second hearing in Delaware in two weeks, while other associates had not attended any, Mr. Monteverde crassly commented that if other associates were as attractive as Ms. Marchuk they might get to attend hearings as well.

**Ms. Marchuk Bravely Reports Mr. Monteverde's**
**Sexual Harassment During Her Second Week of Employment at F&F**

33.     Given his persistent inappropriate behavior, Ms. Marchuk was greatly concerned about attending another hearing in Delaware with Mr. Monteverde.  On Friday, September 16, 2011 (Ms. Marchuk's ninth day of employment at F&F), Ms. Marchuk reluctantly reported her concerns about Mr. Monteverde's behavior to F&F partner Emily Komlossy.  Specifically, she told Ms. Komlossy that after the September 8, 2011 hearing Mr. Monteverde had kissed her and propositioned her to return to the office to have sex, and that his advances were

unwelcome.  Ashamed and embarrassed by the awkward position that Mr. Monteverde had put her in, and self-conscious and nervous about making serious complaints about a F&F partner during only her second week of employment at F&F, Ms. Marchuk broke into tears while conveying her concerns to Ms. Komlossy.

34.     Ms. Komlossy expressed sympathy for Ms. Marchuk's situation and indicated that it was well known in the Firm that Mr. Monteverde behaved inappropriately.  Ms. Komlossy further agreed that, given Mr. Monteverde's standing in the firm, it was not a good idea for Ms. Marchuk to complain about him to other senior partners in the Firm, including Mr. and Ms. Faruqi.  Ms. Komlossy's reaction to Ms. Marchuk's complaint suggested to Ms. Marchuk that if she complained to other F&F partners they might view her as a troublemaker who was endangering the firm's relationship with one of its most successful revenue-generating partners.

35.     Ms. Komlossy immediately relayed to Mr. Faruqi what Ms. Marchuk had told her about Mr. Monteverde's improper actions, whereupon Mr. Faruqi informed Mr. Monteverde that Ms. Marchuk had complained about his behavior.  F&F, however, took no other action to prevent Mr. Monteverde's from further harassing Ms. Marchuk.

36.     Although very uncomfortable, Ms. Marchuk attended the September 20, 2011 hearing in Delaware with Mr. Monteverde.  Immediately before the hearing, Mr. Monteverde again told Ms. Marchuk to try to look as attractive as possible in order to get the judge's attention during the hearing.  As with the prior hearing, Mr. Monteverde did not ask Ms. Marchuk to perform any substantive legal work relating to the hearing; her sole function was to serve as "eye candy" for Vice Chancellor Laster.

37.     On the return train ride back from the September 20 hearing Mr. Monteverde again drank heavily.  He acted annoyed with Ms. Marchuk and stated that he knew that Ms. Marchuk would not go out with him when they reached New York.  As if to show that he did not care that Ms. Marchuk had spurned him, Mr. Monteverde bragged that he liked a good hearing even more than he liked sex.

38.     Over the next several months, Mr. Monteverde continued lewdly to express his interest in a sexual relationship with Ms. Marchuk and repeatedly made inappropriate sexual jokes to Ms. Marchuk and sought to discuss inappropriate sexual topics in the workplace with her.

39.     For example, Mr. Monteverde learned that Ms. Marchuk shared a small apartment with her cousin and had lost a coin toss to determine who got the larger bedroom.  Mr. Monteverde joked that if Ms. Marchuk had told him about her situation he would have chipped in some extra money so that he could start sleeping at her apartment.  He joked that $50 per month should secure him a night or two with Ms. Marchuk each week.

40.     Ms. Marchuk found his comments about staying at her apartment abusive and distressing.  She never invited Mr. Monteverde to her apartment, never introduced him to her cousin, and never expressed any interest in engaging in any romantic relationship with Mr. Monteverde or socializing with him in any way.   Further, she was humiliated by Mr. Monteverde's obvious belief that he could exploit Ms. Marchuk's limited financial means to obtain sex from her.

41.     Mr. Monteverde also repeatedly made suggestive comments about taking Ms. Marchuk on trips outside the office.  Mr. Monteverde had recently acquired a boat and suggestively told Ms. Marchuk that the two of them should go out on his boat together.  When Ms.

Marchuk replied that she did not like boats, Mr. Monteverde commented that his wife also disliked

boats and that he would have to keep searching for a woman who liked boats.

42.     Mr. Monteverde also suggested that he could take Ms. Marchuk skiing with

him.  When Ms. Marchuk said she did not like skiing, Mr. Monteverde grew annoyed with her and

accused her of trying to "be difficult" by repeatedly rejecting his suggestions that they do things

together.

43.     Mr. Monteverde also lewdly commented on Ms. Marchuk's body in front of

other F&F attorneys.  When Mr. Monteverde offered Ms. Marchuk a binder from within his office,

another F&F associate asked for one as well.  Mr. Monteverde crassly joked that the other associate

might get better office supplies if his body looked like Ms. Marchuk's body.

44.     Mr. Monteverde once commented that he wanted Ms. Marchuk to be happy

working for him so he bought her "matching underwear."  He then jokingly claimed that his tongue

had slipped and he meant to say that he had gotten her a desk that matched his.

