UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

ALEXANDRA MARCHUK,

                   Plaintiff,

    -against-

FARUQI & FARUQI, LLP,
JUAN E. MONTEVERDE, NADEEM FARUQI
and LUBNA FARUQI,

                  Defendants.

------------------------------------------------------------ X

13 CV 1669 (AKH)

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

          Plaintiff, Alexandra Marchuk ("Ms. Marchuk"), as and for her second amended

complaint against defendants, Faruqi & Faruqi, LLP ("F&F" or the "Firm"), Juan E. Monteverde

("Mr. Monteverde"), Nadeem Faruqi ("Mr. Faruqi") and Lubna Faruqi ("Ms. Faruqi" and, together

with the other defendants, "Defendants"), and pursuant to Section 3(b) of the Case Management

order dated May 17, 2013, alleges as follows:

**PRELIMINARY STATEMENT**

       1.      This action concerns Defendants' outrageous and illegal mistreatment of

Ms. Marchuk starting from her initial day as a first-year litigation associate in F&F's Manhattan

office and continuing through the conduct of this litigation. Initial discovery has confirmed every

aspect of Ms. Marchuk's disturbing claims of the sexual harassment while she was an employee at

F&F. As stunning, however, is the evidence establishing Defendants' treatment of Ms. Marchuk

as a litigant in this case. On issues large and small Defendants have outright fabricated evidence,

destroyed evidence, and made repeated public misrepresentations about Ms. Marchuk, all purely in

an attempt to gain litigation advantage over her in absolute disregard for her civil rights and the truth.

        2.     Most shocking, the foundational and stabbing allegation in Defendants' **$15 million counterclaims** against Ms. Marchuk – that Ms. Marchuk used Gmail account js832408@gmail.com (the "Gmail Account") to maliciously distribute her Complaint to the media, F&F's clients, opposing counsel in F&F's case, and even to Mr. Monteverde's wife – is a blatant lie. On June 14, 2013, Google responded to Defendants' subpoena with the bombshell disclosure that **the Gmail Account was created on March 13, 2013, the day this case was initiated, from the IP address of F&F's Manhattan office**. Therefore, either in an attempt to frame Ms. Marchuk for the allegations that Defendants then put in their counterclaims against her, or in a case of dysfunctional, intra-firm back-stabbing, **someone at F&F created the Gmail Account on the day the Complaint was filed and emailed it to Mr. Monteverde's wife and, supposedly, others**. (As of the date hereof, Defendants have still failed to produce any documents or information concerning who, other than Mr. Monteverde's wife, allegedly received an email from js832408@gmail.com.) Confirming their disregard for ethical obligations to this Court, Defendants, who never had any good-faith basis for smearing Ms. Marchuk in the first place, still pursue their counterclaims, over two months after receiving Google's knockout disclosure.

        3.     Defendants' shameful conduct regarding the Gmail Account is, however, just one example in a litany of outrageous and illegal litigation tactics designed by Defendants to frustrate and deter Ms. Marchuk from pursuing her claims against Defendants, and to intimidate her and other current or former F&F associates with similar claims – like the associate who, having commenced employment at F&F the month after Ms. Marchuk left, quit three months later

- 2 -

complaining to the Faruqis in writing that "in my presence, on multiple occasions, [Mr. Monteverde] made crude and/or sexually charged comments with which I am uncomfortable."

      4.     The litany is disturbing: Shortly after Ms. Marchuk's counsel wrote their pre-litigation demand letter, Defendants ripped out and discarded the carpet in Mr. Monteverde's office, knowing that it contained important forensic evidence of Mr. Monteverde's assault on Ms. Marchuk. Seeking to discredit Ms. Marchuk's claim that Mr. Monteverde held sway over her compensation, Defendants amateurishly manufactured a letter purporting to inform Ms. Marchuk that she was ineligible for a bonus until 2012. When asked to produce the .doc file containing the metadata that would show when this letter was created, Defendants implausibly claimed that all such information had been destroyed by a "hard drive failure." Defendants' press release heralding their $15,000,000 counterclaims disparaged Ms. Marchuk by stating that she never complained about Mr. Monteverde, though one of Defendants' partners had written a "Confidential Memo" to Mr. Faruqi contemporaneously memorializing Ms. Marchuk's complaint about Mr. Monteverde and her tearful expression of apprehension and fear regarding an imminent trip with him to Delaware by train for a court hearing. Finally, Defendants trotted out an obviously coached witness who just happened to vividly recall Ms. Marchuk's supposedly lighthearted demeanor when she complained about Mr. Monteverde. In reality, this witness turned out to be the named class representative in a case recently filed in federal court by F&F and Mr. Monteverde, although the witness either completely forgot that case or never really hired F&F, because the witness unequivocally denied any knowledge of that case. True to form, Defendants have brazenly refused to produce any documentary evidence that this witness ever retained Mr. Monteverde or F&F.

## NATURE OF THE ACTION

5.      Mr. Monteverde, as a senior partner at F&F and as Ms. Marchuk's direct supervisor, subjected Ms. Marchuk to a barrage of improper, explicit, and unwanted sexual advances.  Incredibly, when Ms. Marchuk complained about Mr. Monteverde's improper advances to F&F and Mr. Monteverde learned of Ms. Marchuk's complaint, Ms. Marchuk's situation got worse, not better.  Mr. Monteverde retaliated against Ms. Marchuk for complaining about him and spurning his advances by publicly and baselessly demeaning her legal abilities and threatening to terminate her employment – all while continuing improperly to proposition Ms. Marchuk.  Despite being aware of Mr. Monteverde's outrageous conduct, F&F did nothing.

6.      Unrestrained, Mr. Monteverde intensified his improper actions on the evening of F&F's December 15, 2011 holiday party.  That evening, Mr. Monteverde, knowing how much Ms. Marchuk needed a bonus and her job, coerced and threatened her that if she did not have sex with him he could not recommend her for a year-end bonus and likely would terminate her employment at F&F.  Thus Mr. Monteverde induced Ms. Marchuk to go back to F&F's offices with him where he quickly and forcefully had sex with her.  Devastated and shamed by Mr. Monteverde's abusive treatment of her, Ms. Marchuk resigned her employment at F&F shortly thereafter.

7.      Despite knowing of Mr. Monteverde's improper and abusive treatment of Ms. Marchuk, as well as his notorious propensity for such behavior towards others, neither F&F, Mr. Faruqi nor Ms. Faruqi took any action to prevent or put an end to it.  Mr. Monteverde was (and still is) one of F&F's most important rainmakers.  Indeed, Mr. Faruqi acquiesced to Mr. Monteverde's request for Ms. Marchuk to be assigned to work exclusively for Mr. Monteverde.

Despite suspecting Mr. Monteverde's lascivious designs, Mr. Faruqi, mindful of Mr. Monteverde's importance in the Firm, acceded to the demand.

8.     Tellingly, after Ms. Marchuk informed F&F and its managing partners that she had consulted an employment attorney and was abruptly resigning her employment – without a new a job and in the worst legal job market in a generation – no one from F&F attempted to contact Ms. Marchuk to address the reasons for her departure.  Though it was obvious that Mr. Monteverde had harassed Ms. Marchuk out of her job, F&F took no action, deciding that sacrificing the employment rights of a first-year associate like Ms. Marchuk was a small price to pay to keep one of F&F's most important partners happy.

9.     On April 2, 2013, Defendants responded to Ms. Marchuk's original complaint in this action (the "Complaint") by filing an answer that includes baseless and retaliatory counterclaims against Ms. Marchuk (the "Original Counterclaims").  The Original Counterclaims are layered with verifiably false allegations and constitute a blatant attempt to (1) retaliate against Ms. Marchuk for asserting her legal rights against Defendants; (2) intimidate other current or former F&F employees from filing similar claims; and (3) defame Ms. Marchuk and permanently damage her personal and professional reputation.  On May 7, 2013, Defendants repeated their retaliatory and defamatory conduct towards Ms. Marchuk by re-alleging their false allegations in their Answer to the First Amended Complaint and Amended Counterclaims (the "Amended Counterclaims" and, together with the Original Counterclaims, the "Counterclaims").

10.     Amazingly, Defendants' Counterclaims otherwise admit many of Ms. Marchuk's material allegations, including that (1) Mr. Monteverde twice drunkenly propositioned Ms. Marchuk (including on her third day of employment at F&F); (2) Ms. Marchuk complained

about Mr. Monteverde's conduct to an F&F partner shortly after beginning her employment at the Firm (admittedly bursting into tears while recounting Mr. Monteverde's behavior); and (3) Defendants themselves recognized that Mr. Monteverde's actions were wildly inappropriate, with Mr. Monteverde twice apologizing to F&F for his actions, and F&F twice reprimanding him for his actions.

11.     Nevertheless, in attempt to retaliate against Ms. Marchuk for asserting her legal rights against Defendants, to deter other female F&F attorneys from doing the same and to damage Ms. Marchuk's personal and professional reputation, Defendants continue to pursue the Counterclaims in a bad-faith campaign against Ms. Marchuk.  Indeed, as set forth herein, material factual developments during initial discovery powerfully substantiate Ms. Marchuk's sexual harassment, retaliation and defamation claims against Defendants.

