UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                        :

ALEXANDRA MARCHUK,                  :    13 CV 1669 (AKH)
                                          :

               Plaintiff,          :
                                          :

        -against-                :
                                          :

FARUQI & FARUQI, LLP,              :
JUAN E. MONTEVERDE, NADEEM FARUQI     :
and LUBNA FARUQI,                  :
                                          :

             Defendants.       :
                                        :
---------------------------------------------------------------- X

 

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
<u>CONCERNING PLAINTIFF'S DEFAMATION CLAIM</u>**

 

ROTTENBERG LIPMAN RICH, P.C.
369 Lexington Avenue, 16th Floor
New York, New York 10017
(212) 661-3080
Attorneys for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii-v

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

MS. MARCHUK RELUCTANTLY INITIATES A SEXUAL
HARASSMENT SUIT AGAINST F&F AND MR. MONTEVERDE ............................................ 3

DEFENDANTS RESPOND TO MS. MARCHUK'S COMPLAINT
WITH A BASELESS MEDIA CAMPAIGN AND FRIVOLOUS
COUNTERCLAIMS ................................................................................................ 3

DEFENDANTS KNEW THAT THEIR DEFAMATORY STATEMENTS
ABOUT MS. MARCHUK IN THE PRESS RELEASE WERE FALSE ........................................ 5

    Defendants Had No Evidence that Ms. Marchuk Emailed Her
    Complaint to Anybody

    Defendants Knew that Ms. Marchuk's Claims about Mr. Monteverde
    were Substantially True ................................................................................................ 7

    Mr. Monteverde's Open and Obvious Harassment of Ms. Marchuk ................................ 11

MR. MONTEVERDE ASSAULTS MS. MARCHUK ON THE
NIGHT OF F&F'S 2011 HOLIDAY PARTY ............................................................................ 13

MR. MONTEVERDE COVERS UP THE EVIDENCE OF HIS ASSAULT
OF MS. MARCHUK AND THEN LIES TO HIS PARTNERS ABOUT
WHAT HAPPENED BETWEEN HIM AND MS. MARCHUK ................................................... 14

ARGUMENT ................................................................................................ 17

DEFENDANTS' DEFAMATORY PRESS RELEASE UNMISTAKABLY
ACCUSES MS. MARCHUK OF IMPROPER CONDUCT IN HER TRADE,
BUSINESS OR PROFESSION ................................................................................................ 17

    The Press Release Accuses Ms. Marchuk of
    Criminal Activity ................................................................................................ 21

    Defendants' Press Release Was Clearly Defamatory ........................................................ 23

    Defendants' Press Release Does Not Reflect Mere Opinion ............................................ 24

    Defendants' Baseless Statements of Opinion, even if Opinion,
    are Actionable ................................................................................................ 25

Defendants' Statements in the Press Release are
not Immune to a Defamation Claim Under New
York's Civil Rights Law..................................................................... 27

CONCLUSION ............................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

600 W. 115th St. Corp. v. Von Gutfeld,
80 N.Y.2d 130 (1992)............................................................................25

Albert v. Loksen,
239 F.3d 256 (2d Cir. 2001) ..................................................................23

Celle v. Filipino Reporter Enters., Inc.,
209 F.3d 163 (2d Cir. 2000) ..................................................................17

Chau v. Lewis,
935 F.Supp.2d 644 (S.D.N.Y. 2013) .....................................................25

Companella v. County of Monroe,
853 F.Supp.2d 364 (W.D.N.Y. 2012)....................................................22

Gjonlekaj v. Sot,
308 A.D.2d 471 (2d Dept. 2003)............................................................20

Grande v. Gristede's Food's, Inc.,
2011 WL 4716339 (S.D.N.Y. Oct. 7, 2011)..........................................22

Held v. Pokorny,
583 F.Supp. 1038 (S.D.N.Y. 1984) .......................................................17

Herlihy v. Metropolitan Museum of Art,
214 A.D.2d 250, 633 N.Y.S.2d 106 (1st Dept. 1995) ...........................21

Jean-Joseph v. Walgreens Inc.,
2011 WL 5025266 (E.D.N.Y. Oct. 11, 2011) ...................................18, 20

Kalimantano GMBH v. Motion in Time, Inc.,
939 F.Supp.2d 392 (S.D.N.Y. 2013) .....................................................17

Kelly v. Schmidberger,
806 F.2d 44 (2d Cir. 1986) ....................................................................23

Kimmerle v. New York Evening Journal,
262 N.Y. 99, 186 N.E. 217 (1933) ........................................................23

LeBlanc v. Skinner,
103 A.D.3d 202, 955 N.Y.S.2d 391 (2d Dept. 2012)............................18

Levin McPhee,
119 F.3d 189 (2d Cir. 1997) ........................................................................23

Liberman v. Gelstein,
80 N.Y.2d 429, 590 N.Y.S.2d 857 (1992)..................................................18

Nichols v. Item Publishers, Inc.,
309 N.Y. 596 (1956) ...................................................................................17

Pavlica v. Behr,
2006 WL 1596763 (S.D.N.Y. June 9, 2006) .............................................25

Public Relations Soc. of America, Inc. v. Road Runner High Speed Online,
799 N.Y.S.2s 847, 8 Misc.3d 820 (N.Y. Co. 2005)...................................20

Ram v. Moritt,
205 A.D. 516, 612 N.Y.S.2d 671 (2d Dept. 1994) ................................18, 20

Rinaldi v. Holt, Rinehart & Winston, Inc.,
42 N.Y.2d 369, 397 N.Y.S.2d 943 (1977).................................................18

Silsdorf v. Levine,
59 N.Y.2d 8, 462 N.Y.S.2d 822 (1983).....................................................26

Steinhilber v. Alphonse,
68 N.Y.2d 283, 508 N.Y.S.2d 901 (N.Y. 1986) ...........................24, 25, 26

Tedeschi v. Smith Barney,
548 F.Supp. 1172 (S.D.N.Y.1982) .............................................................17

Thomsons v. Bosswick,
855 F.Supp.2d 67 (S.D.N.Y. 2012) ...........................................................23

Weldy v. Piedmont Airlines, Inc.,
985 F.2d 57 (2d Cir. 1993) .........................................................................21

Williams v. Williams,
233 N.Y.2d 592 (1969).................................................................................27

Wolinsky v. Standard Oil of Connecticut Inc.,
712 F.Supp.2d 46 (D. Ct. 2010) ................................................................22

Yesner v. Spinner,
765 F.Supp. 48 (E.D.N.Y. 1991) ...............................................................21

**Statutes**

N.Y. Penal Law § 155.05(2)(e) ..................................................................................22

ABA Model Rules of Professional Conduct Preamble and Scope, Paragraph 5...........................22

Plaintiff, Alexandra Marchuk, submits this memorandum of law in opposition to Defendants' motion for partial summary judgment seeking the dismissal of her defamation claim.

## PRELIMINARY STATEMENT

Overwhelming evidence establishes that Defendants, in retaliation against Ms. Marchuk for filing her sexual harassment complaint against them, launched a pernicious media and litigation campaign for the purpose, and with the effect, of defaming her.

