UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXANDRA MARCHUK,              :  13 CV 1669 (AKH)

              Plaintiff,     :

                        :

     - against –          :

                        :

FARUQI & FARUQI, LLP, JUAN E.     :
MONTEVERDE, NADEEM FARUQI    :
and LUBNA FARUQI,             :

                        :

           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE

ROTTENBERG LIPMAN RICH, P.C.
369 Lexington Avenue, 16th Floor
New York, New York 10017
(212) 661-3080
Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii-iii

1.    MIL #1:  Evidence Concerning Defendants' Financial
       Information is Relevant to Critical Factual Disputes ............................................................. 1

2.    MIL #2:  Defendants Have No Basis to Preclude Dr.
       Jacobson's Testimony .......................................................................................................... 5

3.    MIL's #3, 4 and 5:  Plaintiff May Offer the Testimony of Former
       F&F Associates Kerrianne Goodwin, Jamie Mogil and Brian Moon
       Regarding Mr. Monteverde's Oppressive, Booze Fueled, Sexually
       Charged Conduct towards F&F Associates ........................................................................ 7

       Brian Moon ......................................................................................................................... 9

       Kerrianne Goodwin ............................................................................................................ 10

       Jamie Mogil ........................................................................................................................ 11

4.    MIL #6: Plaintiff May Offer Her Prior Consistent
       Statements to Rebut the Inference of Recent Fabrication .................................................. 16

5.    MIL #7:  Defendants Have No Basis Pre-Emptively
       to Limit Plaintiff's Right to Impeach Mr. Munoz Based on
       His Extraordinary Employment Record or other Evidence
       Reflecting Upon his Credibility ......................................................................................... 19

6.    MIL #8:  Plaintiff  May Question Defendants about
       Bernaz v. Chobani, Inc. ..................................................................................................... 21

7.    MIL #9:  Plaintiff  Does Not Intend to Refer to
       the Voluntarily Dismissed Malicious Prosecution
       and Title VII Claims Against the Individual Defendants .................................................... 22

8.    MIL #10:  Defendants' Motion to Preclude Plaintiff's
       Claim for Constructive Discharge is Baseless and Procedurally
       Improper ............................................................................................................................ 22

CONLUSION ............................................................................................................................ 24

i

<u>TABLE OF AUTHORITIES</u>

**Cases**

Aktas v. JMC Development Co., Inc.,
2013 WL 55827 (N.D.N.Y. 2013) .................................................................... 5, 7

Alfonso v. Costello,
 295 F.3d 365 (2d Cir. 2002) (citations omitted, collecting cases) ................ 12

Byrne v. Telesector Resources Group, Inc.,
339 Fed.Appx. 13 (2d Cir. 2009) ................................................................... 13

Dabney v. Christmas Tree Shops,
958 F.Supp.2d 439 (S.D.N.Y. 2013) ............................................................. 15

DeMarco v. West Hills Montessori,
350 Fed.Appx. 592 (2nd Cir. 2009) ............................................................... 13

East Coast Novelty Co., Inc. v. City of New York,
842 F.Supp. 117 (S.D.N.Y. 1994) ................................................................. 23

Gutierrez v. City of New York,
2012 WL 2357063 (S.D.N.Y. 2012) .............................................................. 15

Heyne v. Caruso,
69 F.3d 1475 (9th Cir. 1995) ......................................................................... 14

Leibovitz v. N.Y.C. Transit Auth.,
252 F.3d 179 (2d Cir. 2001).......................................................................... 15

Media Alliance, Inc. v. Mirch,
2012 WL 162375 (N.D.N.Y. 2012) ................................................................ 23

Millenium Expressions, Inc. v. Chauss Marketing, Ltd.,
2006 WL 288353 (S.D.N.Y. 2003).............................................................. 23

Nat'l R.R. Passenger Corp. v. Morgan,
536 U.S. 101, 122 S.Ct. 2061 (2002)............................................................ 13

Perry v. Ethan Allen, Inc.,
115 F.3d 143 (2d Cir. 1997)........................................................................... 13

Schwenn v. Anheuser-Busch, Inc.,
1998 WL 166845 (S.D.N.Y. 1998).............................................................. 14

Scott v. WPIX, Inc.,
2012 WL 2026428 (S.D.N.Y. 2012) ........................................................................... 14

Sprint/United Management Co. v. Mendelsohn,
552 U.S. 379, 128 S.Ct. 1140 (2008) ......................................................................... 14

Terry v. Ashcroft,
336 F.3d 128 (2d Cir. 2003) ...................................................................................... 22

U.S. v. Ferguson,
2007 WL 4240782 (D. Ct. 2007) ................................................................................. 4

U.S. v. Guttenberg,
2007 WL 4115810 (S.D.N.Y. 2007) ............................................................................ 5

U.S. v. Logan,
250 F.3d 350 (6th Cir. 2001) ....................................................................................... 4

U.S. v. Pietro,
232 F.3d 816, 820 (11th Cir. 2000) ........................................................................... 19

U.S. v. Quattrone,
441 F.3d 153 (2d Cir. 2006) ..................................................................................... 3, 4

Whidbee v. Garzarelli Food Specialties, Inc.,
223 F.3d 62 (2d Cir. 2000) ........................................................................................ 14

Zubulake v. UBS Warburg LLC,
382 F.Supp.2d 536 (S.D.N.Y. 2005) .......................................................................... 14

Plaintiff, Alexandra Marchuk, submits this memorandum of law in opposition to Defendants' ten motions in limine, which baselessly seek to strip this case of compelling evidence relating to Mr. Monteverde's egregious workplace conduct and the Faruqis' knowing toleration if not encouragement of that conduct.  There is no legal support for any of Defendants' ten motions and the Court should deny all of them.

