F230mar1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   ALEXANDRA MARCHUK,
4               Plaintiff,
5           v.                        13 CV 1669(AKH)
6   FARUQI & FARUQI, LLP, et al.,
7               Defendants.
8   ------------------------------x
9                                   February 3, 2015
10                                  10:30 A.M.
11
    Before:
12
                    HON. ALVIN K. HELLERSTEIN,
13
                                        District Judge
14
                        APPEARANCES
15
    ROTTENBERG LIPMAN RICH, PC
16       Attorneys for Plaintiff
    BY:  HARRY W. LIPMAN
17       JONATHAN S. HERSHBERG
         THOMAS E. CHASE
18
    BURSOR & FISHER, PA
19       Attorneys for Defendants
    BY:  SCOTT A. BURSOR
20       NEAL J. DECKANT
         YITZCHAK KOPEL
21
22
23
24
25

F230mar1                    Trial

1          (Trial continuing)

2          (Jury not present)

3          THE DEPUTY CLERK:  All rise.

4          THE COURT:  Good morning, all.  Be seated.

5          I have distributed a revised version of the proposed

6   charge to counsel.  I'm marking this one, I think it is five,

7   court exhibit five.  And a revised verdict form, which I'm

8   marking court exhibit six.

9          Not all of the points that you wanted yesterday, Mr.

10  Lipman, have been put in, as you have probably noticed.

11         MR. LIPMAN:  I have not noticed yet.

12         THE COURT:  Well, the Ellerth and Faragher defenses

13  have not been put in for Mr. Monteverde.  And I think you may

14  have wanted that, I'm not sure.  You also wanted a charge for

15  the City law that dealt with a nonvicarious liability for the

16  law firm, and I didn't give that.

17         MR. LIPMAN:  Did not?

18         THE COURT:  Did not.

19         MR. LIPMAN:  Plaintiff objects to that.

20         THE COURT:  Objection is noted.

21         Are there any other objections you have on this?

22         I have distributed this in advance so you could know

23  if there is anything you wanted to object to.

24         MR. LIPMAN:  Well, we only got it about -- Judge, we

25  got it one minute ago.

1    THE CLERK:  Right now.

2    THE COURT:  Sorry.  I'm sorry, Mr. Lipman.  Go ahead.

3    MR. LIPMAN:  Thank you.

4    THE COURT:  The only changes are in the substantive

5    part.  Starts on page 7 and continues through page 20.  But

6    there were no changes in the damages section.  Except for on

7    the first page of the damages section.

8    MR. LIPMAN:  Judge, at the bottom of page 8.

9    THE COURT:  Yes.

10    MR. LIPMAN:  The instruction says, "If you find that

11   Faruqi & Faruqi proved by a preponderance of the evidence that

12   it had procedures that reasonably could have prevented

13   discriminatory behavior and Ms. Marchuk failed to take

14   advantage," I think that you need the word "unreasonably"

15   failed to take advantage in there.

16    THE COURT:  I'll add "unreasonably."

17    MR. BURSOR:  Where is that?

18    THE COURT:  First word on page 9.

19    MR. LIPMAN:  Judge, claim four, page 13.  I mean there

20   are two other factors here that would, if found by the jury,

21   make the entity liable.

22    THE COURT:  Those are the points you wanted yesterday

23   having to do with negligence and supervision.  I --

24    MR. LIPMAN:  Not merely negligence.  I think it is a

25   reckless standard.

F230mar1                    Trial

1          THE COURT:  I'm not giving that, because we're dealing

2     with vicarious liability.  So if Mr. Monteverde is found liable

3     and he is found to be a supervisor, then the law firm is

4     liable.

5          MR. LIPMAN:  But if the jury finds that the law firm

6     knew about his behavior, but did nothing to prevent it or -- or

7     curb it, the law firm is liable.

8          THE COURT:  Even though the supervisor is not.  Is

9     that what you are saying?

10         MR. LIPMAN:  Yes.

11         THE COURT:  We don't have that situation.

12         MR. LIPMAN:  Well, we do, Judge.

13         THE COURT:  It's not part of this case, and I'm not

14    charging it.

15         MR. LIPMAN:  Judge, we have --

16         THE COURT:  Your objection is noted.  Your objection

17    is noted.

18         Up to this point, do you have any comments,

19    Mr. Bursor?

20         MR. BURSOR:  Your Honor, the only comment that I have

21    up to this point is one you have ruled on already, which I

22    think, is based on the DeWitt case by Judge Scheindlin.  And I

23    think the law is that --

24         THE COURT:  Your objection is noted, carried over from

25    the previous session.

F230mar1                    Trial

1          MR. LIPMAN:  Judge, on page 20, with regard to

2     punitive damages in the last paragraph, we would again urge the

3     Court to --

4          THE COURT:  We went through, that fully.  I'm not

5     changing it.

6          MR. LIPMAN:  I would just ask the Court to add the

7     word "immediately" Determined, so that the jury --

8          THE COURT:  No, it is staying the way it is.

9          MR. LIPMAN:  -- does not feel daunted by the task.

10          THE COURT:  Should stay the way it is.

11          Okay, anything else?

12          Let's call the jury.

13          Who is going to be your first witness in rebuttal?

14          MR. LIPMAN:  Brian Moon, your Honor.

15          THE COURT:  Get him out.

16          MR. BURSOR:  You said you had court exhibit number 6,

17     revised verdict form.  We have not seen that.

18          MR. LIPMAN:  The only revision was to the third point,

19     right, that was separated into A and B; is that right?

20          THE COURT:  I think that's right.  And the lines are

21     made eight spaces each.

22          THE DEPUTY CLERK:  All rise.

23

24

25

F230mar1                     Trial

1            (In open court)

2            (Jury present)

3            THE COURT:  Good morning, ladies and gentlemen.  I'm

4    glad to see you are all well and alert after the long break,

5    and the snow and ice storms that have engaged us all.

6            Please be seated, everyone.

7            I have had a number of meetings with the lawyers to go

8    over issues of law.  We have resolved them.  And there is going

9    to be a short rebuttal by the plaintiff.  There will be two

10   witnesses.  Brian Moon is on the witness stand now.  He will be

11   very short.  And then followed by Ms. Marchuk to deal, in

12   rebuttal, with some information that she did not cover in her

13   direct examination.

14           I have ruled that that rebuttal has to be focused only

15   on that which came up in the opposition case, in defendant's

16   case, that could not be anticipated and was not covered.

17           So we'll swear Mr. Moon now as a witness.  Pay

18   attention to oath, please.

19           THE DEPUTY CLERK:  Raise your right hand.  State your

20   full name and spell your last name.

21           THE WITNESS:  Brian Thomas Moon, M-O-O-N.

22           THE COURT:  And Brian is B-R-I-A-N?

23           THE WITNESS:  That is correct.

24    BRIAN MOON,

25       called as a witness by the Plaintiff,

F230mar1                    Trial

1     having been duly sworn, testified as follows.

2             THE COURT:  You may inquire, Mr. Chase.

3             MR. CHASE:  Thank you, Judge.

4   DIRECT EXAMINATION

5   BY MR. CHASE:

6   Q.  Good morning, Mr. Moon.  Can you tell us where you went to

7   college?

8             MR. BURSOR:  Objection.

9             THE COURT:  Overruled.

10  A.  Columbia.

11  Q.  Did you go to law school?

12  A.  I did.

13  Q.  And what law school?

14  A.  NYU.

15  Q.  And what year did you graduate from NYU?

16  A.  2007.

17  Q.  And where did you work after graduation?

18  A.  Started at Shearman & Sterling.

19  Q.  And how long were you there?

20  A.  About two years.

21  Q.  And did there come a time when you joined Faruqi & Faruqi?

22  A.  There was.

23  Q.  When did you join Faruqi & Faruqi?

24  A.  About May of 2011.

25  Q.  And what type of work did you do at Faruqi & Faruqi?

F230mar1                    Moon - direct

1    A.   Mergers and acquisitions litigation.

2    Q.   And did you work with Mr. Monteverde?

3    A.   Yes, I did.

4    Q.   And who were you assigned to, primarily, at Faruqi &

5    Faruqi?

6    A.   Juan.

7              THE COURT:  Mr. Monteverde?

8              THE WITNESS:  That's correct.

9    Q.   And was that assignment formalized in any way -- or when

10   did you learn that you were assigned to him?

11   A.   I can't recall specifically if it was immediately before

12   being hired, or immediately after being hired.  But I believe

13   it was communicated to me that I would be working with Juan

14   pretty much exclusively.

15             THE COURT:  Mr. Monteverde.

16             THE WITNESS:  Sorry.  Mr. Monteverde exclusively.

17   BY MR. CHASE:

18   Q.   And how long did you work for Mr. Monteverde?

19   A.   Until the end of December, 2012.

20   Q.   And is that when you left the firm?

21   A.   That's correct.

22   Q.   And did you have an understanding of Mr. Monteverde's role

23   at the firm?

24             MR. BURSOR:  Objection.

25             THE COURT:  Overruled.

1          MR. BURSOR:  Objection.

2     A.   I believed I did.

3     Q.   And can you tell us what your understanding was?

4     A.   He was a partner and head of the mergers and acquisitions

5     group.

6     Q.   And was it your understanding that he was an influential

7     partner?

8     A.   Yes, it was.

9     Q.   And what was that based on?

10    A.   A lot of it was based on Mr. Monteverde's own statements

11    that he was.  As well as sort of general conversations with

12    other people in the firm indicating that he was.

13    Q.   And what kind of statements did he make indicating that he

14    was an important partner at the firm?

15    A.   He would often say that he was making the most money, or

16    the only money, for the law firm.  And that -- and that's

17    basically what it amounted to.

18    Q.   Did he indicate to you that he was keeping the firm afloat?

19    A.   Yes, he did.

20    Q.   Did Mr. Monteverde instruct other partners not to give you

21    work?

22    A.   Yes, he did.

23    Q.   And was he territorial about who you worked for?

24          THE COURT:  How do you know --

25          MR. BURSOR:  Objection.

Moon - direct

1              THE COURT:  Sustained.

2              How do you know he said anything that he mentioned to

3    other partners.

4              THE WITNESS:  I believe I witnessed, at least on one

5    occasion, him calling another partner, Adam Gonnelli, on the

6    phone when I was there, saying not to give me work.

7    Q.  And did you understand from Mr. Faruqi and Ms. Faruqi that

8    you were to work primarily for Mr. Monteverde?

9    A.  Certainly from Mr. Faruqi.

10             THE COURT:  Mr. Chase, ask questions that will elicit

11   competent testimony, not hearsay.

12             MR. CHASE:  Okay.

13   Q.  Did you believe that if you were unhappy working for

14   Mr. Monteverde you could be --

15             THE COURT:  Objection sustained.

16             Did there come a time when you had a conversation with

17   either of the Faruqis having to do with where you would work in

18   the firm?

19             THE WITNESS:  Yes.

20             THE COURT:  When.

21             Can you ask questions that way?

22             THE WITNESS:  I believe that -- that it was, again,

23   either shortly before I was hired or immediately after I was

24   hired, Mr. Faruqi indicated to me that I would be working with

25   Mr. Monteverde.

1    THE COURT:  In or about May of 2011?

2    THE WITNESS:  That is correct.

3  BY MR. CHASE:

4  Q.  Did you ever attend hearings in Delaware with

5  Mr. Monteverde?

6  A.  No, I did not.

7  Q.  Did you ever ask to attend hearings in Delaware with

8  Mr. Monteverde?

9  A.  I believe I did, indirectly.

10  Q.  You believe you did.  Indirectly, did you say?

11  A.  Yes.

12  Q.  And can you elaborate what you mean?

13  A.  I recall a time when I noted that Ms. Marchuk had attended

14  a couple of hearings in Delaware soon after starting.  And I

15  was starting work at the firm.  And I was surprised that she

16  had, so quickly, been invited to attend a hearing.  And so I

17  recall making some sort of comment to Mr. Monteverde indicating

18  that I was surprised that she had, and meant to imply, you

19  know, would I be invited to also attend court hearings with

20  him.

21    THE COURT:  What did he say?

22    THE WITNESS:  I don't recall the specific words, but I

23  do recall that he, Mr. Monteverde, sort of barked up what I

24  perceived to be a harsh response that took me aback.

25    THE COURT:  What did he say?

F230mar1                    Moon - direct

1          THE WITNESS:  I don't recall the words, I just --

2          THE COURT:  Was it, in substance, no?

3          THE WITNESS:  I -- yes.  I took it as a no, for the

4     time being, or -- or a deflection of the question.

5          THE COURT:  Pardon?

6          THE WITNESS:  Or that he was dismissing my question.

7          THE COURT:  Well, what did he say to dismiss your

8     question?

9          THE WITNESS:  I don't recall what he said.  I just

10    recall my own feeling of being surprised that Mr. Monteverde

11    had reacted in a strong way when I thought I had been showing

12    enthusiasm to, you know, participate in substantive work.

13    BY MR. CHASE:

14    Q.  And in any event, did you ever go to Delaware?

15    A.  No, I did not.

16    Q.  Did you ever get invited on Mr. Monteverde's boat?

17    A.  Not really, no.

18    Q.  What do you mean, "not really?"

19    A.  He talked about his boat a lot and, you know, talked about,

20    you know how he, you know in sort of an abstract way, would

21    like to have people on his boat.  But I never received an

22    actual invitation.

23    Q.  Who was Andrea Nash at Faruqi & Faruqi?

24          THE COURT:  Are you going beyond the subjects

25    discussed?

F230mar1                         Moon - direct

1          MR. CHASE:  Excuse me?

2          THE COURT:  Are we going beyond the subjects we

3     discussed.

4          MR. CHASE:  No, your Honor.  This is absolutely what

5     we discussed.

6     A.  Andrea Nash was an associate of the firm.  She started at

7     about the same time that I did.

8     Q.  And do you have an understanding why she left the firm?

9     A.  Yes.

10    Q.  And what is that understanding based on?

11    A.  A conversation that I had with Mr. Monteverde.

12    Q.  And what did Mr. Monteverde tell you about why Ms. Nash

13    left the firm?

14    A.  He told me that he had fired her.

15    Q.  And did he take you out to lunch and have a discussion with

16    you around that time?

17    A.  Yes, he did.

18    Q.  And what did he discuss with you at that lunch?

19    A.  My recollection is that, shortly after Ms. Nash left the

20    firm, that Mr. Monteverde took me out to lunch and specifically

21    told me that he was taking me out to lunch to reassure me that,

22    you know, even though he had fired Ms. Nash, that he felt that

23    it was necessary to do so, and that he was meaning to, you

24    know, comfort me in case I had any concerns about my own job

25    security, given that Ms. Nash and I had started work at about

F230mar1                    Moon - direct

1    the same time.

2    Q.  Was it your belief at that time that Mr. Monteverde had the

3    ability to terminate you?

4    A.  Yes, I did.

5    Q.  Did anybody at the firm ever indicate to you that if you

6    wanted to work in a different department, you could?

7    A.  No.

8    Q.  Did Mr. Faruqi or Ms. Faruqi ever indicate to you that if

9    you were unhappy with the workplace, or had any concerns with

10   the workplace, you should express those concerns to them?

11   A.  I recall one firm meeting, towards the end of my tenure

12   there, when Ms. Faruqi did say something like that.

13   Q.  Well, did you believe that if you expressed your concern

14   about working for Mr. Monteverde, they would take action with

15   respect to those --

16          THE COURT:  Sustained.

17   Q.  Did there come a time that Ms. Marchuk came and joined the

18   firm while you were there?

19   A.  Yes.

20   Q.  And who did Ms. Marchuk work for?  When she joined the

21   firm.

22   A.  Mr. Monteverde.

23   Q.  And how did you know that?

24   A.  Mr. Monteverde told me, in advance of her arrival, that she

25   would be joining his team.  And that came to pass when she

F230mar1                    Moon - direct

1    actually did join.

2    Q.   Were you told that she would be replacing Ms. Nash?

3    A.   Yes.

4    Q.   And what was Ms. Marchuk's office demeanor like?

5    A.   Professional.

6    Q.   Do you recall, at all, Ms. Marchuk following Mr. Monteverde

7    around the office?

8    A.   No.

9    Q.   Do you recall her flirting with Mr. Monteverde, at all?

10   A.   No.

11   Q.   Did she excessively or inappropriately laugh at his jokes?

12   A.   No.

13   Q.   Did you attend the holiday party at the end of 2011?

14   A.   I did.

15   Q.   And do you recall Ms. Marchuk following Mr. Monteverde

16   around at the holiday party?

17   A.   No, I don't recall that.

18   Q.   Do you recall her acting flirtatiously toward

19   Mr. Monteverde at the holiday party?

20   A.   No, I don't recall that.

21   Q.   When you and Ms. Marchuk would speak in the office, did

22   Mr. Monteverde interject himself at all in these conversations?

23   A.   Yes, he would do that.

24            THE COURT:  Overruled.

25   Q.   And what -- can you elaborate?

1    A.  I recall, on several occasions, and on enough occasions

2    that I noted this.  If Ms. Marchuk and I were very briefly

3    engaged in a casual conversation, you know, like co-workers,

4    Mr. Monteverde would sort of appear from seemingly nowhere and

5    interject himself and say, you know, what are you talking about

6    or something along those lines.

7    Q.  And did you go out to lunch with Ms. Monteverde after she

8    started at the firm?

9            MR. BURSOR:  Objection.

10           THE COURT:  Ms. Marchuk.

11           MR. CHASE:  Ms. Marchuk, sorry.

12   A.  Yes.  Yes, I did.

13   Q.  And what do you recall about that lunch?

14   A.  I recall us going out to lunch because she had recently

15   started in the same group as me, and me wanting to be friendly.

16   And I recall her telling me about what I considered to be a

17   disturbing episode that she had told me had happened when she

18   recently started working.

19   Q.  What was that episode?

20   A.  From what I recall, she told me that she had attended a

21   hearing in Delaware with Mr. Monteverde.  I believe it was

22   within the first few days that she was at the firm.  And that

23   on the return trip, Mr. Monteverde wanted to drink alcohol on

24   the train.  And that he also wanted to go out for drinks at a

25   bar after arriving in New York.  And that the two did drink.

F230mar1                    Moon - direct

1    And that Mr. Monteverde kissed her.

2    Q.  Did Ms. Marchuk indicate to you in that conversation

3    whether that advance was welcome or unwelcome?

4    A.  She didn't use the exact word, but I believe the whole

5    context of the conversation was that it was unwelcome.

6    Q.  Unwelcome?

7    A.  Yes, that's correct.

8            THE COURT:  What did she say about it?

9            THE WITNESS:  She sounded concerned about, you know --

10           THE COURT:  Try to remember the words or substance of

11   what she said, rather than your own characterizations.

12           THE WITNESS:  What I recall was that Ms. Marchuk made

13   a casual comment in the middle of the conversation in response

14   to something I had said saying -- I think she said Juan had

15   something else in mind for me.  And I didn't register that she

16   had said that, or that that meant anything.  And I kept

17   speaking with her further.  And then she started to tell me

18   different episodes.  I think she told me about how when she was

19   a summer associate, the prior summer, Mr. Monteverde had said

20   to her --

21           MR. BURSOR:  Objection.

22           THE COURT:  Sustained.  We're going beyond the scope.

23           THE WITNESS:  Okay.

24           THE COURT:  No, now stop.

25           THE WITNESS:  Pardon me?

THE COURT: Stop.

THE WITNESS: Okay.

BY MR. CHASE:

Q. At that time, after learning that information, did you feel comfortable going to Mr. Faruqi or Mrs. Faruqi and expressing your concerns about the workplace?

MR. BURSOR: Objection.

THE COURT: Sustained.

I think we're finished with the scope of what we -- right, Mr. Chase?

MR. CHASE: No, I have a couple of more questions, your Honor, about the environment at the firm. I think we discussed it.

THE COURT: You have covered it. You have covered it. What more do we need?

MR. CHASE: Well, the hostile work environment in a larger sense.

THE COURT: I don't recall that. Step up to the sidebar.

(Continued on next page)

Moon - direct

1          (At the side bar)

2          THE COURT:  Where are we going, Mr. Chase?

3          MR. LIPMAN:  Sexual comments Mr. Monteverde made

4    repeatedly to him, and to the others, in the office, regarding

5    strippers, blow jobs, other sexual jokes.  Sexual partners.

6    Hostile work environment type of testimony, your Honor.  We

7    discussed it yesterday.

8          MR. BURSOR:  He testified at his deposition he never

9    once saw or heard Mr. Monteverde make any sexual jokes or

10   comments in the presence of Ms. Marchuk.

11         THE COURT:  You can bring that out.

12         MR. BURSOR:  He said he didn't know --

13         THE COURT:  He can ask.

14         You can ask.

15         MR. BURSOR:  -- in any event.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

F230mar1                    Moon - direct

1              (In open court)

2    BY MR. CHASE:

3    Q.  Mr. Moon, did you witness Mr. Monteverde making jokes or

4    comments of a sexual nature while you worked at Faruqi &

5    Faruqi?

6    A.  I did.

7    Q.  And what kind of jokes?

8              THE COURT:  When and where.

9              THE WITNESS:  Throughout my entire time at the firm,

10   in the office, at a local bar that Mr. Monteverde often invited

11   people to join him.

12             THE COURT:  Is that Lex Bar?

13             THE WITNESS:  That's correct.  And also --

14             THE COURT:  Stay with the firm.  How about inside the

15   firm?

16             THE WITNESS:  Yes, I recall hearing Juan making jokes

17   of a sexual nature in the office.

18             Mr. Monteverde.  Excuse me.

19   BY MR. CHASE:

20   Q.  Do you recall him commenting about his sex life in the

21   office?