45.     A male attorney once referred to a case involving the company BJ's

Wholesale.  In front of Ms. Marchuk, Mr. Monteverde responded that he did not know anything

about "BJs" other than he really liked getting them.  When the other male attorney looked

uncomfortable with the comment, Mr. Monteverde smugly assured him that it was not a problem

because Mr. Monteverde could say whatever he wanted around Ms. Marchuk, suggesting she

enjoyed this type of banter, or worse.  Ms. Marchuk never expressed any interest in discussing or

joking about sexual topics with Mr. Monteverde.  She found such topics particularly offensive in

light of Mr. Monteverde's prior sexual advances towards her and she was careful not to respond in

any way to his suggestive jokes, because she feared it would encourage him and make her professional life even more uncomfortable.

46.     Mr. Monteverde also routinely told Ms. Marchuk about the strip clubs he frequented, and he recounted which cities have the "dirtiest" shows at their strip clubs. Ms. Marchuk never participated in these conversations or expressed interest in hearing about such things.

47.     Several times Ms. Marchuk told Mr. Monteverde that F&F's handbook prohibited his sexually inappropriate conduct. He belittled her comment by asking whether she was offering to "spank" him with the handbook. Mr. Monteverde further mocked Ms. Marchuk's complaints by falsely telling F&F co-workers that Ms. Marchuk had offered to "spank" him with the employee handbook.

48.     Mr. Monteverde also belittled and ridiculed the complaint that Ms. Marchuk made about him to Ms. Komlossy.   To show that her complaints were of no concern to him, Mr. Monteverde joked that maybe Ms. Marchuk, Ms. Komlossy and Mr. Monteverde should have sex together. Once when Ms. Marchuk and Ms. Komlossy were standing near each other in F&F's office, Mr. Monteverde stepped between them and provocatively stated that he liked being in the middle.

49.     While discussing a television program about flight attendants set in the 1960s, Mr. Monteverde characterized that era as the "good old days." Mr. Monteverde stated that earlier times were better because, as he described it, women worked to serve men and men could do whatever they wanted to women.

50.     One evening in October 2011, Ms. Marchuk was preparing to leave F&F's offices. She checked in with Mr. Monteverde to see if he needed anything else before she left. He responded, "Nothing work related" and leaned back in his chair, smiled, then suggestively grabbed the waistband of his pants, indicating, once again, his desire for sex. Concerned because Mr. Monteverde and she were the last employees in the office, Ms. Marchuk said good night and quickly left the office. She did not feel physically safe alone with Mr. Monteverde and thereafter avoided being alone with him in the office.

51.     Ms. Marchuk was sufficiently uncomfortable with Mr. Monteverde that it interfered with her job responsibilities. She avoided being alone with Mr. Monteverde. She tried to discuss work related matters with him in his office only when others were nearby. Towards the end of the work day, Ms. Marchuk was always cognizant of who was leaving and when (most of the attorneys at F&F on her floor had to pass by her office to leave), because she was wary of being left alone with Mr. Monteverde.

52.     Mr. Monteverde also repeatedly made improper and offensive comments that sexualized Ms. Marchuk's interactions with other male lawyers. Mr. Monteverde complained that Brian Moon, an associate with whom Ms. Marchuk worked well, was "flirting" with Ms. Marchuk and had a "crush" on her.

53.     When Ms. Marchuk commented that a male associate at another firm had done good legal work on a case, Mr. Monteverde began derisively referring to him as Ms. Marchuk's "boyfriend" and baselessly questioned why she was romantically interested in him. In doing so he looked up the guy's firm profile and made comments about his appearance (he was balding) and suggested that he could not be the type of guy Ms. Marchuk would be interested in.

54.     Once when Ms. Marchuk assisted F&F partner Adam Gonnelli to prepare for a deposition on one of Mr. Monteverde's cases, Mr. Monteverde complained that his "matchmaking" had brought Ms. Marchuk and Mr. Gonnelli together.  Mr. Monteverde further accused Ms. Marchuk of having a "crush" on Mr. Gonnelli.

55.     Mr. Monteverde also grew jealous when he felt that Ms. Marchuk was being friendly with Jim McEvilly, another F&F partner.  In an attempt to embarrass Ms. Marchuk, Mr. Monteverde falsely told Mr. McEvilly that Ms. Marchuk had a "crush" on him.

56.     After Ms. Marchuk continuously spurned his advances and complained about them, Mr. Monteverde retaliated against Ms. Marchuk.  Mr. Monteverde started communicating with Ms. Marchuk in a brusque and peremptory manor, often berating her over entirely insignificant issues.

57.     On or about October 6, 2011, Mr. Monteverde flew into a rage at Ms. Marchuk when he learned that Ms. Marchuk had agreed to sit in on a conference call with Mr. Gonnelli.  Although she had no urgent assignments for Mr. Monteverde, he angrily told her that she needed carefully to consider which partners she wanted to work for at the firm, implying that if she continued to work for Mr. Gonnelli, she could not work for Mr. Monteverde.  Ms. Marchuk perceived this to be an obvious threat as Mr. Monteverde led a successful group within F&F and it would hurt Ms. Marchuk professionally if she was not allowed to work within it.  Ms. Marchuk understood that Mr. Monteverde's childish threat was motivated exclusively by his paranoid belief that Ms. Marchuk liked Mr. Gonnelli more than Mr. Monteverde.

58.     Continuing his pique at Ms. Marchuk, on or around October 7, 2011, Mr. Monteverde spitefully demanded that she work over the weekend to complete a non-urgent

assignment although he knew that Ms. Marchuk had plans to attend a baby shower that weekend. Ms. Marchuk worked over the weekend and completed the assignment. Mr. Monteverde then ignored her work product for several days to underscore its true lack of urgency and to emphasize the retaliatory nature of the assignment. When he eventually reviewed the documents later in the week, Mr. Monteverde was punitively harsh, shouting corrections angrily at Ms. Marchuk from his office regarding minor matters such as formatting.