## PARTIES

12.     Ms. Marchuk maintains her primary residence in Omaha, Nebraska.  While employed at F&F, Ms. Marchuk lived in Manhattan, New York.  In November 2012, Ms. Marchuk re-located to Omaha, Nebraska to take an in-house legal job at an insurance company.

13.     F&F is a limited liability partnership organized under the laws of the State of New York.  F&F maintains its principal business office at 369 Lexington Avenue, New York, New York.  F&F is a law firm that specializes in representing plaintiffs in class action and shareholder rights litigation.

14.     Mr. Monteverde is a senior partner at F&F and is described on F&F's website as "Chair of the firm's Shareholder Merger and Transactional Litigation Department."  On

information and belief, Mr. Monteverde is married, has at least one child, and maintains his primary residence in Manhattan, New York.

15.     Mr. Faruqi is a senior partner at F&F and is described on F&F's website as "Co-founder and Managing Partner of the Firm."  On information and belief, Mr. Faruqi maintains his primary residence in the State of New York.

16.     Ms. Faruqi is a senior partner at F&F and is described on F&F's website as both a "Co-Founder" and as "Managing Partner" of F&F.  On information and belief, Ms. Faruqi maintains her primary residence in the State of New York.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, by virtue of the fact that (1) F&F, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi are citizens of the State of New York, and Ms. Marchuk is a citizen of the State of Nebraska; and (2) the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. The Court further has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Ms. Marchuk asserts discrimination claims arising under the Civil Rights Act, 42 U.S.C. §§ 2000, et seq.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (1) F&F and Mr. Monteverde reside in this district, and (2) a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## FACTUAL ALLEGATIONS

19.    Ms. Marchuk attended Vanderbilt University Law School.  During her second year of law school she applied for and obtained a summer associate position at F&F for the summer of 2010.

20.    While a summer associate at F&F, Ms. Marchuk worked with a number of different F&F attorneys, including Mr. Monteverde.  While working together, Mr. Monteverde was very friendly and flirtatious with Ms. Marchuk and from time to time made inappropriate, sexually charged comments in Ms. Marchuk's presence.

21.    On one occasion, Ms. Marchuk accompanied some F&F lawyers, including Mr. Monteverde, to a "happy hour" to network with other class-action plaintiffs' lawyers. Afterwards, Ms. Marchuk went to dinner at an upscale restaurant for dinner with Mr. Monteverde, another F&F partner who had been with them at the event earlier, and his girlfriend.  Mr. Monteverde drank heavily at the dinner and, seeing that Ms. Marchuk had drunk only a half glass of wine, urged her to drink more, which she did not do.  Mr. Monteverde further commented that Ms. Marchuk was an "expensive date" and that she was "lucky" that he was married because he otherwise would expect a "blow job" for the expensive meal that he had purchased for her.

22.    Ms. Marchuk was shocked by Mr. Monteverde's comment, which was offensive, demeaning and entirely unwelcome.  She hoped, however, that it was an isolated incident.

23.    Ms. Marchuk graduated from law school in the spring of 2011 and accepted a position as a full-time litigation associate at F&F.  Upon graduation, Ms. Marchuk had large student loans and was excited to secure a job that would permit her to start paying down her loans.

Ms. Marchuk's starting salary at F&F was $75,000, which came with the representation that, depending on her performance and the performance of F&F, she was eligible for significant year-end bonuses.

24.     On September 6, 2011, Ms. Marchuk joined F&F as a first-year associate. On her first day at work, she was surprised to learn from Mr. Monteverde that he had arranged for her to work exclusively for him. Mr. Monteverde further informed Ms. Marchuk that he needed her to attend a hearing with him in Delaware two days later, on September 8, 2011.

25.     Ms. Marchuk was excited to attend a court hearing but it quickly became clear that her primary role was not as an attorney but Mr. Monteverde's female companion. Mr. Monteverde asked her to do minimal preparation for the hearing, she did not participate in the hearing in any way, and Mr. Monteverde did not discuss with her in any meaningful way the legal issues addressed at the hearing.

26.     On the train ride back to New York after the hearing, Mr. Monteverde drank heavily. After arriving in New York, he asked Ms. Marchuk to join him at Lex Bar, near F&F's office, where his drinking continued.

27.     After several more drinks at Lex Bar, Mr. Monteverde aggressively grabbed and kissed Ms. Marchuk and attempted to fondle her breasts. Ms. Marchuk physically rebuffed Mr. Monteverde's advances. Mr. Monteverde then asked Ms. Marchuk to go back to F&F's offices with him to have sex. Ms. Marchuk rejected the offer and went home. She had no romantic interest in Mr. Monteverde and was greatly troubled that her sole supervising attorney was making wildly inappropriate sexual advances to her on only her third day of full time employment at F&F.

28.     On Ms. Marchuk's fourth day of employment at F&F, Mr. Monteverde's advances continued.  He took Ms. Marchuk to lunch and told her that he wanted her to be his mistress.  As a married man, Mr. Monteverde attempted to justify his actions by explaining that his father has "a wife, a girlfriend, and a mistress."  Mr. Monteverde further explained that he married his wife only to obtain a United States green card.

29.     After lunch, Mr. Monteverde sensed Ms. Marchuk's obvious discomfort with him and his actions.  In the elevator ride up to F&F's office, Mr. Monteverde asked Ms. Marchuk if they needed to talk about what had happened the night before at Lex Bar.  Hoping to put the event behind her, and having made her disinterest in Mr. Monteverde clear, Ms. Marchuk said they did not need to discuss the prior evening.

30.     Mr. Monteverde then inappropriately stroked Ms. Marchuk's stomach and side in the elevator and joked that the next time that he took her out they would go to dinner before having drinks.  Mr. Monteverde's inappropriate physical contact in the confined space of the elevator made Ms. Marchuk extremely uncomfortable.  She was further troubled by Mr. Monteverde's suggestion that they would go out in the future, when she clearly had failed to respond to Mr. Monteverde's advances towards her.  When the doors opened, Ms. Marchuk quickly exited the elevator and walked to her office to get away from Mr. Monteverde.

31.     Mr. Monteverde's inappropriate comments and touching were wholly unsolicited and unwelcomed by Ms. Marchuk.  She had no interest in Mr. Monteverde and found his unwanted advances to be offensive, demeaning and entirely inappropriate in a professional environment.  Ms. Marchuk, however, had (and still has) crushing student loans, and was reluctant

to be seen as overly resistant, or a troublemaker, by immediately accusing one of F&F's most important partners of sexual harassment during her first week of employment at the Firm.

32.     Later on September 9, 2011, Mr. Monteverde stopped by Ms. Marchuk's office, closed her door, and asked her to go out with him that night.  She shook her head no, and he responded "OK, not tonight," indicating that he would not be deterred by her refusals and would ask her out again another night.

33.     On Monday, September 12, 2011 (Ms. Marchuk's fifth day of employment at F&F), Mr. Monteverde again asked Ms. Marchuk to go out with him for dinner or drinks after work.  Again, Ms. Marchuk rejected Mr. Monteverde's request.

34.     On or about September 15, 2011 (Ms. Marchuk's eighth day of employment at F&F), Mr. Monteverde told Ms. Marchuk that she again needed to accompany him to a class-action settlement-confirmation hearing before Vice Chancellor Travis Laster of the Delaware Chancery Court on Tuesday, September 20, 2011.  Mr. Monteverde explained that Judge Laster was partial to good-looking female lawyers, but F&F's female local counsel was ugly; so Mr. Monteverde wanted Ms. Marchuk to appear with him because her good looks would influence the judge in favor of F&F.  Mr. Monteverde told Ms. Marchuk to wear her hair down, wear a low-cut shirt, and to try to look as alluring as possible during the hearing.

35.     Mr. Monteverde, moreover, demeaned and embarrassed Ms. Marchuk by making it obvious to other F&F attorneys that he valued Ms. Marchuk only for her looks, not her legal ability.  When another associate commented that Ms. Marchuk would be attending her second hearing in Delaware in two weeks, while other associates had not attended any, Mr. Monteverde

crassly commented that if other associates were as attractive as Ms. Marchuk they might get to attend hearings as well.

**Ms. Marchuk Bravely Reports Mr. Monteverde's**
**Sexual Harassment During Her Second Week of Employment at F&F**

36.     Given his persistent inappropriate behavior, Ms. Marchuk was greatly concerned about attending another hearing in Delaware with Mr. Monteverde.  On Friday, September 16, 2011 (Ms. Marchuk's ninth day of employment at F&F), Ms. Marchuk reluctantly reported her concerns about Mr. Monteverde's behavior to F&F partner Emily Komlossy. Specifically, she told Ms. Komlossy that after the September 8, 2011 hearing Mr. Monteverde had kissed her and propositioned her to return to the office to have sex, and that his advances were unwelcome.  Ashamed and embarrassed by the awkward position that Mr. Monteverde had put her in, and self-conscious and nervous about making serious complaints about a F&F partner during only her second week of employment at F&F, Ms. Marchuk broke into tears while conveying her concerns to Ms. Komlossy.