On April 2, 2013, Defendants distributed a press release to numerous media outlets touting their knowingly frivolous counterclaims against Ms. Marchuk (the "Press Release"). Ex. 1. The Press Release, distributed to the media by the public-relations firm Rubinstein & Associates, accused Ms. Marchuk of undertaking an extortionate e-mail crusade to damage Defendants' business and ruin Mr. Monteverde's relationship with his wife. The Press Release stated, "Ms. Marchuk and/or her agents emailed her malicious and false complaint to clients of F&F, opposing counsel in F&F cases, as well as to Mr. Monteverde's wife." Id.

These statements were complete fabrications. Defendants had no supporting evidence or information whatsoever. The statements' purpose, however, was clear: to discredit and disparage Ms. Marchuk as an unstable, vindictive woman who, having been spurned romantically by Mr. Monteverde, sought to strike back against him and his firm, F&F. The press release continued: "her lawsuit was maliciously brought to extort money from F&F, to defame and damage F&F's reputation and business, as well as the reputation of Juan Monteverde, with whom she was obsessed." Id.

Defendants' statements in the Press Release constitute a veritable textbook example of defamation. Defendants knew or should have known that their statements were false

when they made them.  Defendants never had any evidence that Ms. Marchuk e-mailed her

Complaint to clients, to opposing counsel or to Ms. Monteverde.  Indeed, Defendants were

forced to admit that they never asked any such clients or opposing counsel if they had received

the Complaint from the anonymous Gmail address from which Ms. Monteverde allegedly

received it.  Discovery in fact revealed that it was somebody within F&F – *not Ms. Marchuk* –

who e-mailed the complaint to Ms. Monteverde.

   Ms. Marchuk has adequately pleaded damages, but Defendants' statements

constitute defamation "per se," so that Ms. Marchuk's damages are presumed, because the

statements have materially damaged Ms. Marchuk's reputation for professionalism.  Few legal

employers would risk hiring an attorney accused of maliciously destroying her former firm's

client relationships, intentionally embarrassing her former firm in the eyes of opposing counsel,

and attempting to destroy personal relationships of her former colleagues, as Defendants have

publicly (and falsely) accused Ms. Marchuk of doing.

   Further, Defendants' statements do not constitute mere opinion; they concern

statements of objectively verifiable facts – claims that Ms. Marchuk had launched an e-mail

campaign targeted to parties related to Defendants – which any reasonable reader would assume

were substantiated by readily available e-mail records.

   Defendants' statements, finally, are not protected by New York's "fair comment"

rule, which provides a safe harbor for certain statements about pending litigation.  There was

nothing fair about Defendants' false public statements about Ms. Marchuk's conduct.  The

Counterclaims to which Defendants' public statements supposedly relate were a sham:

Defendants never produced a single e-mail or any other evidence substantiating their

preposterous and harmful claims that Ms. Marchuk had launched an extortionate e-mail

campaign against them, and Defendants voluntarily withdrew the Counterclaims after they had

served their public-relations purpose.  There is no safe harbor under such circumstances.  The

Court, therefore, should deny Defendants' motion for partial summary judgment.

## STATEMENT OF FACTS

**Ms. Marchuk Reluctantly
Initiates a Sexual Harassment Suit
Against F&F and Mr. Monteverde**

On March 13, 2013, Ms. Marchuk reluctantly filed her Summons and Complaint

against F&F and Mr. Monteverde detailing the illegal sexual harassment that Mr. Monteverde

subjected her to, and that F&F knowingly tolerated, during her employment at the Firm.[1]  Ex. 3.

Because of the explicit nature of some of Ms. Marchuk's allegations, together with Mr.

Monteverde's and F&F's complicated reputation within the class-actions plaintiffs' bar, Ms.

Marchuk's Complaint received coverage in the business and legal press.  Neither Ms. Marchuk

nor her counsel took any action to publicize the filing of her Complaint to the media.

**Defendants Respond to Ms. Marchuk's
Complaint with a Baseless Media Campaign
and Frivolous Counterclaims**

On April 2, 2013, Defendants filed an Answer with Counterclaims denying Ms.

Marchuk's allegations and asserting $15 million in counterclaims against her (the

"Counterclaims").  Ex. 4.  The Counterclaims alleged that Ms. Marchuk was obsessed with Mr.

Monteverde and had filed the Complaint in an unlawful attempt to extort money from

Defendants because Mr. Monteverde had spurned Ms. Marchuk's advances.  Ex. 4 at ¶ 3.

---

[1] Plaintiff attempted to avoid publicly litigating her embarrassing claims against Defendants.  By
letter dated October 1, 2012 – five months before Plaintiff ultimately filed her claims –
Plaintiff's counsel wrote a detailed demand letter to Defendants outlining every aspect of Ms.
Marchuk's claims against Mr. Monteverde and F&F.  Ex. 2.  Despite several further attempts to
engage Defendants in discussions with the hope of consensually resolving Plaintiff's claims
against Defendants, Defendants never responded to Plaintiff's counsel's communications.

Critically, the Counterclaims alleged that Ms. Marchuk used Gmail account

js832406@gmail.com under the pseudonym "John Smith" to distribute her Complaint to the

media, F&F's clients, opposing counsel in F&F cases, and to Mr. Monteverde's wife. Ex. 4 at ¶

63 (the "John Smith E-mail Account").

      Defendants filed the Counterclaims for the naked purpose of supporting

Defendants' media campaign against Ms. Marchuk, not to optimize Defendants' legal position.

Defendants, for example, filed their Answer with Counterclaims over six weeks before it was

due, focusing on the media's interest in the case rather than taking the time to investigate

whether the Counterclaims had any factual basis, which they did not.[2]

      E-mails confirm that Defendants targeted and timed the filing to obtain maximum

press coverage: "I don't think it's a good idea to file a lawsuit on Good Friday. For many

reasons. Not the least of which is that the newsrooms will be short staffed," Rubinstein's Marcia

Horowitz wrote to Defendants on March 28, 2013. Ex. 5. Further, with Rubenstein's assistance

Defendants simultaneously distributed the Press Release to numerous media outlets, touting the

allegations in the Counterclaims. Ex. 1. The Press Release claims that the Complaint was the

result of Ms. Marchuk's obsession with Mr. Monteverde and accused Ms. Marchuk of seeking to

extort money from F&F by e-mailing her Complaint to F&F's clients, to F&F's opposing

counsel and to Ms. Monteverde:

> We have filed this counter-lawsuit today against Ms. Marchuk
> because we believe her lawsuit was maliciously brought to extort
> money from F&F, to defame and damage our business, as well as
> the reputation of Juan Monteverde, with whom she was obsessed.
> Ms. Marchuk and/or her agents e-mailed her malicious and false

---

[2] Proskauer Rose LLP, which initially represented Defendants in this action, agreed to accept service of the Complaint and requested, and received, an extension of 60 days – until May 20, 2013 – to serve a responsive pleading. See Waiver of the Service of Summons, dated March 20, 2013 (Civil Docket, 13-CV-01669, Doc. # 2).

complaint to clients of F&F, opposing counsel in F&F cases, as
well as to Mr. Monteverde's wife.  This is a clear violation of the
'Fair Comment Rule' with the intent to damage the firm, Mr.
Monteverde and other parties outside any relevance to the court
proceeding. . . .

Ex. 1 (emphasis added).