1.   MIL #1:  Evidence Concerning Defendants'
     Financial Information is Relevant to Critical
     Factual Disputes

Defendants seek to preclude all evidence relating to Defendants' "financial condition" without differentiating between evidence of Defendants' assets or wealth, evidence relating to F&F's financial performance, or evidence relating to the relative compensation paid to F&F attorneys.  Defendants' motion to preclude all financial information is overbroad and seeks to preclude Plaintiff from offering important evidence directly relevant to material factual disputes in this case.

██████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████

██████████████████████████████████

████████████████████████████████████

1

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

Evidence of Mr. Monteverde's outsized revenue production for the Firm is relevant to numerous contested issues in this case.  The evidence is relevant to whether Mr. Monteverde supervised Ms. Marchuk and other attorneys at F&F, whether he had authority, or at least heavy influence on decisions, to hire and fire attorneys at the Firm, whether Ms. Marchuk could reasonably request to work for a different partner or in a different practice group at the Firm, and whether Mr. and Mrs. Faruqi had a powerful financial incentive to turn a blind eye towards Mr. Monteverde's outrageous office behavior because he was generating so much revenue for the Firm, which they exclusively owned.

Defendants have contested Mr. Monteverde's seniority within the firm, characterizing him as little more than a contract attorney.  At his deposition, for example, Nadeem Faruqi refused to acknowledge that Mr. Monteverde was Ms. Marchuk's "supervisor" (or anyone's supervisor) and claimed that no associates ever "reported" to Mr. Monteverde. Associates supposedly work only "with" rather than "for" Mr. Monteverde:

Q. When did Mr. Monteverde start supervising other attorneys at the firm?

2

| | | |
|---|---|---|
| A. | What do you mean by supervising? |
| Q. | I mean in its conventional litigation sense. |
| A. | I don't even know what that means. |
| Q. | Supervising other attorneys.  It's not a trick question. |
| A. | If you want to know when he started giving assignments to other attorneys?  Is that what you're asking for? |
| Q. | Well, I mean supervising in a general sense.  Giving assignments to other attorneys is one part of that; when did he start doing that? |
| A. | I'm the supervisor for litigation.  I decide what people work on.  He's able to assign assignments to people that work with him. |
| Q. | Has Mr. Monteverde ever supervised other attorneys at the firm? |
| A. | He has had other attorneys work with him. |

Ex. 5 at 54-55.

| | |
|---|---|
| Q. | [W]hat other associates reported to Mr. Monteverde? |
| A. | I can tell you other associates that worked with him. |

Ex. 5 at 57.

Plaintiff permissibly may offer evidence relating to Mr. Monteverde's significant financial contribution to F&F's financial performance in order to support her allegation that she reported directly to Mr. Monteverde; that Mr. Monteverde made it explicitly clear to her that he could and would fire her -- as he fired her predecessor -- if she did not like up to expectations; that he had significant influence over her compensation and bonus; etc.  Plaintiff may also offer evidence of Mr. Montevede's financial contributions to the Firm to explain the Faruqis' astonishing refusal to reprimand meaningfully Mr. Monteverde for his repeated and obvious outrageous workplace conduct.

In U.S. v. Quattrone, 441 F.3d 153 (2d Cir. 2006), the Second Circuit affirmed the trial court's admission of evidence relating to the defendant's substantial compensation at CSFB because the evidence tended to show that the defendant's desire to protect his compensation may have given him a motive to obstruct the governments' investigation into an illegal IPO allocation process which threatened the defendants' lucrative income.

> . . . evidence of Quattrone's compensation for 1999 and 2000 was relevant to Quattrone's motive to protect his reputation and that of CSFB's Tech group.  Despite Quattrone's protests to the contrary, the compensation evidence was not unduly prejudicial.  As the government highlights, its references to Quattrone's compensation during its statement and summation specified that evidence of his compensation was to be used for the limited purpose of establishing a motive to obstruct and could not be used to convict Quattrone simply because of his wealth.

Id. at 187.   Similarly, in U.S. v. Logan, 250 F.3d 350, 369 (6th Cir. 2001), the Court sustained

the admission of evidence of the defendants' significant annual salary in order to establish their

motive to continue the wrongful, profitable, conduct:

> In this way, the income evidence had a significant probative value because it demonstrated what Appellants stood to lose if they properly reported that actual loan delinquencies.  For this reason, the trial court properly exercised its broad discretion in admitting this evidence.

See also U.S. v. Ferguson, 2007 WL 4240782 (D. Ct. 2007) (allowing evidence of compensation

payable under deferred compensation plan because it provided defendant a motive to inflate

AIG's share price:  "Evidence that links a defendant's financial compensation to his possible

motives for participating in an alleged fraud is relevant to proving fraud").

Defendants cite no authority precluding Plaintiff from offering evidence of Mr.

Monteverde's outsized contribution to F&F's financial performance.  The cases cited by

Defendants concern only the generic proposition that Plaintiff should not be permitted to offer

evidence of Defendants' wealth in order to suggest liability.  Def. Memo at 1-3.  Plaintiff has no

intention of offering evidence of Defendants' wealth for the purpose of suggesting that they are

liable in this case.  Indeed, Plaintiff has obtained no asset discovery from Defendants and

therefore has no evidence relating to their wealth.  Plaintiff should be permitted, however, to

offer evidence of F&F's stark financial performance in 2011 which created an obvious and

undeniable incentive on the part of F&F and the Faruqi's to tolerate Mr. Monteverde's wrongful conduct.