22   A.  I recall him commenting about his sex life, I don't --

23             THE COURT:  You remember him commenting, in the

24   office, about his sex life.  That's what you meant, right?

25             THE WITNESS:  Right.  I -- I recall him --

F230mar1                    Moon - direct

1        THE COURT:  Just a movement of a few words.

2        THE WITNESS:  I have some recollection --

3        MR. BURSOR:  Objection.  I think he has answered the

4   question, your Honor.  The answer was yes.

5   BY MR. CHASE:

6   Q.  Can you tell us what you recall?

7        MR. BURSOR:  Objection.

8        THE COURT:  Wait a minute, wait a minute.

9        THE WITNESS:  Pardon?

10        THE COURT:  One minute.

11        Where and when.  The question is, "What do you

12   recall?"

13        And before you answer that, where was it said and when

14   was it said.  Then you can answer.

15        THE WITNESS:  I believe it would have been in the sort

16   of common area where the paralegals and staff members sat in

17   the office, the open floor plan.

18        Time.  You know, there were a series of episodes where

19   he would talk generally about things of a sexual nature.  I

20   can't recall the specific time that I heard him talking about,

21   you know, mistresses or things of that nature, but I recall

22   hearing him talk about that in that environment.

23   Q.  Did he discuss --

24        MR. BURSOR:  Your Honor, I object to that.  Move to

25   strike it.

F230mar1                         Moon - direct

1            THE COURT:  Overruled.

2       BY MR. CHASE:

3       Q.  Did you discuss --

4            THE COURT:  Did you understand these to be of a

5       boastful nature?

6            THE WITNESS:  It was not entirely clear how I was

7       supposed to understand these comments.

8            THE COURT:  He just said this?

9            THE WITNESS:  Yes.

10           THE COURT:  Sprinkling it through his speech?

11           THE WITNESS:  Yes.

12      BY MR. CHASE:

13      Q.  Did you ever provide similar anecdotes to him, is this part

14      of a give-and-take at all?

15      A.  No, I did not.

16      Q.  And were you sufficiently good friends or friendly with

17      Mr. --

18           THE COURT:  Next question, next question.

19      BY MR. CHASE:

20      Q.  Did you witness Mr. Monteverde commenting upon women's

21      physical appearance and attractiveness?

22           THE COURT:  I think we have covered the area for

23      rebuttal.  That's enough.

24           How many people were there, in the office,

25      approximately.  Lawyers and staff.

F230mar1                    Moon - direct

1          THE WITNESS:  My recollection would have been

2     somewhere around 30.

3          THE COURT:  And what was the division between men and

4     women, approximately?

5          THE WITNESS:  I -- I feel like it would be something

6     of an even split.

7     BY MR. CHASE:

8     Q.  Do you recall him making comments about --

9          THE COURT:  Of your own view -- I'll let counsel ask

10    this, withdrawn.

11          Continue.

12    BY MR. CHASE:

13    Q.  Do you recall Mr. Monteverde making comments about

14    strippers in the office place?

15          MR. BURSOR:  Objection.

16          THE COURT:  I'll allow this last one.

17    A.  I recall him looking up websites for strippers in the

18    office.

19    Q.  And how did you know that, or how did you come to learn

20    that?

21          MR. BURSOR:  Objection.

22          THE COURT:  Sustained.

23          All right, I think we have elicited enough.  Anything

24    else?

25          MR. CHASE:  Yes.  One several quick final questions.

1   BY MR. CHASE:

2   Q.  Do you recall jokes about the firm handbook at the firm?

3   A.  I do.

4   Q.  And what do you recall in that regard?

5   A.  I would recall that Mr. Monteverde would often make jokes

6   of a sexual nature in some public place in the office, either

7   in a meeting, or just in that open floor plan, and say

8   something inappropriate.  And Mr. Faruqi, as a way to sort of

9   get a punchline would underscore the inappropriateness of what

10  he had said by saying something like --

11              MR. BURSOR:  Objection.

12              THE COURT:  Instead of being discursive about it, who

13  said what, when, and where?

14              THE WITNESS:  Okay.

15              Mr. Monteverde would make comments, either on the

16  office floor, or in a conference room, something of a sexual

17  nature.  Mr. Faruqi would be there --

18              MR. BURSOR:  Objection.

19              THE WITNESS:  -- would hear it --

20              THE COURT:  Overruled.

21              THE WITNESS:  -- and would respond, "Handbook, Juan,

22  handbook."  And then Juan --

23              THE COURT:  What did you understand that to mean?

24              THE WITNESS:  I took it as sort of a like a sit com

25  punchline, like isn't it funny that Mr. Monteverde is being

1    inappropriate, and --

2              THE COURT:  You knew the handbook of the firm said

3    something about the appropriateness, or not, in an office

4    environment of coarse language?

5              THE WITNESS:  Yes.

6              THE COURT:  What was your understanding, whether it

7    was permitted or not, according to the handbook?

8              THE WITNESS:  My understanding is that inappropriate

9    sexual conduct should not have been permitted in the office.

10             THE COURT:  Including language to that effect?

11             THE WITNESS:  That would have been my understanding,

12   yes.

13             THE COURT:  And did you understand that when

14   Mr. Faruqi said what you said, he was referring to the

15   proscription in the handbook?

16             THE WITNESS:  Right.  That was my understanding.

17             THE COURT:  So why did you think it was a joke.

18             THE WITNESS:  The tone, and the timing, and the fact

19   that Mr. Monteverde's reaction would be to laugh.  And that

20   Mr. Faruqi did not ever follow up with a statement to indicate

21   that he was actually serious and that it was not a joke.  And.

22   Usually, this was eliciting laughter.

23   Q.  Do you recall jokes about blow jobs when the subject of the

24   BJ Wholesale --

25             THE COURT:  Objection sustained.  We're finished with

F230mar1                    Moon - direct

1    this.

2              MR. CHASE:  Could I ask one final question, your

3    Honor?

4              THE COURT:  I thought the last one was a final

5    question.

6              MR. CHASE:  I said a couple.

7              THE COURT:  Can I ask about his compensation, your

8    Honor?

9              MR. BURSOR:  No.  Objection.

10             THE COURT:  Objection sustained.

11             Okay, what's next.

12   CROSS-EXAMINATION

13   BY MR. BURSOR:

14   Q.  Good morning, Mr. Moon --

15             MR. CHASE:  Can you wait a second?

16             MR. BURSOR:  No, I'm ready to go.

17             THE COURT:  No, wait a second.

18             MR. BURSOR:  Pardon me?

19             THE COURT:  Are you finished getting away from the

20   lectern, Mr. Chase?

21             MR. CHASE:  Barely, your Honor.

22             THE COURT:  Go ahead, Mr. Bursor.

23             MR. BURSOR:  May I approach?

24             THE COURT:  You may.

25             MR. BURSOR:  I'm providing the witness with exhibit

F230mar1                    Moon - Cross

1    XX.

2    BY MR. BURSOR:

3    Q.  Mr. Moon, do have exhibit XX?

4    A.  I do.

5    Q.  Have you seen it before?

6    A.  I have.

7    Q.  What is it?

8    A.  It is a screenshot of my Facebook account messages, and it

9    is a conversation with Ms. Marchuk.

10            MR. BURSOR:  Defendants offer XX.

11            THE COURT:  Conversation was December 23, 2011?

12            THE WITNESS:  That's correct.

13            MR. CHASE:  Objection, your Honor.

14            THE COURT:  To what?

15            MR. CHASE:  I think he moved it into evidence, is that

16    right?

17            MR. BURSOR:  Yes.

18            MR. CHASE:  We object to it.  It is outside of the

19    scope, it's hearsay, it's not evidence.

20            THE COURT:  Sustained.

21    BY MR. BURSOR:

22    Q.  On December 23, did you learn that Ms. Marchuk was no

23    longer at the firm?

24    A.  Am I meant to be looking at this exhibit still?

25            THE COURT:  You can look at it, or you can answer

1    independently.

2    A.  Well, I don't recall the date independently of this

3    exhibit, but it looks like --

4            THE COURT:  Then leave the exhibit alone.

5            Did there come a time when you learned that Ms.

6    Marchuk had withdrawn from the firm?

7            THE WITNESS:  Yes.

8    Q.  How did you learn that?

9            MR. BURSOR:  Oh, I'm sorry your Honor.

10           THE COURT:  I was going to ask when.

11           THE WITNESS:  My recollection is that I learned this

12   some time after the 2011 holiday party.

13   BY MR. BURSOR:

14   Q.  How did you get that knowledge?

15   A.  From what I recall, Olive Alston made a comment indicating

16   that Ms. Marchuk would not be returning.

17   Q.  How did you react?

18   A.  I was startled and very surprised.  And I then reached out

19   to Ms. Marchuk, via Facebook, to ask for her contact

20   information.

21   Q.  And you expressed your startlement and surprise, right?

22   A.  When?

23   Q.  Through Facebook.

24   A.  Yes, I did.

25   Q.  And you were shocked that she left; right?

F230mar1                    Moon - Cross

1   A.  I think that's a fair characterization.

2   Q.  Okay.  And you were not -- when she left, it was unexpected

3   to you; right?

4   A.  Yes, it was unexpected.

5   Q.  You didn't say I'm not surprised she left because the work

6   environment was so hostile to her?

7          MR. CHASE:  Objection.

8          THE COURT:  Overruled.

9   Q.  That's not your reaction to that?

10  A.  My reaction was that I was very concerned what would be the

11  circumstances that would drive Ms. Marchuk to leave the firm.

12  Q.  And so you reached out to Ms. Marchuk to hear, firsthand,

13  why she left, right?

14  A.  That's correct.

15  Q.  And you reached out with an acronym, WTF?

16  A.  That's right.

17  Q.  That's how you reached out.  What is that an acronym for?

18  A.  Well --

19  Q.  We have heard it all in this trial.

20         THE WITNESS:  It is profanity, your Honor, is that all

21  right.

22         THE COURT:  Yeah, we have, unfortunately, had a fair

23  amount of experience with those kinds of things in this case.

24         So I'm concerned about the jurors' education, but

25  since they all look like mature people.

1          THE WITNESS:  All right.  For the benefit of the jury,

2     I think --

3          THE COURT:  I can just picture them going around

4     afterwards and saying, You can't imagine what Judge Hellerstein

5     allowed to be said in his courtroom.

6     A.  So don't say you learned it from me, but WTF stands for

7     what the fuck.

8     Q.  That was your expression of surprise?

9     A.  That's correct.

10    Q.  And you asked for Ms. Marchuk's cell phone number?

11    A.  Correct.

12    Q.  This is December 23?

13    A.  According to this exhibit.

14    Q.  This is one day after she quit?

15    A.  I don't recall that.

16    Q.  All right.  And you did speak to -- she did provide the

17    cell phone number, right?

18    A.  That's correct.

19    Q.  And you did speak to her on the cell phone?

20    A.  I did, briefly.

21    Q.  About why she quit?

22    A.  More or less, yes.

23         MR. BURSOR:  Your Honor, may I approach?

24         THE COURT:  You may.

25         MR. BURSOR:  I'm providing the witness with exhibit

F230mar1                    Moon - Cross

1  YY?

2          THE COURT:  For identification.  Not in evidence.

3  BY MR. BURSOR:

4  Q.  Mr. Moon, do you have exhibit YY?

5  A.  I do.

6  Q.  Have you seen it before?

7  A.  I have.

8  Q.  What is it?

9  A.  It is a screenshot of a GChat conversation with my father.

10 Q.  Defendants offer YY.

11         MR. CHASE:  Objection, your Honor.

12         THE COURT:  Sustained.

13 BY MR. BURSOR:

14 Q.  Did you have a GMail chat with your father on

15 December 27th, 2011?

16 A.  It appears I did.

17 Q.  And did you discuss, with your father, Ms. Marchuk's sudden

18 and abrupt departure from the law firm?

19 A.  Well, actually, it looks like I broached the subject, but

20 asked whether or not I should have a GChat conversation with

21 him.

22         THE COURT:  Should have a what?

23         THE WITNESS:  Whether or not I should talk about it on

24 GChat.

25         THE COURT:  You were worried about it being

1    overheard?

2            THE WITNESS:  Correct.

3    BY MR. BURSOR:

4    Q.  You were worried that the Faruqis might be logging your

5    keystrokes and see what you said to your dad, right?

6    A.  I thought it was a possibility.

7    Q.  Okay.  So what you did, was you said, dad, I'm going to

8    send you an e-mail about this; right, that's what you did?

9    A.  I asked him for his opinion on whether or not I should be

10   concerned about a key stroke log.  And my father said send me

11   an e-mail.  Even though that would not change whether or not

12   there was a keystroke log, but, yes.

13           MR. BURSOR:  Your Honor, may I approach?

14           THE COURT:  You may.

15           MR. BURSOR:  I'm providing the witness with a copy of

16   ZZ.

17           THE COURT:  For identification.

18   BY MR. BURSOR:

19   Q.  Mr. Moon, do you have exhibit ZZ?

20   A.  I do.

21   Q.  Have you seen it before?

22   A.  I have.

23   Q.  What is it?

24   A.  E-mail sent to my father in response to his suggestion that

25   I do so.

F230mar1                     Moon - Cross

1              MR. BURSOR:  Defendants offer ZZ.

2              MR. CHASE:  Objection.

3              THE COURT:  Sustained.

4    BY MR. BURSOR:

5    Q.  Did you tell your father what Ms. Marchuk told you on the

6    phone call, one day after she resigned?

7    A.  No, I did not.

8    Q.  Defendants offer ZZ.

9              MR. CHASE:  Objection.

10             THE COURT:  Sustained.

11             Did you have a conversation with Ms. Marchuk?

12             THE WITNESS:  I did.

13             THE COURT:  And did you make an effort to repeat

14   aspects of the conversation to your father?

15             THE WITNESS:  No, I did not.

16             THE COURT:  In this GMail, did you write to your

17   father about what you and Ms. Marchuk told each other on the

18   phone?

19             THE WITNESS:  No, not directly.

20             THE COURT:  What do you mean "directly."

21             THE WITNESS:  I didn't mean to --

22             THE COURT:  Do you see this third sentence here?

23             THE WITNESS:  Yes, I do. I do.

24             THE COURT:  And do you see the second, you "reached

25   out to her."  Does this mean you physically threw out your

F230mar1                    Moon - Cross

1   hand, trying to touch her?  What does it mean, "you reached out
2   to her?"
3           THE WITNESS:  Via Facebook.  I sent her a message on
4   Facebook.
5           THE COURT:  What does it mean you "reached out to
6   her".  You called her up, you texted her?
7           THE WITNESS:  Well, it says hear I reached out to her
8   via Facebook, which means I sent her a message on Facebook.
9           THE COURT:  You communicated with her.
10          THE WITNESS:  I sent a message on Facebook.
11          THE COURT:  You communicated to her, you intended to
12  convey a message to her.  I'm an old-fashioned person.  What
13  does it mean to communicate?
14          THE WITNESS:  Have a back-and-forth discussion.
15          THE COURT:  Just say something?
16          THE WITNESS:  Correct.
17          THE COURT:  In words or writing.
18          THE WITNESS:  Right.
19          THE COURT:  And to listen to the response.
20          THE WITNESS:  Uh-huh.
21          THE COURT:  Yes?
22          THE WITNESS:  That sounds accurate to me.
23          THE COURT:  So did you have a communication with Ms.
24  Marchuk that you recorded in some fashion in this Gmail?
25          THE WITNESS:  I did have a conversation.

F230mar1                    Moon - Cross

1          THE COURT:  Tell us about it.

2          THE WITNESS:  Okay.  So the conversation --

3          THE COURT:  What you did you say to her, and what did

4    she say to you?

5          THE WITNESS:  I don't recall what my initial statement

6    to her was.  It was probably something along the lines of:

7    What happened.

8          And my recollection of what she said to me on that

9    phone call was that things got out of hand.  And that part I

10   remember specifically.  And then she either said something like

11   I have decided not to come back, or I have decided to leave.

12   Something along those lines.

13         MR. BURSOR:  Defendants offer ZZ.

14         THE COURT:  No, you can use it as cross-examination.

15   You know how to do a cross-examination, right, Mr. Bursor?

16         MR. BURSOR:  I do.  I also know how to put documents

17   in evidence, your Honor.

18         THE COURT:  Do it.

19   BY MR. BURSOR:

20   Q.  When you spoke to Ms. Marchuk on the phone --

21         THE COURT:  The document is hearsay, but the

22   conversations in it are not.

23         MR. BURSOR:  Prior inconsistent statement of the

24   witness.

25         THE COURT:  My ruling stands.

1    MR. CHASE:  Your Honor --

2    THE COURT:  Sit down, Mr. Chase.

3    MR. CHASE:  Badgering the witness.

4    THE COURT:  The witness is not being badgered.

5    MR. CHASE:  He is yelling at him.

6    MR. BURSOR:  The mic doesn't work.

7    BY MR. BURSOR:

8    Q.  When you spoke to Ms. Marchuk one day after she resigned,

9    she told you she had an affair with Juan?

10   A.  That's not correct.

11   Q.  When you wrote to your father, you told him --

12   THE COURT:  Mr. Bursor.

13   MR. CHASE:  We can all hear him, your Honor.

14   THE COURT:  When you wrote to your father did you tell

15   your father that Ms. Marchuk told you that she had an affair

16   with Juan?

17   THE WITNESS:  I wrote those words, but what I was

18   doing was adding my gloss to what Ms. Marchuk told me.  What

19   Ms. Marchuk actually told me was, quote, "things got out of

20   hand," end quote.  And something like:  And I'm not coming

21   back.

22   Q.  And when you wrote, "she told me she had an affair with

23   Juan," that was your gloss of what you understood Ms. Marchuk

24   said to you?

25   A.  That was my speculation as to what she meant by things got

1    out of hand.  And I never pressed Ms. Marchuk to elaborate what

2    she meant by, "things got out of hand."

3              MR. BURSOR:  Defendant offer ZZ.

4              MR. CHASE:  Objection.  Still.

5              THE COURT:  Accepted.  It is admitted into evidence.

6    It is a prior inconsistent statement of a witness.

7              This information is not relevant, in and of itself,

8    except as to affect the credibility, if you consider it as

9    such, of the witness.

10             (Defendant's Exhibit ZZ received in evidence)

11             MR. BURSOR:  May I display it?

12             THE COURT:  You may not.

13             MR. BURSOR:  I may what?

14             THE COURT:  You may not.

15             MR. BURSOR:  I may not display it.

16             THE COURT:  It is a prior inconsistent statement.

17   That is all it is.  It is not evidence in chief.

18   BY MR. BURSOR:

19   Q.  Between the time you told your father that Ms. Marchuk told

20   you she had an affair with Juan, and the time you came here on

21   direct and said there was a disturbing episode, how many

22   meetings did you have with these fellows here?

23             THE COURT:  Overruled.

24             THE WITNESS:  Zero.

25   BY MR. BURSOR:

1   Q.  Pardon?

2   A.  Zero.

3          (Continued on next page)

F23emar2                    Moon - cross

1    BY MR. BURSOR:

2    Q.  Zero meetings with Mr. Lipman?

3    A.  The only conversations I've had with Mr. Lipman have been

4    about scheduling my deposition, which I was required to appear

5    for pursuant to a subpoena, as well as for testimony today.

6    Q.  Now, Ms. Marchuk also told you about the kiss with Juan

7    after the hearing in Delaware, right?

8    A.  She did, at the lunch, correct.

9    Q.  And is that the one that today on the witness stand you

10   described as the disturbing episode?

11   A.  That -- yes.

12   Q.  Now, when you wrote an e-mail to your father on

13   December 23rd, you didn't describe it as a disturbing episode,

14   did you?

15   A.  (Pause)

16        THE COURT:  What's your recollection, Mr. Moon?

17   A.  Well, in this e-mail I say, She told me previously that she

18   and Juan had kissed on her third day of work here after

19   drinking a lot.

20   Q.  You wrote, I think it was mutual, right?

21   A.  Right.  I speculated that it was mutual.

22   Q.  And then when you came here and testified on direct, you

23   testified to this jury you thought it was unwelcome?

24   A.  Yes.  That's my testimony.

25   Q.  What happened between December 27, 2011, and today that

1   made you change your story from a mutual kiss to an unwelcomed

2   kiss?  What was it that made you make that change?

3   A.  I think when I was writing this e-mail, I frankly was more

4   concerned about my own personal situation, which was how to

5   handle what I considered to be a very awkward situation at

6   work.  And the point that I was trying to get advice from from

7   my father is whether or not I need to say anything or address

8   this somehow.  And the circumstances of Ms. Marchuk leaving the

9   firm was actually secondary.  And I was meaning to give a very

10  quick gloss on what had happened so I could get to the real

11  point, which is the second paragraph, which is me asking, How

12  should I handle this situation?  This is very awkward.  Am I

13  supposed to say anything?

14          So for purposes of getting that, you know, input from

15  my father, I sent this fairly tersely-worded e-mail.  And so at

16  that time I put the gloss that I thought it was mutual and she

17  decided to leave.

18  Q.  You understand what's happening at this trial, right?

19          MR. CHASE:  Objection, your Honor.

20  Q.  You've been following this trial?

21          THE COURT:  Overruled.

22  A.  I try not to pay attention to this trial.

23  Q.  You understand that a big issue in this case is whether the

24  conduct was welcome or unwelcome.  You understood that before

25  you came in here today, didn't you?

1    A.  I understand that that is an issue.

2    Q.  And with that understanding, you changed your story from

3    mutual to, quote, unwelcome on your direct testimony with

4    Mr. Lipman; right?

5    A.  I don't know that I was referring in this -- I actually

6    don't recall in this e-mail what I was referring to, if mutual

7    was the kiss that happened on the third day of work or whatever

8    it was that happened at the holiday party.  So I'm not sure

9    that I'm saying something different.