59.    On or about October 14, 2011 Mr. Monteverde threatened Ms. Marchuk, in the presence of another associate, stating that he would fire her if she made any more mistakes. Mr. Monteverde's threat had nothing to do with Ms. Marchuk's work product but was motivated exclusively by the fact that she complained about him to Ms. Komlossy, had rejected his advances, and had the temerity to express an interest in working for other male attorneys at F&F. Ms. Marchuk had no doubt that Mr. Monteverde had both the authority and the temperament to act on his threats and to fire her if she offended his fragile ego.

60.    Mr. Monteverde intended his threat of termination to prey upon Ms. Marchuk's significant financial concerns. Between her loans for college and law school, Ms. Marchuk owed a substantial amount of money. Mr. Monteverde knew that finances were a matter of great sensitivity to Ms. Marchuk because he had asked her numerous personal questions about the topic. In 2011 the job market for junior attorneys was abysmal and, if Ms. Marchuk lost her job at F&F, she was certain that she would default on her loans and/or be forced to move out of New York City.

61.    Indeed, a common thread linking Mr. Monteverde's inappropriate conduct was that he sought to exploit the fact that he had greater financial resources and power than did

Ms. Marchuk.  From his "expensive date" comment when he bought Ms. Marchuk dinner as a

summer associate, to his offer to cover some of her rent so that he could sleep at her apartment, to

offers to take Ms. Marchuk on trips, to suggestive comments about buying Ms. Marchuk office

supplies and a "matching" desk, to his outright threat to terminate Ms. Marchuk's employment,

Mr. Monteverde repeatedly mixed references to financial issues and to financial inducements into

his sexually suggestive comments to Ms. Marchuk.

62.     Mr. Monteverde dramatically increased his improper coercive pressure on

Ms. Marchuk on the evening of F&F's holiday party on December 15, 2011.

63.     Following a reception and sit-down dinner, a number of F&F employees,

including Ms. Marchuk and Mr. Monteverde, went out to Lex Bar for further drinks.

64.     At the bar, Ms. Marchuk struck up a conversation with Mr. Monteverde

about F&F's finances.  Ms. Marchuk was interested to learn more about F&F's finances because

she desperately hoped to receive a year-end bonus.  When she was hired she was told that year-end

bonuses could be an important part of her compensation package and she desperately needed the

money.  Further, as a first year associate, Ms. Marchuk knew very little about the inner workings

of F&F.

65.     Mr. Monteverde immediately saw that he could exploit to his advantage Ms.

Marchuk's interest in F&F's finances and her acute concern about her own finances.  First, he

established his power with F&F.  Mr. Monteverde bragged to Ms. Marchuk that his group was the

most profitable group within F&F. He further said that while his group had a very good year, F&F

as a whole did not.  As he had before, he suggested that Ms. Marchuk was fortunate to be working

for him.

66.     Second, he established his financial leverage.  Mr. Monteverde told Ms. Marchuk that he did not think he could recommend her for a year-end bonus.  He said that he was concerned that if he recommended Ms. Marchuk for a bonus it might raise concerns that he improperly favored Ms. Marchuk.  Ms. Marchuk believed that Mr. Monteverde's comment was meant to chastise her for complaining about him, by suggesting that her complaint now limited his ability to pay her a deserved bonus.  Moreover, the news that Mr. Monteverde had decided that she would not receive a year-end bonus was extremely upsetting to Ms. Marchuk, as she had been counting on at least a small bonus to cover necessary expenses.

67.     Finally, Mr. Monteverde established his power as Ms. Marchuk's employer, capable of deciding whether she would continue working at the firm or not.  He unexpectedly commented that he was surprised Ms. Marchuk was so interested in F&F when she probably would not be there much longer.  Mr. Monteverde's comment shocked Ms. Marchuk.  His comment suggested either that F&F was planning on terminating Ms. Marchuk or that Mr. Monteverde felt that Ms. Marchuk was not interested in continuing to work at F&F long-term.

68.     When Ms. Marchuk asked Mr. Monteverde what he meant by his comment, he explained that since she had started working at F&F he had been testing Ms. Marchuk's loyalty and toughness, and that she was failing miserably.  He expressed disappointment in Ms. Marchuk for "betraying" him by complaining to Ms. Komlossy about his behavior towards her.  Mr. Monteverde suggested that Ms. Marchuk was not committed to working at the Firm and that she did not have the toughness to be a lawyer at F&F, or maybe anywhere.

69.     Ms. Marchuk was devastated by Mr. Monteverde's comments.  From a financial perspective, she was distraught to learn both that she would not receive a bonus and that

she soon might not have a job at all.  From a professional perspective, she was leveled by the suggestion that she might not have the talent or commitment required to be a lawyer.  While Ms. Marchuk had no romantic interest in Mr. Monteverde and was offended by his sexist behavior, she admired him professionally for his success and highly valued his opinion of her legal ability.

70.     By this time, most or all of the other F&F attorneys had left the bar and Mr. Monteverde started suggesting that Ms. Marchuk accompany him to F&F's office, which was only a short walk away.  Under the influence of alcohol, and desperate to repair what Mr. Monteverde said was her tattered standing at F&F, Ms. Marchuk acceded to Mr. Monteverde's pleas and walked back to F&F's offices with him.