37.     Ms. Komlossy expressed sympathy for Ms. Marchuk's situation and indicated that it was well known in the Firm that Mr. Monteverde behaved inappropriately.  Ms. Komlossy further agreed that, given Mr. Monteverde's standing in the firm, it was not a good idea for Ms. Marchuk to complain about him to other senior partners in the Firm, including Mr. and Ms. Faruqi.  Ms. Komlossy's reaction to Ms. Marchuk's complaint suggested to Ms. Marchuk that if she complained to other F&F partners they might view her as a troublemaker who was endangering the firm's relationship with one of its most successful revenue-generating partners.

38.     Ms. Komlossy immediately relayed to Mr. Faruqi what Ms. Marchuk had told her about Mr. Monteverde's improper actions, whereupon Mr. Faruqi informed Mr. Monteverde that Ms. Marchuk had complained about his behavior.

39.     Contradicting Defendants' public statements that Ms. Marchuk never complained about sexual harassment, Ms. Komlossy memorialized Ms. Marchuk's September 16, 2011 complaint in a September 19, 2011 email to Mr. Faruqi entitled "Confidential Memo." Ms. Komlossy's Confidential Memo describes textbook harassment:

> [Ms. Marchuk] proceeded to disclose to me that she had gone out with Juan Monteverde for drinks one night soon after she joined, at the conclusion of which she claimed that he had kissed her and grabbed her breast.  Alexandra also indicated that since then, Juan had invited her to join him on his boat . . . she was apprehensive about going to Delaware with [Monteverde] the following Tuesday because she knew he would get drunk and was afraid of what may happen . . . she continued to be teary and upset for the next several hours.

40.     Contemporaneous communications between Ms. Marchuk and her friends confirm that she had no romantic interest in Mr. Monteverde and that he was sexually harassing her.  On September 19, 2011, Ms. Marchuk told one friend that she "spilled her guts" to Ms. Komlossy about Mr. Monteverde and had a "cry hangover," to which the friend replied, "wow/ juan is the jackass partner you work for?"

Marchuk:  yep/ who kissed me

Friend:     omg/ did you tell her that?

Marchuk:  yea/ I wouldnt have except i was drunk/ and he had told her that i flirted with him/ im pretty sure she told him off this weekend/ because he didnt say a single offensive thing to me today/ he always says stuff about spanking/sucking etc./ today/ nada

Friend:     wow/ so… is that…. better?

- 13 -

Marchuk:  haha/ i dont know/ ive been trying not to think about it/ if everything goes well, i think i can make a good living from this firm/ but if i make a big deal about anything that wont happen/ i just need to find a nice middle line/ where im not being harassed but not the big wet blanket either

Friend:  yeah… you're waaaaaay on the harassed side of that line right now though

41.     Despite knowing from Ms. Komlossy of Mr. Marchuk's concerns, F&F took no action to address them or assure her that it took them seriously.  Indeed, the Counterclaims admit that after hearing from Ms. Komlossy and speaking to Mr. Monteverde (who claimed the conduct was consensual and a "mistake"), Mr. Faruqi did not even ask Ms. Marchuk about the incident.  According to the Counterclaims, Mr. Faruqi simply concluded – on the basis of her alleged request Monday morning to accompany Mr. Monteverde the next day to Chancery Court in Delaware (a request she did not make, and had no reason to make in any event because Mr. Monteverde clearly had the authority to have her join him) – "that whatever happened previously between Monteverde and Marhcuk was consensual, and that Marchuk was completely comfortable working with Monteverde."

42.     Apprehensive and fearful, Ms. Marchuk attended the September 20, 2011 hearing in Delaware with Mr. Monteverde.  Immediately before the hearing, Mr. Monteverde again told Ms. Marchuk to try to look as attractive as possible in order to get the judge's attention during the hearing.  As with the prior hearing, Mr. Monteverde did not ask Ms. Marchuk to perform any substantive legal work relating to the hearing; her sole function was to serve as "eye candy" for Vice Chancellor Laster.

43.     On the return train ride back from the September 20 hearing Mr. Monteverde again drank heavily.  He acted annoyed with Ms. Marchuk and stated that he knew that

Ms. Marchuk would not go out with him when they reached New York. As if to show that he did not care that Ms. Marchuk had spurned him, Mr. Monteverde bragged that he liked a good hearing even more than he liked sex. (The associate attorney who started at, and resigned from, F&F shortly after Ms. Marchuk quit, has testified in this case that Mr. Monteverde once remarked in her presence that his wife "doesn't have sex with him before court hearings because she likes him to have pent-up aggression.")

44.     Over the next several months, Mr. Monteverde continued lewdly to express his interest in a sexual relationship with Ms. Marchuk and repeatedly made inappropriate sexual jokes to Ms. Marchuk and sought to discuss inappropriate sexual topics in the workplace with her.

45.     For example, Mr. Monteverde learned that Ms. Marchuk shared a small apartment with her cousin and had lost a coin toss to determine who got the larger bedroom. Mr. Monteverde joked that if Ms. Marchuk had told him about her situation he would have chipped in some extra money so that he could start sleeping at her apartment. He joked that $50 per month should secure him a night or two with Ms. Marchuk each week.

46.     Ms. Marchuk found his comments about staying at her apartment abusive and distressing. She never invited Mr. Monteverde to her apartment, never introduced him to her cousin, and never expressed any interest in engaging in any romantic relationship with Mr. Monteverde or socializing with him in any way. Further, she was humiliated by Mr. Monteverde's obvious belief that he could exploit Ms. Marchuk's limited financial means to obtain sex from her.

47.     Mr. Monteverde also repeatedly made suggestive comments about taking Ms. Marchuk on trips outside the office. Mr. Monteverde had recently acquired a boat and suggestively told Ms. Marchuk that the two of them should go out on his boat together. When Ms.

Marchuk replied that she did not like boats, Mr. Monteverde commented that his wife also disliked boats and that he would have to keep searching for a woman who liked boats.

48.     Mr. Monteverde also suggested that he could take Ms. Marchuk skiing with him.  When Ms. Marchuk said she did not like skiing, Mr. Monteverde grew annoyed with her and accused her of trying to "be difficult" by repeatedly rejecting his suggestions that they do things together.

49.     Mr. Monteverde also lewdly commented on Ms. Marchuk's body in front of other F&F attorneys.  When Mr. Monteverde offered Ms. Marchuk a binder from within his office, another F&F associate asked for one as well.  Mr. Monteverde crassly joked that the other associate might get better office supplies if his body looked like Ms. Marchuk's body.

50.     Mr. Monteverde once commented that he wanted Ms. Marchuk to be happy working for him so he bought her "matching underwear."  He then jokingly claimed that his tongue had slipped and he meant to say that he had gotten her a desk that matched his.

51.     A male attorney once referred to a case involving the company BJ's Wholesale.  In front of Ms. Marchuk, Mr. Monteverde responded that he did not know anything about "BJs" other than he really liked getting them.  When the other male attorney looked uncomfortable with the comment, Mr. Monteverde smugly assured him that it was not a problem because Mr. Monteverde could say whatever he wanted around Ms. Marchuk, suggesting she enjoyed this type of banter, or worse.  Ms. Marchuk never expressed any interest in discussing or joking about sexual topics with Mr. Monteverde.  She found such topics particularly offensive in light of Mr. Monteverde's prior sexual advances towards her and she was careful not to respond in

any way to his suggestive jokes, because she feared it would encourage him and make her professional life even more uncomfortable.

52.     Mr. Monteverde also routinely told Ms. Marchuk about the strip clubs he frequented, and he recounted which cities have the "dirtiest" shows at their strip clubs.  Ms. Marchuk never participated in these conversations or expressed interest in hearing about such things.

53.     Several times Ms. Marchuk told Mr. Monteverde that F&F's handbook prohibited his sexually inappropriate conduct.  He belittled her comment by asking whether she was offering to "spank" him with the handbook.   Mr. Monteverde further mocked Ms. Marchuk's complaints by falsely telling F&F co-workers that Ms. Marchuk had offered to "spank" him with the employee handbook.

54.     Mr. Monteverde also belittled and ridiculed the complaint that Ms. Marchuk made about him to Ms. Komlossy.   To show that her complaints were of no concern to him, Mr. Monteverde joked that maybe Ms. Marchuk, Ms. Komlossy and Mr. Monteverde should have sex together.  Once when Ms. Marchuk and Ms. Komlossy were standing near each other in F&F's office, Mr. Monteverde stepped between them and provocatively stated that he liked being in the middle.

55.     While discussing a television program about flight attendants set in the 1960s, Mr. Monteverde characterized that era as the "good old days."  Mr. Monteverde stated that earlier times were better because, as he described it, women worked to serve men and men could do whatever they wanted to women.

56.     One evening in October 2011, Ms. Marchuk was preparing to leave F&F's offices. She checked in with Mr. Monteverde to see if he needed anything else before she left. He responded, "Nothing work related" and leaned back in his chair, smiled, then suggestively grabbed the waistband of his pants, indicating, once again, his desire for sex. Concerned because Mr. Monteverde and she were the last employees in the office, Ms. Marchuk said good night and quickly left the office. She did not feel physically safe alone with Mr. Monteverde and thereafter avoided being alone with him in the office.