**Defendants Knew that their Defamatory Statements
about Ms. Marchuk in the Press Release were False**

**Defendants Had No Evidence that Ms. Marchuk E-mailed
Her Complaint to Anybody**

Defendants failed to produce any evidence substantiating the statements in the

Press Release that Ms. Marchuk e-mailed her Complaint to F&F's clients, F&F's opposing

counsel or Mr. Monteverde's wife.  Indeed, the record confirms that Defendants never attempted

to find evidence supporting their baseless claims against Ms. Marchuk.  On October 18, 2013,

Plaintiff served Defendants with Requests to Admit asking them to admit, for each of the clients

and opposing counsel to whom they claimed Ms. Marchuk e-mailed her Complaint, that

Defendants never actually attempted to contact them to ascertain whether they received the

Complaint from the John Smith E-mail Account (much less from Ms. Marchuk).  Ex. 6.   On

November 15, 2013, Defendants served Responses to the Requests to Admit, admitting that they

had made no such attempts.  Ex. 7.  This is an astonishing admission:  Defendants are litigators,

but they failed to undertake the fundamental and simple ascertaining whether there was any basis

for their harmful allegation that Ms. Marchuk (or even "John Smith") had wrongfully e-mailed

the Complaint.

Defendants, moreover, may well have manufactured the only evidence they

initially cited supporting their claim that Ms. Marchuk e-mailed her Complaint to Ms.

Monteverde.  On June 14, 2013, Google produced information showing that the John Smith E-

mail Account was created on the afternoon of March 13, 2013 – the day the Complaint was filed – by someone accessing the Internet from the IP address associated with F&F's New York offices. Ex. 8. Defendants themselves, therefore, or one of their employees, established the John Smith E-mail Account and used it to send Ms. Marchuk's Complaint to Ms. Monteverde. Either Defendants used the John Smith E-mail Account to forward the Complaint in an attempt to frame Ms. Marchuk for the actions that Defendants then immediately sued her for, or one of Mr. Monteverde's colleagues had a score to settle. Either way, it is clear that Ms. Marchuk had no involvement in sending her Complaint to Ms. Monteverde, and Defendants knew or should have known that fact when they issued the Press Release accusing her of that scurrilous conduct on April 2, 2013 (and simultaneously suing her for $15 million for such conduct).

Even Defendants' own PR agent, Marcia Horowitz at Rubinstein Associates, questioned Defendants' reckless attack on Ms. Marchuk. Ms. Horowitz recognized the absurdity of Defendants' claim that Ms. Marchuk had improperly forwarded her Complaint to the media, and she therefore removed any reference to that fact from the Press Release and urged Defendants similarly to remove the baseless and hypocritical claim from the Counterclaims:

> I see you put in [to the Counterclaims] the fact that she e-mailed the complaint to media outlets. I left that out of the press release since we are going to do something similar. Frankly, I would leave it out of the complaint. Filed lawsuits are given to the press all the time. <u>The pot cannot call the kettle black here. It could come back bite us. We plan to circulate the filed lawsuit to make it easier for reporters. We will do it off the record but that doesn't make us any different from her. Or any different than what happens all the time.</u> **<u>No [media] outlet said she e-mailed it to them as I recall</u>**.

Ex. 9 (emphasis added). Fully aware that the claim was factually baseless and entirely hypocritical, Defendants disregarded Rubinstein's advice and proceeded to sue Ms. Marchuk for distributing her Complaint to the media. Ex. 4 at 71. Even the media commented on Defendants'

absurd claim that Ms. Marchuk had orchestrated the distribution of her Complaint. Above the Law reported, "We generally do not comment on the identity of our sources, but in this case we can confirm that we did not receive the complaint from [Ms. Marchuk's counsel]. As we stated in our earlier story, we got it from multiple sources after it went viral over email in New York lawyer circles." Ex. 10 at p. 3.

Consequently, the evidence establishes that Defendants knew or recklessly disregarded that the statements in the Press Release accusing Ms. Marchuk of maliciously e-mailing her complaint to clients, opposing counsel and Mr. Monteverde's wife were false.

**Defendants Knew that Ms. Marchuk's**
**Claims about Mr. Monteverde were Substantially True**

Defendants further had reason to disbelieve their own disparaging statements in the Press Release because they knew that Ms. Marchuk's allegations were substantially true and that Mr. Monteverde had acknowledged many of the material facts relating to those allegations. Defendants, therefore, had no basis to state that Ms. Marchuk was "obsessed" with Mr. Monteverde or that her lawsuit was "maliciously brought to extort money from F&F." Ex.

The evidence shows that Mr. Monteverde is notorious within F&F as a walking, talking, one-man hostile work environment. He is either unwilling or unable to conduct himself appropriately at F&F. Mr. Monteverde regularly discusses strippers, blow jobs, his own sex life and the sex life of others in F&F's offices. A former F&F partner testified concerning Mr. Monteverde:

> A.   He might mention that he had sex with his wife, but that's it.
> Q.   Sex with other women?
> A.   Yes . . .  He said he had met someone that – at a bar and he ended up later having sex with her . . . I think it was Lex Bar.

7

Ex. 11 at 144-45.  An F&F associate recalled that Mr. Monteverde "talk[ed] about how his wife doesn't have sex with him before court hearings because she likes him to have pent-up aggression." Ex. 12 at 118.  Another associate testified that in F&F's offices Mr. Monteverde would tell "stories about previous work trips he had been on, and how he had had great times frequenting strippers." Ex. 13 at 16.  He bragged about sexual conquests: "I have one recollection of him saying something to the effect that in previous times a person could just have sex with a Lex Bar waitress in the coat check room." Id. 17-18.  He solicited and fondled waitresses at Lex Bar in front of F&F colleagues and subordinates: "I recall him soliciting attention from waitresses at Lex Bar regularly, and being in close contact with them . . . I recall Juan touching waitresses at Lex Bar." Id. 22.  "You know he's very open and – I don't know if it's the Latin personality, but he's very open." Ex. 14 at 64.  Mr. Monteverde bragged about his father's sexual exploits, suggesting his behavior was hereditary, or a birthright: "I recall him describing his father having multiple relationships with women." Ex. 13 at 17-18.

       Mr. Monteverde propositioned at least one other female associate at F&F at the same time that he was harassing Ms. Marchuk:

> Q.    And what did he say or do that you deemed inappropriate?
> A.    He asked me would I date a married man . . .
> Q.    And when he asked you that, did you understand that he was referring to himself?
> A.    At that time – at that time, yes, I did feel uncomfortable that he was talking about himself.

Ex. 14 at 57-58.  Mr. Monteverde further advised the associate that she should have sex with another F&F attorney. "Q.  And what did Mr. Monteverde say about you and Frank McConville?  A.  Well, from what I recall at the time, it was something along the lines of that we should just screw and get it over with." Id. at 60-61.  Another female associate was shocked when Mr. Monteverde used a graphic hand gesture towards her at a bar after a court appearance.

"I had just started.  And he made a hand gesture in front of me that I understood to mean – to

signify two fingers in the vagina, one finger in the anus."  Ex. 12 at 112.  Soon thereafter, this

associate resigned, complaining in writing to the Faruqis that, "[s]ince joining the firm, on a near

daily basis, I have been harassed by Juan . . . [O]n multiple occasions, Juan has made crude

and/or sexually charged comments with which I am uncomfortable."  Ex. 15.