The Court should further deny Defendants' motion to preclude evidence relating to their financial performance because it is premature.  The Court may more properly rule on the admissibility of financial evidence at trial, when the Court has the benefit of being able to consider the specific evidence offered by Plaintiff and the specific purpose for which it is offered. See U.S. v. Guttenberg, 2007 WL 4115810, *9 (S.D.N.Y. 2007) (denying motion in limine seeking to preclude evidence of financial circumstances, stating "[a]t this pre-trial stage, it is improper to preclude all evidence of wealth or economic circumstances on the mere speculation that such evidence could get exploited in a prejudicial manner"); Aktas v. JMC Development Co., 2013 WL 55827 (N.D.N.Y. 2013) (denying as premature motion in limine to preclude income information, "[a]t this juncture, the Court is unable to ascertain whether evidence regarding [plaintiff's] income will become relevant during the course of this trial").

2.      MIL #2:  Defendants Have No Basis
        to Preclude Dr. Jacobson's Testimony

Defendants' motion to preclude the testimony of Plaintiffs' psychiatric expert Dr. Lawrence Jacobson is factually baseless.  Defendants' claim that Dr. Jacobson impermissibly stands to participate in Plaintiff's recovery in this case is a misrepresentation of the record. Defendants base their motion on Ms. Marchuk's testimony at her deposition (Def. Memo at 3-4), although she admittedly was unsure about the details of Dr. Jacobson's retention:

> Q.  Would you pay him any fee if there was no settlement or success in the litigation?
>
> A.  He had an arrangement with my counsel.
>
> Q.  That he would only be paid in the event you were successful in your litigation?
>
> MR. LIPMAN:  Objection.  Competence.

5

> A.   I don't believe that was the arrangement, <u>but I have not seen it</u>.

Ex. 6 at 89-90 (emphasis added).

Dr. Jacobson, however, confirmed at his deposition that he has been paid in full for all time devoted to this case to date:

> A.   I then called Harry, asked him about what the situation was, and he said that – that his firm would guarantee the fee, and he asked sort of would I see her – or what fee would I see her at, and kind of give him the whole situation.  I said I would see her for one twenty five, and that was the thing.  And then at the end (inaudible)
>
> THE COURT REPORTER:  I can't hear you, sir.
>
> A.   (Continuing)  I mean I didn't know at that point that she was going to get a job and move, <u>but when I last saw her I sent a bill to them and got paid</u>.
>
> Q.   When you say you sent the bill to them, to whom did you pay [sic] the bill bill?
>
> A.   Probably to Harry.
>
> Q.   And who paid it?  Who paid the bill?
>
> A.   The firm but I don't know who signed the check

Ex. 7 at 17-18 (emphasis added).

Ms. Marchuk was mistaken, moreover, that Dr. Jacobson's fee would increase in the event of a recovery.  Def. Memo at 3.  The only "back end" element of the payment of Dr. Jacobson's fee is due to the fact that his fee is treated as a cost of this litigation.  <u>See</u>  Ex. 8 at ¶ 3. As a litigation cost, Ms. Marchuk's counsel, Rottenberg Lipman Rich, P.C., is responsible for paying Dr. Jacobson's fee, but permissibly will be reimbursed for those payments from any recovery, that is, on the "back end."  Consequently, Dr. Jacobson has been paid all invoiced fees to date, will be paid all incurred fees prior to trial, and does not stand to earn any further fees in the event Ms. Marchuk obtains a recovery in this action.  <u>Id</u>. ¶¶ 6-7.  The Court, therefore, should deny Defendants' second motion <u>in limine</u>.

3.      MIL's #3, 4 and 5:  Plaintiff May Offer the Testimony of
        Former F&F Associates Kerrianne Goodwin, Jamie Mogil
        and Brian Moon Regarding Mr. Monteverde's Oppressive,
        <u>Booze-Fueled, Sexually Charged Conduct towards F&F Associates</u>

Defendants seek to preclude compelling and highly relevant testimony by F&F former associates Kerrianne Goodwin, Jamie Mogil and Brian Moon that corroborates Ms. Marchuk's allegations that Mr. Monteverde subjected to her to a barrage of inappropriate, oppressive, often alcohol-fueled, sexually explicit comments and conduct.  The testimony of these other F&F associates establishes that Mr. Monteverde's boorish conduct was open and notorious at F&F, permeated every aspect of Mr. Monteverde's practice area within F&F, and was known to, but ignored by, Mr. and Mrs. Faruqi.  Defendants have no legal basis for their extraordinary application to whitewash the record of this highly relevant evidence, and the Court should deny their third, fourth and fifth motions <u>in</u> <u>limine</u>.

Extensive evidence corroborates Ms. Marchuk's allegation that Mr. Monteverde created a toxic hostile work environment at F&F.  Most important in this regard is the candid testimony of ex-F&F partner Emily Komlossy, to whom Ms. Marchuk complained about Mr. Monteverde and who reported Ms. Marchuk's complaint to Mr. Faruqi both orally and in an email.  <u>See</u> Ex. 9.  Ms. Komlossy's testimony confirms that Mr. Monteverde's conduct was known to the Firm.  "I mean I guess the phrase I use is, he has no boundaries," she testified.  Ex. 3 at 147.  "Q.  Would his knowing no boundaries also include talking about things of a sexual nature?  A.  Well, I mean, what comes to mind is the BJ stuff."  <u>Id</u>. at 148.  Ms. Komlossy confirmed that she knew Mr. Monteverde to openly discuss both his sex life with his wife and with other women:

Q.      Sex with his wife?
A.      He might mention that he had sex with his wife, but that's it.
Q.      Sex with other women?

7

> A.    Yes . . .  He said he had met someone that – at a bar and he
>       ended up later having sex with her . . . I think it was Lex
>       Bar.

Ex. 3 at 144-45.  Ms. Komlossy further knew Mr. Monteverde to be partial to young, thin, blond

women based on his obvious fascination with them wherever he went:

> Q.    He likes them young, thin and blond, you write?
> A.    Correct.
> Q.    And why do you think that?
> A.    Personal observation . . .
> Q.    [T]alking to young, thin and blond women or commenting about young,
>       thin and blond women?
> A.    Yes.