10              THE COURT:  Are you saying something at the holiday

11   party --

12              THE WITNESS:  I don't think I was ever saying the kiss

13   was a welcome kiss in the e-mail, so I don't think I'm changing

14   my testimony.

15              THE COURT:  So the mutuality of the affair you wrote

16   about at the holiday party could be what might have been

17   mutual?

18              THE WITNESS:  That's -- I think that may be what I was

19   saying in the e-mail.

20              THE COURT:  So you might be saying that the activity

21   that took place at the party was mutual but the kiss on the

22   third day of work was unwelcomed?  Is that what you're telling

23   us?

24              THE WITNESS:  I think that may be the case, because I

25   don't feel like I've ever said that in my lunch with

F23emar2                    Moon - cross

1    Ms. Marchuk that she was trying to tell me that she was happy

2    that her boss had kissed her.

3            THE COURT:  So her withdrawal from the firm followed

4    something that was mutual?

5            THE WITNESS:  I was speculating there that perhaps

6    something had changed from the third day of work to whatever

7    had happened at the holiday party, and that that was mutual.

8            THE COURT:  And then she withdrew?

9            THE WITNESS:  Correct.

10           THE COURT:  After a mutual affair?

11           THE WITNESS:  Correct.  That was my speculation.

12   BY MR. BURSOR:

13   Q.  That was your conclusion based on the phone call you had

14   with Ms. Marchuk?

15   A.  I wouldn't say it was based on the phone call.  I think it

16   was just --

17           THE COURT:  Mr. Bursor.

18   A.  I don't know what it was based on.

19           THE COURT:  I think whatever your points are, they're

20   finished.

21   Q.  Now, you were the person -- there were three people on your

22   team, right?

23   A.  I don't know the number of people on my team.  There was a

24   handful of people who were in mergers and acquisitions

25   litigation.

F23emar2                         Moon - cross

1    Q.  You worked with Ms. Marchuk every day when she was at the

2    firm, right?

3    A.  We were on the same team.  I'm not sure that I would say

4    that we worked together.  We worked on separate cases.

5    Q.  You worked on the same floor with Ms. Marchuk and

6    Mr. Monteverde every day for three months?

7    A.  That's right.

8    Q.  And you worked on M and A cases and they worked on M and A

9    cases, right?

10   A.  That's correct.

11   Q.  And you never once in that office heard or saw

12   Mr. Monteverde make any sexual jokes or comments in the

13   presence of Ms. Marchuk; isn't that true?

14   A.  I think that's right.

15   Q.  And you never once heard or saw Mr. Monteverde acting

16   inappropriately around Ms. Marchuk in the office?

17   A.  I find that hard to believe.

18           MR. BURSOR:  Your Honor, may I approach.

19           THE COURT:  You may.

20           MR. BURSOR:  Just approaching to provide your Honor

21   with the deposition transcript.  Your Honor, page 59, line 18

22   to 22.  I'd like to read that to the jury.

23           THE COURT:  You can't read it to the jury, but you can

24   ask the witness about it.

25   Q.  Were you asked the following questions and did you give the

1   following answer, quote:  Did you ever observe him acting

2   inappropriately around her?

3   "A    When you ask that way, I'm not sure if I have specific

4   recollections of what I would call inappropriate."

5           Were you asked that question and did you give that

6   answer at your deposition?

7   A.  Well, assuming the transcript is accurate, I think that's

8   right.

9           THE COURT:  What's your recollection?

10          THE WITNESS:  I don't recall specifically being asked

11  that question or my answer.

12          THE COURT:  Now that you read it, does it refresh your

13  recollection?

14          THE WITNESS:  It sounds to me like what I'm saying

15  there is -- do I have a specific recollection --

16          THE COURT:  It sounds to me that you can read, right,

17  Mr. Moon?  You passed the bar?

18          THE WITNESS:  I did.

19          THE COURT:  You learned how to read?

20          THE WITNESS:  I did.

21          THE COURT:  Did you read this question and this

22  answer?

23          THE WITNESS:  I understand the question and the

24  answer.

25          THE COURT:  And were you asked that question and did

F23emar2                      Moon - cross

1  you give that answer when you had your deposition taken on

2  October 21, 2013?

3              THE WITNESS:  That sounds correct to me.

4              MR. BURSOR:  Nothing further, your Honor.

5              THE COURT:  Redirect.

6              MR. CHASE:  Yes.

7  REDIRECT EXAMINATION

8  BY MR. CHASE:

9  Q.  Quick questions.  I believe you testified that you were

10 shocked when you learned that Ms. Marchuk left the firm.  Why

11 were you shocked?

12             MR. BURSOR:  Objection.

13             THE COURT:  Overruled.

14 A.  From what I recall, there was -- I had concerns that there

15 was a lot of turnover at the firm.  So just generally hearing

16 another instance of an attorney leaving or possibly being fired

17 concerned me.

18             I also wasn't under the impression that Ms. Marchuk

19 had any intention of leaving the firm.  So I was shocked that

20 she would.

21 Q.  Had she ever discussed her loan situation with you?

22 A.  I believe she did.

23             MR. BURSOR:  Objection.

24             THE COURT:  Sustained.

25 Q.  When you were writing your dad an e-mail Mr. Bursor went

F23emar2                    Moon - redirect

1  over with you, were you toning down at all the sexual content

2  because you're communicating with your dad?

3           THE COURT:  Objection sustained.

4           MR. BURSOR:  Objection.

5  A.  I don't specific --

6           THE COURT:  Don't answer when I sustain an objection.

7  Q.  And finally, what's your recollection of the exact words

8  Ms. Marchuk said to you about the evening after the holiday

9  party when you called her?

10 A.  What I specifically recall was that Ms. Marchuk said,

11 Things got out of hand.

12          MR. CHASE:  I have no further questions.

13          THE COURT:  Thank you, Mr. Moon.  You're excused.

14          (Witness excused)

15          MR. LIPMAN:  Your Honor, plaintiff calls herself,

16 Ms. Marchuk, to the stand.

17          THE COURT:  Ms. Marchuk, I remind you that you remain

18 under your original oath.

19          You may inquire, Mr. Lipman.

20          MR. LIPMAN:  Thank you, your Honor.

21                              - - - - -

22

23

24

25

F23emar2                    Moon - redirect

1    ALEXANDRA MARCHUK,

2         called as a witness on her own behalf in rebuttal,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. LIPMAN:

6    Q.  Ms. Marchuk, after you started at Faruqi & Faruqi working

7    full time on September 6, 2011, did you ever ask anyone at the

8    firm whether you could go to Delaware to attend any hearings?

9         MR. BURSOR:  Objection, your Honor.  This is not in

10   the form that we discussed yesterday.

11        THE COURT:  That's true, but I'm going to allow it.

12   A.  No, never.

13   Q.  Why not?

14   A.  It didn't seem appropriate to ask to go.  You're told what

15   to do in a law firm.  You don't make demands on the employer.

16   Q.  Mr. Monteverde testified that after the first trip to

17   Delaware for the hearing on September 8, 2011, when you and he

18   were at Lex Bar together, that there was no discussion of your

19   student loan debt.  What do you recall?

20   A.  I recall that when we were talking about my unemployed

21   classmates, that I had said that it wasn't an option for me;

22   that I had loans, that I had to start paying them off.  I

23   remember him asking me more questions about it.  He wanted to

24   know the exact amount.  I didn't want to tell him, but he kept

25   pressing me.  I didn't tell him the amount that night.

F23emar2                    Marchuk - direct

1    Q.  Did the subject of your student loan debt arise between you

2    and Mr. Monteverde after that night?

3    A.  Yes, frequently.

4    Q.  Did you bring it up or did he bring it up?

5    A.  He brought it up.

6    Q.  Concerning your interactions with Mr. Monteverde on

7    September 8th after the first trip to Delaware, did he kiss

8    you?

9         MR. BURSOR:  Objection.

10        THE COURT:  Overruled.

11   A.  He did.

12   Q.  Where?

13        MR. BURSOR:  Objection.

14        THE COURT:  Sustained.  Outside the scope.  This has

15   been covered substantially by Ms. Marchuk on her direct case,

16   and we're not going to repeat the direct case.

17   Q.  Mr. Monteverde testified that you propositioned him for sex

18   on your third day of work outside of Lex Bar.  Is that true?

19   A.  No.

20   Q.  Did you ever do such a thing?

21   A.  No.

22   Q.  There was testimony by Olive Alston that you and

23   Mr. Monteverde were like magnet and steel at the holiday party.

24   Is that true?

25   A.  No.

1    Q.  Did you follow Mr. Monteverde around at the holiday party?

2    A.  I did not.

3    Q.  Did you attempt to ever sit next to Mr. Monteverde during

4    the holiday party?

5    A.  No.  I specifically tried not to.  There were two seats

6    left at the last table.  One was next to Mr. Monteverde and

7    Mr. Moon.  I whispered that he should take it, and he did.

8    Q.  Did you speak with Mr. Monteverde at the holiday party?

9    A.  The first time I spoke with him was when we were leaving,

10   walking down the stairs.

11   Q.  As you were leaving, walking down the stairs, what did you

12   say to Mr. Monteverde and what did he say to you?

13   A.  My bonus was still on my mind.  I finally just said

14   directly, am I getting a bonus?  He said that we shouldn't talk

15   about it in front of everyone else.  He had me stand with him

16   next to the stairs while everyone was going to the coat check.

17   Q.  At that time did you ask Mr. Monteverde about why Dave

18   Leventhal had been fired from the firm?

19   A.  No.

20   Q.  At that time did you ask Mr. Monteverde about the finances

21   of the firm?

22   A.  No.

23   Q.  On the Friday, the day after the holiday party, when you

24   got to the office, did you contact Mr. Monteverde?

25   A.  I did.

F23emar2                      Marchuk - direct

1   Q.  And what did you contact him for?

2   A.  He had said the night before to not tell anyone what had

3   happened.  He specifically said not to tell my cousin that I

4   lived with.  When I got to the office, my -- there was a stain

5   on the floor, and it was obvious that -- what had happened.

6   And I didn't want anyone else to see it because he had said

7   that, you know, we couldn't tell anyone about it.  And I didn't

8   know what else to do.  He was the only person I could talk to

9   about it.

10  Q.  In the office on the Friday after the holiday party, did

11  you speak with Nadeem Faruqi?

12  A.  Not that I recall.

13  Q.  Did you tell him, I had a great time at the party last

14  night?

15  A.  I don't think so.

16  Q.  In the office on the Friday after the holiday party, did

17  you have any discussions with Lubna Faruqi?

18  A.  Not that I recall.

19  Q.  Did you tell Lubna Faruqi that you had a great time at the

20  party last night?

21  A.  I don't think so.

22  Q.  During the day on Friday, the full day after the holiday

23  party, how do you remember feeling during that day?

24              MR. BURSOR:  Objection.

25              THE COURT:  Sustained.

F23emar2                        Marchuk - direct

```
 1    Q.  Do you recall Mr. Faruqi testifying in this case,

 2    Ms. Marchuk, that you seemed perfectly normal on the Friday?

 3    A.  I do.

 4    Q.  Remembering back to that Friday, how did you feel while you

 5    were in the office that day?

 6              MR. BURSOR:  Objection.

 7              THE COURT:  Overruled.

 8    A.  I wasn't -- wasn't myself.  I -- I felt overwhelmed, but I

 9    also felt like I couldn't -- I couldn't talk to Brian, I

10    couldn't talk to the people that I normally saw.  I stayed in

11    my office.

12    Q.  Did Mr. Monteverde say anything to you about staying in

13    your office?

14    A.  Yeah.  He told me not to even look at Emily; to stay in my

15    office.

16    Q.  Emily Komlossy?

17    A.  Yes.

18    Q.  Did you get work done on that Friday?

19    A.  Not that I recall.

20    Q.  Dr. Hammer testified that you went to work on the Friday,

21    and that was evidence that you were fine after what had

22    happened.  Is that true?

23    A.  No.

24              THE COURT:  Well, what's not true, that he said it or

25    that she felt that way or what?
```

F23emar2                    Marchuk - direct

1          MR. LIPMAN:  Right.

2     Q.  Is that true that you felt that way, you felt fine?

3     A.  I didn't feel fine.

4     Q.  Why did you go to work on that Friday?

5     A.  It -- it's what I always did.  It -- just when my alarm

6     went off, I got up and I went to work.  I -- I don't know why I

7     did.

8          THE COURT:  You set the alarm, right?

9          THE WITNESS:  It's a weekly -- on weekdays it goes off

10    at a certain time.

11    Q.  Dr. Hammer also testified that when he asked you during his

12    court ordered examination of you what you did on the weekend

13    immediately following the holiday party, you told him, quote,

14    nothing special, closed quote, or quote, nothing special

15    happened, closed quote.

16         What do you actually recall telling him?

17    A.  I said that I didn't do anything.  Those are my exact

18    words.

19    Q.  Did Dr. Hammer follow up with you?

20    A.  No.

21    Q.  Did Dr. Hammer ask you any questions at all about what you

22    did on the weekend following the holiday party, other than to

23    just ask you if you did anything?

24         MR. BURSOR:  Objection.

25         THE COURT:  One minute.

1          You covered this with Dr. Hammer, Mr. Lipman.

2     Objection sustained.

3     Q.  What did you do that weekend, Ms. Marchuk?

4              MR. BURSOR:  Objection.

5              THE COURT:  Overruled.

6     A.  I -- I don't have a clear recollection of doing much beyond

7     just staying in bed.  It wasn't until we got my phone records

8     for this that I remembered I called Annie Prescott, my roommate

9     from law school; that I called two gynecologists' office; that

10    I had called my friend, Tori Leventhal; that I had called my

11    brother.  The only person I actually spoke to was Annie

12    Prescott.

13    Q.  Mr. Monteverde testified that over that weekend that you

14    were actively involved in working on the Pharmacet matter, I

15    think it was.  Were you?

16    A.  No.  On Sunday he had sent me an e-mail.  He had said that

17    a settlement had been reached.  I sent -- I think first I sent

18    like a quick follow-up e-mail a few hours later that said,

19    Good.  And then I sent a follow-up question.  There had been a

20    problem with the banker books.  He responded that it was fine.

21    He used an emoticon, which was really unusual.  I don't think

22    he'd ever done that before.  He -- his first e-mail he had

23    asked, he hoped -- if I was feeling any better.

24    Q.  If you were to add up the minutes that you spent over that

25    weekend doing any kind of substantive work on cases for the

1    Faruqi firm, what would that total be?

2    A.   Under five minutes.

3    Q.   Danielle Serpica testified that you followed Mr. Monteverde

4    around the office like a puppy dog.  Did you?

5    A.   No.

6    Q.   Faruqi & Faruqi partner Adam Gonnelli testified that you

7    and he went to lunch together in March of 2012 in connection

8    with you asking him to be a reference for you on your resume.

9    Is that correct?

10   A.   Yes.

11   Q.   He testified that you asked him to keep your conversation

12   confidential.  Is that true?

13   A.   No.  I had told him that I had counsel in connection with

14   my departure from the firm and that I couldn't say anything

15   more.  But I didn't give him any confidential information, and

16   I didn't ask him to keep anything confidential.

17   Q.   Did he ask you why you left the firm?

18   A.   He did.

19   Q.   And what did you say to him?

20   A.   My exact words were, Because of Juan.

21   Q.   Did he ask you to elaborate?

22   A.   He did.

23   Q.   What did you do?

24   A.   I told him that I couldn't; that I had counsel of my own,

25   and that he couldn't get involved.

F23emar2                    Marchuk - direct

1    Q.  How did Mr. Gonnelli react?

2    A.  He was upset.  I remember that he balled his fist and he

3    hit the wall next to us.

4    Q.  Mr. Monteverde testified that, looking back on the fall of

5    2011, he thinks you were obsessed with him.  Were you?

6    A.  No.

7    Q.  Did you hire my law firm because we were in the same

8    building as Mr. Monteverde?

9            MR. BURSOR:  Objection.

10   Q.  Because you were obsessed with him?

11           THE COURT:  I'm letting this question go.

12           Go ahead.  You can answer.

13   A.  No.

14   Q.  What were the circumstances under which --

15           THE COURT:  You hired Mr. Lipman because you thought

16   he was a good lawyer?

17           THE WITNESS:  I hired him because the first lawyer I

18   spoke with specifically referred me to him.

19           THE COURT:  Because you were referred to him, and you

20   thought he was a good lawyer?

21           THE WITNESS:  Yeah.

22           THE COURT:  That's the end of it.

23   Q.  Did it have anything --

24           THE COURT:  The end of the inquiry about the law firm.

25           You're in business to do these cases, right,

F23emar2                        Marchuk - direct

 1    Mr. Lipman?  You've done these a long time.  You're doing well.

 2    That's all it goes to.  That's how clients choose lawyers.

 3              Next question.

 4              MR. LIPMAN:  I was going to respond to your question,

 5    but I don't think need to.

 6              THE COURT:  Next question.

 7    Q.  Is there any reason why you didn't pursue --

 8              THE COURT:  Once upon a time clients hired me.  Long

 9    time ago.

10              MR. LIPMAN:  They should be so lucky again, Judge.

11              THE COURT:  Thank you, but I'm happy now.

12    BY MR. LIPMAN:

13    Q.  Is there a reason that you didn't pursue further mental

14    healthcare or therapy --

15              THE COURT:  We've gone over this.

16    Q.  -- after your sessions with -- after your sessions with

17    Dr. Jacobson ended?

18              THE COURT:  We've gone over that, Mr. Lipman.

19              MR. LIPMAN:  It was part of the defendants' case to

20    question with Dr. Hammer why she didn't pursue further therapy.

21              THE COURT:  Why didn't you pursue further therapy Once

22    you moved to the Midwest?

23              THE WITNESS:  When I was going to see Dr. Jacobson, it

24    was really disruptive.  I was starting a new job.

25              THE COURT:  It was really?

1            THE WITNESS:  Disruptive.

2            THE COURT:  Disruptive.  Took time?

3            THE WITNESS:  The way I felt the remaining day,

4    sometimes the day afterwards, it was okay for a document

5    review.  I didn't think it was a good way to start at a new

6    job.  And then I just didn't start back up.

7            MR. LIPMAN:  No more questions.

8            THE COURT:  Mr. Bursor?

9            MR. BURSOR:  Your Honor, may I approach?

10           THE COURT:  You may.

11           MR. BURSOR:  Your Honor, I'm providing the witness

12   with a copy of Exhibit 33.

13   CROSS EXAMINATION

14   BY MR. BURSOR:

15   Q.  Ms. Marchuk, do you have Exhibit 33?

16   A.  Yes.

17   Q.  Have you seen it before?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's the e-mail that I sent to Mr. Monteverde on Friday,

21   December 16th.

22           MR. BURSOR:  Defendants offer 33.

23           THE COURT:  Objection sustained.

24           MR. LIPMAN:  Objection.

25           MR. BURSOR:  Sustained?

F23emar2                     Marchuk - cross

1              THE COURT:  Right.  It doesn't mean you cannot

2      inquire.  You can inquire.

3      BY MR. BURSOR:

4      Q.  Friday, December 16th, were you the second person in the

5      office?

6      A.  No.  My recollection is that Danielle Serpica, Steven --

7      last name starts with a B.

8      Q.  Bentsianov?

9      A.  Thank you. -- and Ms. Alston were already there when I got

10     into the office.

11             THE COURT:  This is the morning after the party?

12             THE WITNESS:  Yes.

13     Q.  What's the first thing you did when you got in?

14     A.  I think I put my things down in my office, and then I

15     walked to Mr. Monteverde's office.

16     Q.  And that's when you saw the stain?

17     A.  Yes.

18     Q.  And then you closed Mr. Monteverde's door?

19     A.  I did.

20     Q.  Because you didn't want anyone else to see the stain?

21     A.  Correct.

22     Q.  And then you sent an e-mail to Mr. Monteverde?

23     A.  Correct.

24     Q.  And your e-mail had four words?

25             THE COURT:  You wanted Mr. Monteverde to call you at

F23emar2                    Marchuk - cross

1    work, right?

2             THE WITNESS:  That's correct.

3             THE COURT:  Let's go beyond this, please.

4    Q.  You sent an e-mail to Mr. Monteverde -- you didn't ask him

5    to call you at work, did you?

6    A.  I did not use a question mark.

7    Q.  You didn't say please?

8             THE COURT:  Please, Mr. Bursor.  Just go ahead.

9    Q.  You were comfortable expressing yourself to Mr. Monteverde

10   in the form of a command, weren't you?

11   A.  I was not in my normal state on that Friday.  I didn't have

12   Mr. Monteverde's personal number.  I wanted to speak with him.

13   I don't think I put much more thought into it beyond that.

14   Q.  So you didn't ask him to call you; you told him to call

15   you, correct?

16   A.  I think I communicated it as quickly as possible.  I didn't

17   know what to do.

18            THE COURT:  Ms. Marchuk, it's a communication to

19   Mr. Monteverde by e-mail asking or telling him, Call me at

20   work.  That's what it is, right?

21            THE WITNESS:  Right.

22   Q.  And the reason you sent that e-mail was because you wanted

23   to speak to him, correct?

24   A.  Yes.

25   Q.  And the reason you approached him as you were leaving

1  Valbella was because you wanted to speak to him, correct?

2  A.  I didn't approach him at Valbella.  He was walking next to

3  me down the stairs.  It seemed -- I had been drinking.  It

4  seemed like a good time to bring up money.  It was on my mind.

5  Q.  You approached him; he didn't approach you?

6  A.  I don't know how we ended up walking next to each other

7  down the stairs, but I do not recall approaching him.

8  Q.  He hadn't spoken to you all night?

9  A.  I don't recall speaking to him all night.  I purposely

10 didn't sit near him at the table.  When he left, I moved to

11 talk to Sarah.