71.     After entering his office, Mr. Monteverde pushed Ms. Marchuk to the floor and quickly, forcefully, and painfully had sex with her.  Suffering discomfort and not wanting to continue having sex with him, Ms. Marchuk implored Mr. Monteverde to stop, but he disregarded her pleas and continued having sex with her.  After he finished, Ms. Marchuk had left a large bloodstain on Mr. Monteverde's carpet.  Seeing that Ms. Marchuk was emotionally and physically traumatized by his aggressive conduct, Mr. Monteverde immediately directed her not to tell anyone what he had done.  He then quickly escorted Ms. Marchuk from F&F's office and down to the street, obviously concerned that they might be discovered by other F&F employees.  Mr. Monteverde advised Ms. Marchuk to forget what had just happened.  Ms. Marchuk walked to the nearest train station and took the subway home alone.

72.     Ms. Marchuk was shattered by Mr. Monteverde's abusive and manipulative treatment of her and immediately sought professional help.  Concerned that Mr. Monteverde's rough and unprotected sex may have physically harmed her, she visited her gynecologist the

following Monday.  Knowing that Defendants' actions had egregiously violated her legal rights, Ms. Marchuk immediately met with an employment attorney on December 20, 2011.

73.    Physically repulsed by the further sight of Mr. Monteverde and emotionally unable to continue working for him as F&F required her to do, on December 22, 2011 Ms. Marchuk reluctantly sent an email to Mr. Faruqi and Ms. Faruqi informing them that she had consulted with an employment lawyer and was immediately resigning her employment at F&F.

74.    Despite abruptly resigning after consulting with an employment attorney, and without replacement employment in a terrible job market, nobody from F&F ever contacted Ms. Marchuk to determine the reason for her resignation.

75.    On information and belief, Mr. Faruqi and Ms. Faruqi had actual knowledge of Mr. Monteverde's inappropriate treatment of Ms. Marchuk.  On information and belief, Mr. Faruqi and Ms. Faruqi learned of Mr. Monteverde's treatment of Ms. Marchuk by seeing it first hand and/or by hearing about it from Ms. Komlossy or others.

76.    Mr. Monteverde made no effort to conceal his inappropriate behavior at F&F.  Mr. Monteverde openly engaged in bawdy conversations and jokes, at the expense of Ms. Marchuk and other female employees, in F&F's offices and in the presence of other F&F partners.

77.    Indeed, Mr. Monteverde's inappropriate office behavior was, and may still be, a running joke within F&F (although it was no laughing matter for Ms. Marchuk).  In fact, Mr. Faruqi even told other F&F attorneys that he was concerned that someday Mr. Monteverde's inappropriate behavior would cost the Firm a lot of money.  Further, on one occasion when Mr. Monteverde complained that F&F should have paid him more on a case, Mr. Faruqi jokingly replied by looking approvingly at Ms. Marchuk and protesting, "I gave you Alexandra."  Mr.

Faruqi, of course, had assigned Ms. Marchuk exclusively to Mr. Monteverde, no doubt based on Mr. Monteverde's inappropriate interest in her, which he had expressed when she was a summer associate at the Firm.

78.     Consequently, F&F had actual notice that Mr. Monteverde was subjecting Ms. Marchuk to inappropriate sexual harassment in the workplace, but made no effort to prevent it or to remedy it.

79.     As a result of Defendants' wrongful conduct, Ms. Marchuk has suffered severe emotional and financial harm.

80.     Following her resignation from F&F, Ms. Marchuk suffered from continuing bouts of depression, anxiety, anger and guilt.  She obtained treatment from a clinical psychologist who diagnosed her as suffering from post-traumatic stress disorder.  Among other things, since Ms. Marchuk's departure from F&F she has experienced flashbacks, nightmares, heightened emotionality, bouts of self-condemnation and diminished self-confidence.

81.     Ms. Marchuk diligently searched for replacement employment after leaving F&F but did not find any.  Without a steady income and under the weight of crushing student loans, Ms. Marchuk soon ran out of money and was forced to give up her Manhattan apartment and move back in with her parents in New Jersey.

82.     In an attempt to continue her career more or less on track, Ms. Marchuk searched for employment with law firms having practice areas similar to those of F&F, but to no avail.  The job market was extremely tight, and the only paid work Ms. Marchuk could find was a short stint as a document reviewer.

83.     Finally, in November 2012, Ms. Marchuk was offered a legal job overseeing a foreclosure docket at an insurance company in Omaha, Nebraska.  Her new job has a significantly lower salary than did her position at F&F, and represents a material and less remunerative change in career path.  Ms. Marchuk relocated, at her own expense, to Omaha and started her new job on November 23, 2012.

**Defendants File Retaliatory Counterclaims,**
**and Issue a Baseless Press Release,**
**in Response to Ms. Marchuk's Lawsuit**

84.     On March 13, 2013, Ms. Marchuk filed her original complaint in this action against Mr. Monteverde and F&F (the "Complaint").

85.     Neither Ms. Marchuk, nor any agent acting on her behalf, took any action to publicize her Complaint.

86.     At all times relevant hereto, Ms. Marchuk had no desire for her allegations against Mr. Monteverde and F&F to become the subject of media interest.  Like many victims of sexual harassment, Ms. Marchuk hoped that her extremely personal allegations would receive no media attention and that details about this sordid case would not become the first thing that people read about when searching Ms. Marchuk's name on the Internet, perhaps for many years to come.