57.     Ms. Marchuk was sufficiently uncomfortable with Mr. Monteverde that it interfered with her job responsibilities. She avoided being alone with Mr. Monteverde. She tried to discuss work related matters with him in his office only when others were nearby. Towards the end of the work day, Ms. Marchuk was always cognizant of who was leaving and when (most of the attorneys at F&F on her floor had to pass by her office to leave), because she was wary of being left alone with Mr. Monteverde.

58.     Mr. Monteverde also repeatedly made improper and offensive comments that sexualized Ms. Marchuk's interactions with other male lawyers. Mr. Monteverde complained that Brian Moon, an associate with whom Ms. Marchuk worked well, was "flirting" with Ms. Marchuk and had a "crush" on her.

59.     When Ms. Marchuk commented that a male associate at another firm had done good legal work on a case, Mr. Monteverde began derisively referring to him as Ms. Marchuk's "boyfriend" and baselessly questioned why she was romantically interested in him. In doing so he looked up the guy's firm profile and made comments about his appearance (he was balding) and suggested that he could not be the type of guy Ms. Marchuk would be interested in.

- 18 -

60.     Once when Ms. Marchuk assisted F&F partner Adam Gonnelli to prepare for a deposition on one of Mr. Monteverde's cases, Mr. Monteverde complained that his "matchmaking" had brought Ms. Marchuk and Mr. Gonnelli together.  Mr. Monteverde further accused Ms. Marchuk of having a "crush" on Mr. Gonnelli.

61.     Mr. Monteverde also grew jealous when he felt that Ms. Marchuk was being friendly with Jim McEvilly, another F&F partner.  In an attempt to embarrass Ms. Marchuk, Mr. Monteverde falsely told Mr. McEvilly that Ms. Marchuk had a "crush" on him.

62.     After Ms. Marchuk continuously spurned his advances and complained about them, Mr. Monteverde retaliated against Ms. Marchuk.  Mr. Monteverde started communicating with Ms. Marchuk in a brusque and peremptory manor, often berating her over entirely insignificant issues.

63.     On or about October 6, 2011, Mr. Monteverde flew into a rage at Ms. Marchuk when he learned that Ms. Marchuk had agreed to sit in on a conference call with Mr. Gonnelli.  Although she had no urgent assignments for Mr. Monteverde, he angrily told her that she needed carefully to consider which partners she wanted to work for at the firm, implying that if she continued to work for Mr. Gonnelli, she could not work for Mr. Monteverde.  Ms. Marchuk perceived this to be an obvious threat as Mr. Monteverde led a successful group within F&F and it would hurt Ms. Marchuk professionally if she was not allowed to work within it.  Ms. Marchuk understood that Mr. Monteverde's childish threat was motivated exclusively by his paranoid belief that Ms. Marchuk liked Mr. Gonnelli more than Mr. Monteverde.

64.     Continuing his pique at Ms. Marchuk, on or around October 7, 2011, Mr. Monteverde spitefully demanded that she work over the weekend to complete a non-urgent

assignment although he knew that Ms. Marchuk had plans to attend a baby shower that weekend. Ms. Marchuk worked over the weekend and completed the assignment. Mr. Monteverde then ignored her work product for several days to underscore its true lack of urgency and to emphasize the retaliatory nature of the assignment. When he eventually reviewed the documents later in the week, Mr. Monteverde was punitively harsh, shouting corrections angrily at Ms. Marchuk from his office regarding minor matters such as formatting.

65.     On or about October 14, 2011 Mr. Monteverde threatened Ms. Marchuk, in the presence of another associate, stating that he would fire her if she made any more mistakes. Mr. Monteverde's threat had nothing to do with Ms. Marchuk's work product but was motivated exclusively by the fact that she complained about him to Ms. Komlossy, had rejected his advances, and had the temerity to express an interest in working for other male attorneys at F&F. Ms. Marchuk had no doubt that Mr. Monteverde had both the authority and the temperament to act on his threats and to fire her if she offended his fragile ego.

66.     Mr. Monteverde intended his threat of termination to prey upon Ms. Marchuk's significant financial concerns. Between her loans for college and law school, Ms. Marchuk owed a substantial amount of money. Mr. Monteverde knew that finances were a matter of great sensitivity to Ms. Marchuk because he had asked her numerous personal questions about the topic. In 2011 the job market for junior attorneys was abysmal and, if Ms. Marchuk lost her job at F&F, she was certain that she would default on her loans and/or be forced to move out of New York City.

67.     Indeed, a common thread linking Mr. Monteverde's inappropriate conduct was that he sought to exploit the fact that he had greater financial resources and power than did

- 20 -

Ms. Marchuk. From his "expensive date" comment when he bought Ms. Marchuk dinner as a summer associate, to his offer to cover some of her rent so that he could sleep at her apartment, to offers to take Ms. Marchuk on trips, to suggestive comments about buying Ms. Marchuk office supplies and a "matching" desk, to his outright threat to terminate Ms. Marchuk's employment, Mr. Monteverde repeatedly mixed references to financial issues and to financial inducements into his sexually suggestive comments to Ms. Marchuk.

      68.    Mr. Monteverde dramatically increased his improper coercive pressure on Ms. Marchuk on the evening of F&F's holiday party on December 15, 2011.

      69.    Following a reception and sit-down dinner, a number of F&F employees, including Ms. Marchuk and Mr. Monteverde, went out to Lex Bar for further drinks.

      70.    At the bar, Ms. Marchuk struck up a conversation with Mr. Monteverde about F&F's finances. Ms. Marchuk was interested to learn more about F&F's finances because she desperately hoped to receive a year-end bonus. When she was hired she was told that year-end bonuses could be an important part of her compensation package and she desperately needed the money. Further, as a first year associate, Ms. Marchuk knew very little about the inner workings of F&F.

      71.    Mr. Monteverde immediately saw that he could exploit to his advantage Ms. Marchuk's interest in F&F's finances and her acute concern about her own finances. First, he established his power with F&F. Mr. Monteverde bragged to Ms. Marchuk that his group was the most profitable group within F&F. He further said that while his group had a very good year, F&F as a whole did not. As he had before, he suggested that Ms. Marchuk was fortunate to be working for him.

72. Second, he established his financial leverage. Mr. Monteverde told Ms. Marchuk that he did not think he could recommend her for a year-end bonus. He said that he was concerned that if he recommended Ms. Marchuk for a bonus it might raise concerns that he improperly favored Ms. Marchuk. Ms. Marchuk believed that Mr. Monteverde's comment was meant to chastise her for complaining about him, by suggesting that her complaint now limited his ability to pay her a deserved bonus. Moreover, the news that Mr. Monteverde had decided that she would not receive a year-end bonus was extremely upsetting to Ms. Marchuk, as she had been counting on at least a small bonus to cover necessary expenses.

73. Finally, Mr. Monteverde established his power as Ms. Marchuk's employer, capable of deciding whether she would continue working at the firm or not. He unexpectedly commented that he was surprised Ms. Marchuk was so interested in F&F when she probably would not be there much longer. Mr. Monteverde's comment shocked Ms. Marchuk. His comment suggested either that F&F was planning on terminating Ms. Marchuk or that Mr. Monteverde felt that Ms. Marchuk was not interested in continuing to work at F&F long-term.

74. When Ms. Marchuk asked Mr. Monteverde what he meant by his comment, he explained that since she had started working at F&F he had been testing Ms. Marchuk's loyalty and toughness, and that she was failing miserably. He expressed disappointment in Ms. Marchuk for "betraying" him by complaining to Ms. Komlossy about his behavior towards her. Mr. Monteverde suggested that Ms. Marchuk was not committed to working at the Firm and that she did not have the toughness to be a lawyer at F&F, or maybe anywhere.

75. Ms. Marchuk was devastated by Mr. Monteverde's comments. From a financial perspective, she was distraught to learn both that she would not receive a bonus and that

- 22 -

she soon might not have a job at all.  From a professional perspective, she was leveled by the suggestion that she might not have the talent or commitment required to be a lawyer.  While Ms. Marchuk had no romantic interest in Mr. Monteverde and was offended by his sexist behavior, she admired him professionally for his success and highly valued his opinion of her legal ability.

76.     By this time, most or all of the other F&F attorneys had left the bar and Mr. Monteverde started suggesting that Ms. Marchuk accompany him to F&F's office, which was only a short walk away.  Under the influence of alcohol, and desperate to repair what Mr. Monteverde said was her tattered standing at F&F, Ms. Marchuk acceded to Mr. Monteverde's pleas and walked back to F&F's offices with him.

77.     After entering his office, Mr. Monteverde pushed Ms. Marchuk to the floor and quickly, forcefully, and painfully had sex with her.  Suffering discomfort and not wanting to continue having sex with him, Ms. Marchuk implored Mr. Monteverde to stop, but he disregarded her pleas and continued having sex with her.  After he finished, Ms. Marchuk had left a large bloodstain on Mr. Monteverde's carpet.  Seeing that Ms. Marchuk was emotionally and physically traumatized by his aggressive conduct, Mr. Monteverde immediately directed her not to tell anyone what he had done.  He then quickly escorted Ms. Marchuk from F&F's office and down to the street, obviously concerned that they might be discovered by other F&F employees.  Mr. Monteverde advised Ms. Marchuk to forget what had just happened.  Ms. Marchuk walked to the nearest train station and took the subway home alone.