       Mr. Monteverde is notorious within F&F, moreover, for making inappropriate

sexual advances towards the wives and girlfriends of other F&F employees, so much so that an

F&F associate made sure that his girlfriend never met Mr. Monteverde:

> A.     I recall not wanting Florence to meet Juan.
> Q.     And why was that?
> A.     Because I was concerned that he would act inappropriately,
>        okay, and I didn't want to complicate our working
>        relationship . . . I had heard rumors that Juan had made
>        inappropriate sexual comments about other employee's
>        significant others.

Ex. 13 at 39-40.

       Mr. Monteverde's inappropriate conduct appears linked to his chronic alcohol

abuse.  His F&F partners know him to get "really drunk" and act inappropriately:

> Q.     What was the nature of her concern that she expressed to you?
> A.     That he gets really drunk.
> Q.     When he gets really drunk what happens?
> A.     He gets loud.

Ex. 11 at 47.

> Q.     Did you get a sense of why she [Ms. Marchuk] was apprehensive
>        about the train ride?
> A.     Just that he gets really drunk.

Ex. 11 at 72.  On one trip to Vermont, Mr. Monteverde consumed approximately 12 drinks on a

bender the night before a hearing.  Ex. 1 at 24-25.  Mr. Monteverde did not dispute the number

of drinks, but chalked it up to a stingy pour: "I don't remember 12. I remember they were small, not New York size." Ex. 16 at 307.

Mr. Monteverde's outrageous conduct is widely known within F&F's relatively small office, including by the Faruqis:

> Q.   And is it your belief, in fact, that anyone in the office would have witnessed it [Mr. Monteverde's inappropriate conduct]?
> A.   Certainly anyone within earshot.
> Q.   And Mr. Monteverde was open and notorious with his conduct, was he not?
> A.   Yeah, I think he was very – open personality.

Ex. 13 at 129-130. Mr. Faruqi's office is only a few feet away from Mr. Monteverde's. Ex. 17 at 10, 78. Asked about Mr. Monteverde's activities, Mr. Faruqi was unequivocal: "I know everything that goes on in my office." Ex. 18 at 185. Mr. Faruqi, who acknowledged that he had visited strip clubs with Mr. Monteverde (Ex. 18 at 70-71), even made Mr. Monteverde's inappropriate conduct the subject of a running joke in the office. One associate recalled "multiple occasions Juan being in some public space in the office and making some sort of joke of a sexual nature and in response Nadeem [Faruqi] would say 'Juan, handbook' in a joking manner. And then Juan would generally peal with laughter afterwards." Ex. 13 at 77-78. His former law partner Ms. Komlossy repeated the "handbook" joke in at least one e-mail, in response to Mr. Monteverde's boast about a drinking tutorial he was giving to "Natalie" at Lex Bar:

> Mr. Monteverde:   At lex bar . . . Nick is with me and he is amazed . . . doing Tequila shots with Natalie now.
> Ms. Komlossy:   Handbook.
> Mr. Monteverde:   May we hire her?

Ex. 19.

Mr. Monteverde's notorious drinking at Lex Bar once allowed Mr. Faruqi to score a triple pun.  When an F&F attorney sent an e-mail congratulating Ms. Marchuk ("Lexie") for passing the New York Bar exam, Mr. Faruqi e-mailed the Firm: "Juan this is for passing the Bar, not passing out at Lex Bar." Ex. 20.  Mr. Faruqi also joked that Mr. Monteverde's inappropriate conduct would someday cost the Firm a lot of money: "I have been present when Juan has made some probably questionable jokes and Nadeem has said, one of these days you're going to cost the firm a lot of money." Ex. 12 at 163-164.

**Mr. Monteverde's Open and
Obvious Harassment of Ms. Marchuk**

Ms. Marchuk's first encounter with Mr. Monteverde occurred while she was a summer associate at the Firm during the summer of 2010.  Several F&F attorneys, including Ms. Marchuk and Mr. Monteverde, went out for dinner after attending a litigation conference.  Mr. Monteverde picked up Ms. Marchuk's part of the tab and, after all three other persons at the table testified consistently about his conduct, admitted at his deposition that he made a comment that he typically expects a blow job for such a payment, though he tried to pass it off as some kind of a joke: "It was some – it was a remark like geez, this is expensive for this kind of money, you know, if I were on a date I would expect a blow job or something like that." Ex. 16 at 360.

When Ms. Marchuk returned to F&F as a first-year associate in September 2011, she was disturbed that Mr. Monteverde showed an immediate sexual interest in her.  On her first day, Tuesday September 6, 2011, Mr. Monteverde informed Ms. Marchuk that she would be going with him to a Delaware Chancery Court appearance on her third day, Thursday, September 8, 2011.  This was unusual, as attending court was a plum assignment at F&F; Ms. Marchuk had no familiarity with the case; and more senior F&F associates were eager to attend.

After the hearing, Mr. Monteverde drank heavily on the train to New York and encouraged Ms. Marchuk to celebrate the outcome of the hearing with him at Lex Bar, a bar on Lexington Avenue near F&F's offices. Ex. 21. After more drinks at Lex Bar, Mr. Monteverde aggressively attempted to kiss Ms. Marchuk and grabbed her breast. Ms. Marchuk rebuffed Mr. Monteverde's advances and went home, distraught by the outrageous conduct of her supervisor on her <u>third day</u> as a lawyer.

Mr. Monteverde's inappropriate advances and demeaning sexual comments continued the following days, which Ms. Marchuk memorialized in an e-mail. <u>See</u> Ex. 22. On Friday, September 16, 2013 (her ninth day of work at F&F), Ms. Marchuk broke down while disclosing her untenable situation to F&F partner Emily Komlossy over dinner at a restaurant near F&F's offices. Ex. 21. Ms. Komlossy instantly called Mr. Faruqi at his home and told him about the conversation, and then followed with an e-mail memorializing what Ms. Marchuk had told her:

> On Friday September 16, I invited Alexandra to join me for dinner at Rossini's. We were generally chatting about work and my experience as a young lawyer. Alexandra proceeded to disclose to me that she had gone out with Juan Monteverde for dinks one night soon after she joined, at the conclusion of which she claimed that he had kissed her and grabbed her breast. Alexandra also indicated that since then, Juan had invited her to join him on his boat.
>
> She then proceeded to get teary and did not want it to be disclosed, saying that she wanted to continue working with Juan but that she was apprehensive about going to Delaware with him the following Tuesday because she knew he would get drunk and was afraid of what might happen. As she continued to be teary and upset for the next several hours, we stayed at the restaurant until midnight. I walked her part way to Grand Central and told her that I wanted to know what, if anything, happened on Tuesday.

Ex. 21.