Ex. 3 at 138-39.  Ms. Komlossy further confirmed that Mr. Monteverde is especially

inappropriate and boorish when extremely intoxicated, which is frequent:

> Q.    What was the nature of her concern that she expressed to you?
> A.    That he [Mr. Monteverde] gets really drunk.
> Q.    When he gets really drunk what happens?
> A.    He gets loud.

Ex. 3 at 47.

> Q.    Did you get a sense of why she [Ms. Marchuk] was apprehensive
>       about the train ride?
> A.    Just that he gets really drunk.

Ex. 3 at 72.  Ms. Komlossy further knew that Mr. Monteverde once had hit on the girlfriend of

another F&F partner.  Ex. 3 at 140.  Mr. Komlossy recognized, moreover, that it was impossible

to avoid this side of Mr. Monteverde, because working with Mr. Monteverde necessarily entailed

socializing and drinking with him.  Ex. 3 at 81.

　　　　The testimony of former F&F associates Brian Moon, Jamie Mogil and Kerrianne

Goodwin – each of whom worked closely with Mr. Monteverde – further corroborates Ms.

Marchuk's allegations of a hostile work environment.

**Brian Moon**

Mr. Moon, who alongside Plaintiff worked for Mr. Monteverde in F&F's New York office, confirmed that Mr. Monteverde constantly engages in loud and inappropriate conversations about his own sex life, the sex lives of others, and his general titillation by anything relating to sex.  He would tell "stories about previous work trips he had been on, and how he had had great times frequenting strippers."  Ex. 4 at 16.  "Q.  What kind of comments did he make about his own sex life?  A.  Well, he told me about past sexual experiences with people.  You know, that's my answer."  Id. at 13.  "I have one recollection of him saying something to the effect that in previous times a person could just have sex with a Lex Bar waitress in the coat check room."  Id. 17-18.  Mr. Moon recalled Mr. Monteverde fondling waitresses at LexBar in front of his F&F colleagues: "I recall him soliciting attention from waitresses at Lex Bar regularly, and being in close contact with them . . .  I recall Juan touching waitresses at Lex Bar."  Id. 22.  An active litigation involving BJ's Wholesale, Inc. was irresistible fodder: "Q.  To the best of your knowledge, did Mr. Monteverde make a joke about blow jobs every time the subject of BJ's Wholesale came up?  A.  Yes."  Ex. 4 at 77.  Mr. Monteverde bragged to Mr. Moon about his father's extra-marital affairs, "I recall him describing his father having multiple relationships with women."  Ex. 4 at 17-18.

Mr. Monteverde's crass comments were uninvited and unreciprocated.  "[H]e would volunteer this information . . . .  I never exchanged comparable anecdotes . . . I never asked him about his sexual experiences.  Q. Would you say that he offered those comments to you in an unsolicited manner?  A. Yes."  Ex. 4 at 13.  "Q.  Did you and Mr. Monteverde have a sufficiently close relationship that you felt that he was confiding things in you that he might not be confiding in other employees at Faruqi & Faruqi?  A.  No."  Ex. 4 at 21.  Mr. Monteverde's conduct, moreover, was open and obvious:

> Q.    And is it your belief, in fact, that anyone in the office
>        would have witnessed it [Mr. Monteverde's inappropriate
>        conduct]?
> A.    Certainly anyone within earshot.
> Q.    And Mr. Monteverde was open and notorious with his
>        conduct, was he not?
> A.    Yeah, I think he was very – open personality.

Ex. 4 at 129-130.

Like Ms. Komlossy, Mr. Moon knew Mr. Monteverde to have inappropriately propositioned the girlfriend of another F&F partner.  Consequently, Mr. Moon made sure that his girlfriend never met Mr. Monteverde so not to "complicate" his relationship with his boss:

> A.    I recall not wanting Florence to meet Juan.
> Q.    And why was that?
> A.    Because I was concerned that he would act inappropriately,
>        okay, and I didn't want to complicate our working
>        relationship . . . I had heard rumors that Juan had made
>        inappropriate sexual comments about other employee's
>        significant others.

Ex. 4 at 39-40.

Mr. Moon further confirmed that working for Mr. Monteverde necessarily entailed socializing and drinking with him as well.  Mr. Moon felt pressure to go out drinking with Mr. Monteverde.  Ex. 4 at 187.  On one trip to Vermont, Mr. Moon accompanied Mr. Monteverde to numerous bars where Mr. Monteverde consumed approximately 12 drinks the night before a hearing.  Ex. 4 at 24-25.  Mr. Moon recalled discussions in the office about who should go out drinking with Mr. Monteverde on different nights.  Ex. 4 at 188.

**<u>Kerrianne Goodwin</u>**

Kerrianne Goodwin is an ex-F&F associate who worked in F&F's Delaware office between from January through April 2012.  Like Ms. Marchuk, Mr. Goodwin immediately ran into Mr. Monteverde's buzz saw of inappropriate conduct.  Shortly after starting at F&F, Ms. Goodwin met Mr. Monteverde for a court appearance, which was followed by a trip to a bar with

Mr. Monteverde and another F&F partner.  At the bar, Ms. Goodwin was shocked when Mr. Monteverde joked about a sex act and made an explicit hand gesture.  "I had just started.  And he made a hand gesture in front of me that I understood to mean – to signify two fingers in the vagina, one finger in the anus."  Ex. 10 at 112.

On another occasion, Ms. Goodwin was shocked to learn about Mr. Monteverde's method of preparing for oral argument and the contribution that Mr. Monteverde's wife made to the success of the Firm.  Mr. Monteverde explained to Ms. Goodwin that "his wife doesn't have sex with him before court hearings because she likes him to have pent-up aggression."  Ex. 10 at 118.  Soon thereafter, Ms. Goodwin resigned from the Firm, complaining in writing to the Faruqis that, "[s]ince joining the firm, on a near daily basis, I have been harassed by Juan . . . [O]n multiple occasions, Juan has made crude and/or sexually charged comments with which I am uncomfortable."  Ex. 11.