12 Q.  You sought him out to discuss your bonus, isn't that true?

13 A.  That's not true.  I had asked Mr. Moon about his bonus.

14 When I was walking out, I was next to Mr. Monteverde and I

15 asked him about it.  I mean, I brought it up.  I completely

16 admit that.  But I didn't seek him out.

17 Q.  Did you speak to Mr. Moon the day after you quit your job?

18 A.  I did.

19 Q.  Did you tell Mr. Moon you'd had an affair with

20 Mr. Monteverde?

21 A.  I did not.

22        MR. BURSOR:  Nothing further, your Honor.

23        MR. LIPMAN:  One question, your Honor.

24                        - - - - -

25

1   REDIRECT EXAMINATION

2   BY MR. LIPMAN:

3   Q.  Ms. Marchuk, as best you can recall, what did you say to

4   Mr. Moon and what did he say to you when you had a conversation

5   with him on December 23rd, 2011?

6   A.  I -- I don't remember if it hadn't -- I don't know that I

7   recalled it until this litigation that I'd even spoken to

8   Mr. Moon.  I don't know.

9              MR. LIPMAN:  No more questions.

10             THE COURT:  Thank you very much, Ms. Marchuk.

11             (Witness excused)

12             THE COURT:  Plaintiff rests?

13             MR. LIPMAN:  Sorry?

14             THE COURT:  Plaintiff rests?

15             MR. LIPMAN:  Plaintiff rests and requests a

16   five-minute bathroom break.

17             THE COURT:  Defendant rests?

18             MR. BURSOR:  Yes, sir.

19             THE COURT:  I like to ask before the bathroom break,

20   lest in the bathroom they think of something else.

21             You'll take a ten-minute recess, and then we'll go on

22   from there.  Close up your books.  Keep an open mind.  Do not

23   discuss the case.

24             People on that side, please move over to the left

25   side.

F23emar2                          Marchuk - redirect

1          (Recess)

2          (In open court; jury not present)

3          THE COURT:  How much are you going to speak in the

4     first go-around?

5          MR. LIPMAN:  I'm hoping to take about 25 minutes.

6          THE COURT:  Because we're going to time you.  I'm

7     serious.

8          MR. LIPMAN:  I assumed you would.  I assumed you

9     would.

10         THE COURT:  So you get 25, Mr. Bursor gets 30, and you

11    get 5.

12         MR. LIPMAN:  If I run over my 25, I'll take my lumps.

13         THE COURT:  We'll give you a warning, whenever you

14    want.

15         MR. LIPMAN:  Sorry?

16         THE COURT:  When do you want -- Bridget will warn you.

17         MR. LIPMAN:  Maybe at 20.

18         THE COURT:  Twenty, sure.

19         Bridget, do one at 20 and one at 23.

20         MR. LIPMAN:  It won't start until I start speaking, I

21    hope.

22         MR. BURSOR:  Your Honor, during my closing, I'd like

23    to put my timeline back from the opening statement.  May I do

24    so?

25         THE COURT:  You may.  We'll have a very short break,

F23emar2                    Marchuk – redirect

1    so you'll be able to set up.

2            MR. BURSOR:  And, your Honor, I'm also going to use a

3    demonstrative that I showed to these gentlemen a couple days

4    ago on the screen.

5            THE COURT:  On the screen?

6            MR. BURSOR:  On the screen.

7            MR. CHASE:  There's no stoppage time for fumbling with

8    a tripod, right?

9            THE COURT:  I don't have a basketball referee fixing

10   the clock.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury present)

2            THE COURT:  In this stage of the case are the lawyers'

3     summations.  What the lawyers say is not evidence, but it's

4     entitled to be listened to very carefully.  The lawyers have

5     lived the case, and now it's their time to put it all together

6     for you.

7            Each side will have 30 minutes to do that.

8     Mr. Lipman, arguing first for the plaintiff, has told me that

9     he wants to use 25 minutes for his main speech and then reserve

10    5 minutes for rebuttal.  So Ms. Jones will give him a warning

11    at 20 minutes and 23 minutes to guide him.  Then Mr. Bursor

12    will speak for 30 minutes.  And then Mr. Lipman will conclude.

13    We'll have a very short break between summations.

14            So the lawyers are going to persuade you, each from

15    their perspective, and you should listen very carefully to

16    them.  They may say that this witness said that and the other

17    witness said this and so on.  And there may be objections, but

18    you should know that your recollections are what counts.  You

19    do not have to accept -- and you should not necessarily

20    accept -- what the lawyers said about what happened at the

21    trial.  You have your own recollections.  But they've lived

22    this.  They know this, and they try to be faithful to the

23    record; because in the end, you can look up what actually

24    happened and have it called back.

25            So listen carefully to what they say.  They'll try to

 1   persuade you each from their turn.  And then after that, after

 2   lunch, I will give you the instructions, and then you'll begin

 3   your deliberations.

 4        Keep an open mind until after the instructions and you

 5   begin your deliberations.

 6        Mr. Lipman.

 7        MR. LIPMAN:  Thank you, your Honor.

 8        THE COURT:  It's 12:18.  We'll give you as if it's

 9   12:20, give you an extra three minutes' grace.

10        MR. LIPMAN:  I may need them, Judge.  Thank you.

11        There's a lot to say.  It's been a long case, but I

12   appreciate all of you, the time and effort that you've put into

13   this case.  Your attention has been amazing, from what I'm able

14   to tell.  I haven't been looking at you the whole time, but

15   from what I can tell, you guys have paid a lot of attention.

16   And that's great.

17        This case is about Mr. Monteverde's abuse of his power

18   over and against Ms. Marchuk at the Faruqi & Faruqi firm.

19   Mr. Monteverde was the most powerful partner at the firm.  He

20   made the most money in 2011 of anyone in the New York office.

21   And he used that power to his advantage against Ms. Marchuk in

22   many ways.  And I'll be discussing them with you over the

23   course of this closing statement.

24        Mr. Bursor is going to tell you that Ms. Marchuk made

25   advances on Mr. Monteverde; that she had amorous inclinations

1  towards him; that she invited him to do what he did to her;

2  that she went happily with him on the night of the holiday

3  party up to the offices.  Not even close.  She had no romantic

4  feelings towards Mr. Monteverde whatsoever.  We will show you

5  why that is so with the documents that are in evidence, by

6  referring to some of her friends' testimony.

7          What she did on the night of the holiday party she did

8  because she was under enormous pressure.  She felt threatened.

9  He threatened her.  And Mr. Monteverde took full advantage of

10  that situation.  It's all about his power and position in the

11  firm, the firm that she had just started at, the firm that she

12  had just started her whole career at.

13          Defendants' case is all about blaming the victim,

14  blaming Ms. Marchuk, blaming Ms. Marchuk for being in the

15  position she was in and reacting as best she could.  They

16  should not get away with that, given the evidence, the

17  landslide of evidence here that you've seen and paid a lot of

18  attention to and to which you are going to apply your common

19  sense, your life experience.  They say that she asked for it,

20  that she should have done something.  They're trying to put her

21  on trial when Mr. Monteverde is really on trial, and the Faruqi

22  firm is on trial.

23          She asked to go to Delaware, they say.  She got to the

24  firm her first day and she wanted to go to Delaware.  That's

25  just not true.  She was told she was going to Delaware.  And

1   she was happy to go to Delaware, when she was told she was

2   going to Delaware, because it was a big motion; the glamor of

3   going to court in a room like this down in Delaware, great.

4   She went down.

5        And then on the way back, Mr. Monteverde had won his

6   first money for the firm.  You heard that.  He ordered wine.

7   You heard that.  He suggested that she join him in drinking on

8   the train.  Technical violation of the handbook there, no big

9   deal.  The handbook really didn't matter to anyone at the

10  Faruqi firm.

11       They got back to New York and they went out to Lex

12  Bar.  And you've heard a lot about that encounter at Lex Bar.

13  You heard Mr. Monteverde say that inside the bar they were

14  making out.  Well, that just didn't happen.  Inside the bar,

15  they had a discussion.  Ms. Marchuk just testified -- you heard

16  her -- they discussed her loans.  This was like a shark

17  circling a prey and bumping it.  This is Mr. Monteverde, the

18  predator, bumping his prey, testing her out, wanting to know

19  her loans, wanting to know how she was feeling about being

20  fresh in New York City, right off the boat.  And he kissed her

21  when they left Lex Bar.

22       They didn't make out in Lex Bar.  Mr. Monteverde

23  wouldn't have done that.  He testified that he did, but that

24  doesn't make any sense.  Anyone from the firm could have walked

25  in the bar.  He's a married man.  They didn't make out in Lex

1    Bar.  He stole a kiss from her on the street and asked her to

2    come up to the office.

3            His testimony is she asked him to come up to the

4    office on her third day of work.  That just doesn't make any

5    sense.  I couldn't imagine a brand new associate at a firm

6    being anywhere near that forward, much less that forward.  It

7    just doesn't happen.

8            That night Ms. Marchuk barely slept.  She was so

9    upset.  She had gone from this great sort of trip down to

10   Delaware to see a court hearing to getting hit on by the main

11   partner who she was assigned to work for.

12           And you heard it from Mr. Moon today:  Ms. Marchuk was

13   assigned to work for Mr. Monteverde exclusively.  He was

14   working for Mr. Monteverde exclusively, too.  It didn't happen

15   later, according to defendants.

16           The next day Ms. Marchuk went back to work, hopeful

17   that when Mr. Monteverde asked her out to lunch that day, that

18   he was going to apologize and things were going to get back on

19   track.  Everything would be okay.  It was just a momentary

20   lapse of reason on his part, perhaps.  But when he took her out

21   to lunch that next day, he started talking about his father

22   having affairs.  He started talking about the fact that he was

23   in a green card marriage.  She saw pretty clearly, I think, at

24   that point that she was in a tough spot.

25           The next Monday he asked her out to dinner.  And what

can she do but nod her head no.  And here you have a document

that's in evidence, that defendants actually put into evidence.

And it's a GChat between Lexi Marchuk, plaintiff, and Melissa

Edwards on September 13, 2011.  It's Plaintiff's Exhibit 19.

          The judge is going to tell you you can bring these

exhibits with you into deliberations.  I urge you to.  This

exhibit is in evidence.  You can look at it.  It's pretty

amazing what it says.  And it's a real conversation that

Ms. Marchuk is having with her friend --

          MR. BURSOR:  Objection.

          MR. LIPMAN:  -- Melissa Edwards.

          It's in evidence.

          MR. BURSOR:  I don't think 19 is in.

          MR. LIPMAN:  I think this should be stopped time.

          THE COURT:  I won't charge you.  (Pause)  Referee's

time.  We'll fix the clock.  I gave an extra three minutes to

begin with.

          Don't you have a list?  Our records show 19 is not in.

          MR. LIPMAN:  It is in.  It's in our admitted exhibits

book, 19.  Definitely in.

          THE COURT:  Look at the transcript.

          MR. HERSHBERG:  We're looking at it right now.

          THE COURT:  There's a glossary at the end with

exhibits.  (Pause)

          MR. BURSOR:  Page 122, your Honor.

1          THE COURT:  We don't have this as an admitted exhibit.

2    The objection is sustained.

3          MR. LIPMAN:  Judge, we object.  This was admitted.

4          THE COURT:  Your recourse is to check the transcript,

5    show me where it's offered and received.  But our records show

6    us that it was not an admitted exhibit.  Therefore, the

7    objection is sustained.

8          MR. LIPMAN:  We'll try to get back to it.  May I

9    continue?

10         THE COURT:  Of course.

11         MR. LIPMAN:  The defendants say that Ms. Marchuk asked

12   to go down to Delaware again.  I put it to you, she did not do

13   that.  The second trip to Delaware was announced, and

14   Ms. Marchuk was extremely distraught by the prospects of going

15   down to Delaware again.  You've got to remember the position

16   she was in at this point.  It's her second week at work.  Her

17   boss has just hit on her.  He's the most influential partner in

18   the firm and he wants to bring her down to Delaware again.

19   There are no other jobs out there for her, and she's got almost

20   $300,000 of debt.  She's in a tight spot.  And that's where

21   she's coming from.

22         Where's Mr. Monteverde coming from?  He is the rising

23   star in the firm.  He's feeling his oats.  He's going down to

24   Delaware for an even bigger hearing than the first one, and he

25   is feeling super powerful.

1          Now, Mr. Rowley, whose picture I will show you just in

2    case you don't remember him, Mr. Rowley testified about

3    Mr. Monteverde and his power at the firm.  He sat right there.

4    Mr. Rowley was, I put it to you, very credible.  He's a 24-year

5    lawyer, 13 years partner with the Faruqis themselves.  He saw

6    everything firsthand.

7          What did he tell you about Mr. Monteverde?  He said

8    Mr. Monteverde is basically crude and rude.  He runs roughshod

9    in the office.  He's offensive to women.  Mr. Rowley would feel

10   embarrassed and just walk back to his office when

11   Mr. Monteverde would say some of the things that he typically

12   said.  Mr. Moon echoed that this morning.

13         Mr. Rowley also testified that when Mr. Monteverde

14   would make these kind of sexually charged comments in the

15   office place, that Mr. Faruqi would say, Handbook, in reference

16   to the employee handbook, and it became a joke.  And Mr. Moon

17   echoed that this morning in his testimony.

18         Mr. Rowley testified that the environment at the

19   Faruqi firm was toxic on account of Mr. Monteverde.

20         Mr. Rowley also testified that Nadeem Faruqi, after

21   Mr. Monteverde made sexually charged comments, said, Someday,

22   Juan, you're going to cost this firm a lot of money.

23         So the second Delaware trip is coming, and Ms. Marchuk

24   is feeling enormous pressure.  She talks to her friend Tori

25   Leventhal.  You saw Tori Leventhal testify.  Tori Leventhal is

1      here.  She sat right there.  She testified that her very good

2      friend, Ms. Marchuk, was beside herself with worry about this

3      trip to Delaware and about generally her situation at the firm.

4      She wanted to try to help her friend, but she realized, and

5      Ms. Marchuk realized, that she didn't have any options, okay?

6      There was no other job out there.  And complaining within

7      Faruqi & Faruqi was not going to work.

8              So Ms. Marchuk went out to dinner with Emily Komlossy

9      by coincidence.  Emily Komlossy was in New York, and she saw

10     Ms. Marchuk in the firm.  She invited her out to dinner.  And

11     that gave rise to some very serious evidence in this case that

12     I don't think that you've gotten a lot of time with.

13             But what happened was they went out to dinner.

14     Ms. Marchuk sat down with Ms. Komlossy.  Ms. Komlossy told

15     Ms. Marchuk that Juan Monteverde had reported to Ms. Marchuk

16     that Ms. Marchuk was -- I'm sorry, Mr. Monteverde had reported

17     to Ms. Komlossy that Ms. Marchuk had a crush on him, something

18     like that.  And then Ms. Marchuk set Ms. Komlossy straight and

19     told her about what happened on the first trip to Delaware.

20             And Ms. Komlossy memorialized that meeting in a

21     document, which is Plaintiff's Exhibit 23.  And I urge you to

22     take this one -- you can't take this because this is a

23     demonstrative, but take the actual exhibit with you into the

24     jury room.  And I want to go over it with you a little bit

25     right now, because --

1        MR. BURSOR:  Objection.

2        MR. LIPMAN:  What's the basis of the objection?  This

3   is definitely in evidence.

4        MR. BURSOR:  23 is not in.

5        THE COURT:  Just a minute.  Don't talk to each other.

6        Overruled.

7        MR. LIPMAN:  Thank you.  This is Plaintiff's 23 in

8   evidence.

9        THE COURT:  Excuse me.  23 is not in evidence.

10       MR. LIPMAN:  Yes, it is.

11       MR. BURSOR:  Transcript page 121, your Honor.

12       MR. LIPMAN:  It was initially not admitted but it

13  later was definitely admitted.

14       THE COURT:  What page?

15       MR. BURSOR:  Page 121 of the trial transcript.

16       THE COURT:  What page was it admitted?

17       MR. BURSOR:  That's where you sustain the objection.

18  I don't think it was admitted.

19       MR. LIPMAN:  It was later admitted.  No doubt.  This

20  is outrageous.

21       THE COURT:  Get your team working.

22       MR. BURSOR:  Your Honor, withdrawn.

23       THE COURT:  Okay.

24       MR. LIPMAN:  Thank you.

25       THE COURT:  Don't do that, Mr. Lipman.

F23emar2                    Mr. Lipman - summation

1            MR. LIPMAN:  It's a little exasperating, Judge.  I'm

2      sorry.

3            THE COURT:  Objection is overruled.

4            MR. LIPMAN:  I think 19 is also in.

5            THE COURT:  You may argue.

6            MR. LIPMAN:  I apologize.

7            Plaintiff's Exhibit 23 is an e-mail.  The principal

8      part of it is an e-mail from Emily Komlossy to Nadeem Faruqi on

9      September 19.  The dinner at Rossini's was three days earlier,

10     on September 16, on Friday night.  And she's reporting to

11     Mr. Faruqi on Friday, September 16, I invited Alexandra to join

12     me for dinner at Rossini's.  We were generally chatting about

13     work and my experiences as a young lawyer.  Alexandra proceeded

14     to disclose to me that she had gone out with Juan Monteverde

15     for drinks one night soon after she joined, at the conclusion

16     of which she claimed that he had kissed her and grabbed her

17     breast.  Alexandra also indicated that since then Juan had

18     invited her to join him on his boat.

19           So this is what Ms. Komlossy is reporting to the head

20     of the firm that Ms. Marchuk told her.  It's a very significant

21     document, because this shows what Ms. Marchuk actually told

22     Ms. Komlossy.

23           She goes on, She then proceeded to get teary and did

24     not want to be disclosed, saying that she wanted to continue

25     working with Juan but that she was apprehensive about going to

1   Delaware with him the following Tuesday because she knew he

2   would get drunk and was afraid of what might happen.

3          Now, what's interesting here is, yes, she does say she

4   wants to continue working with Juan.  But the reason she said

5   that is obviously because the only alternative is to leave the

6   firm.  He's got all the business.  She can't simply work with

7   someone else.  It's a small firm.

8          She was apprehensive about going to Delaware because

9   he was going to get drunk, and she was afraid what might

10  happen.  As she continued to be teary and upset for the next

11  several hours.  We stayed at the restaurant until after

12  midnight.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    We stayed at the restaurant until after midnight.

2              Now, Mr. Faruqi got this e-mail.  He says, thanks, is

3    his reply.  Early Monday night, he says thanks.  We don't know

4    exactly when he got the e-mail, but by that evening, he said

5    thanks.

6              The next day Ms. Marchuk is scheduled to go to

7    Delaware with Juan Monteverde.  Now, you heard about the street

8    corner conversation between Juan Monteverde and Nadeem Faruqi

9    the day after the Rossini's dinner, where Mr. Faruqi supposedly

10   read Mr. Monteverde the riot act and said, oh, it was totally

11   consensual.  That was on the Saturday.  Two days later,

12   Mr. Faruqi got this e-mail.  You can't read this e-mail and not

13   conclude that what happened at Lex Bar was not consensual.  And

14   Ms. Marchuk had her version of the story to tell.  And

15   Mr. Faruqi never inquired of her.  Now he says he was

16   respecting her privacy, because she didn't want it to be

17   disclosed.  But she had disclosed it to Ms. Komlossy, a partner

18   in the firm.

19             Why didn't Mr. Faruqi overcome his trepidations about

20   offending Ms. Marchuk's privacy and get to the bottom of this?

21   I'll tell you why.  Because Mr. Monteverde was keeping the firm

22   afloat.  Mr. Faruqi didn't want to rock the boat.  Mr. Faruqi

23   also could have sent Ms. Komlossy back to Ms. Marchuk to see

24   how things were going, to make sure that she was really

25   comfortable in this uneven, unequal relationship that had been

1    reported.  But Ms. Komlossy also never followed up.

2              This e-mail, ladies and gentlemen, I would put to you,

3    is Ms. Marchuk's cry for help.  In her second week at work:  My

4    boss is hitting on me, I am uncomfortable with that.

5              And they just let it go.  Nothing is done.  Supposedly

6    Mr. Faruqi told Mr. Monteverde only don't socialize alone with

7    her.  This is documentation.  And it was documented by a lawyer

8    in the firm.

9              Now, when Mr. Monteverde heard that Ms. Komlossy had

10   made this report to Mr. Faruqi, he immediately called her up

11   called Komlossy up.  You heard him admit in cross-examination,

12   he called her up.  He was upset.  He was upset that she had

13   told on him, basically.  And Mr. Monteverde was really not so

14   much upset with Ms. Komlossy, but I think he was upset with Ms.

15   Marchuk for betraying him.  And that would come up the night of

16   the holiday party at Lex Bar, right before they went up to the

17   office.  He accused Ms. Marchuk of betraying him by telling

18   Ms. Komlossy about the Lex Bar incident.

19             Now, after the dinner at Rossini's on the 16th, and

20   the second trip to Delaware where Mr. Monteverde was on his

21   best behavior, but still made a blow job comment that Brad

22   DeLeeuw testified about.  Brad DeLeeuw was the witness who my

23   colleague, John Hershberg, over here, read the testimony from,

24   was on his best behavior, but still couldn't help himself and

25   made a disgusting comment.

1       From that point on, two months later, Mr. Monteverde

2   continued the harassment of Ms. Marchuk, unabated.  And

3   he intermix mixed, within that sexual harrassment, praise and

4   criticism.  So he is the boss.  She's working for him

5   full-time.  And he is threatening to fire her over typos, and

6   then he is praising her work.  He is manipulating her.  It is

7   textbook.  Softening his prey, as well continuing his sexual

8   harrassment and banter.