87.     Many media outlets, however, monitor new case filings in state and federal courts in New York City, looking for newsworthy filings.  Given Mr. Monteverde's and F&F's prominence, or their apparently notorious reputation, among class-action lawyers, Ms. Marchuk's complaint was immediately flagged by the legal and business press as a story of interest.  On information and belief, immediately after the Complaint was filed, monitoring services forwarded it to multiple news outlets including, among others, the popular legal website Above the Law.

88.     By the end of the day on March 13, 2013, numerous Internet-based media outlets, including Above the Law, had posted on-line stories about the Complaint.  Indeed, Above the Law posted a copy of the Complaint, making it easily available for review by, and distribution to, the general public.

89.     Defendants, moreover, are, upon information and belief, experienced class-action litigators who know that media outlets review newly filed complaints for stories of interest.  Defendants further presumably understand that – because of Mr. Monteverde's and F&F's complicated standing within the class action plaintiffs' bar – a charge of sexual harassment against Mr. Monteverde and F&F is of interest to the business and legal communities, independent of any alleged (though non-existent) promotion of the Complaint by Ms. Marchuk.

90.     Disregarding that the business and the legal communities had an obvious interest in the Complaint, and that Above the Law immediately made an electronic copy the Complaint available to the general public on its popular website, Defendants, on April 2, 2013, filed counterclaims against Ms. Marchuk absurdly alleging that Ms. Marchuk orchestrated the distribution of the Complaint to the news media, to F&F's clients, and to Mr. Monteverde's wife, among others (the "Counterclaims").  On information and belief, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi each supported filing the Counterclaims.

91.     Defendants filed their Counterclaims without any good-faith basis for the allegation that it was Ms. Marchuk or her agents who disseminated the Complaint – rather than the thousands of others who had access to, and interest in, the Complaint.  Defendants filed the Counterclaims in bad faith only to retaliate against Ms. Marchuk and to deter other female employees at F&F from similarly asserting their rights.  Defendants' retaliatory purpose in filing

the Counterclaims is evidenced by the transparently false and hypocritical nature of the allegations in the Counterclaims.

**The Counterclaims Falsely Claim that**
**Ms. Marchuk was Ineligible for a 2011 Bonus**

92.     While many of the allegations in the Counterclaims will be refuted by the testimony of those involved, some of the allegations in the Counterclaims are refuted by Defendants' own documents. The Counterclaims, for example, falsely seek to depict Ms. Marchuk as a liar by repeatedly disputing her claim that Mr. Monteverde used his influence over her 2011 bonus as a means to pressure her to have sex with him. The Counterclaims claim that F&F has an explicit policy – allegedly conveyed to Ms. Marchuk orally and in writing – against awarding bonuses to any first-year associates such as Ms. Marchuk.

93.     With respect to Ms. Marchuk's eligibility for a 2011 bonus, the Counterclaims falsely allege:

> Before she started at the Firm, Nadeem Faruqi sent an employment letter to Marchuk confirming her $75,000 annual salary and stating that she would first become eligible for a bonus at the end of 2012.

> During their meeting, among other things, Lubna . . . stated that she would not be eligible for a salary increase or a performance bonus until December 2012 . . . .

> Nadeem Faruqi had advised Marchuk in writing before she was hired that she was not eligible for a bonus until December 2012. Lubna Faruqi to Marchuk the same thing on Marchuk's first day as a first-year associate.

Counterclaims ¶¶ 16, 17, 37.

94.     The foregoing allegations in the Counterclaims are demonstrably false.  The letter that Defendants sent to Ms. Marchuk on August 4, 2011, signed by Mr. Faruqi, actually promised Ms. Marchuk that she <u>was</u> eligible for a bonus at the end of 2011:

> You will be paid a "base salary" of $6,025.00 per month, bi-weekly, or $75,000 annually.  **In addition, at the end of 2011 you will be eligible for a bonus based on your performance.**

<u>See</u> Ex. A (emphasis added).

95.     Defendants, therefore, had and have no good-faith basis to claim that Ms. Marchuk was ineligible for a 2011 bonus.  To the contrary, they assured her, in writing, that she was eligible for a 2011 bonus in an effort to induce her to re-locate to New York and accept employment at the Firm.  Nevertheless, Defendants baselessly allege in the Counterclaims that Ms. Marchuk was not eligible for a 2011 bonus purely to retaliate against Ms. Marchuk by baselessly and publicly portraying her as a liar with respect to one of the central allegations in the Complaint.

**The Counterclaims Falsely Allege that the**
**Complaint Immediately Harmed F&F's Business**

96.     The Counterclaims also misrepresent the reputational harm that Mr. Monteverde and F&F have experienced as a result the publicity surrounding the Complaint.  The Counterclaims incredibly allege that during the mere 20 days between the filing of the Complaint and the filing of the Counterclaims, F&F's clients abandoned the Firm and F&F terminated a critical new business initiative, all due to the negative publicity engendered by the Complaint.  Among other things, the Counterclaims falsely allege:

> As a result of Marchuk's false allegations and dissemination of the complaint, Defendants have experienced a chilling effect on their business and ability to attract new clients and business.  Defendants are having difficulty marketing their legal services to public entities, which account for over 50% of the Firm's business.  Just before this

complaint was filed, F&F had substantially invested in a new public sector practice area and hired attorneys to bring in and generate business as a significant segment of the Firm's practice. This initiative is on hold, indefinitely. F&F and Monteverde have lost and will lose substantial business because of the fabrications alleged in the complaint.