78.     Ms. Marchuk was shattered and disturbed by Mr. Monteverde's abusive and manipulative assault upon her, and immediately sought professional help.  Concerned that Mr. Monteverde's rough and unprotected sex may have physically harmed her, she visited her

gynecologist the following Monday, December 19, 2011. Given the circumstances, and noticing that Ms. Marchuk appeared extremely distressed, the doctor asked about whether the sex had been consensual. Ms. Marchuk, still in shock from the encounter, unsure of whether she would continue working at F&F, and apprehensive about what might happen if she reported what had actually happened, replied that her boss had stopped when she told him to, even though that was not the truth. Knowing that Defendants' actions had egregiously violated her legal rights, Ms. Marchuk met with an employment attorney on December 20, 2011.

79.    Physically repulsed by the further sight of Mr. Monteverde and emotionally unable to continue working for him as F&F required her to do, on December 22, 2011 Ms. Marchuk – although facing liability under her lease and onerous student loans, and knowing that she would almost certainly remain unemployed for many months – reluctantly sent an email to Mr. Faruqi and Ms. Faruqi informing them that she had consulted with an employment lawyer and was immediately resigning her employment at F&F.

80.    Despite abruptly resigning after consulting with an employment attorney, and without replacement employment in a terrible job market, nobody from F&F ever contacted Ms. Marchuk to determine the reason for her resignation.

81.    On information and belief, Mr. Faruqi and Ms. Faruqi had actual knowledge of Mr. Monteverde's inappropriate treatment of Ms. Marchuk. On information and belief, Mr. Faruqi and Ms. Faruqi learned of Mr. Monteverde's treatment of Ms. Marchuk by seeing it first hand and/or by hearing about it from Ms. Komlossy or others.

82.     Mr. Monteverde made no effort to conceal his inappropriate behavior at F&F.  Mr. Monteverde openly engaged in bawdy conversations and jokes, at the expense of Ms. Marchuk and other female employees, in F&F's offices and in the presence of other F&F partners.

83.     Indeed, Mr. Monteverde's inappropriate office behavior was, and may still be, a running joke within F&F (although it was no laughing matter for Ms. Marchuk).  Mr. Faruqi even told other F&F attorneys that he was concerned that someday Mr. Monteverde's inappropriate behavior would cost the Firm a lot of money.  Further, on one occasion when Mr. Monteverde complained that F&F should have paid him more on a case, Mr. Faruqi jokingly replied by looking approvingly at Ms. Marchuk and protesting, "I gave you Alexandra."  Mr. Faruqi, of course, had assigned Ms. Marchuk exclusively to Mr. Monteverde, no doubt based on Mr. Monteverde's inappropriate interest in her, which he had expressed when she was a summer associate at the Firm.

84.     Consequently, F&F had actual notice that Mr. Monteverde was sexually harassing Ms. Marchuk but made no effort to prevent or to remedy it.

85.     As a result of Defendants' wrongful conduct, Ms. Marchuk has suffered severe emotional and financial harm.

86.     Following her resignation from F&F, Ms. Marchuk suffered from continuing bouts of depression, anxiety, anger and guilt.  She obtained treatment from a clinical psychologist who diagnosed her as suffering from post-traumatic stress disorder.  Among other things, since Ms. Marchuk's departure from F&F she has experienced flashbacks, nightmares, heightened emotionality, bouts of self-condemnation and diminished self-confidence.

87.     Ms. Marchuk diligently searched for replacement employment after leaving F&F but did not find any.  Without a steady income and under the weight of crushing student loans, Ms. Marchuk soon ran out of money and was forced to give up her Manhattan apartment and move back in with her parents in New Jersey.

88.     In an attempt to continue her career more or less on track, Ms. Marchuk searched for employment with law firms having practice areas similar to those of F&F, but to no avail.  The job market was extremely tight, and the only paid work Ms. Marchuk could find was a short stint as a document reviewer.

89.     Finally, in November 2012, Ms. Marchuk was offered a legal job overseeing a foreclosure docket at an insurance company in Omaha, Nebraska.  Her new job has a significantly lower salary than did her position at F&F, and represents a material and less remunerative change in career path.  Ms. Marchuk relocated, at her own expense, to Omaha and started her new job on November 23, 2012.

**Defendants Wrongfully Destroy the Bloody Carpet After Being Contacted by Ms. Marchuk's Counsel**

90.     On October 1, 2012, Ms. Marchuk's counsel wrote to Defendants informing them of Ms. Marchuk's allegations, including references to the forceful, painful and unwanted sexual encounter with Mr. Monteverde that resulted in a large blood stain on his office carpet.  The letter stated Ms. Marchuk's belief at that time that the carpet had already been destroyed.  The letter further directed Defendants to preserve other evidence relating to Ms. Marchuk's allegations.

91.     Despite the obvious forensic importance of the carpet in Mr. Monteverde's office, in January 2013, three months after receiving Plaintiff's counsel's October 2012 letter, Defendants admittedly ripped out and discarded the entire carpet in Mr. Monteverde's office.

**Defendants File Fraudulent, Retaliatory and Defamatory**
**Counterclaims, and Issue a Fraudulent, Retaliatory and Defamatory**
**Press Release in Response to Ms. Marchuk's Lawsuit**

92.     On March 13, 2013, Ms. Marchuk filed her original complaint in this action against Mr. Monteverde and F&F (the "Complaint").

93.     Neither Ms. Marchuk, nor any agent acting on her behalf, took any action to publicize her Complaint.

94.     At all times relevant hereto, Ms. Marchuk had no desire for her allegations against Mr. Monteverde and F&F to become the subject of media interest.  Like many victims of sexual harassment, Ms. Marchuk hoped that her extremely personal allegations would receive no media attention and that details about this sordid case would not become the first thing that people read about when searching Ms. Marchuk's name on the Internet, perhaps for many years to come.

95.     Many media outlets, however, monitor new case filings in state and federal courts in New York City, looking for newsworthy filings.  Given Mr. Monteverde's and F&F's prominence, or their apparently notorious reputation, among class-action lawyers, Ms. Marchuk's complaint was immediately flagged by the legal and business press as a story of interest.  Among others court-filing monitoring outfits, Courthouse News flagged the Complaint on the day it was filed and alerted its clients to the potentially newsworthy filing.  Within hours of its filing, the Complaint was available in electronic form to hundreds, even thousands of news organizations, law firms or other businesses subscribing to court-monitoring services.

96.     By the end of the day on March 13, 2013, numerous Internet-based media outlets, including the popular legal website Above the Law, had posted on-line stories about the Complaint.  Indeed, Above the Law posted a copy of the Complaint, making it easily available for review by, and distribution to, the general public.

97.     Defendants, moreover, are, upon information and belief, experienced class-action litigators who know that courthouse monitoring outfits and media outlets review newly filed complaints for stories of interest.  Indeed, upon information and belief, Defendants have used such services themselves.  Defendants further presumably understand that – because of Mr. Monteverde's and F&F's complicated standing within the class-action plaintiffs' bar – a charge of sexual harassment against Mr. Monteverde and F&F is of interest to the business and legal communities, independent of any alleged (though non-existent) promotion of the Complaint by Ms. Marchuk.

98.     Disregarding that the business and the legal communities had an obvious interest in the Complaint, and that Above the Law immediately made an electronic copy the Complaint available to the general public on its popular website, on April 2, 2013 Defendants  filed the Original Counterclaims absurdly alleging that Ms. Marchuk orchestrated the distribution of the Complaint to the news media, to F&F's clients, and to Mr. Monteverde's wife, among others, allegedly utilizing the email address js832408@gmail.com.

99.     Simultaneous to filing the Original Counterclaims, Defendants disseminated a false press release repeating their defamatory statements accusing Ms. Marchuk of maliciously trying to destroy Defendants' business (the "Press Release").  Employing the public relations firm Rubinstein & Associates, Defendants disseminated the Press Release stating:

Alexandra Marchuk was sued today, Tuesday, April 2, 2013, in
Federal Court (United States District Court for the Southern District
of New York) by the law firm of Faruqi & Faruqi ("F&F") and
partner, Juan Monteverde, for intentionally defaming and damaging
F&F's and Mr. Monteverde's reputations and business and for
intentionally trying to ruin Mr. Monteverde's career.
The F&F lawsuit is both an Answer to Ms. Marchuk's March 13,
2013 complaint alleging claims of sexual harassment by Mr.
Monteverde, and it asserts Counterclaims accusing Ms. Marchuk of
defamation, tortious interference with business, among other
wrongful conduct.

A spokesperson for F&F and Mr. Monteverde said: "We have filed
this counter-lawsuit today against Ms. Marchuk because we believe
her lawsuit was maliciously brought to extort money from F&F, to
defame and damage F&F's reputation and business, as well as the
reputation of Juan Monteverde, with whom she was obsessed. Ms.
Marchuk and/or her agents emailed her malicious and false
complaint to clients of F&F, opposing counsel in F&F cases, as well
as to Mr. Monteverde's wife. This is a clear violation of the 'Fair
Comment Rule' with the intent to damage the firm, Mr. Monteverde
and other parties outside any relevance to the court proceeding.

100.    Further, despite knowing (1) that they had destroyed the carpet in Mr.

Monteverde's office containing forensic evidence of the sexual assault that occurred in his office

on the evening of the holiday party and (2) that Ms. Marchuk had clearly complained about Mr.