Mr. Faruqi testified that he immediately spoke to Mr. Monteverde about Ms. Marchuk's complaint, reprimanded him for his inappropriate conduct, warned him not to let it happen again, and instructed Mr. Monteverde not to be alone with Ms. Marchuk. Ex. 18 at 161-162. Yet, either Mr. Faruqi never admonished Mr. Monteverde for his conduct towards Ms. Marchuk or Mr. Monteverde immediately brushed it off, because on a following trip to Delaware on September 20, 2011, Mr. Monteverde was as offensive, demeaning and insufferable as ever. Ex. 23 at ¶ 42-43. F&F's own local Delaware counsel, Brad DeLeeuw, still recalls Mr. Monteverde's unpleasant behavior towards Ms. Marchuk several years after the fact. While meeting outside the courtroom, Mr. DeLeeuw mentioned the status of the BJ's Wholesale litigation, and Mr. Monteverde suggestively commented in front of Ms. Marchuk, "I don't know anything about BJ's except I – you know – like getting them." Ex. 24 at 20. Mr. DeLeeuw was made uncomfortable by Mr. Monteverde's remark and Mr. Monteverde boasted that such comments were business as usual between him and Ms. Marchuk:

> My recollection is it was a slightly awkward moment and, you know, it made me slightly uncomfortable and then Mr. Monteverde said something to the effect of . . . 'Don't worry, you know, you should hear, you know, what we say around each other' something to that effect.

Ex. 24 at 20. Mr. Monteverde's inappropriate conduct towards Ms. Marchuk continued unabated over the next several months. Ex. 23 at ¶¶ 44-67.

**Mr. Monteverde Assaults Ms. Marchuk**
**on the Night of F&F's 2011 Holiday Party**

F&F held its holiday party on Thursday, December 15, 2011. After a dinner at the restaurant Valbella, Mr. Monteverde, Ms. Marchuk and other F&F employees went to Lex Bar for further drinks. Ex. 25 at 97-98. At Lex Bar, Mr. Monteverde aggressively flirted with Ms. Marchuk and preyed on her insecurities about her job performance and the precarious

financial position caused by her excessive student loans.  He expressed his disappointment that she had complained to Ms. Komlossy about him and crassly suggested that she could show her loyalty to him by being romantic with him.  Ex. 25 at 99.  Under the influence of alcohol, at approximately 2:00 a.m. Ms. Marchuk succumbed to Mr. Monteverde's advances and walked across the street to F&F's offices with Mr. Monteverde.

Upon arriving at Mr. Monteverde's office, Mr. Monteverde was very rough with Ms. Marchuk, pushed her to the floor and quickly, forcefully and painfully had sex with her.  Ms. Marchuk implored Mr. Monteverde to stop, but he did not and continued having sex with her to completion.  Id. at 18-19.  Afterwards, Mr. Monteverde quickly got dressed and hurried Ms. Marchuk out of F&F's offices, apparently concerned that someone from F&F might discover them.  Id. at 22.  Realizing that his conduct had been wildly inappropriate, Mr. Monteverde berated Ms. Marchuk to forget that it had ever happened.  Id.

**Mr. Monteverde Covers up the Evidence of**
**His Assault of Ms. Marchuk and then Lies to His**
**Partners about what Happened Between Him and Ms. Marchuk**

The morning after the holiday party, Ms. Marchuk arrived at F&F's offices and found blood stains on Mr. Monteverde's carpet from the night before.  When Mr. Monteverde arrived shortly thereafter, he professed to be shocked by the stains and denied that he and Ms. Marchuk had sex.  Ex. 16 at 20-21.  In a fraught exchange, Ms. Marchuk insisted that the blood was from sexual intercourse, and accused Mr. Monteverde of being too drunk if he could not remember what had happened the previous night.  Ex. 16 at 54-55.[3]  Despite disputing the source of the stains and Ms. Marchuk's accusation that he had blacked out the relevant events, Mr.

---

[3] "She came to – to tell me that she was still hurt.  I didn't understand why and I said you got to go to a doctor, if that's the case.  I still told her I don't understand how that's possible but if that's what you're saying, you gotta take care of yourself."  Ex. 16 at 53-54.

Monteverde loudly pretended to spill coffee on his carpet, so that the office manager would come

in and clean up his mess:

> It was immediately – I spilled the coffee and I – I made a grandiose
> announcement "Oh, my God!  I spilled coffee," then immediately
> Olive – Olive circulates the office, she's the office manager . . . – I
> sort of said, "I'm a klutz," uh, "I spilled coffee," you know.  I
> don't even know if I precisely said, "go and have it cleaned."  I
> think it was implied, or I might have, you know, I did tell her I
> spilled the coffee.
>
> . . . I didn't want anyone to know about the stains, so why would I
> ask her about them.  The point was to spill coffee, so people
> wouldn't see them.

Id. at 152-153.

Ms. Marchuk was emotionally and physically traumatized by Mr. Monteverde's

manipulative treatment of her, his rough sexual assault of her, and his flippant denial of his

conduct.  On December 19, 2013, in the company of a good friend, Ms. Marchuk visited a

gynecologist to determine if she had suffered any injury from Mr. Monteverde's assault and to be

tested for sexually transmitted diseases.  Ex. 26.  She abruptly resigned from the firm two days

later.

Spilling coffee over the blood stains on his carpet was only part of Mr.

Monteverde's cover-up of the events that occurred after F&F's holiday party.  After Ms.

Marchuk resigned, Mr. Faruqi cross-examined Mr. Monteverde about what had happened

between him and Ms. Marchuk after the holiday party.  Mr. Monteverde acknowledged that he

had a sexual encounter with Mr. Marchuk, but failed to tell Mr. Faruqi about his acrimonious

disagreement with Ms. Marchuk regarding whether they had sex or not, her claim that he injured

her during sex and caused her to bleed on his carpet, and her claim that he must have been too

drunk to remember the events from that night:

15

Q.      Mr. Faruqi, Mr. Monteverde knew, whether he agreed with
        it or not, that Ms. Marchuk had claimed that that was her
        blood on the carpet that morning.  And he didn't tell you
        that she had made that allegation despite the fact that you
        interviewed him as part of an investigation.  Isn't that
        right?
A.      He didn't tell me about it, that's right.

Ex. 18 at 334 (line 22) - 335 (line 9).

Q.      Mr. Monteverde knew of but did not tell you about Ms.
        Marchuk's claim that she had bled in his office as a result
        of their sexual encounter.  Isn't that right?
A.      Yes.

Id. at 337 (lines 18-22).  Mr. Faruqi conceded that Mr. Monteverde's glaring omissions to him

were material:

Q.      If he [Mr. Monteverde] disputes Ms. Marchuk's account of
        how she came to bleed all over the carpet in your office and
        they had this discussion about whether she needed to go to
        the emergency room or not, would you want to know that
        as part of your investigation?
A.      If Ms. Marchuk or counsel had come to us at that time –
Q.      Please –
A.      -- yes, it would be important.
Q.      Please answer the question.  Would you've wanted to know
        about it regardless of whether she came to you or counsel
        came to you?
A.      I would have wanted to know about it if Ms. Marchuk was
        making those allegations.

Id. 404-05.

        Consequently, when Defendants issued the Press Release on April 2, 2013 they

had no reason to believe – and every reason not to believe – their fanciful statements that Ms.