**Jamie Mogil**

Jamie Mogil was another female attorney who worked for Mr. Monteverde and was subject to his sexually aggressive workplace conduct.  In 2011, Ms. Komlossy advised Ms. Mogil that -- because Mr. Monteverde liked to socialize and go out drinking -- it would be beneficial to Ms. Mogil's career at F&F if she also socialized with him.  Ex. 12 at 199-200. Following Ms. Komlossy's advice, Ms. Mogil made an effort to join Mr. Monteverde for drinks at LexBar, which had predictably bad results.  Mr. Monteverde quickly propositioned Ms. Mogil:

> Q.    And what did he say or do that you deemed inappropriate?
> A.    He asked me would I date a married man . . .
> Q.    And when he asked you that, did you understand that he
>        was referring to himself?
> A.    At that time – at that time, yes, I did feel uncomfortable
>        that he was talking about himself.

Ex. 12 at 57-59.   Ms. Mogil was shocked by Mr. Monteverde's solicitation and rebuffed his

advances.  Ex. 12 at 58-59.  Mr. Monteverde then crassly advised Ms. Mogil that she should

attempt to work out her differences with another F&F attorney by having sex with him.  "Q.

And what did Mr. Monteverde say about you and Frank McConville?  A. Well, from what I

recall at the time, it was something along the lines of that we should just screw and get it over

with."  Ex. 12 at 60-61.  Shortly after rebuffing Mr. Monteverde's advances, Ms. Mogil was

transferred out of Mr. Monteverde's lucrative practice area, which she believed was motivated

by her rejection of his advances.   Ex. 12 at 48-49.   Shortly after complaining to the Faruqis

about Mr. Monteverde's conduct, her employment at the firm was terminated.  <u>See</u> Ex. 13 at 2.

The picture painted by the consistent testimony of Ms. Komlossy, Mr. Moon, Ms.

Mogil, Kerrianne Goodwin and Ms. Marchuk is that Mr. Monteverde's sexually charged – and

often alcohol-infused – conduct created an open and obvious hostile work environment at F&F.

The prevalence of this testimony also powerfully confirms that Mr. and Mrs. Faruqi knew of Mr.

Monteverde's conduct and turned a blind eye to it.

<u>Admissibility of "Other Employee" Testimony</u>

The testimony of the other F&F associates is relevant to Ms. Marchuk's claims in

two respects.  First, it is relevant to show a hostile work environment.  Second, it is relevant to

show Mr. Monteverde's sexist and degrading attitude towards women, and his willingness to

openly share his views about women in the F&F workplace.

<u>Hostile Work Environment</u>

To prove her claim of a hostile work environment case, Ms. Marchuk must show

that her "harassment was sufficiently severe and pervasive to alter the conditions of [her]

employment and create an abusive working environment and that a specific basis exists for

imputing the objectionable conduct to the employer."  <u>Alfonso v. Costello</u>, 295 F.3d 365, 373

(2d Cir. 2002) (citations omitted; collecting cases).  In <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 120, 122 S.Ct. 2061, 2076 (2002), the Supreme Court held that a plaintiff could establish a hostile work environment claim based in part on events occurring outside of the 300 day limitation for filing a claim.  The Court recognized the importance of other-employee evidence substantiating the existence of a hostile work environment:  "Morgan presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets.  Although many of the facts upon which his claim depends occurred outside the 300 day filing period, we cannot say that they are not part of the same actionable hostile environment claim."  <u>Id</u>. at 120, 122 S.Ct. at 2076.

In <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 150-51 (2d Cir. 1997), the Second Circuit discussed the critical importance of testimony of other employees in a hostile work environment case:

> Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant.  Thus, as the district court itself noted, "in a hostile workplace case, the trier of fact must examine the totality of the circumstances, including evidence of sexual harassment directed at employees other than plaintiff. . . Evidence of harassment of women other than [plaintiff], if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment at Ethan Allen and could have been found probative of the company's notice of that environment within the period that the district court viewed as relevant.  The district court did not identify any respect in which the prejudice that might result from such probative evidence would have been unfair.

<u>See</u> <u>DeMarco v. West Hills Montessori</u>, 350 Fed.Appx. 592 (2d Cir. 2009) ("[plaintiff] was certainly entitled to put witnesses on the stand and elicit testimony of their experiences with harassment to support her claim"); <u>Byrne v. Telesector Resources Group, Inc.</u>, 339 Fed.Appx. 13

13

(2d Cir. 2009) ("[t]o be sure, 'a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim'") (citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)); Schwenn v. Anheuser-Busch, Inc., 1998 WL 166845 (S.D.N.Y. 1998) ("[t]he testimony of the alleged sexual harassment of women other than plaintiff is relevant to show a hostile work environment").

> Discriminatory Intent

Ms. Marchuk also may offer the testimony regarding the harassment of others to establish that Mr. Monteverde has a sexist and demeaning attitude towards women and that the Faruqis knew of and tolerated that attitude in their workplace.  In Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 387, 128 S.Ct. 1140, 1147 (2008), the Supreme Court specifically rejected the type of per se ban against such testimony suggested by Defendants.  Id. at 387, 128 S.Ct. 1147 ("had the District Court applied a per se rule excluding the evidence [of harassment experienced by other employees], the Court of Appeals would have been correct to conclude that it had abused its discretion").