9       He talked to her about perhaps sleeping in her

10  apartment.  Renting space, renting space in her apartment and

11  sleeping with her some evenings.  Skiing trips, boating trips.

12  And I will say, again, in this e-mail, Ms. Marchuk reported to

13  Ms. Komlossy that Juan had invited me to join him on his boat.

14      He talked about flight attendants, and how he would

15  want to go back to the 1950s when the morals were a little

16  looser.  Talked about Russian hookers.  Talked about strip

17  clubs.  He was constant with it.

18      Now, Mr. Moon testified that Mr. Moon never

19  specifically saw Mr. Monteverde make any of these comments to,

20  or in the presence of, Ms. Marchuk.  He was making them all

21  over the place anyway.  But he was directing a lot of comments

22  at her secretly, because that was his MO.  He didn't put

23  anything in writing.  He was careful.  He was the lawyer.  He

24  was not going make evidence of this.

25      One evening, and Ms. Marchuk testified to this, and

1   this is what got her very nervous.  She came to his office as

2   she was leaving and said do you need anything else.  And he sat

3   back, and he gestured towards his mid section, and he said

4   nothing work related.  And from that point on, she didn't go

5   into his office anymore.  She conducted meetings with him at

6   his threshold.  She was nervous about him.

7           Mr. Moon testified about Mr. Monteverde's interactions

8   with him, in which -- and also with respect to partner Gonnelli

9   where Mr. Moon thought that Mr. Monteverde was territorial.

10  With respect to Ms. Marchuk, he was jealous.  Ms. Marchuk, at

11  one point, expressed that a lawyer on a case at another firm

12  had done good work.  And Mr. Monteverde looked him up on the

13  internet and said, oh, look he is so ugly, you can't possibly

14  like him, you can't possibly have a crush on him.

15          She didn't say she had a crush on him, she said she

16  admired his work.  Ms. Marchuk was not interested in

17  Mr. Monteverde.

18          Lexie Menish, Ms. Marchuk's friend from law school,

19  great woman.  Fulbright scholar.  Worked in World China

20  teaching English for three years.  Absolutely credible.  She

21  testified to you, from that stand, that she went out for drinks

22  with her good friend, and her good friend was in tears over her

23  situation with her loans, with her lease that her father had

24  guaranteed, with her boss hitting on her.  There is no question

25  that Ms. Marchuk was not interested in Mr. Monteverde.

1    Tori Leventhal.  Again, Tori Leventhal testified to

2    you.  Tori Leventhal said that she was very seriously concerned

3    with the situation, and tried to troubleshoot it with Ms.

4    Marchuk, but couldn't.

5    And Ms. Marchuk also testified as to conversations she

6    had with her friend Sean Perryman, where he suggested maybe you

7    should make up a big boyfriend or something like that.

8    They were trying to deal with the terrible situation

9    that their friend was in.

10    Now, the defendants are gonna make an argument, I

11    assume, based upon the handbook, that Ms. Marchuk signed for

12    the employee handbook at Faruqi & Faruqi and, thereby subjected

13    herself to the letter of each of its provisions.  And because

14    she did not report, using chapter and verse of the handbook,

15    that somehow she doesn't have a claim to the sexual harrassment

16    that she was experiencing.  And I put it to you on several

17    different levels that that is just a specious, hollow argument.

18    First of all, the handbook at the Faruqi firm was a

19    joke.  You have heard Mr. Rowley, and now Mr. Moon, testify

20    that Mr. Faruqi would say "handbook" in a joking way when

21    Mr. Monteverde would make his typical sexually-charged comments

22    around the office.

23    Ms. Goodwin testified, Kerrianne Goodwin, who came up

24    from Philadelphia and testified to you, that she had never even

25    received the handbook

1          THE COURT:  Two minutes.

2          MR. LIPMAN:  Thank you.

3          And Mr. Moon.  Mr. Moon testified to that, as well.

4    And Ms. Marchuk also testified that when she mentioned the

5    handbook to Mr. Monteverde, that he offered to spank her with

6    it.

7          Exhibit 23 is effectively Ms. Marchuk's complaint in

8    the case, even though it wasn't under the handbook.

9          You've heard a lot about the holiday party.  I'm

10   running out of time.  And I apologize, I wish I had more time.

11   But Mr. Bursor initially promised you seven eyewitnesses.  He

12   didn't deliver.  Daniel Serpica, Olive Alston, Lubna Faruqi,

13   Nadeem Faruqi, all at the holiday party, said that Ms. Marchuk

14   and Mr. Monteverde were like magnet and steel, that she

15   shadowed him, that she was sitting next to him.  Mr. Monteverde

16   and Ms. Marchuk agree on one thing.  They didn't even speak to

17   each other during the holiday party.  So that's four out of

18   seven, gone.

19         The other one, Sarah Westby, testified only that Ms.

20   Marchuk walked -- sat at Mr. Monteverde's plate and ate his

21   steak, which had not been touched before.  She didn't testify

22   that they were following around.

23         The other two, David Bower and Vinny Munos.

24         David Bower, Mr. Monteverde's lifetime companion, was

25   bombed out of his mind that night.  And testified

1   inconsistently on the stand, from his deposition testimony,

2   about the kiss at Lex Bar, and about sharing the cab from

3   Valbella to Ginger Man.  He was out of it that night.

4           And Vinny Munos, Vinny Munos signed out --

5           THE COURT:  Two minutes.

6           MR. LIPMAN:  Vinny Munos signed out that night.  This

7   is plaintiff's exhibit 103.  End of shift.  Vinny Munos.

8   Midnight.  Gone.

9           So much for the eyewitnesses.

10          And you have heard a lot about what happened up in the

11  office the night of the holiday party, I'm not going to belabor

12  the point of what happened.  I think Ms. Marchuk's testimony is

13  a lot more credible than Mr. Monteverde's twisted partner sex

14  fantasy about what went on that night.

15          There was blood on the floor the next day.  Defendants

16  admit that.  And that is indicative, from Dr. Park's testimony,

17  of what Ms. Marchuk said happened that night, not what

18  Mr. Monteverde testified happened that night.

19          Now I'm going to talk about damages.  I don't have too

20  much time.

21          THE COURT:  You don't have any time.  Two minutes for

22  damages, and we'll stop.

23          MR. LIPMAN:  Did you count the stop time?

24          THE COURT:  Well, you have 30 minutes and 25 minutes

25  on this, and you're finished.

1          MR. LIPMAN:  We broke for the exhibit for three

2     minutes.

3          THE COURT:  I gave you the time.  I gave you the time,

4     you started at 17 after.  I counted it as 20 after.

5          MR. LIPMAN:  Can I have three minutes for damages,

6     Judge?

7          THE COURT:  It is now 14 minutes to 1:00.  At 10

8     minutes to 1:00, I will stop you.

9          MR. LIPMAN:  Okay.

10         There are four components to Ms. Marchuk's damages in

11    the case.  There is back pay, and front pay, compensatory

12    damages for her emotional distress, and pain and suffering, and

13    punitive damages.  And she deserves it all.

14         The back pay is the lost wages from January 2012

15    through today.  In 2012, Ms. Marchuk made only $19,000.  She

16    should have made $75,000.  That's a difference you can

17    calculate.  You can do the math.

18         In front pay, that's the money that she could earn

19    from today onward, were it not for the discrimination and her

20    having to leave the firm because of what had happened to her,

21    which is another element you need to find, that she felt she

22    couldn't stay there any longer.  And I think you can easily

23    find that.

24         There is a different income, you know, that Ms.

25    Marchuk now is making $85,000.  If she had stayed at the Faruqi

1  firm for four years, she could earn between $85,000 and

2  $160,000 today.  Defendants didn't even dispute that when

3  Michael Lord testified that that is the range that she could

4  expect to earn today.  And we ask you to give her that

5  difference, between the high end of that range, which is what

6  Mr. Lord said she could earn, and the 85,000 that she is making

7  today.  And you can project that out five or ten years in her

8  favor, depending on what you think her employability is going

9  forward, how much you think she would want to work given her

10  debt structure and her expectations.

11       Now, in terms of compensatory damages for pain and

12  suffering, Ms. Marchuk's life is forever disrupted by what

13  happened to her.  Now, you may not know, you may not have a

14  loved one or yourselves, I hope none of you, have ever

15  experienced what she experienced.  But you saw her when she was

16  testifying.  She was shaking.  And she is still affected by

17  this.  And she will be affected by this for a long time to

18  come.  It was a sexual encounter which was awful.  We ask

19  you to award her for pain and suffering and return a verdict in

20  the range of $2,000,000 for that.

21       I'm out of time.

22       THE COURT:  Lawyers are not allowed to suggest any

23  number.  The number that you pick is your number.  And you

24  should disregard any suggestion.  I will instruct you about

25  damages.  Basically, they have to be proved, like everything

1      else in the case.

2                MR. LIPMAN:  And you will also be asked to indicate on

3      the verdict form whether or not punitive damages are

4      appropriate here.  And we implore you to say that they are.

5      Because punitive damages get awarded --

6                THE COURT:  This is a matter of instruction and proof.

7      Appeals to implore are not appropriate.  You are not to be

8      governed by emotion, you are governed by a rational and careful

9      review of all of the evidence.

10               I think you have used up your time.

11               MR. LIPMAN:  We ask you to award punitive damages in

12     this case, pursuant to the judge's instructions.

13               Thank you.

14               THE COURT:  Okay.  Why don't we stretch in place.

15               Mr. Bursor will set up.

16               MR. BURSOR:  Your Honor, may I have equal time,

17     because that went over a bit.  Or did he use all of his 30.

18               THE COURT:  Yes, you will have equal time.

19               Mr. Lipman, take 23 away.

20               Mr. Lipman nine minutes to.  I'll count like it is

21     five minutes to.  Gives you an extra four minutes.

22               MR. LIPMAN:  Judge, I think you might have meant Mr.

23     Bursor.

24               THE COURT:  Mr. Bursor.  Sorry.

25               MR. BURSOR:  Thank you, your Honor.

1    THE COURT:  So you will end at 1:25.

2    MR. BURSOR:  Ladies and gentlemen of the jury, I

3  appreciate the time you have spent on this case very much, but

4  I only have 34 minutes, so I can't thank you too many times

5  during the closing argument.

6    But this is the --

7    THE COURT:  One good thanks is worth --

8    MR. BURSOR:  Heartfelt thanks.

9    This is the timeline that I showed you during the

10  opening statement.  I said that we were going to put on seven

11  witnesses about the events of the night of the holiday party.

12  And we did that.  We put on Sarah Westby, who did testify that

13  the plaintiff ate Mr. Monteverde's food.  We put on Olive

14  Alston, who testified that the plaintiff and Mr. Monteverde

15  were like magnet and steel during the holiday party.  We did

16  put on Ms. Serpica, who testified that Ms. Marchuk shadowed

17  Mr. Monteverde around the party.  We put on Mr. Bower, who

18  testified that he saw Mr. Monteverde and Ms. Marchuk walking

19  hand in hand from the Ginger Man Bar to Lex Bar, and then saw

20  them affectionate on the couch at the Lex Bar.

21    And, Mr. Bower, if you remember, was initially

22  confused.  He was talking like it was 9:00 at night, and then

23  there was a suggestion maybe he was drunk out of his mind

24  because he was three hours off.  But then on redirect, I asked

25  him, you flew in from LAX that day?  And he said, Oh, yeah.  So

1    he was three hours off because he was on West Coast time.

2              And then we have put on Vinny Munoz, who saw the

3    plaintiff and Ms. Marchuk as they walked in the building,

4    giggling, hugged up.  And saw them as they walked out of the

5    building, 30 minutes later, giggling and hugged up.  That's

6    five.  The other two were Mr. and Ms. Faruqi, who also saw the

7    following at the party.  So that's the seven witnesses.  I did

8    what I said I was gonna do.

9              And the judge is gonna instruct you, after we finish

10   on the law, and how you're to evaluate the claims.  And one

11   thing that you are going to hear is you are going to have to

12   determine, based on the totality of the evidence, whether the

13   interactions between Ms. Marchuk and Mr. Monteverde were

14   hostile and coerced on the one hand, or if they were welcome on

15   the other hand.

16             Because if they were welcomed, you can't have a

17   hostile work environment claim for conduct that is welcomed

18   that you seek out.  And every one of these witnesses was

19   eyewitness testimony that Ms. Marchuk sought him out.  She

20   sought him out at the party.  She, herself, testified she

21   sought him out to discuss her compensation at the end of

22   Valbella.  And, you know, we don't dispute that there was, you

23   know, some sexual conduct of some sort that did occur in the

24   office and that wasn't not right.  But she sought that out.

25   You can't seek out a sexual encounter and then sue your law

1   firm because you sought out a sexual encounter with one of the

2   partners.  That's the seven witnesses.

3           Now, the most important witness -- and I want to say,

4   this entire trial was really about what happened in this 30

5   minutes when they were in that office.  Was that welcome or

6   unwelcome.  And there has been a lot of sort of -- that's the

7   main meal, I would say.  There has been a lot of parsley and

8   garnish about these inappropriate comments, that may or may not

9   have happened in Delaware, or as somebody is going to a mens'

10  room.

11          Ms. Marchuk didn't leave her job because somebody made

12  a joke about BJ's wholesale club.  That's not why she left her

13  job.  She left her job, their theory is, because she was upset

14  about the sexual encounter that happened in this 30 minutes

15  right here.  And that's why I was very surprised, a few minutes

16  ago, that Mr. Lipman in his 25 or 30 minute closing argument,

17  didn't talk about that.  He didn't talk about that.

18          He talked about Komlossy, and Rossini's restaurant.

19  He spent almost half an hour talking about everything but what

20  happened in that office where the blood got on the carpet.  So

21  I do want the talk about that, because I thought that was what

22  the case -- that was the reason that she left the firm.

23          Now, we know that they went to the office at 3:00 a.m.

24  Right there that's a pretty strong fact.  Because their story

25  is he was sexually harassing her, he was vile, he was coercing

1    her.  But the facts are she followed him from bar to bar.  And

2    she was closing down Lex Bar at 3:00 a.m.  Is that consistent

3    with a relationship of hostility?  Or is it consistent with

4    welcoming behavior and encouraging behavior.

5            Who goes to a bar for hours and closes the bar down

6    with someone that is hostile to them.  Who says I was sexually

7    harassed by this guy, when I followed him from bar to bar at

8    3:00 a.m. because he was harassing her.  Then why did she

9    follow him from bar to bar.  It is a strange story.  And then

10   when Mr. Marchuk explained what they did when they -- after

11   they closed down Lex Bar.  We know they walked to the office.

12           And I asked Ms. Marchuk, did you walk with him

13   willingly to the office.  And she said yes.

14           He didn't drag her to the office, she went willingly.

15   And, again, the judge is gonna tell you you need to weigh the

16   evidence and say was this hostile or was it welcome.  If you

17   are walking willingly to the office at 3:00 a.m., you don't do

18   that if you are in a relationship with hostility.  You do that

19   if you are in a welcoming and encouraging relationship.

20           And I asked her:  You knew you were not going to the

21   office for a work purpose, right?

22           Answer:  Right.

23           She went to that office for sex.  He did, too.  But so

24   did she.  There was no pretense about what was going to happen

25   at that office.  They walked from a bar, to the office, for

1    sex.  They shouldn't have.  Neither one of them should have.

2    But that's what they did.  And they both did it.  They both did

3    it.

4         Now, Mr. Lipman wants to portray her as some innocent

5    being bumped by a shark.  They try to give the impression that

6    she was some babe in the woods.  But she was not a babe  in the

7    woods.  She was the wolf.  She sought him out.  And she took

8    him back to that office.  For sex.

9         And then the judge asked Ms. Marchuk, the judge said:

10   You could have just gotten in a cab, couldn't you?

11        Yeah, or I could have walked to Grand Central.  That's

12   where I was headed.  I could have.

13        She had choices.  He did not drag her there

14   involuntarily.  He did not coerce her there.  She sought it

15   out.  She had choices.

16        Now, she says she was being threatened.  She was

17   crying.  Vince Munos says different.  Vince Munos, the security

18   guard, sees them coming in, because he has to unlock the door.

19        Now, their theory I guess is that Vince Munoz is not

20   there.  Their theory is that Mr. Monteverde and Ms. Marchuk

21   walked to an office building, one block from Grand Central

22   Station, at 3:00 in the morning, unguarded, unlocked, just

23   walked in.  That's their case.

24        I say Vince Munoz was there.  Vince Munos says Vince

25   Munos was there.  Vince Munos says they were both there.  And

1    Vince Munos says they were hugged up and they were giggling.

2    Nobody was crying.

3              Oh, and by the way there, were no flowers.  She didn't

4    carry 10 pounds of flowers to three different bars.  We'll talk

5    about the flowers in a minute.

6              So he sees them on the way in, and he sees them on the

7    way out.  And this is on the way out, they were still hugged up

8    giggling.

9              What happened in between?  What happened in between

10   hugged up and giggling going up, and hugged up giggling going

11   down.

12             Ms. Marchuk's version is that Mr. Monteverde put the

13   numbers on the key pad to open the door to the office.  First

14   her version is we walked in, nobody saw us.  Munoz is not

15   there.  Walked into the unguarded building at 3:00 a.m.

16   Mr. Monteverde does the keypad on the office, opens the door

17   for her.  She walks in ahead of him leading the way to the

18   office.  She has a 10-pound centerpiece of flowers in a bag,

19   according to her.  That's the second version.

20             The first version, she walks to the office, flowers

21   are not mentioned yet.  She pauses in the doorway.  She is

22   going willingly to the office in front of Mr. Monteverde.  He

23   shoves her from behind, so hard she thinks she's in a fight and

24   her right shoe falls off.

25             Now, she has walked willingly from Lex Bar to the

1    office at 3:00 a.m. for sex.  And, suddenly, from behind, the

2    man shoves her?  Shoves her?  So that's the first shove.

3            Then she says he comes into the office, behind her,

4    and he undresses her.  So now she is naked, he is fully

5    clothed, he shoves her again.  He shoved the naked woman, so --

6    knocked her to the ground.  This is her story.

7            Then he leaves her on the ground, goes, disrobes

8    completely.  Then comes back, gets on top of her.  And you have

9    heard the two different versions.  That's her version.  Until I

10   asked her on cross, that first shove, what happened.  I was

11   trying to get her to say that I braced myself so that I

12   wouldn't fall.  Because if a 6-foot man shoves a 5'2" woman,

13   hard, she's probably going to fall, or she's going to have to

14   catch herself.  So I thought she was going to say I caught

15   myself, or braced myself.  And I was going to say where were

16   the flowers.  But it didn't happen that way.

17           Instead, she said she did this, she curled her fingers

18   around the arms of her coat when she was shoved and somehow

19   caught her balance.  And that's when I did where were the

20   flowers, because there were no flowers.  And then we got a

21   story about the flowers being set down in a hallway outside,

22   but nobody else saw those flowers.

23           She made up the flowers, because it was weird.  She

24   made up the flowers during her session with Dr. Hammer.

25   Because she let down her guard, and Dr. Hammer asked her -- she

1   went into his office the morning after.  She went -- she said

2   she was -- she didn't use this word, I used the word.  She

3   essentially said she was raped, all right.  I think I'm the

4   only person said that word at this trial, and I'm sorry for

5   that, but that's essentially what she is saying.

6           So, now, six hours after the rape, she goes back into

7   his office.  He is not even there.  He is not even there.  She

8   goes into his unoccupied office.  And Dr. Hammer said why did

9   you do that.  And she couldn't think of a reason.  And so she

10  came up with the flowers.  I thought I left the flowers in

11  there the night before, so I went to get the flowers.

12          Now, let's say there were flowers.  Suppose there were

13  flowers, she's telling the truth about the flowers.  Six hours

14  after being raped, she's thinking about flowers?  I got to get

15  those flowers from Mr. Monteverde's office?  That seems -- does

16  that seem like what would be going through the mind of a rape

17  victim six hours later, I want to go back to the scene of the

18  crime --

19          MR. LIPMAN:  Objection, mischaracterizes --

20          THE COURT:  Overruled.

21          MR. BURSOR:  So what happens?  She goes in his office,

22  she sees that they have left an embarrassing stain on the

23  carpet.  And who does she contact, who does she seek out?  She

24  seeks him out again, 9:36 a.m., the alleged rapist.  Call me at

25  work.  This babe in the woods, who is so fearful of

1    Mr. Monteverde, who has been raped by Mr. Monteverde six hours

2    ago, seeks him out again.  And she doesn't ask, she tells him,

3    call me at work.  She was not a babe in the woods.  She was the

4    wolf.  She commanded him to call, and he called.  She's still

5    seeking him out.

6          Now, the story falls apart even more the next Monday

7    when we get to the gynecologist, because she did have the

8    injuries, she had the small tear to the hymenal ring.  And

9    Dr. Park came in and explained it.  And she didn't tell the

10   gynecologist, I was shoved twice, I was raped.  What did she

11   tell the gynecologist?  This is from exhibit 38, the

12   gynecologist notes, Dr. Park, "After unprotected intercourse.

13   December 15.  After getting drunk at office holiday party.

14   Patient reports it was consensual with boss.  She remembered

15   that he stopped when she told him.  And he did not come inside.

16   Patient states she is emotionally, psychologically okay. "

17         Now -- she has PTSD now.  She is like a Vietnam vet

18   coming back from the war.  But when she was talking to Dr. Park

19   on December 19th, she was emotionally, psychologically Okay.

20   Now she wants $2,000,000 for PTSD.

21         So, I ask Dr. Park -- there was all this shoving going

22   on.  Dr. Park saw no bleeding by the time Ms. Marchuk got

23   there.  No active bleeding.  No bleeding of any kind.  It was a

24   small tear in the hymenal ring.  It was well healed by the

25   Monday.  And, in fact, it was healed by six hours later,

1   because -- and this is one of the most embarrassing things I

2   ever had to do in the courtroom -- but I asked Ms. Marchuk,

3   were you wearing a sanitary pad when you went back to the

4   office Friday morning, six hours later.  And she said she was

5   not.