Counterclaims ¶ 65.

97.     On information and belief, Defendants included the foregoing (and other) allegations in the Counterclaim without any good-faith basis for doing so. On information and belief, the foregoing allegations are materially false because, among other reasons, (1) F&F's representation of public companies or institutional clients has never constituted more than 50% of F&F's business; (2) such "public" clients, if they exist at all, did not immediately inform F&F after reading the Complaint that they would discontinue doing business with F&F because of the allegations in the Complaint; and (3) F&F did not immediately discontinue any significant business initiative because of the filing of the Complaint. On information and belief, discovery in this action regarding Defendants' past financial performance, the amount and composition of Defendants' fees, and Defendants' past and present business strategies will prove that the foregoing allegations are fictional. Their sole purpose, therefore, is to retaliate and intimidate.

**The Counterclaims Gratuitously Include Salacious New Details that Confirm that Defendants Have No Good-Faith Belief that the Similar Allegations in the Complaint Harmed Mr. Monteverde's or F&F's Business Prospects and Confirm that Defendants Filed the Counterclaims Purely for <ins>the Retaliatory Purpose of Embarrassing Ms. Marchuk</ins>**

98.     The Counterclaims gratuitously include lurid details that entirely undermine Defendants' claims that the Complaint harmed Mr. Monteverde's and/or F&F's business prospects. The Counterclaims unnecessarily provide many new lurid and troubling details about Mr.

Monteverde's interactions with Ms. Marchuk.  The fact that the Counterclaims gratuitously provide many new details about Mr. Monteverde's outrageous behavior confirms that Defendants have no good-faith belief that the similar allegations contained in the Complaint harmed Defendants business prospects in any way.

99.     For example, the Complaint alleged that Mr. Monteverde pressured Ms. Marchuk to have sex with him by suggesting that her bonus and possibly her job were in jeopardy if she refused.  The Counterclaims respond to this allegation by clarifying that, although Mr. Monteverde – drunk and with his pants around his ankles – did indeed lie on top of Ms. Marchuk and try to have sex with her in his office at 3:00 a.m. on the night of the Firm holiday party, Mr. Monteverde was in fact too drunk to achieve an erection much less complete the act.  The Counterclaims allege that Mr. Monteverde then "rolled" off of Ms. Marchuk and recovered his faculties sufficient to receive oral sex from Ms. Marchuk moments later on his office couch:

> Monteverde, who was inebriated, got on top of her with his clothes still on and his pants around his ankles.  He could not get an erection.  After 15-20 seconds, and with no penetration, Monteverde rolled off of her.  Marchuk then told Monteverde to sit on the couch where she performed oral sex on him.

Counterclaims ¶ 49.

100.    The Counterclaims, therefore, confirm in lurid detail (1) that many aspects of the shocking allegations in the Complaint are true and (2) that Defendants have absolutely no concern whatsoever that the repetition, or amplification, of these salacious allegations in the media will harm Mr. Monteverde's or F&F's business prospects.

101.    Indeed, it was Defendants' effort to publicize the Counterclaims, rather than any action by Ms. Marchuk, that engendered much of the disparaging media coverage about Mr.

Monteverde and F&F. The day after Defendants filed their Counterclaims – and issued a press release broadcasting that filing – The New York Post ran its first story about this case. The Post story focused on Mr. Monteverde's unusual defense that he did not sexually harass Ms. Marchuk in part because he was too drunk to obtain an erection the night of the holiday party. The print copy of the Post story ran under the headline "It's 'No Stiff' Drink" and the Internet version of the Post story appeared under the headline "Sex Suit Defense: I was too drunk for erection." If the Complaint supposedly tarnished Defendants' reputations or business prospects, then Defendants' own publicity-seeking Counterclaims turned them indelibly black.

102.    Perhaps worse than providing gratuitously detailed allegations regarding Mr. Monteverde's inebriation and sexual escapades, the Counterclaims make the troubling revelation that Mr. Monteverde cavalierly destroyed evidence relevant to Ms. Marchuk's charges. The Complaint alleges that Mr. Monteverde's coerced sexual exploitation of Ms. Marchuk was evidenced by a blood stain remaining on Mr. Monteverde's office carpet. In response, the Counterclaims assert that Mr. Monteverde and Ms. Marchuk did not have sexual intercourse and imply (totally falsely) that Ms. Marchuk intentionally stained the carpet the next day in attempt to frame Mr. Monteverde. Counterclaims ¶ 54 ("Monteverde did not know whether the stains were blood; their color was red and not brown, the color of dried blood").

103.    Under either Ms. Marchuk's allegations (involving a coerced sexual encounter), or Mr. Monteverde's fanciful version of events (involving a criminal attempt by Ms. Marchuk to frame him for sex that never occurred), the stain on Mr. Monteverde's carpet was important evidence of illegal conduct. Mr. Monteverde, an experienced litigator, no doubt understood this. The Counterclaims, however, blithely acknowledge that Mr. Monteverde

immediately and intentionally compromised the evidence: "Monteverde responded that he would spill coffee on the stains, which he did." Counterclaims ¶ 54. More troubling still, upon information and belief, Defendants replaced the carpet in Mr. Monteverde's office and discarded the carpet.