Monteverde's improper behavior as memorialized in Ms. Komlossy's September 19, 2010 email

entitled "Confidential Memo," Defendants' bad-faith Press Release falsely stated that there had

been no sexual intercourse between Ms. Marchuk and Mr. Monteverde and that Ms. Marchuk

never complained about Mr. Monteverde:

Ms. Marchuk now alleges that Mr. Monteverde forcibly had sexual
intercourse with her and sexually harassed her at other times, and that Lubna
and Nadeem Faruqi, as well as another F&F female partner, did nothing
when she complained. There was no sexual intercourse, forced or
otherwise; there was no sexual harassment, and there were not complaints.

- 29 -

(emphasis added).  Defendants' public statement in the Press Release that there were no

sexual between Ms. Marchuk and Mr. Monteverde, and that Ms. Marchuk never

complained to F&F about Mr. Monteverde, were knowingly false when made.

      101.    On May 7, 2013 Defendants repeated their baseless claims against Ms.

Marchuk when they filed the Amended Counterclaims.

**Defendants Establish the Gmail Account and
Send Ms. Monteverde the Complaint, but then Maliciously
and Fraudulently Sue Ms. Marchuk for those Actions**

      102.    On May 9, 2013, Plaintiffs' counsel sent a "Rule 11" letter to Defendants'

counsel, demanding that Defendants withdraw their baseless counterclaims against Plaintiff

pursuant to the ethical requirements imposed by Rule 11 of the Federal Rules of Civil Procedure.

Plaintiff's counsel asserted that Defendants had no good-faith basis to accuse Ms. Marchuk –

rather than any of the thousands of others with access to the Complaint – of maliciously

distributing it, and demanded that Defendants withdraw the Counterclaims.

      103.    On May 14, 2013, Defendants' counsel defiantly responded to Plaintiffs'

Rule 11 letter, rejecting Plaintiffs' demand that Defendants withdraw their baseless Counterclaims.

Defendants' counsel stated that Defendants were in the process of subpoenaing Google for

information relating to the Gmail Account and were sure that Google's responses would implicate

Ms. Marchuk.  Defendants' counsel boasted of Defendants' resolve to pursue the wrongdoer,

without fear or favor, wherever the facts might lead:

> The subpoena to be served on Google – which you have stated that
> you would not join, but would not oppose – is likely to lead to the
> discovery of the person that forwarded the complaint to Ms.
> Monteverde's wife and the other recipients.  We believe that person
> to be Ms. Marchuk or one of her agents.  Your denial on her behalf
> does not suffice.  In any case, for Rule 11 purposes, in light of the

Google subpoena that Defendants are serving this week, Defendants "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," and so any sanction motion on Ms. Marchuk's part would be frivolous . . . [quoting Rule 11]

Please do not doubt our resolve. Neither we nor our clients will be intimidated or bullied by bluster. We will follow the facts wherever they may lead, to whomever [sic] may be accountable, and to whatever consequences they may yield.

104.    On June 14, 2013 Google produced information relating to the creation of the Gmail Account. Google's disclosure confirms that the Gmail Account was created at 2:34 p.m. Eastern Standard Time on March 13, 2013 by a user accessing the Internet from IP address 63.119.35.178. A search for this IP address on the Internet readily confirms that it is assigned to Faruqi & Faruqi LLP, New York. Google's disclosure, therefore, establishes that someone at F&F utilized the firm's computer system on March 13, 2013 to create the Gmail Account and then maliciously forwarded the Complaint to Mr. Monteverde's wife, or perhaps others. That is, someone at F&F either tried to frame Ms. Marchuk for the acts that Defendants then immediately put into their Counterclaims or settle some intra-firm score with Mr. Monteverde.

105.    The Google revelation undercuts the Counterclaims and deflates the soaring rhetoric of Defendants' counsel's May 9, 2013 letter. Indeed, rather than courageously follow the supposedly sacrosanct Google information wherever it might lead, Defendants and their counsel have ignored it altogether. As of the filing of this second amended complaint, some nine weeks after Google disclosed that Defendants themselves sent the email for which they are suing Ms. Marchuk for $15 million, Defendants still pursue their false and spiteful Counterclaims, most recently on the theory that a former F&F employee must have hacked into F&F's computer network to access Google. Remarkably, in early July 2013, Defendants took the extraordinary step

of serving Plaintiffs' undersigned counsel with a subpoena demanding production of all

information relating to the creation of the Gmail Account.

**Defendants Falsely Claim that Ms. Marchuk was**
**Ineligible for a 2011 Bonus and Manufacture a False**
**Letter Regarding Ms. Marchuk's Bonus**

106.   The Counterclaims further falsely depict Ms. Marchuk as a liar by disputing

her claim that Mr. Monteverde used his influence over her compensation, including her 2011

bonus, to pressure her to have sex with him.  The Counterclaims assert that F&F has an explicit

policy – allegedly conveyed to Ms. Marchuk orally and in writing – against awarding bonuses to

any first-year associate such as Ms. Marchuk.

107.   Deceitfully attempting to support their contention that Ms. Marchuk is

fabricating her claims, Defendants manufactured evidence.  The Amended Counterclaims cite a

letter dated August 4, 2011 (a copy of which Defendants produced in discovery) that states that Ms.

Marchuk will be eligible for a bonus at the end of 2012.  This letter inexplicably contradicts the

letter dated August 4, 2011 (the original of which Ms. Marchuk fortunately retained) that clearly

states that she will be eligible for a bonus at the end of 2011.  Suspecting that Defendants probably

assumed that she had not retained her letter and therefore simply fabricated one of their own, Ms.

Marchuk demanded that Defendants produce their letter in electronic form, including the metadata

reflecting the date on which the letter was drafted.  Confirming Ms. Marchuk's worst fears,

Defendants now implausibly claim that their letter was not saved to a firm network, that the

desktop computer on which the letter was drafted had a hard drive failure over a year ago, and the

hard drive failure has destroyed all relevant metadata.  Defendants' official response: "no such

metadata exists because the desktop computer to which these documents were saved experienced

a hard drive failure in or around April 2012."

**The Counterclaims Falsely Allege that the**
**Complaint Immediately Harmed F&F's Business**

108.    The Counterclaims also misrepresent the reputational harm that Mr.

Monteverde and F&F have experienced as a result of the publicity surrounding the Complaint.  The

Counterclaims incredibly allege that during the mere 20 days between the filing of the Complaint

and the filing of the Counterclaims, F&F's clients abandoned the Firm and F&F terminated a

critical new business initiative, all due to the negative publicity engendered by the Complaint.

Among other things, the Counterclaims falsely allege:

> As a result of Marchuk's false allegations and dissemination of the
> complaint, Defendants have experienced a chilling effect on their
> business and ability to attract new clients and business.  Defendants
> are having difficulty marketing their legal services to public entities,
> which account for over 50% of the Firm's business.  Just before this
> complaint was filed, F&F had substantially invested in a new public
> sector practice area and hired attorneys to bring in and generate
> business as a significant segment of the Firm's practice.  This
> initiative is on hold, indefinitely.  F&F and Monteverde have lost
> and will lose substantial business because of the fabrications alleged
> in the complaint.

Counterclaims ¶ 65.

109.    On information and belief, Defendants included the foregoing (and other)

allegations in the Counterclaim without any good-faith basis for doing so.  On information and

belief, the foregoing allegations are materially false because, among other reasons, (1) F&F's

representation of public companies or institutional clients has never constituted more than 50% of

F&F's business; (2) such "public" clients, if they exist at all, did not immediately inform F&F after

reading the Complaint that they would stop doing business with F&F because of the allegations in

- 33 -

the Complaint; and (3) F&F did not immediately discontinue any significant business initiative because of the filing of the Complaint. On information and belief, discovery in this action regarding Defendants' past financial performance, the amount and composition of Defendants' fees, and Defendants' past and present business strategies will prove that the foregoing allegations are fictional. Their sole purpose, therefore, is to retaliate and intimidate.

110.    The purely retaliatory nature of the Counterclaims has been confirmed by the discovery taken by Plaintiff, or attempts to take discovery, to date. Plaintiff immediately demanded that Defendants produce all documents confirming that (1) any F&F clients contacted F&F to express concern about the allegations contained in the Complaint; (2) any clients or potential clients expressed reservations about retaining F&F because of the allegations contained in the Complaint; (3) F&F was in the process of developing a new public entity practice; or (4) F&F discontinued any business initiative because of the publicity generated by the Complaint. True to form, Defendants have asserted a variety of frivolous objections to these discovery demands and, as of the date of this complaint, have still failed to produce a single document confirming any of the relevant allegations in their Counterclaims.

111.    Further, the discovery that Plaintiff has uncovered undermines Defendants' claims that they maintain with their clients sensitive and valuable relationships that might be jeopardized by the allegations in the Complaint.

112.    In their Initial Disclosures, Defendants identified a number of witnesses as having knowledge of Defendants' claims and defenses. One such witness was deposed recently and testified under oath concerning a certain event alleged in the Complaint and Counterclaims.

113.    In preparing for this deposition, Plaintiff's counsel discovered that one year

earlier this witness was named as the sole lead plaintiff in a putative class-action lawsuit that Mr.