Marchuk was "obsessed" with Mr. Monteverde, that Ms. Marchuk was acting "maliciously"

towards Mr. Monteverde and F&F, or that Ms. Marchuk was wrongfully attempting to "extort

money from F&F," as recounted in the Press Release.  Defendants knew of Mr. Monteverde's

notorious reputation for inappropriate sexual conduct at F&F, knew that Ms. Marchuk had made

bona fide complaints about Mr. Monteverde's sexual harassment while she was employed at F&F, knew that she had been tearfully apprehensive about going to Delaware with him because he would get drunk and she was afraid of what might happen, knew that they had sternly warned Mr. Monteverde not to be alone with Ms. Marchuk, knew that Mr. Monteverde had brazenly disregarded that instruction the night of the holiday party, knew about similar complaints from other female associates at F&F and, most importantly, knew that Mr. Monteverde had repeatedly lied to them about the critical events occurring the night of F&F's 2011 holiday party.

## ARGUMENT

Under New York law, a plaintiff must establish five elements to recover on a defamation claim:  (1) a written defamatory statement concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity; and (5) special damages or per se actionability.  Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 176 (2d Cir. 2000); Kalimantano GMBH v. Motion in Time, Inc., 939 F.Supp.2d 392, 419 (S.D.N.Y. 2013).  Defendants concede, as they must, that Plaintiff can readily establish the second, third and fourth elements of defamation, and argue only that that Plaintiff cannot prove the first element (the existence of a defamatory statement) and the fifth element (the existence of special damages or per se actionability) of her defamation claim.  Def. Mem. at 4.

**Defendants' Defamatory Press Release Unmistakably Accuses
Ms. Marchuk of Improper Conduct in her Trade, Business or Profession**

Under New York law, a statement is defamatory per se if it "tends to disparage a person in the way of his office, his profession, or trade."  See, e.g., Held v. Pokorny, 583 F.Supp. 1038, 1041 (S.D.N.Y. 1984) (citing Tedeschi v. Smith Barney, 548 F.Supp. 1172, 1175 (S.D.N.Y. 1982)); Nichols v. Item Publishers, Inc., 309 N.Y. 596, 600 (1956).  "Words which

affect a person in his or her profession by imputing to him or her any fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualification in the exercise of one's profession can constitute defamation per se." Jean-Joseph v. Walgreens Inc., 2011 WL 5025266, *4 (E.D.N.Y. Oct. 11, 2011) (citing Ram v. Moritt, 205 A.D. 516, 517, 612 N.Y.S.2d 671 (2d Dept. 1994)). A statement need not directly relate to a person's employment responsibilities to constitute defamation per se, it is sufficient that it induces a negative connotation or suspicion about a person which likely interferes with his or her profession. A statement is defamation per se if "it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society." Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 949 (1977); see LeBlanc v. Skinner, 103 A.D.3d 202, 214, 955 N.Y.S.2d 391, 401(2d Dept. 2012) (same). Further, statements constitute defamation per se if they charge a person with a serious crime. Liberman v. Gelstein, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 860 (1992).

The statements in the Press Release reflect negatively on Ms. Marchuk's professional fitness as an attorney and therefore constitute defamation per se. In the Press Release, Ms. Marchuk's former employer publicly accuses her of reprehensible professional conduct. The Press Release accuses Ms. Marchuk of using information obtained during her employment to destroy her former employer's business. Defendants accused Ms. Marchuk of maliciously using her knowledge about Defendants' clients, opposing counsel and family members to destroy Defendants' business. The Press Release claims that "Ms. Marchuk and/or her agents e-mailed her malicious and false complaint to clients of F&F, opposing counsel in F&F cases, as well as to Mr. Monteverde's wife." Ex. 1.

18

Most legal employers would find Ms. Marchuk's alleged conduct to be abhorrent. Interfering with an employer's relationship with its clients, an employer's relationships with opposing counsel, or the familial relationships of an employer's employees for the purpose extracting an economic concession from the employer, is wildly inappropriate professional conduct. Perhaps more than any other asset, law firms value their relationships with their clients. Few employers would risk hiring somebody who has been publicly accused by their former employer of maliciously attempting to destroy those relationships.

Ms. Marchuk has retained Michael Lord to provide expert testimony on her behalf in this case. Since 2002, Mr. Lord has owned and operated Michael Lord & Company ("ML&C") as an attorney-placement firm with offices in Manhattan and Fairfield County, Connecticut. ML&C focuses specifically on the placement of associate and partner level attorneys at large global and national law firms, branch offices, regional and boutique firms, corporations and investment banks. Mr. Lord has successfully placed hundreds of attorneys and has worked on many more legal searches.

Mr. Lord's expert report concludes that Defendants' Press Release has caused enormous damage to Ms. Marchuk's professional reputation and employability. Presently there is a glut of legal talent competing for a limited number of positions. In this competitive environment, questions about an attorney's professional judgment and temperament, such as the significant questions that are raised by the Press Release's defamatory statements about Ms. Marchuk, likely disqualify Ms. Marchuk as a viable candidate even for positions for which she might be ideally suited. Mr. Lord opines:

> Under these circumstances, most placement professionals would
> not offer Ms. Marchuk as a candidate to fill a position, even if she
> were ideally suited for the position. Ms. Marchuk's former
> employer F&F has publicly accused her of reprehensible

professional conduct.  F&F has accused Ms. Marchuk of intentionally interfering with F&F's relationships with F&F's clients for the purpose of damaging F&F's business.  F&F has also publicly accused Ms. Marchuk of intentionally attempting to damage or destroy Mr. Monteverde's relationship with his wife.

Most law firms zealously protect their relationships with their clients and would consider Ms. Marchuk's alleged actions against F&F's clients to be abhorrent.  Most employers also value good working relationships among their employees and would be reluctant to hire anybody who might threaten that environment by improperly involving spouses or family members in work-related matters, as F&F accused Ms. Marchuk of doing.  As far as anybody in the legal community knows, F&F's statements about Ms. Marchuk were truthful and, therefore, placing Ms. Marchuk at a firm risks exposing the firm to similar malicious and harmful conduct.  Even if an employer might dismiss F&F's statements about Ms. Marchuk as litigation hyperbole, few legal placement professionals would take the risk.  Why risk losing a placement when there are other candidates who do not present the nettlesome issues raised by Ms. Marchuk's candidacy?  <u>Consequently, it is my professional opinion that few or no legal placement professionals would promote Ms. Marchuk as a candidate even for positions for which she is well qualified.  I believe, therefore that Ms. Marchuk's employability as an attorney has been materially adversely affected, and perhaps entirely destroyed, by F&F's public statements about her.</u>

Ex. 29 (emphasis added).

The statements in the Press Release pointedly accuse Ms. Marchuk of the type of "fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualification in the exercise of one's profession" sufficient to constitute defamation <u>per se</u>.  <u>See Jean-Joseph v. Walgreens Inc.</u>, 2011 WL 5025266, *4 (E.D.N.Y. Oct. 11, 2011) (<u>citing Ram v. Moritt</u>, 205 A.D. 516, 517, 612 N.Y.S.2d 671 (2d Dept. 1994)).  Courts have frequently held that less egregious statements – reflecting less directly on a person's professional competence – constitute defamation <u>per se</u>.  <u>See Gjonlekaj v. Sot</u>, 308 A.D.2d 471, 281 (2d Dept. 2003) (statements such as that plaintiff "is a representative of the Marxist ideology" were libel <u>per se</u>); <u>Public Relations</u>

20

Soc. of America, Inc. v. Road Runner High Speed Online, 799 N.Y.S.2s 847, 851 8 Misc.3d 820

(N.Y. Co. 2005) (statements were libel per se because "the statement attributes insincerity and

dishonesty to Bolton in her dealings with the PRSA staff and Board"); Herlihy v. Metropolitan

Museum of Art, 214 A.D.2d 250, 633 N.Y.S.2d 106 (1st Dept. 1995) (statements that plaintiff

was anti-Semitic were per se libel because "brazen anti-Semitism would certainly be

incompatible with the proper conduct of plaintiff's duties"); Yesner v. Spinner, 765 F.Supp. 48,

52 (E.D.N.Y. 1991) (statements in letter referring to plaintiff court reporter's "practice of

modifying transcripts" and "refusal to pay agreed upon rates" was per se libel because they

"tend to disparage the plaintiff in his trade, business or profession").  Defendants' untrue

statements in the Press Release have similarly caused Ms. Marchuk enormous professional harm.