Numerous cases recognize that testimony from other employees witnessing discriminatory conduct by an employer is directly relevant to proving that the employer harbors discriminatory animus.  "As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." Zubulake v. UBS Warburg LLC, 382 F.Supp.2d 536, 544 (S.D.N.Y. 2005) (collecting cases; citations omitted).  "The sexual harassment of others, if shown to have occurred, is relevant and probative of [defendant's] general attitude of disrespect toward his female employees, and his sexual objectification of them." Id. (quoting Heyne v. Caruso, 69 F.3d 1475, 1479 (9th Cir. 1995)).  See  Scott v. WPIX, Inc., 2012 WL 2026428 (S.D.N.Y. 2012) ("The testimony of other employees about their treatment by defendant is relevant to the issue of the employer's

14

discriminatory intent"); <u>Gutierrez v. City of New York</u>, 2012 WL 2357063 (S.D.N.Y. 2012)

("evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is

relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's

employment action against an employee was motivated by invidious discrimination").

   The cases cited by Defendants, moreover, do not remotely support their motion to

exclude the Moon, Goodwin and Mogil testimony. <u>Leibovitz v. N.Y.C. Transit Auth.</u>, 252 F.3d

179 (2d Cir. 2001), clearly recognizes a plaintiff's right to offer testimony of similarly situated

employees: "evidence of harassment directed at other co-workers can be relevant to an

employee's own claim of hostile work environment discrimination." <u>Id</u>. at 190. In fact, the

primary issue in <u>Leibovitz</u> was that plaintiff failed to offer <u>enough</u> such evidence substantiating

her hostile work environment. <u>Id</u>. (plaintiff "failed to allege or prove that harassment of other

women adversely affected the terms and conditions of her own employment"). Similarly,

<u>Dabney v. Christmas Tree Shops</u>, 958 F.Supp.2d 439 (S.D.N.Y. 2013), merely held that isolated

hearsay statements regarding offensive statements made to other employees did not create an

issue of fact at the summary judgment stage. <u>Id</u>. at 458 ("Plaintiff has provided only hearsay –

that the co-worker said these things happened").

   Finally, there is no basis for Defendants' argument that incidents in bars, or in

Delaware, or after Ms. Marchuk resigned are irrelevant because they occurred outside of

Plaintiff's employment environment. Def. Memo at 9, 13, 16. All of the incidents, regardless of

their time and place concern the contemporaneous actions of Ms. Marchuk's supervisor, Mr.

Monteverde, towards similarly situated F&F employees, and therefore are relevant to show the

hostile working environment at F&F. Ms. Goodwin's testimony, for example, is pointedly

probative regarding Mr. Monteverde's conduct, regardless that it concerns events in the weeks

following Ms. Marchuk's resignation. Ms. Goodwin recounts Mr. Monteverde's conduct in front

15

of another F&F partner; her testimony mirrors Ms. Marchuk's claims about Mr. Monteverde's views regarding the supposed relationship between his sexual aggression and his performance in court; and her testimony concerns Mr. Monteverde's continued outrageous conduct at a time when the Firm had supposedly placed him on final probation for his conduct towards Ms. Marchuk.  Oddly, Defendants observe that Ms. Goodwin testified that she never met Ms. Marchuk, "nor did their employment overlap at all," Def. Memo at 6, as if that supported preclusion; whereas in fact it only bolsters the relevance and credibility of each of these two young women's testimony about virtually identical abuses they independently suffered under Mr. Monteverde.

The Court, therefore, should deny Denfendants' motion in limine to preclude the testimony of Brian Moon, Kerrianne Goodwin and Jamie Mogil.

4.      MIL #6: Plaintiff May Offer Her Prior Consistent
               Statements to Rebut the Inference of Recent Fabrication

Defendants have repeatedly argued that Ms. Marchuk's claims against Mr. Monteverde are a recent fabrication.  Defendants claim that Ms. Marchuk had a longtime attraction to Mr. Monteverde and engaged in a consensual romantic liaison with him the evening of the Firm holiday party.  Defendants' legal assistant, Danielle Serpica, testified that Ms. Marchuk "followed him around the office like a puppy . . . it was obvious that she had feelings for him."  Ex. 14 at 71, 73.  Defendants' office manager, Olive Alston, further claims that Ms. Marchuk's interest in Mr. Monteverde was evident the night of the holiday party:  "She was sitting – she was sitting pretty close to him.  You know, she was so close to him they were like magnet and steel."  Ex. 15 at 74.  Mr. Monteverde then testified that he and Ms. Marchuk had a "beautiful" time together in F&F's offices after the holiday party.  "Then we got dressed, we laid in – we sat on my couch, we cuddled a little bit, we – we chatted.  I made a joke about how we're

16

going to be hungover the next morning.  I'd say it was a beautiful exchange we had.  We – we talked, we then left the office."  Ex. 16 at 22-23.

Defendants' April 2, 2013 press release, moreover, criticized Ms. Marchuk for waiting so long to bring her claims, suggesting that the delay undermined the merits of her claims: "The Faruqis did not hear another word from Ms. Marchuk or anyone acting on her behalf for more than nine months . . . On March 13, 2013, almost 15 months after her resignation, Ms. Marchuk commenced this lawsuit."  Ex. 17 at 1-2; <u>see</u> Defendants' Answer, dated April 2, 2013 at ¶ 2.   Asked to reconcile Ms. Marchuk's supposed strong affection for Mr. Monteverde with her current allegations against him, Mrs. Faruqi felt it was obvious:  "A scorned woman." Ex. 18 at 273.

To rebut Defendants' charge that Ms. Marchuk is a spurned lover who only recently fabricated her claims, Ms. Marchuk must be permitted under F.R.E. 801(d)(1)(B) to offer evidence of her numerous prior consistent statements reflecting that she (1) has continuously disavowed any romantic interest in Mr. Monteverde and (2) was distraught by his repeated harassment of her.