6          So the pleading was not a big deal.  But the judge is

7   gonna tell you you can consider the bleeding.  We don't dispute

8   there was blood on the carpet.  The significance of that, that

9   is for you to decide.  But there was no sanitary pad on Friday,

10  no active bleeding at the gynecologist's office.  Dr. Park, no

11  injury of any kind on the external genitalia.

12         Dr. Park only thinks she saw a slight laceration on

13  the hymenal ring.  I asked Dr. Park, did Ms. Marchuk tell you

14  this story about the two shoves, like she told this jury.

15  Nothing about any acts of violence like being shoved or hit.

16         And of course Dr. Park testified Ms. Marchuk told her

17  it was consensual.  And so, now, gynecologist is a big problem

18  for their case.  Because she sought him out.  She went to the

19  office for sex.  That is what she told her gynecologist.  So

20  now they've got a problem with the gynecologist, so they put

21  Ms. Marchuk on the stand to try to fix it.

22         How does she fix it?  She says that she lied to her

23  gynecologist.  That's what she says now.  Is she lying to her

24  gynecologist, or is she lying to you?  You are going to have to

25  judge her credibility.

1    Now, during her entire tenure at the firm, she never

2    once made any complaint about Mr. Monteverde.  And, in fact,

3    she went to great lengths to ensure that the relationship that

4    she was having with Mr. Monteverde would not be revealed to

5    Nadeem Faruqi or to Lubna Faruqi.  That was Ms. Komlossy's

6    testimony.  And the plaintiff did not dispute that.

7    She told Ms. Komlossy, at Rossini's restaurant, they

8    had this kiss.  Ms. Komlossy's testimony, Ms. Komlossy

9    testified the plaintiff told her Mr. Monteverde was a bad

10   kisser.  Now it's a stolen kiss.  But it was enough kissing for

11   her to form a judgment about whether he was a good kisser or a

12   bad kisser.  That's consistent with welcome and encouraged

13   activity, not hostile and unwelcomed or coerced activity.

14   She never made any complaint.  Instead, she went --

15   she went and had lunch with Tori Leventhal.  And that's when

16   things went very badly.  Because Tori Leventhal has a very,

17   very deep hatred for Mr. Monteverde and for the Faruqis.  And

18   you know why.

19   And Tori Leventhal is her best friend.  So if she's

20   involved in a consensual relationship with Mr. Monteverde,

21   that's not gonna be very helpful to her friendship with her

22   best friend.  It's gonna be a problem.

23   So, now, Tori Leventhal gets involved.  Then we get

24   some lawyers involved.  Tori Leventhal gets her to the

25   gynecologist, you've got to go see a lawyer.  Tori Leventhal

1   didn't say, oh, my God, you were raped, let's go tell the

2   police.  She didn't say that.  You know why?  Because the

3   police don't give out $2,000,000 for PTSD.  That's why they

4   didn't tell the police.  The other reason they didn't tell the

5   police was because it didn't happen.  There was no rape here.

6             So who did she tell, and what did she say?

7             December 22nd, e-mail to Lexie Menish.  I really

8   wanted to not make a big deal about it and keep working with

9   him.

10            Not that she wanted to keep working at the firm, but

11  she wanted to keep working with him.  She wanted to not make a

12  big deal about it.  Does someone who gets raped say I don't

13  want to make a big deal about it?  You know what she didn't

14  want to make a big deal about, was that the sex was so bad,

15  because he was so drunk and it was so awkward.  She didn't want

16  to make a big deal about it, she wanted to keep working with

17  him.  She is still seeking him out on December 22.  But she had

18  a good friend who wouldn't let that happen.  That's why she

19  quit her job.  We know who that good friend is.  She quit her

20  job because of what her friend thought, not what she thought.

21            Gmail chat, same day, to Melissa Edwards:  I would

22  have kept working there, to be honest --

23            This is when she was being honest.  This is when she

24  was being honest.  She would have kept working there.

25            -- but everyone else has such a strong reaction.

1    One of the things the judge is gonna tell you is that

2    in order for you to find the work environment hostile, you have

3    to find that an objectively reasonable person would have found

4    it so intolerable that they had no choice but to leave, and

5    that the plaintiff, herself, subjectively perceived the

6    environment to be so intolerable that she had no choice but to

7    leave.

8           MR. LIPMAN:  Objection, misstates the law.

9           THE COURT:  Overruled.

10          MR. BURSOR:  And exhibit 44 -- and, by the way, this

11   one is in evidence --

12          THE COURT:  Whether it misstates or accurately states,

13   you'll determine for yourself when you hear the charge.  The

14   lawyers are free to anticipate the charges and argue what they

15   think I'll say.  But you will hear it yourself.

16          MR. BURSOR:  Now this is exhibit 44.  It is in

17   evidence, you can get it, you can take it in the jury room if

18   you want to see it.  This is what she said when she was being

19   honest.  And the judge is gonna tell you what the law is.  And

20   please listen carefully, because this is very, very important.

21   She did not subjectively perceive the office to be so

22   intolerable that she had to get out of there.  It was everyone

23   else.  It was Tori Leventhal giving her bad advice.

24          And then I asked her, were you quitting because of the

25   reactions of other people and not your own.  The reason I asked

1   her that is because I knew, at the end the case, the judge was

2   gonna tell you what the law was, and I was gonna make this

3   argument.  And she said Tori and I have been friends for a long

4   time.  We typically have similar reactions to thing.  And hers

5   was so different than mine.

6           Hers was different because Ms. Marchuk's reaction was

7   everything is okay.  To be honest.  I wanted to keep working.

8   Not at the firm, I want to keep working with him.  She had an

9   attachment to him.  But, then, she also had a disappointment

10  about how her career was going, how much money she was making.

11  She was not happy with her bonus, we heard a ton about that.

12  And in her dealings with Tori Leventhal, she figures out, oh,

13  my God, I can get paid off to go away.  She never expected

14  there to be a trial.  Hopefully, it wouldn't come to that.  She

15  didn't expect she was going to have to raise her hand on the

16  witness stand, swear to tell the truth, and tell the lies that

17  she told from that stand.  She thought the Faruqis would just

18  break out the checkbook and pay her off to go away so she could

19  go kayaking in Hawaii with her friends.

20          This lawsuit was a strategy to boost up her bonus.

21  This is what she was telling her friends immediately before

22  quitting.  Now, she still hasn't said a word to Nadeem Faruqi

23  and she hasn't said a word to Lubna Faruqi, and hasn't said a

24  word to Olive Alston.  This is a sucker punch.  She never gave

25  them a chance.  She never gave them a chance to do anything

1    about it.

2           This is what she did.  Exhibit 45.  She sends an

3    e-mail later in the day:  Yesterday was my last day at the

4    firm.  I will not be returning.  You will hear from my lawyer.

5    Don't contact me.

6           She never gave them a chance to do anything about it

7    if she had a problem.  And, in fact, when Emily Komlossy

8    offered to do something about it, if you have a problem with

9    Juan, we'll put you somewhere else.  No, no, I want to keep

10   working with Juan.  She sought him out, and sought him out, and

11   wanted to stay with him until this.  Until this sucker punch.

12          And the reason it is a sucker punch is because she

13   agreed she wouldn't do this.  When she came to the firm, and

14   this is exhibit N, also in evidence.  You got a problem, tell

15   Lubna Faruqi, Olive Alston, and Nadeem Faruqi.  She never gave

16   this policy a chance.  She never gave these three people a

17   chance.

18          She didn't even speak to them face to face and say why

19   she left.  She didn't even tell them why she left.  In her

20   e-mail.  She didn't even mention Mr. Monteverde in her e-mail.

21   She didn't even send that resignation e-mail to Mr. Monteverde.

22   This case has nothing to do with Mr. Monteverde.  This case is

23   about these two people, the Faruqis.  She wants their money.

24          The judge is gonna -- the judge already told you, the

25   judge already told you, page 5 of the transcript, on the first

1   day of this trial before I even gave my opening statement.  She

2   cannot just quit her job and sue for lost wages.  She must

3   prove by a preponderance of the evidence that her working

4   conditions were so intolerable that a reasonable person would

5   have felt compelled to resign.  That's what the judge said

6   before this trial even started.  And what did she say, the same

7   day she quit:  I would have kept working there, to be honest,

8   but everyone else has such a strong reaction.

9           And she was honest with Brian Moon on December 23rd,

10  the following day.  And Brian Moon came away from that

11  conversation, she had affair with Juan, it was mutual.

12          This story about the fake rape and this fake PTSD was

13  invented for this lawsuit to get money from the Faruqis.  There

14  is no evidence to support it.

15          Now, the judge is gonna give you a verdict form when

16  you go back to the room.  There is gonna be a verdict form that

17  says, several times, it's little bit repetitive:  Has the

18  plaintiff proved her case against Mr. Monteverde; has the

19  plaintiff moved her case against the law firm.

20          And there is a yes and a no.

21          And I want you to take this verdict form and check no

22  on every one of these questions.  She has not -- she had the

23  burden to prove it, and she hasn't proven it.  We didn't have

24  the burden to prove anything.  She has got to prove her case

25  and she did not do it.  And, in fact, we disproved her case.

1  Because everything we say is backed up by a document, it is

2  backed up by sworn testimony.

3          And they have got people making up stories.  Like

4  Brian Moon.  How credible did Brian Moon look to you?  How

5  credible did he look?  The judge is asking him if he speaks

6  English.  Did he seem honest when he saying, yeah, it seemed

7  unwelcome.  How credible was that?

8          Now, I want you to answer no to every one of these

9  questions about whether she proved her case.  In the unlikely

10 event that you do not do that, and you answer yes to one of

11 those questions, then you're gonna have to answer a series of

12 questions about damages.

13         Now, damages are not automatic.  Damages have to be

14 proven.  So even if you say, well, maybe there was some

15 discrimination here, you can't award damages just because you

16 find discrimination.  You have to find damages were proven.

17 And there is three types of damages being sought.  One is back

18 pay.  That's pay for how much her salary is reduced from the

19 time she quit till the day you render that verdict.  The

20 problem is, you don't have any evidence about that.  You didn't

21 have an expert come up here and calculate it for you.  You

22 didn't have a schedule, here's how much she made, here's how

23 much less she made, with the math.  There was no evidence of

24 any lost back pay.  They had the burden to prove that, they did

25 not do it.

1    THE COURT:  Five minutes.

2    MR. BURSOR:  What did they do?  They didn't put a

3  damage expert on.  They put on this fellow, Lord.  And they

4  tried to pass him off as an expert on damages.  And the judge

5  said, no, he is an expert on recruiting.

6    So, for back pay, they needed to prove what she would

7  have made if she stayed at Faruqi & Faruqi from the day she

8  quit until today, how much would she have made.  And then you

9  can award that -- then you subtract whatever she did make, and

10  you can award that as back pay.

11    The problem they have is Lord didn't evaluate what she

12  was going to make at Faruqi & Faruqi.  The Court asked him how

13  did you figure that out, he said he didn't.  No evidence of

14  back pay.  No evidence for front pay, either.  Front pay is

15  from today, going forward.  No evidence what that would be.

16  Lord made no effort to discuss her actual job searches.  Didn't

17  get any data on that.  Didn't consider it.  No data on any

18  lawyer that ever lateraled out of Faruqi & Faruqi.  And, by the

19  way, he had access to these data, but he didn't want to sign a

20  confidentiality agreement to say he wouldn't put it up on his

21  website and do something improper.  So he said, you know what,

22  don't show me that data.  I'm just going to make up this 80 to

23  165 range.  They didn't even say, they put on their whole case,

24  took two weeks, they never once said how much money they want

25  until Mr. Lipman, in closing argument, said give us two million

1   for PTSD.  Because he knows he didn't put on any proof of real

2   economic damages.

3          Lord didn't study her actual compensation after she

4   left.  He had to say what would she have made and then how much

5   less did she make after she left and subtract it.  He didn't do

6   it.

7          Sorry for the yelling, I get excited.

8          So then we have PTSD.  So, now, no economic damages at

9   all, no back pay, no front pay, no real economic damages.

10  Nothing.  No evidence of it.

11         So what do they come up with?  Post traumatic stress

12  disorder, like a Vietnam vet.  And how did they prove that?

13  They brought that guy with the English accent, Dr. Lawrence

14  Jacobson.  Sometimes.  Nom-de-plume, when he is recommending

15  the services of his wife on Park Slope List Serve for Young

16  Mothers who has had a baby.  He poses as a woman.  Not only as

17  a woman, he poses as the mother of young children to recommend

18  the counseling services of his wife --

19         THE COURT:  Two minutes.

20         MR. BURSOR:  -- to mothers of other young children in

21  Park Slope, Brooklyn.  Mr. Lipman knows that, because Mr.

22  Lipman is his very good friend.  Because Mr. Lipman's law firm

23  represented him in a dispute with his ex-wife.  Because Mr.

24  Lipman's law firm represented him in a real estate deal.  That

25  is the impartial psychologist they brought.  Heather Baker.

1    And if you would bring a scammer like that, if you would bring

2    a scammer and a liar, like Heather Baker, a/k/a Jacobson into

3    this courtroom, if you would fake PTSD for a lawsuit to get

4    money -- she's never been treated for any disorder other than

5    by that quack, Jacobson, posing as Baker.  No treatment before,

6    no treatment after, only treatment at the behest of her lawyer.

7    She is faking PTSD.  It is the fakest case of PTSD you will

8    ever see in your life.  What kind of person does that?

9              THE COURT:  One minute.

10             MR. BURSOR:  What kind of a person fakes PTSD for a

11   lawsuit to get money?  A person who wants to profit from her

12   own wrongdoing.

13             She was complicit every step of the way.  She went to

14   the that office for sex, just like Monteverde went to that

15   office for sex.  But Monteverde has been punished.  And you

16   heard his punishment.  And his punishment was severe.  She

17   wants to be rewarded.

18             She did wrong, too.  This PTSD is fake.  And when you

19   think about her credibility, you have to weigh it not only

20   against the seven witnesses, you have to weigh it against the

21   fake PTSD she claims to suffer.  And by the way, Jacobson even

22   admitted, he doesn't know if she has PTSD now.  He can't

23   testify whether she has any condition now.  And Dr. Hammer told

24   you she didn't, she had no impairment.

25             There is no basis for any award of emotional,

1    distress, damages, PTSD, nothing.  The Faruqis have been

2    punished enough.  Monteverde has been punished enough.  Do not

3    punish them more.  Do not reward her for her own wrongdoing.

4    She was not a babe in the woods.  She was the wolf.

5              THE COURT:  Five minutes, Mr. Lipman.

6              MR. LIPMAN:  Thank you, your Honor.

7              THE COURT:  Now, Mr. Bursor is very emotional.  I'm

8    sure this case means a lot to him.  It means a lot to me, too.

9              The one thing he really avoided discussing was the

10   obvious, the sexual harrassment that had gone on for Ms.

11   Marchuk's entire time at the Faruqi firm.  He didn't discuss

12   that, at all.  He didn't discuss his client Juan Monteverde's

13   pervasive and continuous hostile actions in the office,

14   generally, which we completely proved, and towards Ms. Marchuk,

15   herself.

16             Ms. Marchuk was definitely harassed here.  And all

17   that activity is what led up to the night of the holiday party.

18   And that's all about credibility.  That's the one thing I agree

19   with Mr. Bursor about is you've got to judge the credibility of

20   the witnesses here.  And Ms. Marchuk, I put it to you, was

21   extremely credible on the stand.  And the only lie she told in

22   this whole case was to her gynecologist, because she thought --

23   and she testified to this -- she thought her gynecologist was

24   going to force her to report to the police.  And she still

25   wanted to keep her job.  She was so traumatized by what had

1    happened, by the whole series of events, her debt, everything

2    else.  She just wanted to keep her job, so she told a white lie

3    to her gynecologist.  And that's what they want to blow up as

4    to impede her entire credibility here.

5              On the other hand, look at Mr. Monteverde.  Who did he

6    lie to in this case?  When Mr. Faruqi called Mr. Monteverde at

7    the airport when Mr. Monteverde was about to fly to Spain, he

8    said what happened.  Mr. Monteverde told him about what

9    happened up in the office, but he didn't mention the blood on

10   the carpet the next day, the tense disagreement he had with Ms.

11   Marchuk the next day as to whether or not they had sex.  He

12   didn't mention Ms. Marchuk having to go to the gynecologist.

13   He lied to his partners.  And he continued to lie to them for

14   the next 10 months, until they got my firm's demand letter.

15             Mr. Bursor said, Ms. Marchuk never gave the firm a

16   chance.  She sure did.  She sure did.  She sent them a demand

17   letter.  We didn't have to be here, she sent them a demand

18   letter --

19             MR. BURSOR:  Objection.

20             THE COURT:  Overruled.

21             MR. LIPMAN:  She sent them a demand letter and they

22   ignored it, which set into motion these events.

23             Even after they got the demand letter, Mr. Monteverde

24   didn't come clean to them.  He didn't mention about the

25   disagreement about sex.  He had to admit the bloodstain because

F230mar3                    Rebuttal – Lipman

1    it was in the letter.  And he said, yeah, there was a

2    bloodstain.  They didn't do anything about it.  They had the

3    carpet ripped up.

4            Tori Leventhal seems to be a very pivotal person for

5    them in this case.  Ms. Marchuk's good friend, Tori

6    Leventhal --

7            THE COURT:  Two minutes.

8            MR. LIPMAN:  -- had no hatred for anybody.  She

9    testified on the stand, her husband who got fired from the

10   firm, was happy to get fired, because he already had other

11   plans that he had made the previous August.

12           Now, in terms of damages, Mr. Bursor is dead wrong.

13   We have a solid claim for back pay.  Because when Ms. Marchuk

14   left, when she was forced to leave the firm, she didn't make

15   hardly any money for the next year, okay.  She made $19,000,

16   she would have made 75.  That's clearly back pay.

17           In terms of front pay, Michael Lord did testify as to

18   the expected range that Ms. Marchuk would make at this point in

19   time, forward.  And that was from 85,000 to 160,000.  And he

20   testified that she could make within the top range of that.  So

21   those are her damages, what she could be expected earn had this

22   never happened to her.  And now she's making 85.  So the

23   difference between 85 and what she could earn, projected out

24   five or ten years, is what we say are her front damages, and we

25   ask you to give her.

1    THE COURT:  One minute.

2    MR. LIPMAN:  And what I found particularly offensive

3    about Mr. Bursor, is the words he had to say about Dr.

4    Jacobson.  Dr. Jacobson has been practicing therapy in this

5    city, helping people for the better part of 25 years.  And

6    to hear him be disparaged as a quack, he treated Ms. Marchuk

7    without even knowing that there was gonna be a trial or

8    anything, because we were concerned about her.  He saw her, and

9    helped her, tried to help her.  And they she moved to Nebraska.

10    THE COURT:  Thirty seconds.

11    MR. LIPMAN:  His testimony was from his own perception

12    of her.  He thought that she had PTSD.  Of course he couldn't

13    testify as to what she has now, because he has not treated her

14    recently.  But you observed her testifying about what happened.

15    And we rely on your common sense and your good

16    judgment as to who is telling the truth here.  We think it is

17    obvious.

18    Thank you.

19    THE COURT:  Okay.  Thank you, members of the jury for

20    your patience.

21    Thank you, lawyers, for your summations.  It's now

22    1:30.  2:15, back for lunch.  We'll have lunch.  We'll give you

23    the instructions at 2:15.  They will take about an hour and a

24    half, maybe a little less.  That will get us to about 3:30.

25    My plan would be, then, to have you start your

1    deliberations, elect a foreman, and then you continue as long

2    as you need to.  I know one of the jurors has something to go

3    to late this afternoon.  I'm not sure you can make it, but

4    we'll give it a try.  And you can count on coming back in

5    tomorrow at 10:00 and continuing your deliberations.

6            What I need to tell you, now, we'll collect the

7    notebooks now.  Do not discuss the case.  It is not over.  Keep

8    an open mind, listen to my instructions, and then you can start

9    to deliberate.  You will have all of the discussions you need.

10           All right, stand for the jury.

11           (Jury excused)

12           THE COURT:  Okay, recess for lunch.  Back at 2:15.

13           (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

F23emar4

1          AFTERNOON SESSION

2          2:25 p.m.

3          (In open court; jury not present)

4          THE COURT:  Someone wants to talk to me?

5          MR. BURSOR:  Yes, sir.

6          Your Honor, two issues with the verdict form.  One is

7    just that the numbering of the questions, it goes one, two,

8    three, five.  There's no question four.  So five should be four

9    and six should be five.

10          But the more significant issue, your Honor, is that

11   the way the verdict form is set up, it suggests that the jury

12   has to consider and respond to questions on damages when that's

13   not necessarily the case.  If the answers to questions one

14   through three are no, then they don't need to proceed past the

15   first page.  They should not consider questions four and five;

16   five and six, as they're currently numbered.  And we would

17   suggest that a statement on the verdict form after question

18   three that says, if you have not answered in the affirmative to

19   any of these three questions, you should not -- sign the

20   verdict form and send it in.  You're done.

21          THE COURT:  I'll instruct them that way.

22          (Continued on next page)

23

24

25

1          (In open court; jury present)

2          THE COURT:  Be seated, everyone.

3          I hope that's not a comment on the case.

4          JUROR:  No, sir.

5          THE COURT:  So, members of the jury, this is the last

6     stage, the Court's instructions as to the law.