104.    Surely if any F&F clients were actually concerned about doing business with Mr. Monteverde and/or F&F after reading the Complaint, those clients' concerns would only be heightened after reading about the outrageous conduct admitted in the Counterclaims. Thus, if Defendants had any real concern that the allegations in the Complaint might have harmed their reputations or business prospects, a simple and more traditional "denial" of the relevant allegations in the Complaint would have sufficed to preserve their rights and minimize the media frenzy. The fact that Defendants instead chose to file the salaciously detailed Counterclaims, and to promote the Counterclaims with a contemporaneous press release, shows that Defendants have no actual belief that the allegations in the Complaint harmed their business prospects and that Defendants filed the Counterclaims exclusively to retaliate against Ms. Marchuk by seeking to disparage and embarrass her.

**The Counterclaims are Legally Frivolous**

105.    Further evidencing the purely retaliatory nature of the Counterclaims is the fact that they are legally frivolous. The Counterclaims are based exclusively upon the allegation that Ms. Marchuk or unnamed agents of hers improperly disseminated the Complaint to others, including to various media outlets:

> Marchuk and/or her agents emailed copies of the complaint to . . . certain media outlets on the same day that her complaint was filed with this Court.

Marchuk and/or John or Jane Doe emailed a copy of the complaint under the pseudonym "John Smith" from email account js832408@gmail.com to a list of "undisclosed recipients" . . . and, upon information and belief, several media outlets – including The New York Times and Thomson Reuters . . . .

The false and defamatory statements were intentionally published by email to . . . the media within hours of filing the complaint. Marchuk and John or Jane Doe made these statements for the sole and malicious purpose of disseminating them outside of this judicial proceeding and throughout Defendants' industry.

Counterclaims ¶¶ 3, 63, 72.

106.    While Ms. Marchuk did not in fact distribute her Complaint to a single person, had she done so, it would not have been legally actionable.  There is a well-established privilege that largely protects allegations made in legal filings from legal liability.  There is also as strong public policy providing that all court filings, except in extraordinary cases, are open to the public.

107.    Defendants well know that their Counterclaims are legally frivolous because Defendants themselves aggressively promote "investigations" that they launch concerning suspected corporate wrongdoing, and similarly promote complaints that they file, including by issuing press releases about those investigations and complaints.  Indeed, at the time of the filing of this First Amended Complaint, the F&F website contains almost 600 press releases announcing various investigations, complaints or settlements undertaken by Defendants.  Given their unique expertise regarding publicizing complaints and other pleadings, Defendants know that their Counterclaims are legally frivolous but nevertheless filed them against Ms. Marchuk to retaliate against her for asserting her rights.

**Defendants Issue a Press Release and**
**Otherwise Promote their Filing of the Counterclaims**

108.    Confirming that Defendants' true purpose in filing the Counterclaims was to retaliate against Ms. Marchuk by generating negative publicity about her, Defendants issued a contemporaneous press release announcing the filing of the Counterclaims and seeking to draw attention to the Counterclaims (the "Press Release").

109.    Defendants' issuance of the Press Release further establishes that the Counterclaims are purely retaliatory.  If Defendants had any good-faith belief that the salacious subject matter of the Complaint might harm Mr. Monteverde's or F&F's business prospects, Defendants would not have aggressively promoted the Counterclaims, confirming as fact what until that point were merely allegations of Mr. Monteverde's extra-marital, sexually predatory and drunken behavior.  Further, if Defendants had any good-faith belief that Ms. Marchuk's alleged distribution of a publicly available pleading might be the basis for liability, Defendants would not themselves have launched an aggressive media campaign heralding their filing of the Counterclaims and disparaging Ms. Marchuk as an extortionate liar.  Defendants' own actions, therefore, confirm the pernicious and bad-faith retaliatory intent with which Defendants filed the Counterclaims.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Claims against all Defendants for discrimination under**
**New York City Human Rights Law, New York City Administrative Code §§ 8-107, *et seq*.)**

110.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 109 of the complaint as if fully set forth herein.

111.    Mr. Monteverde created a hostile work environment for Ms. Marchuk at

F&F based on Ms. Marchuk's gender. The hostile work environment created by Mr. Monteverde was sufficiently pervasive so as detrimentally to alter the terms, conditions and privileges of Ms. Marchuk's employment at F&F.

112.    Mr. Monteverde is primarily liable under NYCHRL § 8-107 for the hostile work environment at F&F because Mr. Monteverde created that environment as an "agent" of F&F within the meaning of § 8-107(1)(a).

113.    F&F, Mr. Faruqi and Ms. Faruqi were Ms. Marchuk's "employers" within the meaning of NYCHRL § 8-107(1)(a). F&F was Ms. Marchuk's actual employer. Mr. Faruqi and Ms. Faruqi also qualify as Ms. Marchuk's employers within the meaning of NYCHRL § 9-107(1)(a) because (1) each holds a significant ownership interest in F&F and/or (2) each played a primary role in implementing and carrying out F&F's personnel policies and practices.

114.    As Ms. Marchuk's employers, F&F, Mr. Faruqi and Ms. Faruqi are vicariously liable for the hostile work environment created by Mr. Monteverde at F&F pursuant to NYCHRL § 8-107(13)(a) and (b) because (1) Mr. Monteverde exercised managerial and supervisory responsibility at F&F, both generally and with respect to Ms. Marchuk herself, and (2) F&F had actual or constructive knowledge of Mr. Monteverde's unlawful actions because (a) Ms. Marchuk complained about Mr. Monteverde's actions to F&F and (b) Mr. Monteverde's improper actions were open and notorious within F&F.