Monteverde and F&F filed against a corporate defendant in federal court.  In this lawsuit, the

complaint in that case alleges that the witness purchased a certain food product based on a

misleading marketing campaign.

114.    At the deposition, the witness recalled having purchased the food product

on occasion, but for others only; the witness does not care for it.  More astonishingly, the witness

unequivocally denied having ever been a client of F&F and professed to have no knowledge of the

lawsuit described in the preceding paragraph.  Provided with a copy of the full complaint and being

directed to the witness's name in the caption and to Mr. Monteverde's signature for F&F on the last

page, the witness still testified, resolutely and without qualification, to having no knowledge

whatsoever of the legal action brought by F&F on the witness's behalf.  Several days later,

Defendants gratuitously produced an affidavit from this witness, who now incredibly claims to

have been blindsided by the questions about the lawsuit bearing the witness's name, having

focused on Ms. Marchuk's allegations:

> Near the end of the deposition, Marchuk's counsel proceeded to ask
> questions about [the product that is the subject of the lawsuit ].  These
> questions caught me by surprise because I was at the deposition to answer
> questions regarding the events [alleged in Marchuk v. Faruqi].  When asked
> about [the product], I forgot that I was a plaintiff in a ... class action against
> [the product's manufacturer].  I was presented at the deposition with
> documents related to the Marchuk matter and was therefore caught unaware
> when the documents turned to the [other] litigation.

115.    This witness's inability to recall basic events concerning important

interactions with Defendants in 2012 (if that is the true explanation) certainly undermines the

witness's credibility, as does the fact that the witness's daughter works at F&F, and Mr.

Monteverde got her the job.  More important, however, is that this witness's inability to recall

serving as the sole lead plaintiff in a recently filed class action filed by F&F weakens Defendants'

already anemic allegation that their sensitive client relationships are imperiled by the publicity

resulting from Ms. Marchuk's Complaint.  For F&F's client relationships to be damaged, the

clients must first be aware that they are, in fact, F&F's clients.[1]

**The Counterclaims Gratuitously Include Salacious New Details that
Confirm that Defendants Have No Good-Faith Belief that the Similar
Allegations in the Complaint Harmed Mr. Monteverde's or F&F's Business
Prospects and Confirm that Defendants Filed the Counterclaims Purely for
the Retaliatory Purpose of Embarrassing Ms. Marchuk**

116.    The Counterclaims gratuitously include lurid details that entirely undermine

Defendants' claims that the Complaint harmed Mr. Monteverde's and/or F&F's business prospects.

The Counterclaims unnecessarily provide many new and troubling details about Mr. Monteverde's

interactions with Ms. Marchuk.  The fact that the Counterclaims needlessly provide many new

details about Mr. Monteverde's outrageous behavior confirms that Defendants have no good-faith

belief that the similar allegations contained in the Complaint harmed Defendants' business

prospects in any way.

---

[1]  We have genericized the allegations concerning this witness's testimony to comply with the
Confidentiality Stipulation and Order in this case, because Defendants designated the testimony as
"Confidential," a designation we are in the process of asking the Court to nullify.  Designating such
testimony as "Confidential" is yet another example of Defendants' bad-faith tactics, since the
definition of "Confidential Information" under the Confidentiality Stipulation and Order covers
trade secrets, proprietary business information, competitively sensitive information, medical
information, and the like, not testimony in which a witness for F&F denies being F&F's client in
the face of a complaint subscribed by Mr. Monteverde that says otherwise.

117. For example, the Complaint alleged that Mr. Monteverde pressured Ms. Marchuk to have sex with him by suggesting that her bonus and possibly her job were in jeopardy if she refused. The Counterclaims respond to this allegation by clarifying that, although Mr. Monteverde – drunk and with his pants around his ankles – did indeed lie on top of Ms. Marchuk and try to have sex with her in his office at 3:00 a.m. on the night of the Firm holiday party, Mr. Monteverde was in fact too drunk to achieve an erection much less complete the act. The Counterclaims allege that Mr. Monteverde then "rolled" off of Ms. Marchuk and recovered his faculties sufficient to receive oral sex from Ms. Marchuk moments later on his office couch:

> Monteverde, who was inebriated, got on top of her with his clothes still on and his pants around his ankles. He could not get an erection. After 15-20 seconds, and with no penetration, Monteverde rolled off of her. Marchuk then told Monteverde to sit on the couch where she performed oral sex on him.

Counterclaims ¶ 49.

118. The Counterclaims, therefore, confirm in lurid detail (1) that many aspects of the shocking allegations in the Complaint are true and (2) that Defendants have absolutely no concern whatsoever that the repetition, or amplification, of these salacious allegations in the media will harm Mr. Monteverde's or F&F's business prospects.

119. Indeed, it was Defendants' effort to publicize the Counterclaims, rather than any action by Ms. Marchuk, that engendered much of the disparaging media coverage about Mr. Monteverde and F&F. The day after Defendants filed their Counterclaims – and issued a press release broadcasting that filing – The New York Post ran its first story about this case. The Post story focused on Mr. Monteverde's unusual defense that he did not sexually harass Ms. Marchuk in part because he was too drunk to obtain an erection the night of the holiday party. The print copy

of the Post story ran under the headline "It's 'No Stiff' Drink" and the Internet version of the Post story appeared under the headline "Sex Suit Defense: I was too drunk for erection." If the Complaint supposedly tarnished Defendants' reputations or business prospects, then Defendants' own publicity-seeking Counterclaims turned them indelibly black.

120.   Perhaps worse than providing gratuitously detailed allegations regarding Mr. Monteverde's inebriation and sexual escapades, the Counterclaims make the troubling revelation that Mr. Monteverde cavalierly destroyed evidence relevant to Ms. Marchuk's charges. The Complaint alleges that Mr. Monteverde's coerced sexual exploitation of Ms. Marchuk was evidenced by a blood stain remaining on Mr. Monteverde's office carpet. In response, the Counterclaims assert that Mr. Monteverde and Ms. Marchuk did not have sexual intercourse and imply (totally falsely) that Ms. Marchuk intentionally stained the carpet the next day in attempt to frame Mr. Monteverde. Counterclaims ¶ 54 ("Monteverde did not know whether the stains were blood; their color was red and not brown, the color of dried blood").

121.   Under either Ms. Marchuk's allegations (involving a coerced sexual encounter), or Mr. Monteverde's fanciful version of events (involving a criminal attempt by Ms. Marchuk to frame him for sex that never occurred), the stain on Mr. Monteverde's carpet was important evidence of illegal conduct. Mr. Monteverde, an experienced litigator, no doubt understood this. The Counterclaims, however, blithely acknowledge that Mr. Monteverde immediately and intentionally compromised the evidence: "Monteverde responded that he would spill coffee on the stains, which he did." Counterclaims ¶ 54.

122.   Most troubling, discovery has confirmed that Defendants permanently removed and destroyed the carpet in Mr. Monteverde's office on January 13, 2013 after Plaintiff's

counsel had written their demand letter, after Plaintiff's had filed their EEOC charge, and while the impending filing of this lawsuit was obvious.

123.    Surely if any F&F clients were actually concerned about doing business with Mr. Monteverde and/or F&F after reading the Complaint, those clients' concerns would only be heightened after reading about the outrageous conduct admitted in the Counterclaims.  Thus, if Defendants had any real concern that the allegations in the Complaint might have harmed their reputations or business prospects, a simple and more traditional "denial" of the relevant allegations in the Complaint would have sufficed to preserve their rights and minimize the media frenzy.  The fact that Defendants instead chose to file the salaciously detailed Counterclaims, and to promote the Counterclaims with a contemporaneous press release, shows that Defendants have no actual belief that the allegations in the Complaint harmed their business prospects and that Defendants filed the Counterclaims exclusively to retaliate against Ms. Marchuk by seeking to disparage and embarrass her.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Claims against all Defendants for discrimination under
### New York City Human Rights Law, New York City Administrative Code §§ 8-107, et seq.)

124.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 123 of the complaint as if fully set forth herein.

125.    Mr. Monteverde created a hostile work environment for Ms. Marchuk at F&F based on Ms. Marchuk's gender.  The hostile work environment created by Mr. Monteverde was sufficiently pervasive so as detrimentally to alter the terms, conditions and privileges of Ms. Marchuk's employment at F&F.

126.    Mr. Monteverde further discriminated against Ms. Marchuk based on her

gender by continuously sexually harassing her and subjecting her to materially different terms and conditions of employment than other employees because of her gender.

127.    Mr. Monteverde is primarily liable under NYCHRL § 8-107 for the hostile work environment and sexual harassment at F&F because Mr. Monteverde created that environment as an "agent" of F&F within the meaning of § 8-107(1)(a). F&F, Mr. Faruqi and Ms. Faruqi are primarily liable to Ms. Marchuk because they knew of, participated in and/or disregarded Mr. Monteverde's actions.

128.    F&F, Mr. Faruqi and Ms. Faruqi were Ms. Marchuk's "employers" within the meaning of NYCHRL § 8-107(1)(a).  F&F was Ms. Marchuk's actual employer.  Mr. Faruqi and Ms. Faruqi also qualify as Ms. Marchuk's employers within the meaning of NYCHRL § 9-107(1)(a) because (1) each holds a significant ownership interest in F&F and/or (2) each played a primary role in implementing and carrying out F&F's personnel policies and practices.