The Court, therefore, should deny Defendants' motion for summary judgment as the Press

Release constitutes defamation per se.[4]

**The Press Release Accuses Ms. Marchuk of Criminal Activity**

Defendants' statement that Ms. Marchuk is attempting "to extort money from

F&F" also constitutes defamation per se because it accuses Ms. Marchuk of serious criminal

conduct.  Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 62 (2d Cir. 1993) ("since assault is a

---

[4]  Defendants' statements, moreover, accuse Ms. Marchuk of violating basic rules of professional
conduct by initiating an extortionate litigation campaign for the malicious purpose of destroying
Defendants' business.  One of the basic tenets of the rules of professional responsibility is that an
attorney shall not miss-use the legal system for improper gain.  The Model Rules of Professional
Conduct, as but one example, provide:

> A lawyer's conduct should conform to the requirements of the law,
> both in professional service to clients and in the lawyer's business
> and personal affairs.  A lawyer should use the law's procedures
> only for legitimate purposes and not to harass or intimidate others.

Model Rules of Prof'l Conduct Preamble and Scope, Para. 5 (Westlaw 2011) (emphasis added).
The statements in the Press Release therefore also impugn Ms. Marchuk's professional
competence because they accuse her of unethical conduct as an attorney.

serious, indictable crime under both state and federal law, Hathaway's charge of 'aggravated assault' provided a sufficient basis for holding Piedmont liable under a slander *per se* cause of action"); Companella v. County of Monroe, 853 F.Supp.2d 364, 371 (W.D.N.Y. 2012) ("Under New York law, words are per se defamatory if they import criminal activity"). Defendants' accusation of extortion was not merely a colorful description of Ms. Marchuk's Complaint, as Defendants try to argue. Def. Mem. at 9. Rather, the Press Release claims Ms. Marchuk engaged in a pattern of extortionate activity by e-mailing her complaint to clients, opposing counsel and even family members for the purpose of informing them of allegations against Defendants about which they otherwise would not have known. Accusing Ms. Marchuk of such an extortionate campaign is entirely different from stating only that the complaint is extortionate, as Defendants now mis-characterize their statements. Def. Mem. at 8.

   In similar cases, Courts have found charges of extortion to constitute defamation *per* se. Grande v. Gristede's Food's, Inc., 2011 WL 4716339, *4 (S.D.N.Y. Oct. 7, 2011) (statement that plaintiff "tried to extort money" was defamatory because under New York law both extortion and attempted extortion are criminal offenses); Wolinsky v. Standard Oil of Connecticut Inc., 712 F.Supp.2d 46, 58 (D. Ct. 2010) (statement "I think you know Roy and me well enough that we will not submit to extortion" constituted defamation per se because extortion was a class B felony under Connecticut law). Extortion and attempted extortion are criminal offenses under New York law. N.Y. Penal Law § 155.05(2)(e). The Court therefore should deny Defendants' motion for summary judgment because the statements in the Press Release suggest that Ms. Marchuk participated in serious criminal activity.

**Defendants' Press Release Was Clearly Defamatory**

      The statements in the Press Release were defamatory.  <u>See</u> Def. Mem. at 11.  A statement is defamatory if it "tends to expose a person to hatred, contempt or aversion or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community." <u>Levin McPhee</u>, 119 F.3d 189, 195 (2d Cir. 1997) (<u>citing</u> <u>Kimmerle v. New York Evening Journal</u>, 262 N.Y. 99, 102, 186 N.E. 217 (1933)).  Whether a statement is defamatory is generally a question of fact for the jury unless there is no reasonable basis for a defamatory interpretation.  "[A] court need only determine that the contested statements are reasonably susceptible of defamatory connotation.  If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory." <u>Thompson v. Bosswick</u>, 855 F.Supp.2d 67, 76 (S.D.N.Y. 2012) (<u>citing</u> <u>Albert v. Loksen</u>, 239 F.3d 256, 267 (2d Cir. 2001)).  "[T]he issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction.  The Court may not . . . interfere with the jury's role by treating as nondefamatory a statement that a reasonable juror may fairly read in context as defamatory." <u>Kelly v. Schmidberger</u>, 806 F.2d 44, 46 (2d Cir. 1986).

      The statements in the Press Release obviously are susceptible to a defamatory connotation and the Court therefore should not grant Defendants' motion for summary judgment on this ground.  The import of the Press Release is clear: Ms. Marchuk is an unstable, vindictive and greedy woman who was driven by jealousy and her obsession with Mr. Monteverde to launch an extortionate campaign against Defendants.  The popular legal publication <u>Above The Law</u> summarized Defendants' statements in the Press Release in exactly that fashion:  "We previously noted the firm's attempt to make Marchuk look like a bunny boiler – a mentally unstable young woman who was obsessed with Monteverde, the man whom she claims harassed

her." Ex. 30. This on-line story includes a hyper-link to a video clip from the movie Fatal
Attraction in which an unstable woman boils her lover's family pet in revenge for his termination
of their relationship. See http://abovethelaw.com/2013/11 /alexandra-marchuk-v-faruqi-faruqi-a-
mental-case/. The Press Release, therefore, was not only capable of a negative connotation, it
actually engendered highly negative connotations in the press coverage of it. The Press Release
satisfies the first element of a claim for defamation and the Court should deny Defendants'
motion for summary judgment dismissing the Complaint on that ground.

**Defendants' Press Release Does Not Reflect Mere Opinion**

There is no basis for Defendants' argument that the Press Release contains
statements of mere opinion. Def. Mem. at 12. The statements in the Press Release refer to
objectively verifiable facts, not expressions of opinion. The Press Release states, without
qualification, that Ms. Marchuk e-mailed her Complaint to Defendants' clients, opposing counsel
and family members in a manner designed to destroy Defendants' business and reputation: "Ms.
Marchuk and/or her agents e-mailed her malicious and false complaint to clients of F&F,
opposing counsel in F&F cases, as well as to Mr. Monteverde's wife." Ex. 1. This is a statement
of pure fact that the average reader would assume is substantiated by documentation or electronic
records obtained by Defendants.