After starting at F&F, Ms. Marchuk discussed Ms. Monteverde's harassment with several friends.  On September 9, 2011, for example, she e-mailed a friend about Mr. Monteverde's advances towards her during her first week:

> . . .  He took me out for drinks that night, and naturally kissed me and asked me to go back to the office with him.
>
> **This working thing really bites** . . .
>
> . . . **I'm pretty sure he wanted to have sex with me in his office**.

Ex. 19 (emphasis added).   On September 13, 2011, Ms. Marchuk exchanged further e-mails with a friend, again complaining of Mr. Monteverde's unwanted advances:

> My good old boss came into my office yesterday, closed the door
> and asked me to dinner.  Woot.  All I could do was shake my head
> no.  Also, in my many lessons from Juan, I learned that he thinks
> topless dancers make a couple hundred grand a year.  So I guess
> we always could go that route. . .
>
> **Juan is my boss.  Lol, he's a jackass, I doubt he will ever be a
> normal co-worker. . .**
>
> . . . **all the harassment has been by the same married guy, Juan**.
> Would you believe his wife's name is also Alexandra?  He is the
> same one who asked for the BJ last year. . . .
>
> I think the only thing I can do is look for a new job.  Here's hoping
> the market improves?
>
> . . .  I have felt sick for the past two weeks straight and can hardly
> eat.  Which has never happened to me before, not even 1L. . .
>
> This morning I considered not getting off the 6 train at Grand
> Central and just not going to work.  Lol, second week.

Ex. 20 (emphasis added).

Ms. Marchuk's friend Annie Prescott, moreover, confirmed that on the Saturday

following the holiday party – approximately 36 hours after the event and while Ms. Marchuk was

still employed at F&F – Ms. Marchuk told her that she had been assaulted by Mr. Monteverde.

Ms. Prescott recalled Ms. Marchuk telling her:

> When they got up to the offices, he attacked her, tore her clothes
> and very forcefully had sex with her, which she did not want, and
> she was hurt and she bled a lot and asked him to stop and he didn't.
> And finally, when it was over, he told her not to tell anyone what
> had happened, suggested that no one would believe her and told
> her – I don't know what else he said, but she gathered her clothes
> and went home by herself on the subway.

Ex. 21 at 81.  The week after resigning from F&F, Ms. Marchuk exchanged further texts and

emails with friends indicating that Mr. Monteverde had assaulted her.  See Bursor Exs. Q, R, S,

T, U, V.  All of this evidence is admissible to rebut Defendants' argument that Ms. Marchuk

was attracted to Mr. Monteverde and only recently concocted her claims against him.

There is no merit to Defendants' argument that Ms. Marchuk's prior consistent statements after December 20, 2011 must be precluded because Ms. Marchuk first spoke to counsel on or around that date.  Def. Memo at 19 ("consultation with an employment attorney on December 20, 2011 provided the motive to begin shaping a record to benefit her anticipated litigation").  Defendants have repeatedly argued that Ms. Marchuk's delay in filing this lawsuit calls into question the veracity of her claims, and Ms. Marchuk must be permitted to counter that charge by offering evidence of the timely actions that she took, and statements that she made, that are consistent with her claims, such as immediately resigning, immediately visiting a doctor, immediately consulting counsel and contemporaneously and consistently recounting to close friends and family the events that occurred at F&F.

A per se bar against all such prior consistent statements merely because Ms. Marchuk had an initial consultation with counsel would be highly improper.  See U.S. v. Pietro, 232 F.3d 816, 820, 821 (11th Cir. 2000) (rejecting a "per se rule barring the admission of any prior consistent statements made by a witness following arrest"; "reasonable minds can differ as to when the witness may have first possessed a motive to fabricate").  The Court, therefore, should deny Defendants' motion to preclude Ms. Marchuk's late December 2011 communications because Defendants themselves continue to argue that Ms. Marchuk was still smitten with Mr. Monteverde at that time and had no motive to shape her statements otherwise.

5.  MIL #7:  Defendants Have No Basis Pre-Emptively
to Limit Plaintiff's Right to Impeach Mr. Munoz Based on
His Extraordinary Employment Record or other Evidence
Reflecting Upon his Credibility

Defendants seek to preclude Plaintiff from impeaching Vincent Munoz, a security guard for the building in which F&F's office is located, regarding generic subject matters. Defendants fail to cite any specific document or incident, but generally ask the Court to preclude

19

Plaintiff from impeaching Mr. Munoz based on his employment history or family support obligations.  Def. Memo at 19-23.

Defendants intend to call Mr. Munoz to testify about Ms. Marchuk's and Mr. Monteverde's demeanor upon entering and leaving Defendants' office building after the holiday party.  While Mr. Munoz admits that his signature in the building's register indicates that he terminated his shift before midnight on December 15, 2011, he nevertheless testified that he worked through the night and witnessed Ms. Marchuk and Mr. Monteverde enter and exit the building in a friendly manner. Ex. 22 at 60-61 ("they were hugged up").  Despite working at the building for several years and repetitively seeing the same people enter and exit thousands of times – and despite the passage of almost two years between the events in question and his deposition – Mr. Munoz claims to have a vivid memory of the events from December 16, 2011.

Before becoming a doorman at Defendants' building, Mr. Munoz worked at Con Edison until he was terminated in 2011.  At Con Edison, Mr. Munoz compiled an abominable employment history, including write-ups relating to his credibility and veracity, particularly with respect to matters such as attendance, employment responsibilities and employment qualifications.  He was written-up for operating company machinery without a license; mis-representing that his license was re-instated; leaving the scene of an accident; failing to report a vehicle accident; being "AWOL" from his shift and, in one incident, improperly taking a Con Ed backhoe out for a his lunch run.  See Ex. 23.