7          You've attended this trial very patiently, very

8     attentively and I think very interestedly.  It's been a long

9     trial.  A lot of evidence has come in.  Were it not for your

10    patience, were it not for your involvement, we could not have

11    reached this stage.  So I'd like to thank you.  I'd like to

12    thank you for your service.  I'd like to thank you for the

13    quality of your service.

14         And I'd like to remark, once again, on the remarkable

15    notion of the founders of this country in providing for a trial

16    by jury and the Sixth Amendment to the United States

17    Constitution.  We are the only country in the world trying

18    civil cases by juries.  I think the quality of justice that we

19    get by being a partnership of the citizenry, the Court and the

20    lawyers is unique.  It's an example of democracy.  It's an

21    example in applying equal protection of laws to everyone.  It

22    makes what we do part of what you do, and it strengthens the

23    country as it strengthens the quality of justice.  I thank you

24    for all of this, for attending to your duties as citizens of

25    the United States to help the lawyers and the parties resolve

1   their cases.

2           My job is to tell you what the law is.  It's not that

3   I'm smarter than you or smarter than the lawyers.  It's my job.

4   Your job is to receive and absorb what I say and apply it, to

5   understand and resolve the facts of the case.  I have no

6   opinion about the facts.  Notwithstanding my rulings on

7   objections, my asking of questions, my comments to the lawyers,

8   I have no opinion on the outcome of this case.  That's your

9   job.  My job is to give you the instructions on the law.  Your

10  job is to accept them and apply them to the facts of the case.

11          You took an oath to deliver impartial and fair

12  judgment, without prejudice or sympathy, without fear, solely

13  based upon the evidence in the case and the applicable law.

14  I'm confident that this is what you will do.

15          You decide the case on the basis of the evidence.  The

16  evidence before you consists of answers given by witnesses,

17  responsive to the questions put to them, and the exhibits that

18  were received in evidence.  You must base your verdict solely

19  upon the evidence developed at trial or the lack thereof.

20          What I have said is not evidence.  What the lawyers

21  have said in their objections and arguments is not evidence.

22  Evidence comes only from the witnesses who answer the questions

23  put to them and the exhibits.

24          Ms. Marchuk has alleged that she was injured as a

25  result of the actions of Mr. Monteverde and the Faruqi & Faruqi

1    law firm.  As the plaintiff, Ms. Marchuk must prove the facts

2    that support her allegations by a preponderance of the

3    evidence.  When a party is required to prove a fact by a

4    preponderance of the evidence, it means that that party must

5    prove that the fact is more likely true than not true.  A

6    preponderance of the evidence means the greater weight of the

7    evidence.  In determining if a claim has been proved by a

8    preponderance of the evidence, you may consider the relevant

9    testimony of all witnesses, regardless who called them, and of

10   all exhibits received in evidence, regardless of who offered

11   them.

12       If you find that the credible evidence on a given

13   issue is evenly divided between the parties -- that is, it is

14   equally probable that plaintiff is right as it is that

15   defendant is right -- then you must decide that issue against

16   the plaintiff.  If the evidence relevant to an issue is equal,

17   plaintiff has failed to satisfy her burden of proof by a

18   preponderance of the evidence.  However, plaintiff need prove

19   no more than a preponderance.  If you find that the scales tip,

20   however slightly, in favor of plaintiff -- that is, what

21   plaintiff claims is more likely true than not true -- she will

22   have proved that issue by a preponderance of the evidence.

23       We're not involved with the burden of proof in a

24   criminal trial, which is beyond a reasonable doubt.  The

25   standard is preponderance of the evidence.

1    Alexandra Marchuk, the plaintiff, alleges -- an

2    allegation is not proof -- alleges that she was employed as an

3    attorney at the Faruqi & Faruqi law firm in New York City

4    between September 6, 2011, and December 22, 2011, a space of a

5    little more than three months.  She alleges that she worked

6    under the supervision of Juan Monteverde, a partner of the firm

7    and a defendant in the lawsuit.  Ms. Marchuk alleges that she

8    resigned because she was sexually harassed and could not

9    reasonably continue working in that firm and under his

10   supervision.  Ms. Marchuk alleges that both the Faruqi & Faruqi

11   law firm and Juan Monteverde are liable for economic and

12   emotional damages and for punitive damages.

13   Defendants deny that Ms. Marchuk was harassed.

14   Defendants claim that she welcomed Mr. Monteverde's sexual

15   advances, and defendants allege that the sexual encounters were

16   not part of the firm's work environment and cannot be the basis

17   of an employment-based lawsuit against the firm.  Those very

18   basically are the claims and the defenses, and as I said at the

19   outset, set up the trial.  What counts is not the allegations,

20   not the claims, but the proofs; because it is your obligation

21   to decide this case not because of the allegations or what you

22   sense about the allegations, but what is actually proved at the

23   trial.

24   When I last summarized the case before you at the

25   outset, there were a number of additional claims and a number

of additional parties.  The case has been winnowed, so some of

these claims and some of these parties have dropped out.  You

are to pay no mind to claims that have dropped out or to

parties that have dropped out.  I will instruct you on the

claims that are in suit and the parties that are in suit.  Pay

no mind to other claims.  Pay no mind to other parties.  Pay

attention only to the claims and parties described in these

instructions.

Now as a generality, federal law, New York State law

and New York City law each provides for remedies for employees

who face discrimination in the workplace.  Each law has its own

set of characteristics.  And I will ask you to deliver a

judgment, a verdict, on each of these claims; on the federal

claim, on the New York State claim and on the New York City

claim.  I will give you instructions on each.  And the verdict

form that you will get, and I will explain to you later, has

provisions that allow you to deliver your verdict in an easy

yes/no format, after hearing these instructions and using them

to deliberate on the evidence of the case.

I'll start with federal law, if only because I'm a

federal judge and this is a federal court.  You should know

that there is jurisdiction in this court to hear both federal

claims -- that is, a claim arising under the laws or

constitution of the United States -- and in certain situations

state claims.  For example, if one citizen of one state sues a

1   citizen of another state, that case can come into the federal

2   court and the federal judge has to become knowledgable and

3   instruct on state law.  Similarly, if there's a relation

4   between a federal law and state law or city law, the same thing

5   is true.  That's all background context unnecessary.  I just

6   tell you this so you understand how the federal court will

7   involve itself, both in federal law and in state law.  But I

8   will begin my instruction on federal law.

9          Federal law provides that it shall be an unlawful

10  employment practice for an employer to fail or refuse to hire

11  or to discharge any individual or otherwise to discriminate

12  against any individual with respect to compensation or terms or

13  conditions or privileges of employment because of such

14  individual's race, color, religion, sex or national origin.

15  Federal law applies to employers based on conduct of

16  individuals working for them and not to the individual

17  themselves.  And that's why the plaintiff's claim under federal

18  law is against not Juan Monteverde, who is the individual

19  involved, but the employer, Faruqi & Faruqi.  Federal law

20  provides that the employer is the one that is potentially

21  liable, not the individual who works for the employer.

22         Ms. Marchuk complains that she was sexually harassed

23  by Juan Monteverde.  She alleges that Mr. Monteverde was her

24  supervisor at Faruqi & Faruqi.  Sexual harassment means verbal

25  or physical abuse of a sexual nature sufficiently severe or

1  pervasive as to change the terms and conditions of employment

2  and thereby create a hostile work environment.  Specifically,

3  Ms. Marchuk claims that Mr. Monteverde expressed himself in

4  coarse and suggestive language intending to convince

5  Ms. Marchuk to submit to his sexual demands, and that

6  eventually Mr. Monteverde forced sex upon her.  She claims that

7  this created a hostile and abusive environment, changing the

8  terms and conditions of her employment.

9         Mr. Monteverde denies that his speech was harassing,

10  hostile or abusive and claims that his sexual relationship with

11  Ms. Marchuk was voluntary, mutual and welcomed.  And he

12  contends that his conduct had no relation to Ms. Marchuk's work

13  environment.

14         So these are the issues.  It's a clash of claims and

15  denials.  I will give you the instructions that may help you

16  resolve this clash.

17         First, you should determine if Mr. Monteverde was, in

18  fact, Ms. Marchuk's supervisor.  A supervisor is somebody with

19  significant control over an employee's working conditions,

20  including the ability to hire or fire or promote or otherwise

21  affect the employee's pay and work responsibilities.  A person

22  can be a supervisor if his evaluations can affect plaintiff's

23  hiring and firing and promotions, pay and advances of pay and

24  work responsibilities.

25         If you find that Ms. Marchuk has proved by a

preponderance of the evidence that Juan Monteverde was her

supervisor, then Ms. Marchuk can demonstrate a hostile work

environment within Faruqi & Faruqi, but she has to pass and

satisfy three more criteria, each by a preponderance of the

evidence:  Did Mr. Monteverde subject Ms. Marchuk to unwelcomed

sexual advances in a work setting in the form of kissing,

touching, sexually explicit language or intercourse?  In

determining if the advances were unwelcomed, you should

consider if Ms. Marchuk welcomed or encouraged the advances or

whether they were unwelcomed, thrust upon her or coerced.

        Second, if the alleged conduct of Mr. Monteverde was

unwelcomed, was it so severe or pervasive that a reasonable

person in Ms. Marchuk's position would find the work

environment to be, and that Ms. Marchuk subjectively perceived

her work environment to be, hostile or abusive?  Would a

reasonable person in Ms. Marchuk's position find the work

environment to be hostile or abusive, and did she subjectively

think it was that way?  Trivial harms alone, such as coarse

language, jokes and teasing, generally do not suffice.  Both a

reasonable person in Ms. Marchuk's position and Ms. Marchuk

have to feel that the hostile environment was severe and

pervasive.

        Third, was the alleged harassment, hostility or abuse

directed at Ms. Marchuk because she is a woman?  If your answer

to any of the three questions is no, Faruqi & Faruqi win.  If

1   your answer to all three questions is yes, then Ms. Marchuk has

2   made her discrimination claim, subject to one more

3   qualification.  And that is a defense of Faruqi & Faruqi that

4   it had procedures that could have alleviated sexual molestation

5   within the firm, and that Ms. Marchuk unreasonably failed to

6   take advantage of the opportunities that the firm's procedure

7   allegedly gave her.

8           This is a defense, and so it is the burden of Faruqi &

9   Faruqi, not the plaintiff, to prove the defense by a

10  preponderance of the evidence.  If you find that Faruqi &

11  Faruqi proved by a preponderance of the evidence that it had

12  procedures that reasonably could have prevented the

13  discriminatory behavior, and Ms. Marchuk unreasonably failed to

14  take advantage of the opportunities at the firm to fix her

15  situation, then you should find in favor of Faruqi & Faruqi on

16  this federal claim.

17          That ends this instruction on the federal claim.

18  Anybody need a repetition of anything here?  Supervisor, three

19  criteria, the defense.

20          The verdict sheet on this issue says as follows:

21  Under federal law, has plaintiff Alexandra Marchuk proved her

22  case by a preponderance of the evidence against defendant

23  Faruqi & Faruqi, LLP?  Applying these instructions to the

24  evidence, if you find that she has, you check yes.  If you find

25  that she has not, you check no.

1    The next instruction as to the state claim, under

2    New York State human rights law.  Unlike the federal law,

3    New York State law can apply to individual defendants.  And as

4    the case has been shaped, the defendant involved in the

5    New York State law claim by Ms. Marchuk is the individual

6    defendant, Juan Monteverde.

7    The New York State human rights law provides -- and

8    the words are pretty similar to the federal law -- it shall be

9    an unlawful, discriminatory practice for an employer or

10   licensing agency, because of an individual's age, race, creed,

11   color, national origin, sexual orientation, military status,

12   sex, disability, predisposing genetic characteristics, marital

13   status or domestic violence victim status to refuse to hire or

14   employ or to bar or to discharge from employment such

15   individual or to discriminate against such individual in

16   compensation or in terms, conditions or privileges of

17   employment.

18   Under New York State law a supervisor may qualify as

19   an employer.  The test under New York State law is essentially

20   the same as that under federal law.  First, plaintiff has to

21   prove by a preponderance of the evidence that Juan Monteverde

22   acted as her supervisor, applying the same tests as I

23   instructed you to apply under federal law.  I won't repeat

24   them.  I think you have them.

25   Ms. Marchuk then has to prove each by a preponderance

1   of the evidence the same three criteria as I instruct you to

2   consider under federal law.  And again, I won't repeat them

3   unless you want me to.

4           Yes.

5           JUROR:  Are we going to get a copy of that?

6           THE COURT:  No.  I don't -- there are reasons for

7   that.

8           JUROR:  That's fine.

9           THE COURT:  Some judges do give out copies.  I've

10  found out in 38 years of law practice, and 16 as a judge, that

11  people listen to the instructions.  The juries follow them.

12  And for that reason, and many others, I don't give out my

13  charge.  If you have questions later on -- sometimes you don't

14  have questions immediately -- you can ask me to repeat or

15  enlarge on any of these charges.  I don't want any of you to be

16  the judge inside the jury room as to what the judge said.  If

17  you have a question, you'll come back.  And if you want me to

18  repeat at any time, just let me know.  I feel that I can watch

19  your faces and understand if you're attentive in absorbing this

20  better when I deliver it orally than when you have it in

21  writing and you read along with me.

22          So I'm not going to repeat the three criteria, because

23  they're the same under the state law as in the federal law.  So

24  if you find that Ms. Marchuk proved by a preponderance of the

25  evidence that Mr. Monteverde's words and conduct were

1   unwelcomed by her, were sufficiently severe and pervasive as to

2   create a sexually hostile and abusive working environment and

3   were motivated by the fact that Ms. Marchuk is a woman, then

4   you should find in favor of Ms. Marchuk on the state law claim

5   against Mr. Monteverde.

6        If you find that she failed to prove any of the three

7   elements by a preponderance of the evidence, or that

8   Mr. Monteverde was her supervisor, then you should find in

9   favor of Mr. Monteverde on the New York State law claim.  And

10  again, the verdict form in question two provides a yes/no

11  response.  After you apply my instructions to the facts and

12  make your decision unanimously, you check the appropriate box.

13       Under New York State law, has plaintiff, Alexandra

14  Marchuk, proved her case by a preponderance of the evidence

15  against defendant Juan Monteverde?  Yes or no.  You check the

16  appropriate box.

17       The next set of claims has to do with New York City

18  law, since New York City has its own law against

19  discrimination.  And under the charter for the New York City,

20  there is a law enabling provision.  New York City law provides

21  that it shall be an unlawful discriminatory practice for an

22  employer or an employee or agent thereof, because of the actual

23  or perceived age, race, creed, color, national origin, gender,

24  disability, marital status, partnership status, sexual

25  orientation or alienage or citizen status of any person to

1   refuse to hire or employ or to bar or to discharge from

2   employment such person or to discriminate against such person

3   in compensation or in terms, conditions or privileges of

4   employment.

5           Under New York City law Ms. Marchuk needs to show by a

6   preponderance of the evidence that Mr. Monteverde created a

7   hostile or abusive work environment for Ms. Marchuk by treating

8   her less well than other employees, even if the hostile work

9   environment was not severe or pervasive, and did so at least in

10  part because of her gender.

11          So the key to this difference is that the federal and

12  state standard of a severe or pervasive hostile work

13  environment is not required.  The criteria in the New York City

14  law is treating a woman less well.  Whether that makes any

15  difference in its application, I leave to you.  But that's the

16  different criteria.

17          Under New York City law Ms. Marchuk needs to show by a

18  preponderance of the evidence -- I'm instructed to stop

19  coughing.

20          How many of you are old enough to remember the Jackie

21  Gleason show?  I guess none of you.  In the '60s it was a great

22  television star, played a bus driver.  And before that he was a

23  standup comic.  And his trademark was always having a cup of

24  tea.  You could take a bet what was in that cup of tea.  It was

25  not tea.  This is tea.

1      Under New York City law Ms. Marchuk needs to show by a

2  preponderance of the evidence that Mr. Monteverde created a

3  hostile work environment for Ms. Marchuk by treating her less

4  well than other employees, even if the hostile work environment

5  was not severe or pervasive, and that he did so at least in

6  part because of her gender as a woman.

7      If you find that Ms. Marchuk was treated less well

8  than other employees and was treated that way because of her

9  gender, then you should find in favor of Ms. Marchuk on her

10  New York City claim against Mr. Monteverde.  If you determine

11  that she was not treated less well, then you should find for

12  Mr. Monteverde on the New York City claim.  Again, Ms. Marchuk

13  has the burden to prove that by a preponderance of the

14  evidence.

15      On the New York City claim Ms. Marchuk claims also

16  against Faruqi & Faruqi.  If you find in favor of

17  Mr. Monteverde on the New York City claim, then you should also

18  find in favor of Faruqi & Faruqi.  However, if you found in

19  favor of Ms. Marchuk on the New York City claim, then you must

20  determine if Mr. Monteverde was a managerial or supervisory

21  employee at Faruqi & Faruqi.  In other words, Mr. Monteverde

22  can be liable to Ms. Marchuk for creating a hostile work

23  environment, even if he was not her supervisor.  But if he was

24  her supervisor, then there is liability not only against him,

25  assuming Ms. Marchuk proves the case against him by a

preponderance, but also against the firm.

        To determine if Mr. Monteverde was a supervisor under

New York City law, you should consider the amount of influence

Mr. Monteverde had on the firm's operations and the extent to

which he was able to control Ms. Marchuk's working conditions,

including his ability or perceived ability to hire, fire,

promote and affect generally pay and responsibilities of work.

If you find that Mr. Monteverde was a supervisory or managerial

employee -- that is, that Ms. Marchuk proved that by a

preponderance of the evidence -- then you should find in her

favor and against Faruqi & Faruqi on the city law claim.  If

you find that Ms. Marchuk was not successful in proving her

case by a preponderance of the evidence, then you should find

in favor of Faruqi & Faruqi.

        So once again, the verdict form tracks that.  Question

three, under New York City law, has plaintiff Alexandra Marchuk

proved her case by a preponderance of the evidence against, A,

defendant Juan Monteverde?  You check yes or no.  Then you go

on to B:  Against defendant Faruqi & Faruqi, LLP.  Again, yes

or no.

        You heard testimony in the case that when Ms. Marchuk

arrived at work on December 16, 2011, the morning after the

firm party, that she found a stain on the carpet in

Mr. Monteverde's office.  Ms. Marchuk alleges that the stain

was her blood.  Defendants agree that the stain was

1   Ms. Marchuk's blood.  I neglected to add that stipulation to

2   the case.  We'll consider that it was done.

3           What's significant here is that it's for you to

4   determine if this blood stain on Mr. Monteverde's carpet has

5   any significance with regard to the issues of this case, under

6   federal law, New York State law or New York City New York law,

7   as I've charged those issues to you.

8           I have now completed the charge with regard to the

9   alleged sexually hostile work environment under federal law,

10  state law and New York City law.  Anybody need any repetition

11  or enlargement?  Let me move on to the question of damages.

12          Damages arises only if the plaintiff has succeeded

13  against one or another defendant.  If the answer to all the

14  questions, one, two, three, A and B, were no, you have nothing

15  more to do with regard to the issue of damages and you've

16  finished your work.  If you found the answer to be yes to any

17  of the previous questions, then you go on to instruct on

18  damages.

19          Just because I instruct you on damages does not

20  suggest to you that you should find damages.  Damages should be

21  found only in the case of a verdict against one or another

22  defendant.

23          (Continued on next page)

24

25

1    And it's subject to rules all by themselves, which I'll now

2    give to you.

3          Ms. Marchuk seeks compensatory damages for the amount

4    of income she claims to have lost, and the emotional damages

5    she claims to have suffered.  She also seeks punitive damages.

6    And it's my obligation to instruct you on each of these

7    components.

8          Compensatory damages are intended to make a plaintiff

9    whole, so if she's lost anything of monetary value, because of

10   the hostile work environment as defined in any of these logs,

11   then she is entitled to recover compensatory damages to be

12   compensated against her loss.  Plaintiff has to prove her loss

13   by a preponderance of the evidence.

14         In regard to emotional damages, she also has to prove

15   her loss by a preponderance of the evidence.  And then she can

16   be compensated for her loss.  And, again, I will have more to

17   say on this.  So compensatory damages must be proved by a

18   preponderance of the evidence by proving loss.

19         There is also punitive damages, which are

20   discretionary on your part.  Their purpose is to punish a

21   defendant and to deter others from committing similar acts in

22   the future.  The issue of loss is not involved with punitive

23   damages.  Now, in calculating damages, you do not multiply

24   according to multiple claims.  The loss is individual, whether

25   it be of lost pay or emotional suffering.  Just because there

1  are many ways to reach the issue of damage under federal law,

2  or state law, or city law, doesn't mean you add damages.  You

3  focus only on loss.

4        Now one aspect of compensatory damages is what we call

5  back pay.  Back pay means lost wages from the time she left

6  Faruqi & Faruqi in December 2011, until today.

7        If you find that defendants, either of them,

8  discriminated against Ms. Marchuk, she may recover back pay,

9  but only if you find that her working conditions were so

10  intolerable that a reasonable person in her position would have

11  felt compelled to resign.  The law's assumption is that an

12  employee who complains of discrimination should stay on the job

13  while seeking redress, and not quit.  However, if you find that

14  a reasonable person in Ms. Marchuk's position would have felt

15  compelled to resign, then she is entitled to back pay.

16  And Ms. Marchuk must prove that by a preponderance.

17        In calculating back pay, you may consider how much Ms.

18  Marchuk would have earned at Faruqi & Faruqi if she had not

19  resigned.  You must also subtract from the amount she would

20  have earned at Faruqi & Faruqi, that amount which she either

21  did earn, or reasonably could have earned, through replacement

22  employment.