115.    Mr. Faruqi and Ms. Faruqi further are liable as aiders and abettors of Mr. Monteverde's illegal actions under NYCHR §8-107(6) because they knew of and substantially assisted Mr. Monteverde's illegal conduct.

116.    Ms. Marchuk will establish the extent of her damages at trial, but they are

believed to exceed $2,000,000.

## AS AND FOR A SECOND CLAIM FOR RELIEF
**(Claims against all Defendants for Discrimination under
the New York State Human Rights Law, New York State Executive Law §§ 296, *et seq.*)**

117.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 116 of the complaint as if fully set forth herein.

118.    Mr. Monteverde illegally discriminated against Ms. Marchuk by creating a hostile work environment for Ms. Marchuk at F&F based on Ms. Marchuk's gender.  The hostile work environment created by Mr. Monteverde was sufficiently pervasive so as to detrimentally alter the terms, conditions and privileges of Ms. Marchuk's employment at F&F.

119.    F&F, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi each are primarily liable for the hostile work environment at F&F because each qualifies as an "employer" under NYSHRL § 296(1)(a).  F&F was Ms. Marchuk's actual employer.  Mr. Monteverde, Mr. Faruqi and Ms. Faruqi, moreover, qualify as Ms. Marchuk's "employers" under NYSHRL § 296(1)(a) because each has (1) an ownership or other like interest in F&F and/or (2) the power to direct and implement personnel decisions at F&F.

120.    Ms. Marchuk will establish her damages at trial, but they are believed to exceed $2,000,000.

## AS AND FOR A THIRD CLAIM FOR RELIEF
**(Claims against all Defendants for retaliation under the New York State
Human Rights Law and the New York City
New York State Executive Law §§ 296, *et seq.*)**

121.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 120 as if fully set forth herein.

122.    Ms. Marchuk was participating in protected activity under the New York

- 33 -

City and New York State Human Rights Laws when she filed the Complaint against Mr. Monteverde and F&F.

123.     Defendants filed the frivolous Counterclaims against Ms. Marchuk, and issued the contemporaneous press release disparaging Ms. Marchuk, in an improper attempt to retaliate against Ms. Marchuk for participating in activities protected under the New York City and New York State Human Rights Laws.  Defendants further filed the frivolous Counterclaims in an attempt to intimidate other current or former F&F employees from filing similar claims against Defendants.

124.     Because of Defendants' actions in filing the Counterclaims and in releasing the Press Release, Ms. Marchuk has experienced distress and anxiety relating to the facts that (1) Defendants have asserted a $15 million claim against her in her individual capacity and (2) have knowingly publicized blatantly false statements about Ms. Marchuk and her actions to the media. Defendants' retaliatory actions against Ms. Marchuk were sufficiently harmful that they would dissuade a reasonable worker in Ms. Marchuk's position from making or supporting a charge of discrimination.

125.     Ms. Marchuk will establish her damages at trial, but they are believed to exceed $1,000,000.

126.     **WHEREFORE**, Ms. Marchuk respectfully demands judgment as follows:

(a)     On her First Claim for Relief, an award against all Defendants, jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

(b)     On her Second Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

(c)     On her Third Claim for Relief, an award against all Defendants, jointly and severally, in an amount to be determined at trial but believed to exceed $1,000,000.

(d)     On her First, Second and Third Claims for Relief, an award against all Defendants, jointly and severally, for punitive damages in an amount appropriate to punish Defendants for their willful, knowing and intentional violation of the law, to deter Defendants from continuing such actions in the future, and to set an example for similarly situated employers establishing the importance of honoring applicable employment laws, which amount is believed to be at least $10,000,000;

(e)     On her First, Second and Third Claims for Relief, an award against Defendants for Ms. Marchuk's attorneys fees', and related costs and expenses, as permitted by law;

(f)     All interest and costs, as permitted by law; and

(g)     For such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 23, 2013

                                   ROTTENBERG LIPMAN RICH, P.C.

                                   By:_____
                                        Harry W. Lipman
                                        Thomas E. Chase
                                        369 Lexington Avenue, Sixteenth Floor
                                        New York, New York 10017
                                        Attorneys for Plaintiff, Alexandra Marchuk

EXHIBIT A

# FARUQI & FARUQI, LLP

ATTORNEYS AT LAW

369 LEXINGTON AVENUE, 10TH FLOOR
NEW YORK, NEW YORK 10017-6531
(212) 983-9330

TELECOPIER: (212) 983-9331
WEBSITE:  www.faruqilaw.com

August 4, 2011

Ms. Alexandra Marchuk
3000 Vanderbilt Place, #245
Nashville, TN 37212

Re:   Employment Letter

Dear Alexander:

I am writing to confirm that you have accepted our offer of employment.  The terms of employment are:

1. You will be an associate with the firm in its New York office.
2. Your employment will commence on September 6, 2011.
3. You will be paid a "base salary" of $6,025.00 per month, bi-weekly, or $75,000 annually.  In addition, at the end of 2011 you will be eligible for a bonus based on your performance.
4. The firm will provide health insurance to you after our 90 waiting period.  You will be eligible to participate in the firm's 401(k) plan after one year of employment.  You will be entitled to two weeks vacation annually.

We look forward to having you join the firm.

Very truly yours,

Nadeem Faruqi