129.    As Ms. Marchuk's employers, F&F, Mr. Faruqi and Ms. Faruqi are vicariously liable for the hostile work environment created by Mr. Monteverde at F&F pursuant to NYCHRL § 8-107(13)(a) and (b) because (1) Mr. Monteverde exercised managerial and supervisory responsibility at F&F, both generally and with respect to Ms. Marchuk herself, and (2) F&F had actual or constructive knowledge of Mr. Monteverde's unlawful actions because (a) Ms. Marchuk complained about Mr. Monteverde's actions to F&F and (b) Mr. Monteverde's improper actions were open and notorious within F&F.

130.    Mr. Faruqi and Ms. Faruqi further are liable as aiders and abettors of Mr. Monteverde's illegal actions under NYCHR §8-107(6) because they knew of and substantially assisted Mr. Monteverde's illegal conduct.

131.   Ms. Marchuk will establish the extent of her damages at trial, but they are believed to exceed $2,000,000.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Claims against all Defendants for Discrimination under**
**the New York State Human Rights Law, New York State Executive Law §§ 296, *et seq.*)**

132.   Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 131 of the complaint as if fully set forth herein.

133.   Mr. Monteverde illegally discriminated against Ms. Marchuk by creating a hostile work environment for Ms. Marchuk at F&F based on Ms. Marchuk's gender.  The hostile work environment created by Mr. Monteverde was sufficiently pervasive so as to detrimentally alter the terms, conditions and privileges of Ms. Marchuk's employment at F&F.

134.   Mr. Monteverde further discriminated against Ms. Marchuk based on her gender by continuously sexually harassing her and subjecting her to materially different terms and conditions of employment than other employees because of her gender.

135.   F&F, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi each are liable for the hostile work environment and sexual harassment at F&F because each qualifies as an "employer" under NYSHRL § 296(1)(a).  F&F was Ms. Marchuk's actual employer.  Mr. Monteverde, Mr. Faruqi and Ms. Faruqi, moreover, qualify as Ms. Marchuk's "employers" under NYSHRL § 296(1)(a) because each has (1) an ownership or other like interest in F&F and/or (2) the power to direct and implement personnel decisions at F&F.  Further, F&F, Mr. Faruqi and Ms. Faruqi are primarily liable to Ms. Marchuk because they knew of, participated in and/or disregarded Mr. Monteverde's actions.

136.    Ms. Marchuk will establish her damages at trial, but they are believed to exceed $2,000,000.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Claims against all Defendants for Discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000, et seq.)

137.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 136 of the complaint as if fully set forth herein.

138.    Mr. Monteverde illegally discriminated against Ms. Marchuk by creating a hostile work environment for Ms. Marchuk at F&F based on Ms. Marchuk's gender.  The hostile work environment created by Mr. Monteverde was sufficiently pervasive so as to detrimentally alter the terms, conditions and privileges of Ms. Marchuk's employment at F&F.

139.    Mr. Monteverde further discriminated against Ms. Marchuk based on her gender by continuously sexually harassing her and subjecting her to materially different terms and conditions of employment, including but not limited to making her compensation and employment contingent on her provision of sex or sexual favors to him.

140.    F&F, Mr. Monteverde, Mr. Faruqi and Ms. Faruqi each are liable for the hostile work environment and sexual harassment at F&F because each knew of, participated in and/or disregarded Mr. Monteverde's actions.

141.    On October 9, 2012, Ms. Marchuk filed a complaint against Defendants with the United States Equal Employment Opportunity Commission (the "EEOC").  On May 21, 2013, the EEOC issued Ms. Marchuk a "Right to Sue Letter" permitting her to bring her claims under the Civil Rights Act as a private cause of action.

- 42 -

142.    Ms. Marchuk will establish her damages at trial, but they are believed to exceed $2,000,000.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Claims against all Defendants for retaliation under the New York State Human Rights Law, the New York City Administrative Code and the Civil Rights Act)

143.    Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 142 as if fully set forth herein.

144.    Ms. Marchuk was participating in protected activity under city, state and federal law when she filed the Complaint against Defendants.

145.    Defendants filed the frivolous Counterclaims against Ms. Marchuk, and issued the contemporaneous press release disparaging Ms. Marchuk, in an improper attempt to retaliate against Ms. Marchuk for participating in activities protected under the laws. . Defendants further filed the frivolous Counterclaims in an attempt to intimidate other current or former F&F employees from filing similar claims against Defendants.

146.    Because of Defendants' actions in filing the Counterclaims and in releasing the Press Release, Ms. Marchuk has experienced distress and anxiety relating to the facts that (1) Defendants have asserted a $15 million claim against her in her individual capacity and (2) have knowingly publicized blatantly false statements about Ms. Marchuk and her actions to the media. Defendants' retaliatory actions against Ms. Marchuk were sufficiently harmful that they would dissuade a reasonable worker in Ms. Marchuk's position from making or supporting a charge of discrimination.

147.    Ms. Marchuk will establish her damages at trial, but they are believed to exceed $2,000,000.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Claims against all Defendants for Defamation under New York law)

148.   Ms. Marchuk repeats and realleges each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

149.   In response to Ms. Marchuk's Complaint, Defendants filed false and defamatory Counterclaims.  The Counterclaims falsely accuse Ms. Marchuk of seeking to damage F&F's relationships with its clients and Mr. Monteverde's relationship with his wife by using the Gmail Account to email her Complaint to the press, to F&F's clients, to opposing counsel and to Ms. Marchuk's wife.  Defendants aggressively publicized their false and defamatory Counterclaims, including by announcing their filing, and summarizing their false and defamatory content, in the Press Release.

150.   Defendants' statements and the Press Release falsely accused Ms. Marchuk of outrageous and  depraved conduct related to the conduct of her profession and constitute defamation per se under New York law.

151.   Defendants (1) knew or should have known and (2) negligently, recklessly or maliciously disregarded that Defendants themselves – not Ms. Marchuk – established the Gmail Account and used the Gmail Account to distribute the Complaint.  Disregarding that they were responsible for the Gmail Account, Defendants outrageously and publicly blamed Ms. Marchuk for it.

152.   Defendants' defamatory statements were picked up and repeated by numerous media outlets having tens of millions of readers, including The New York Times, The New York Post, Reuters, Above the Law, Law 360 and Inside Counsel, among many others.  Much

of the reporting about Defendants' counterclaims was aimed at the legal community in which Ms.

Marchuk is employed and may seek future employment.

153.    Ms. Marchuk will establish her damages at trial, but they are believed to

exceed $2,000,000.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Claims against all Defendants for Malicious Prosecution under New York law)

154.    Ms. Marchuk repeats and realleges each and every allegation contained in

paragraphs 1 through 153 as if fully set forth herein.

155.    When Defendants filed the Counterclaims and the Amended Counterclaims

they did not have a reasonable basis to believe that Ms. Marchuk had emailed a copy of the

Complaint to any of Defendants' clients, opposing counsel, family members or to the media.

156.    Defendants acted maliciously and with reckless disregard for the truth in

filing the Counterclaims and Amended Counterclaims against Ms. Marchuk.

157.    In any event, after Defendants received Google's response to Defendants'

subpoena indicating that the Gmail Account was established by someone accessing the Internet

from F&F's offices, Defendants not only had no good-faith basis to believe in the veracity of their

Counterclaims and at all such times Defendants nevertheless continued to pursue their

Counterclaims against Ms. Marchuk purely out of malice towards her.

158.    Defendants' malicious prosecution of their Counterclaims and Amended

Counterclaims against Ms. Marchuk has caused Ms. Marchuk special damages consisting of

extreme emotional distress and disparagement to her professional reputation resulting from,

among other things, the extensive media coverage of Defendants' Counterclaims and Amended

Counterclaims.

      **WHEREFORE**, Ms. Marchuk respectfully demands judgment as follows:

          (a)    On her First Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (b)    On her Second Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (c)    On her Third Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (d)    On her Fourth Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (e)    On her Fifth Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (f)    On her Sixth Claim for Relief, an award against all Defendants,

jointly and severally, in an amount to be determined at trial but believed to exceed $2,000,000;

          (g)    On her First, Second, Third, Fourth, Fifth and Sixth Claims for

Relief, an award against all Defendants, jointly and severally, for punitive damages in an amount

appropriate to punish Defendants for their willful, knowing and intentional violation of the law, to

deter Defendants from continuing such actions in the future, and to set an example for similarly

situated employers establishing the importance of honoring applicable employment laws, which

amount is believed to be at least $10,000,000;

(h)     On her First, Second, Third, Fourth, Fifth and Sixth Claims for

Relief, an award against Defendants for Ms. Marchuk's attorneys fees', and related costs and

expenses, as permitted by law;

(i)     All interest and costs, as permitted by law; and

(j)     For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 16, 2013

ROTTENBERG LIPMAN RICH, P.C.

By:_____

Harry W. Lipman
Thomas E. Chase
369 Lexington Avenue, Sixteenth Floor
New York, New York 10017
Attorneys for Plaintiff, Alexandra Marchuk