Courts consider four factors to distinguish statements of fact and opinion. Courts
consider (1) whether the specific statements have a precise meaning or are ambiguous; (2)
whether the statement is capable of being objectively characterized as true or false; (3) the
context in which the statement appears; and (3) the broader context of the communication that
might signal to readers or listeners that what is being read or heard is likely to be opinion, not
fact. Steinhilber v. Alphonse, 68 N.Y.2d 283, 289-290, 508 N.Y.S.2d 901, 904 (N.Y. 1986);

Chau v. Lewis, 935 F.Supp.2d 644, 658 (S.D.N.Y. 2013).  The ultimate test is whether the "average person hearing or reading" a statement might reasonably believe the allegations contained within it are true.  Steinhilber, 68 N.Y.2d at 290; Pavlica v. Behr, 2006 WL 1596763, at *6 (S.D.N.Y. June 9, 2006).  "The dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [reader] could have concluded that [the Press Release was] conveying facts about the plaintiff.'" Gross, 82 N.Y.2d at 152 (quoting 600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139 (1992)).

It is difficult to imagine a more purely factual statement than Defendants' regarding the series of e-mails sent by Ms. Marchuk.  Everybody knows that e-mails generate a readily available record of easily verifiable information reflecting their content, the time and date that they were sent, as well identifying information about their sender and recipient.  When an average reader reads an unqualified statement about the existence of e-mails, the reader reasonably assumes that he or she is reading about a known and verifiable fact, not a mere opinion.  Almost certainly, the average reader of the Press Release assumed that Defendants had obtained and reviewed a damning series of e-mails that were provided to them by their own clients, opposing counsel and/or family members, and that such e-mails showed that Ms. Marchuk sent an e-mail blast forwarding her Complaint to numerous parties related to Defendants.  The Press Release, therefore, contains statements of pure fact, and the Court should not grant Defendants' motion for summary judgment on the ground that such statements were mere expressions of Defendants' opinions.

**Defendants' Baseless Statements, even if Opinion, are Actionable**

Even crediting Defendants' baseless argument that their statements regarding objectively verifiable facts would be understood to express mere opinion, Defendants' statements

in the Press Release are actionable because Defendants' had no reasonable factual basis for

expressing the opinion.  Under New York law a statement of opinion that is based on facts

available to the speaker/writer is actionable if the speaker/writer does not have the facts

necessary to substantiate the opinion:

> When, however, the statement of opinion implies that it is based
> upon facts which justify the opinion but are unknown to those
> reading or hearing it, it is a "mixed opinion" and is actionable.
> The actionable element of a "mixed opinion" is not the false
> opinion itself – it is the implication that the speaker knows facts,
> unknown to the audience, which support his opinion and are
> detrimental to the person about whom he is speaking.

Steinhilber, 68 N.Y.2d at 289-290, 508 N.Y.S.2d at 904; Silsdorf v. Levine, 59 N.Y.2d 8, 15,

462 N.Y.S.2d 822, 826 (1983) ("plaintiff may be able to establish entitlement to recover

damages for the defamatory opinions, assuming, of course, that he is able to demonstrate the

falsity of the letter's statements of fact").

      The record shows that Defendants had no factual basis for their statement that Ms.

Marchuk launched an e-mail campaign against them and never took any action to substantiate

those claims.  Defendants admitted in responses to Plaintiff's Request to Admit that they never

contacted any clients and/or opposing counsel to determine if Ms. Marchuk sent them her

Complaint.  Ex. 7.  On June 14, 2013, moreover, Google produced information confirming that

the John Smith E-mail Account (from which Ms. Marchuk's complaint was supposedly sent to

Ms. Monteverde) was not created by Ms. Marchuk but was created by someone accessing the

Internet from F&F's own offices on the day Ms. Marchuk's complaint was filed.  Ex. 8.  After

learning of Google's bombshell disclosure, however, Defendants took no discernable action to

uncover who in their midst had sent the e-mail to Ms. Monteverde.  Numerous F&F attorneys

and staff have testified that nobody at F&F ever so much as asked them if they had any

information about who might have sent the Complaint to Ms. Monteverde. See Ex. 17 at 62-63; Ex 31 at 93-94; Ex. 32 at 39; and Ex. 33 at 121-122. Defendants' failure to take minimal steps to investigate the factual basis for their claims against Ms. Marchuk reflects that Defendants all along have known the truth about those claims: they were invented from thin air in a bad faith attempt to smear Ms. Marchuk. Predictably, on September 30, 2013 Defendants voluntarily withdrew their claims against Ms. Marchuk.

If Defendants' statements in the Press Release are characterized as opinion (which they should not be) the statements therefore are still actionable. Defendants had no factual basis for their asserted opinions about Ms. Marchuk's conduct, and indeed may have falsely manufactured evidence in attempt to frame Ms. Marchuk for that conduct. Under, these circumstances "opinion" statements are actionable, and the Court should deny Defendants' motion for summary judgment dismissing the Complaint on that ground.

**Defendants' Statements in the Press Release
are not Immune to a Defamation Claim
Under New York's Civil Rights Law.**

Defendants' statements in the Press Release are not protected by New York's Civil Rights Law. New York Civil Rights Law § 74 was enacted to protect reports of judicial proceedings made in the public interest. See Williams v. Williams, 233 N.Y.2d 592, 599 (1969). Intentional and bad-faith defamatory statements such as those in Defendants' Press Release are not protected by Section 74. In Williams, the New York State Court of Appeals addressed a situation similar to the present case. The defendant filed suit against the plaintiff purely as a device to defame plaintiff. After filing the complaint, the defendant widely circulated it in attempt to damage plaintiff's reputation. The Court rejected defendant's argument that Section 74 protected such conduct:

27

> We conclude that it was never the intention of the Legislature in
> enacting section 74 to allow 'any person' to maliciously institute a
> judicial proceeding alleging false and defamatory charges, and to
> then circulate a press release or other communication based
> thereon and escape liability by invoking the statute.

Id.

   The record here establishes that Defendants maliciously instituted their
Counterclaims and then distributed the false Press Release to numerous media outlets touting
their baseless claims.  Indeed, Defendants do not contest that they acted intentionally or
recklessly, or that the Press Release was entirely false.  Defendants also do not dispute that
Plaintiff can establish the third element of defamation (showing fault on the part of Defendants)
or the fourth element of defamation (showing falsity of Defendants' statements).  Def. Mem. at 4.
It is not disputed that Defendants themselves – not Ms. Marchuk – sent the Complaint to Mr.
Monteverde's wife.  Defendants moreover never adduced a single e-mail substantiating their
claim that Ms. Marchuk e-mailed her Complaint to clients and opposing counsel.  Defendants
failed even to take any action to substantiate their claim that Ms. Marchuk sent her Complaint to
clients or opposing counsel.  Clearly, once the media picked up the Press Release and reported
on the Counterclaims, the Counterclaims had served their intended purpose and Defendants were
content to drop them (which they did but only after twice refilling them in amended answers).

   On this record, Defendants' statements are not protected by Section 74 of the
Civil Rights Law, and the Court should deny Defendants' motion for summary judgment
dismissing the Complaint on that ground.

## CONCLUSION

For the reasons set forth herein, the Court should deny Defendants' motion for summary judgment dismissing Plaintiff's defamation cause of action.

Dated: New York, New York
      May 16, 2014

                                        ROTTENBERG LIPMAN RICH, P.C.


                                        By: _____
                                            Harry W. Lipman
                                            Thomas E. Chase
                                            Jonathan S. Hershberg
                                        369 Lexington Avenue, Sixteenth Floor
                                        New York, New York 10017
                                        *Attorneys for Plaintiff, Alexandra Marchuk*

29