Prior to hearing Mr. Munoz's incredible testimony, it is entirely premature to wall-off general subject matters upon which Plaintiff may impeach Mr. Munoz.  While Plaintiff has no intention to cross-examine Mr. Munoz about his family-support obligation, if Plaintiff discovers an order or other judicial action reflecting upon Mr. Munoz's credibility, Plaintiff should be permitted to cross-examine him about it.  Similarly, several of Mr. Munoz's

infractions at Con Ed relate to his integrity regarding his workplace responsibility, particularly his integrity regarding his hours and place of employment, and Plaintiff should be permitted to question him about those infractions.

6.  **MIL #8:  Plaintiff  May Question Defendants about *Bernaz v. Chobani, Inc.***

There is no basis for Defendants' motion to preclude all reference to the *Bernaz v. Chobani, Inc.* litigation (the "Chobani Case").  Defendants' witness Maryann Bernaz was tending bar at the restaurant Rossini's and participated, at some level, in the conversation between Ms. Marchuk and F&F partner Emily Komlossy when Ms. Marchuk complained to Ms. Komlossy about Mr. Monteverde's harassment of her.

Ms. Bernaz's credibility, however, is severely impaired by her close relationship with F&F and her demonstrably feeble memory.  Ms. Bernaz's daughter, Danielle Serpica, is a legal assistant at F&F, and is also a witness in this case.  Moreover, Ms. Bernaz is a client of F&F and was represented by F&F in the Chobani Case, a class action that Ms. Bernaz purportedly brought against the Chobani yogurt company relating to the misleading marketing of its yogurt products.   Ms. Bernaz, however, claimed at her deposition that she knew nothing about the Chobani Case and did not even eat Chobani yogurt.  Immediately after the deposition, Defendants produced an affidavit from Ms. Bernaz in which she testifies that she merely forgot about the Chobani case at her deposition.

The Chobani Case obviously is relevant to Ms. Bernaz's testimony because it (1) tends to show her close and longstanding relationship to F&F, including F&F's representation of her as a plaintiff; (2) reflects her astoundingly poor memory regarding other important contemporaneous interactions with F&F and therefore calls into question her ability clearly to recall the conversation between Ms. Komlossy and Ms. Marchuk; and (3) reflects upon her obvious willingness to support F&F in its litigation efforts even by permitting F&F to file

21

litigation documents on her behalf regarding matters about which she knows nothing.  The Court

therefore should deny Defendants' baseless attempt to preclude Plaintiff from examining Ms.

Bernaz and other witnesses about the embarrassing but nevertheless highly relevant Chobani

Case.

  7.  MIL #9:  Plaintiff Does Not Intend to Refer to
       the Voluntarily Dismissed Malicious Prosecution
       and Title VII Claims Against the Individual Defendants

    Defendants fail to identify particular facts or documents that they seek to preclude

from evidence with respect to their ninth motion in limine.  Plaintiff, therefore, does not oppose

Defendants' ninth motion in limine to the extent that it generally seeks to preclude Plaintiff from

making legal or factual argument in support of her voluntarily dismissed claims of (1) malicious

prosecution and (2) claims of individual liability under Title VII.

  8.  MIL #10:  Defendants' Motion to Preclude Plaintiff's
       Claim for Constructive Discharge is Baseless and Procedurally Improper

    Defendants improperly ask the Court to dismiss Plaintiff's claims to the extent

that they assert a claim for constructive discharge.  This motion is baseless as the record supports

Ms. Marchuk's claim that her working conditions were intolerable and she had no reasonable

alternative other than to resign.  See Terry v. Ashcroft, 336 F.3d 128, 152-153 (2d Cir. 2003)

(reversing dismissal of constructive discharge claim because plaintiff "has put forth sufficient

evidence to allow a trier-of-fact to conclude that the constructive discharge occurred under

circumstances giving rise to an inference of discrimination on the basis of his membership in a

protected class. Terry does not allege that just a single event caused him to be constructively

discharged, but rather that such a discharge resulted from the cumulative, unabated harassment

that he experienced").

More importantly, Defendants' motion is procedurally improper.  Defendants' motion essentially seeks summary judgment dismissing an important theory of recovery on Plaintiff's claims.  Defendants previously filed a motion for partial summary judgment in this case and did not raise any issue concerning constructive discharge at that time; it is therefore improper for them to seek a ruling dismissing a substantive part of Plaintiff's claims in a motion in limine.  Millenium Expressions, Inc. v. Chauss Marketing, Ltd., 2006 WL 288353, *4 (S.D.N.Y. 2003) ("[t]he application for dismissal of Chauss' purported counterclaims explicitly requests a dispositive determination by the Court and, discussed above, is therefore not properly raised on a motion in limine"); East Coast Novelty Co., Inc. v. City of New York, 842 F.Supp. 117, 123 (S.D.N.Y. 1994) ("it is troublesome to dismiss a claim upon a pre-trial motion in limine"); Media Alliance, Inc. v. Mirch, 2012 WL 162375, *5 (N.D.N.Y. 2012) ("defendants have filed a motion in limine seeking to dismiss these claims 'as a matter of law.'  Defendants' motion is improper and untimely").  The Court, therefore, should deny Defendants' tenth motion in limine in its entirety.

<u>CONCLUSION</u>

Defendants' motions <u>in limine</u> improperly seek to preclude highly relevant evidence relating to important aspects of Plaintiff's claims, and the Court should deny all of the motions for the reasons stated herein.

Dated: New York, New York
        December 22, 2014

                                        ROTTENBERG LIPMAN RICH, P.C.


                                  By:_____/S/_____
                                       Harry W. Lipman
                                       Thomas E. Chase
                                       Jonathan S. Hershberg
                                  369 Lexington Avenue, Sixteenth Floor
                                  New York, New York 10017
                                  *Attorneys for Plaintiff, Alexandra Marchuk*