23        Plaintiff has a duty to mitigate or minimize her

24  damages.  So if you find that Ms. Marchuk had an opportunity to

25  reduce her damages by getting another job, but unreasonably did

1  not take advantage of it, you should subtract the amount of

2  avoidable damages from her total.  How much would she have

3  earned at Faruqi & Faruqi had she stayed on after

4  December 2011, less whatever she earned, or could have earned,

5  or should have earned, from other employment, up to today.

6       Let me use a hypothetical to illustrate.  Let's say a

7  hypothetical plaintiff would have earned $75,000 a year in

8  salary.  But because of a discriminatory work environment,

9  earned nothing.  And let's say she used her best efforts to

10  find a new job.  If she didn't find a new job, she would be

11  entitled to the $75,000 she lost, or a proportional part of it

12  if she worked a part of the year.  If she earned nothing,

13  because she did not look for a replacement job, or unreasonably

14  turned down a job, she might be entitled to no compensation for

15  the year.

16       Let's say she found another job that paid less, let's

17  say it was at the rate of $65,000 a year.  She would be

18  entitled to 112th of the 10,000-dollar difference for every

19  month that she had a replacement job, or should have had a

20  replacement job that earned $65,000, rather than a previous

21  salary of $75,000.  And if her new job paid her more money than

22  the previous job, she would get nothing.

23       As with all damages, you should not speculate what

24  amounts she might have earned.  It is a matter of proof.  And

25  as to that proof, the plaintiff has the burden of proof by a

1  preponderance of the evidence.

2          The next category of compensatory damages is called

3  front pay.  If plaintiff proves by a preponderance of the

4  evidence that because of the damage inflicted on her she is

5  unable to work, or unable to find a job in future months and

6  years, she is entitled to recover that as a matter of front

7  pay.  Front pay means lost wages in the future.  Again, if what

8  she could have earned is more than what she would have earned

9  staying on at Faruqi & Faruqi, if she could earn more, she gets

10 no damage.  If she earns less, there is a potential for damage.

11 And if the consequence of the injury inflicted on her is that

12 it would have no effect on her ability to get other jobs and no

13 effect on her earning power, then there is no front pay.

14         So, again, it is a matter of proof by the plaintiff,

15 by a preponderance of the evidence.

16         Plaintiff is required to prove by preponderance how

17 far into the future, if at all, she would have earned a higher

18 salary, if she had not suffered a sexually hostile or abusive

19 environment because of what the defendants did.

20         Like back pay, Ms. Marchuk may recover front pay only

21 if you find that her working conditions were so intolerable

22 that a reasonable person in her position would have felt

23 compelled to resign.  If you do not find that a reasonable

24 person in Ms. Marchuk's position would have felt compelled to

25 resign, Ms. Marchuk is not entitled to front pay damages.

1     Front pay damages may not be speculative.  You should

2   not be guessing at her earning potential.  Plaintiff must prove

3   her claim to front pay damages by a preponderance of the

4   evidence.  If you have to guess or speculate to do your

5   calculation, you should not award front pay damages.

6     The third category is emotional damage.  Ms. Marchuk

7   is seeking compensatory damages for emotional pain and

8   suffering that she alleges proximately resulted from the

9   sexually hostile environment to which she alleges she was

10  subjected at Faruqi & Faruqi and working under Juan Monteverde.

11    Plaintiff claims that she suffered posttraumatic

12  stress disorder.  Feelings of depression, anxiety, humiliation,

13  and mental anguish.  These damages must be considered in

14  relation to this category of emotional damage.  They are not

15  salary issues, back pay or front pay.

16    After you finish calculating your back pay and front

17  pay, you must consider emotional damage, if you consider

18  damages at all.  But you shouldn't duplicate something that has

19  damage applications in more than one category.

20    Ms. Marchuk must prove by a preponderance of the

21  evidence that she suffered emotional harm as a result of the

22  alleged sexually hostile or abusive environment, and for how

23  long.  The proof could be through her testimony, your

24  observations of her demeanor, you're evaluation of the expert

25  testimony, and all of the evidence of the case.

F230mar5          Charge

1       If Ms. Marchuk proved the emotional harm that she

2  suffered by a preponderance of the evidence, she is entitled to

3  damages for past, current, and future emotional harm that she

4  proves by a preponderance.

5       Calculating damages for emotional harm may be

6  difficult to do with mathematical precision.  But you should

7  calculate them with as much definiteness and accuracy as the

8  circumstances permit.  In calculating these damages, you should

9  consider factors such as the severity and duration of the harm

10  and its effect on Ms. Marchuk's quality of life.

11       So, to review it, on the verdict form, if all of the

12  answers to questions 1, 2, and 3 are no, you don't have to fill

13  out anything and should not fill out anything on the following

14  questions.

15       If the answer to any of these questions is yes, then

16  you go on to answer questions on pages two and three of the

17  verdict form.

18       Question four.  Has plaintiff Alexandra Marchuk proved

19  by a preponderance of the evidence that she is entitled to

20  recover.  The first question is back pay, yes or no.  If yes,

21  fill in how much back pay.  Same question with front pay, yes

22  or no.  If yes, how much front pay.  Third question, emotional

23  damage, yes or no.  If yes, how much emotional damage.

24       Again, if all of the answers to questions 1 through 3

25  are no, you don't get into this at all.  If they are yes, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    go on and answer these questions consistent with the legal

2    instructions.

3            Next category of damage, the last one, is punitive

4    damages.

5            If you find that the defendants are liable, either of

6    them, for Ms. Marchuk's injuries, then you have the discretion

7    to award punitive damages in addition to compensatory damages.

8            The intent of punitive damages is to punish the

9    defendant and to warn others not to engage in similar conduct

10   in the future.  You are not required to award punitive damages.

11   They are a matter of your discretion.  If you find that

12   Mr. Monteverde is liable for sexual harrassment, you may award

13   punitive damages against him, only if you determine that he

14   subjectively knew there was a substantial risk that his conduct

15   was illegal, and that he consciously disregarded Ms. Marchuk's

16   rights.

17           If you find that the Faruqi & Faruqi firm is liable

18   for sexual harrassment, you may award punitive damages against

19   the firm.  But only if you find that the firm was aware that

20   Ms. Marchuk was being subjected to a sexually hostile work

21   environment, and that it did not do anything to remedy the

22   situation.  You should not award punitive damages against

23   Faruqi & Faruqi if you find that it had, and that it

24   maintained, good-faith antidiscrimination policies.  They must

25   both have them and enforce them.

1    If you determine that punitive damages are

2    appropriate, we're going to do that in a later process.  The

3    verdict form asks you only if she has proved by a preponderance

4    of the evidence that she is entitled to recover punitive

5    damages.  If yes, you will be asked to come back for a very

6    short proceeding, and to fix the amount on a supplementary

7    verdict sheet.

8    At this point, your answer is, yes, there should be

9    punitive damages or, no, there shouldn't be.

10    And I have just committed an error when I said has

11    plaintiff, Alexandra Marchuk, proofed by a preponderance of the

12    evidence that she is entitled to recover punitive damages.  In

13    a way that is correct.  But the essential point is that it's at

14    your discretion.  So we'll word the question, Should Alexandra

15    Marchuk recover -- be entitled to recover punitive damages.

16    And we'll reword it accordingly.

17    That completes my instructions as to the law.  And I

18    now want to talk to you about evaluating evidence.

19    Are you all right, may I continue?

20    Continue.

21    There are two types of evidence, very generally

22    speaking, direct and circumstantial.  You may rely upon either

23    in reaching your decision.

24    Evidence is direct when exhibits that are admitted

25    into evidence show facts, or when the testimony sworn to by

1   witnesses who have actual knowledge of them from something they

2   have derived from the exercises of their senses, such as

3   something they heard, something they saw, something they

4   smelled, something they touched, and so on.

5          Circumstantial evidence is evidence that tends to

6   prove a disputed fact by proof of other facts.  You infer, on

7   the basis of reason and experience and common sense from an

8   established fact, the existence or nonexistence of other facts.

9   Circumstantial evidence is of no less value than direct

10  evidence.  The law makes no distinction between direct and

11  circumstantial evidence.  The requirement is that, from all of

12  the evidence, plaintiff has proved the case by a preponderance.

13         During the trial, you may have heard the attorneys use

14  the term inference.  In their arguments, they may have asked

15  you to infer, on the bases of your reason, experience, and

16  common sense, from one or more established facts, the existence

17  or nonexistence of some other fact.

18         When you draw an inference, you conclude from one or

19  more established facts that another fact exists.  And you do so

20  on the basis of your reason, experience, and common sense.  The

21  process of drawing inferences from facts in evidence is not

22  guesswork.  It is not suspicion.  And it is not speculation.

23  An inference is a reasoned, logical deduction or conclusion

24  that the jury may draw, but is not required to draw, from the

25  facts that have been established by either direct or

1    circumstantial evidence.  Use your common sense and infer from

2    the facts that are proven whatever reasonable inferences you

3    find to be justified, in light of your common sense, logic, and

4    experience.

5          How do you evaluate the credibility or believability

6    of a witness?  It's clear that witnesses said opposite things.

7    Both witnesses cannot be correct.  One has to be credible, and

8    the other incredible, on the particular point that is

9    contradictory.  You resolve these issues the same way you do in

10   your ordinary affairs of importance, using common sense, logic

11   and experience.  There is no magic formula.  No bullet which

12   allows you to press to find an answer.

13         Use the same test for truthfulness that you would use

14   in determining matters of importance in your everyday lives.

15   Ask yourself, did the witness impress press you as honest,

16   open, and candid.  Or was the witness evasive and edgy as if

17   hiding something.  How did the witness appear.  What was her

18   bearing, behavior, manner, and appearance while testifying.

19   How responsive was the witness to questions asked.  The

20   witness' testimony, was it consistent between with the direct

21   questioning and the cross-examination questioning.  What

22   opportunity did the witness have to see, hear, and know about

23   the things that witness testified about?  How accurate was her

24   memory.  His or her candor, or lack of candor, or intelligence.

25   How did the testimony square with the testimony of others.  Was

it consistent or inconsistent.  Did one witness corroborate
another, or were they talking about different things, or the
same things in different ways.  Size up the witnesses in light
of the witness' demeanor, the explanations given by the witness
and everything else in the case, using your common sense, good
judgment, and life experience.

Few people can recall every detail of every event
precisely the same.  Witnesses may be inaccurate,
contradictory, and sometimes untruthful in one particular
respect, yet entirely credible in other respects.  It's for you
to determine whether the inconsistencies are significant or
consequential, whether they are significant or inconsequential.
Consider if the witnesses have discussed the facts of the case
in their testimony with each other, or with the lawyers before
appearing in court.  Although there is nothing unusual or
improper about a lawyer's preparation of the witness before the
witness testifies, you can give whatever weight to that
preparation that you consider appropriate.

If you find that a witness intentionally testified
falsely, that's something important that you should weigh
carefully.  If you find that a witness has willfully testified
falsely on an important fact, you can, if you want, disregard
the testimony of that witness completely, or you can disregard
it as to the particular point.  Or, you can give it whatever
weight you think it is appropriate to give.  You may accept or

1   reject the testimony to whatever extent you think is

2   appropriate.

3          Some witnesses have testified in an inconsistent

4   manner about a particular point at some earlier point.  And you

5   have seen this in the form of impeachment that each lawyer

6   addressed to one or another witness.  If the prior inconsistent

7   statement was sworn testimony, it can be considered as

8   evidence.  Similarly, if the prior inconsistent statement was

9   that of a party, it can be considered as evidence against that

10  party.  Otherwise, evidence of a prior inconsistent statement

11  is not affirmative evidence, but admitted only as to the issue

12  of credibility of a witness.

13         If you find that the witness made an earlier statement

14  that conflicts with his or her trial testimony, you may

15  consider that inconsistency in deciding what credibility to

16  give to the witness' trial testimony.

17         It's your duty, and exclusively your duty based upon

18  all of the evidence and your own good judgment, to determine

19  the issues of credibility in this case.  Consider everything I

20  have said but, bottom line, give the same kind of common sense,

21  logic, and experience that you use in listening to what people

22  say on any important matter in your life.

23         Some of the witnesses have been experts.  A witness is

24  considered an expert if, because of education or experience,

25  the witness has acquired learning or experience in some

specialized area of knowledge.  A witness having that

qualification can give opinions as to relevant matters on which

they are expert.  Your role in judging credibility applies to

experts, as well as to other witnesses.  You consider the data

upon which the expert gave his opinion, the education or

experience of the witness, the consistency or inconsistency of

the testimony with other evidence in the case, whatever bias

seems to have been existing, and all of the other aspects of

the witness who has given expert testimony.

So under your oath as jurors, you have sworn to decide

this case fairly and impartially in accordance with the

evidence, and in accordance with this legal issue of burden of

proof by a preponderance of the evidence.

As you sift through the evidence, you have to ask if

the party with the burden of proof, in most instances the

plaintiff, has proved her claims against one or another

defendant by a preponderance of the evidence.  You should not

apply bias, prejudice, or sympathy.  They are not part of this

case.  It's the evidence itself, and not any attitude of bias,

prejudice, or sympathy that has to control.  It would be

improper for you to consider your personal feelings about the

personal characteristics of any of the parties or the lawyers.

Race, religion, national origin, sex, age, all of

these are improper considerations.  The parties in the case are

entitled to a trial free from prejudice, bias, or sympathy.

 1   Our judicial system cannot work unless you reach your verdict

 2   through a fair and impartial consideration of the evidence.

 3   Your verdict must be based exclusively upon the evidence, or

 4   lack of evidence.

 5        The attorneys have a duty to argue persuasively on

 6   behalf of their clients, to object to evidence they feel is

 7   improper, and to make appropriate arguments.  They have the

 8   right to ask me to make rulings of law.  They have the right to

 9   ask for conferences at the sidebar and out of the hearing of

10   the jury.  Generally, they have the right to advocate,

11   zealously and as persuasive as they can, the positions of their

12   clients.  You should not show any prejudice against an attorney

13   or his client because of any objections or arguments made by

14   that attorney.

15        You may have observed that sometimes I sustained

16   objections and sometimes I did not.  My rulings on these kinds

17   of questions are of no concern to you, and have nothing to do

18   with your job in evaluating the merits, and should be

19   disregarded.

20        It's the duty of the attorneys to press their

21   positions.  It is my function to cut off counsel from improper

22   or redundant lines of arguments or questioning.  But what I

23   rule on, or what they may have done that is subject to

24   objection, is of no concern to you.  It does not affect the

25   merits in any way.

1    You may have observed that sometimes I asked questions

2   of witnesses.  My questions are of no more or less importance

3   than the questions asked by the attorneys.  I ask questions

4   because I think a particular point needs to be elaborated on

5   because I sense that one or more of you may want more

6   information.

7    But because I asked a question, is not a relevant

8   concern.  It is the answers that the witnesses give to whatever

9   question is put to them.  As long as the question is admissible

10   and the answer is responsive, it is evidence.

11    In determining the facts, rely upon your own

12   recollection of the evidence.  What the lawyers said about the

13   evidence in their opening or closing statements, or what I

14   said, is not evidence.  Only the witness' answers to relevant

15   questions is evidence.  And if there is any doubt, and you

16   can't resolve it according to your own recollections, you can

17   ask that the record be reread or copied and put before you.

18    We have given each of you notebooks.  Some of you have

19   taken notes, some copiously.  Others, have not.  The notebooks

20   are there for your personal use only.  You cannot prove a point

21   to another juror by looking at your own notebook.  What your

22   own notebook does is to help you refresh your own recollection

23   and is not to be used as argument to one another.  If you have

24   any doubt as to the testimony, you may ask for the portion of

25   the trial transcript to be found and made available to you.

1      Please continue your deliberations.  Sometimes it

2  takes some time, and sometimes we have to resolve various

3  arguments with the lawyers as to what is relevant to your

4  questions.

5      Your verdict must be unanimous.  Whatever your verdict

6  is, it must be unanimous.  Each juror is entitled to his or her

7  opinion.  Each should, however, exchange views with fellow

8  jurors, for that is the very essence of jury deliberation, to

9  discuss and consider the evidence, to listen to the arguments

10  of fellow jurors, to present your individual views, to consult

11  with one another, and to reach agreements based solely and

12  wholly on the evidence.

13      Each of you must decide the case for yourself, after

14  consideration and hearing the arguments of the other jurors.

15  But each of your verdict, is a matter of your conscience.  And

16  you must satisfy your own conscience.  You should not hesitate

17  to change an opinion if, after discussion with your fellow

18  jurors, their view appears to be correct and yours does not.

19  Again, that is the very purpose of deliberations, persuasion

20  one of the other.  But if after carefully considering all of

21  the evidence and the arguments of your fellow jurors, you

22  entertain a conscientious view that differs from the others,

23  you should stick to your conscientious conviction, and not

24  abandon it simply because you're out numbered.  It's a matter

25  of logic, argument, proof, and honest persuasion, one to the

1    other.  Every juror counts the same.  There is no monopoly on

2    knowledge.  Good sense and judgment comes in every deportment

3    of life.  An advanced degree is no guarantee of good sense and

4    judgment.  Each juror is entitled to present his or her own

5    view, and must be listened to respectfully by the others.

6            Your final vote must reflect your conscientious

7    conviction as to how the issues should be decided.  Your

8    verdict, whether liable or not liable, must be unanimous.

9            You begin deliberating when all eight of you are

10   present and able to listen to each other's point of view.

11   Those who have made notes may consult them, but not use them to

12   prove a recollection or another point to another juror.

13           And, please, don't show your notes to any other juror.

14           The notes are your personal notes.  They are not to be

15   shared with anyone else.  As I said, if there is doubt as to

16   what a witness said, and your respective recollections are not

17   sufficiently helpful, you have a right to ask for that

18   testimony to be reread.  The foreperson should send me a note,

19   dated and with a time affixed to it, describing the particular

20   question or the particular item of testimony you wish to

21   rehear.  I'll ask the reporter to locate it.  We'll copy it.

22   I'll resolve it with the lawyers and pass it to you.  And since

23   that usually takes some time, please continue your

24   deliberations.

25           If you send me notes, please make sure that you do not

1  indicate what any of you are thinking, or what your preliminary

2  votes are, or who may be recalcitrant, or anything else that is

3  private to you.  I do not enter your deliberations.  They are

4  yours.  You have to be open and candid with each other, and

5  trust that no one, in any later point in time, will compromise

6  the privacy and autonomy of your deliberations.

7       The lawyers will each assemble the exhibits.  They'll

8  do it together.  And they'll be available for you if you ask

9  for them.  We'll keep them here.  And if you ask for a

10  particular exhibit, we'll send the exhibit to you.

11       When you reach a verdict, send me a note that you have

12  reached a verdict.  Don't send out the verdict form.  Just send

13  me a note that you have reached a verdict.  You will come in in

14  open court.  And you'll then deliver the verdict to Ms. Jones.

15  I'll inspect it, and give it to the foreperson, and it will be

16  read, and then inspected in open court.

17       The habit of this Court is that juror number, Mr.

18  Knight will be the foreperson.  But it is a matter of your

19  vote.  If Mr. Knight does not want to serve as the foreperson,

20  and somebody else does, or for any other reason, the jury can

21  select its own foreperson.  In absence of selection, juror

22  number one, Mr. Knight, will be the foreperson.

23       The job of the foreperson is to make sure that every

24  juror has the same right as any other juror to express his

25  opinion, and to find a respectful audience.  Your job is to

1   deliberate.  And the foreperson's job is to help that

2   deliberation.  His view has no greater weight than any other

3   juror's point of view.

4           Please sit a moment.  I want to see if the lawyers

5   have any comments to make, and then we can start deliberations.

6           Sidebar, please.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Mr. Lipman?

3          MR. LIPMAN:  No comments.

4          THE COURT:  Mr. Bursor.

5          MR. BURSOR:  No comments.

6          THE COURT:  Thank you.

7          We have slightly revised the verdict form in the way I

8     told the jury.

9          Show it, please.

10         (Verdict form presented)

11         MR. LIPMAN:  Just to the last question; is that right?

12         THE COURT:  Yeah, right.

13         MR. LIPMAN:  Fine.

14         THE COURT:  Okay.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F230mar5                    Charge

1           (In open court)

2           THE COURT:  The lawyers have no comments to make.

3           Ms. Jones will now give you the revised verdict form

4     which the lawyers have reviewed and have no comment on.

5           Use your notepad for any notes.  Make sure there is

6     nothing on them.

7           And there are envelopes that will be given.  Please

8     give it to Mr. Knight.

9           Ms. Jones will now swear the Court Security Officer.

10          Pay attention to the oath.

11          (Court Security Officer, sworn)

12          THE COURT:  Members of the jury, it's now quarter to

13    four.  When you go back, please decide who will be the

14    foreperson, send it out in a note.  And then let me know how

15    long you want to go today.  You can deliberate for an hour.  I

16    think that might be a good idea.  If you are worn out, let me

17    know that.

18          In any event, we'll continue 10:00 tomorrow.  Is that

19    good?

20          JUROR:  Fair.

21          THE COURT:  Okay.  The jury may retire to begin their

22    deliberations.

23          (Jury excused to deliberate upon its verdict)
      THE COURT:  Okay.

24          (Adjourned until Wednesday, February 4, 2015 at 10:00
      a.m.)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of:                              Page

BRIAN MOON

Direct By Mr. Chase . . . . . . . . . . . .1814

Cross By Mr. Bursor . . . . . . . . . . . .1833

Redirect By Mr. Chase . . . . . . . . . . .1852

ALEXANDRA MARCHUK

Direct By Mr. Lipman . . . . . . . . . . . .1854

Cross By Mr. Bursor . . . . . . . . . . . .1864

Redirect By Mr. Lipman . . . . . . . . . . .1868

DEFENDANT EXHIBITS

Exhibit No.                            Received

  ZZ   . . . . . . . . . . . . . . . . . . .1844