2005

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ALEXANDRA MARCHUK,

4              Plaintiff,

5         v.                         13 CV 1669(AKH)

6  FARUQI & FARUQI, LLP, et al.,

7              Defendants.

8  ------------------------------x

9                                   February 5, 2015

10                                  10:00 a.m.

11
   Before:
12
                   HON. ALVIN K. HELLERSTEIN,
13
                                    District Judge
14
                        APPEARANCES
15
   ROTTENBERG LIPMAN RICH, PC
16      Attorneys for Plaintiff
   BY:  HARRY W. LIPMAN
17      JONATHAN S. HERSHBERG
        THOMAS E. CHASE
18
   BURSOR & FISHER, PA
19      Attorneys for Defendants
   BY:  SCOTT A. BURSOR
20      NEAL J. DECKANT
        YITZCHAK KOPEL
21

22

23

24

25

1          (In open court; jury not present.  Time noted:
2     10:46 a.m.)
3          THE COURT:  Mr. Bursor, have you been able to identify
4     what the jury wants?
5          MR. LIPMAN:  Yes, with one disagreement.  But
6     otherwise, total agreement.
7          THE COURT:  What's the disagreement?
8          MR. LIPMAN:  With regard to question number three,
9     what happened right before they -- what happened in Lex Bar
10    leading up to their exit from Lex Bar the night of the holiday
11    party.  Defendants have identified certain testimony that we
12    agree with, but plaintiffs have identified testimony preceding
13    that testimony that we think is also responsive.  So there's an
14    overlap, but plaintiffs want to give the jury a little more.
15         If I may approach, we have the two different versions
16    here.
17         THE COURT:  Just read out the transcript.
18         MR. LIPMAN:  Number 13.
19         THE COURT:  So the jury wants Ms. Marchuk's testimony
20    related to motivation or thoughts about going to the office at
21    3:00 a.m., both direct and cross-examination.  What is it that
22    you both agree to; what page, what line?
23         MR. LIPMAN:  We both agree to page 161, line 12
24    through 162, line 10.
25         THE COURT:  Okay.  And what's the next proposal?

2007

f25emar1                    Deliberations

1              MR. LIPMAN:  Plaintiffs would add to that the text

2     starting at 159, line 15, through to the agreed upon text.

3     It's about a page and a half, where Ms. Marchuk does testify to

4     her motivation.

5              THE COURT:  I agree with you, Mr. Lipman.  I think the

6     conversation before she left very much relates to her thinking

7     then and right after.  It's a continuous process, so both

8     should be sent in.

9              MR. LIPMAN:  With that said, your Honor, we have the

10    excerpts.  I'm not sure if -- we handed up a copy.

11             THE COURT:  I want one set.  I don't want to identify

12    any separation.  The testimony should begin, what did you say,

13    159, line 15 -- take this down.

14             MR. LIPMAN:  We have the excerpt here, your Honor.

15             THE COURT:  But I want it to run in to the next one.

16             MR. LIPMAN:  It does.

17             THE COURT:  So you have everything?

18             MR. LIPMAN:  In response to number three, yes.  We

19    also have one, two, four and five as well.  But we're agreed on

20    that.  We're also agreed on --

21             THE COURT:  So now we have everything that we need,

22    right?

23             MR. LIPMAN:  With the addition of the testimony in

24    response to the jury's --

25             THE COURT:  Last point?

2008

f25emar1                    Deliberations

1              MR. LIPMAN:  Court Exhibit 14, I think it was.  There

2     was one question, and we're in agreement on that as well.

3              THE COURT:  Okay.  So why don't you package it up and

4     give it to the jury.

5              MR. BURSOR:  Your Honor.

6              THE COURT:  Yes.

7              MR. BURSOR:  Defendants object to sending the

8     transcript in to the jury room.  We want this handled

9     consistently with the way your Honor handled the Komlossy

10    transcript.

11             THE COURT:  By reading it?

12             MR. BURSOR:  By reading it.  This batch, the whole sum

13    of it for all the responses is less than 20 pages.  And we

14    think it's --

15             THE COURT:  Let me see the whole bulk of it.  Separate

16    them with clips.

17             MR. LIPMAN:  And then the last one we did on our

18    computer and we e-mailed it to Mr. Hassan.

19             MR. HERSHBERG:  He's brought up one copy.  It's with

20    Mr. Bursor.

21             MR. LIPMAN:  Your Honor, may I approach?

22             THE COURT:  Yes.  Mr. Bursor, you think there's a

23    difference between sending this in and my reading it?

24             MR. BURSOR:  Yes, sir.

25             THE COURT:  I'll read it.  Let's bring out the jury.

f25emar1                    Deliberations

1              THE DEPUTY CLERK:  Judge, we're going to need just one

2      moment.

3              THE COURT:  Okay.

4              (In open court; jury present.  Time noted: 10:58 a.m.)

5              THE COURT:  Good morning, ladies and gentlemen.

6      Please be seated.

7              So you've given us some homework with six requests.

8      I've read five yesterday, and I'll read them again as I give

9      you the documents that the lawyers identified.

10             The last request, which we received at 4:30 p.m.

11     yesterday, reads as follows:  We request Ms. Marchuk's

12     testimony regarding leaving Lex Bar at 8:00 p.m. after the

13     first Delaware trip through the end of that encounter.

14             The lawyers have identified the following, the first

15     to the request for Ms. Marchuk's cross-examination related to

16     the events between leaving Lex Bar and arriving at the entrance

17     of the office.  This is from page 376 of the trial transcript,

18     beginning at line 9.

19     "Q   You stayed at Lex Bar until 3:00 a.m., right?

20     "A   Approximately.

21     "Q   They were closing it down?

22     "A   I think so.

23     "Q   And at that point you walked from Lex Bar to the Faruqi &

24     Faruqi office with Mr. Monteverde, right?

25     "A   Right.

f25emar1                    Deliberations

1    "Q    Did he push you on that walk?

2    "A    No, but he had his hands on my low back, and then he moved

3    it up to my shoulder.

4    "Q    There was no violence of any kind?

5    "A    No.

6    "Q    Did you walk with him willingly to the office?

7    "A    Yes.

8    "Q    And you knew you were not going to the office for a work

9    purpose, right?

10   "A    Right.

11   "Q    And you were not being forced to go to the office?

12   "A    Based on my discussion with Mr. Monteverde, I thought that

13   to walk away would be to quit.  It just seemed like that was

14   the choice; that I was going with him or I was no longer with

15   the firm.

16   "Q    Did you rehearse that line?

17   "A    No.

18   "Q    Do you recognize the words you just said had been written

19   in many of the briefs that you filed in this case?

20   "A    That's what happened.  I don't know what to say.

21   "Q    Before you left to go to the office, who suggested going

22   to the office?

23   "A    Mr. Monteverde.

24   "Q    As best you can remember, what did he say?

25   "A    It was just like in September.  We got -- we got out of

1   Lex Bar, and he asked me to go up to the office with him.

2   "Q   What did he say?

3   "A   I don't remember his exact words.  I think it was

4   something like, Let's go to the office.

5   "Q   What did you say?

6   "A   I think we just started walking.  I don't think he said

7   anything.

8   "Q   What month was it?

9   "A   December.

10  "Q   Did you have your jackets with you?

11  "A   Yes.

12  "Q   Were you wearing jackets?

13  "A   No.  I think I'd taken it off on the couch, and it was --

14  "Q   Lying next to you?

15  "A   Yeah, kinda behind me.

16  "Q   Did he have a coat?

17  "A   Mr. Monteverde?

18  "Q   Yes.

19  "A   Yes.

20  "Q   Did he check that?

21  "A   I don't remember.

22  "Q   And when he said, Let's go to the office, he just got up?

23  "A   We were already outside.  The bar was closing.

24  "Q   Oh.  So first you closed up the bar?

25  "A   I don't remember lights going on or anything like that,

1   but I think --

2   "Q   You were the last customers or were you?

3   "A   I don't remember seeing anyone.  But I also don't recall

4   that it was an empty bar.

5   "Q   But it was clear that they were closing up?

6   "A   Yes.

7   "Q   What was the conversation before you left?

8   "A   It was a continuation on Mr. Monteverde telling me what he

9   expected from me going forward at the firm.

10  "Q   What did he say?

11  "A   Loyalty, that I was expected to do what he was telling me

12  to do, and I was not going to make any more mistakes.

13  "Q   Did he say how you were not loyal?

14  "A   That I had told Ms. Komlossy about what had happened in

15  September; that I had failed because I had told her.

16  "Q   Did you comment that?

17  "A   I apologized.  And I told him that I didn't mean to tell

18  her; that she had brought it up because he had told her.  And I

19  said I wouldn't do it again.

20  "Q   Did he question you in any other respect about your

21  loyalty?

22  "A   Not that I recall.

23  "Q   Did he comment on the quality of your work?

24  "A   Not that I recall.

25  "Q   How many times did he complain about your alleged

2013

f25emar1                          Deliberations

1   disloyalty?

2   "A    That was the first time that he had ever said I was

3   disloyal or that he had been testing me.  I didn't know that

4   that was -- I didn't know that that was what he thought.

5   "Q    How long had you been in the Lex Bar?

6   "A    I think it must have been almost two hours.

7   "Q    Apart from his comment about your dislsoyalty, do you

8   remember any other part of the conversation between you and

9   Mr. Monteverde?

10  "A    No.

11  "Q    Was Mr. Bower still with you?

12  "A    Not at the end of the night.

13  "Q    How long had you been there before he left?

14  "A    I think we each had a drink.  Mr. Bower finished his

15  first.  I don't know how long that took.  And then he got up to

16  go.

17  "Q    How many drinks did you have at Lex Bar?

18  "A    I think two or three.

19  "Q    And before that at Ginger Man?

20  "A    I didn't have any at Ginger Man.

21  "Q    Before that at Valbella?

22  "A    I think I had three large glasses of wine.

23  "Q    Can you take six glasses of wine in an evening?

24  "A    No.

25  "Q    How about Mr. Monteverde, did you observe how much he had

2014

f25emar1                         Deliberations

1    to drink?

2    "A    No.

3    "Q    Was it at least equal to yours?

4    "A    I think so.

5    "Q    And apart from this aspect of disloyalty, do you recall

6    any other item of conversation between you and Mr. Monteverde

7    that night?

8    "A    I recall that he asked me about my friends that had

9    interviewed, Patrick and Michelle; then he asked me if they had

10   jobs yet, and I said no.

11   "Q    Did he say anything?

12   "A    I don't recall his reaction.

13   "Q    Was there conversation about the difficulty of the law

14   market at that time?

15   "A    Not that I recall.

16   "Q    So when he suggested -- then you went outside with him?

17   "A    I did.

18   "Q    He made the suggestion that you go to the office?

19   "A    Yes.

20   "Q    What did you say?

21   "A    I don't recall saying anything.  His hand was already on

22   my back, and we were walking.

23   "Q    You could have just gotten a cab, couldn't you?

24   "A    Yeah.  Or I could have walked to Grand Central.  That's

25   where I was heading.  I could have."

f25emar1                         Deliberations

1          That ends the reading on the first question.

2          Second question:  Direct testimony about why she left

3    Ginger Man to go to Lex Bar with Juan Monteverde.  This is page

4    383 of the transcript.

5          MR. BURSOR:  No, your Honor.

6          MR. LIPMAN:  Your Honor, I think what you're about to

7    read is the direct in response to the jury's request number

8    one.  Is that right?

9          MR. BURSOR:  383 continues her response to number one.

10         THE COURT:  Okay.  So the lawyers have corrected me.

11   I've read to you from 376 to 382, and it continues.

12   "Q   Were you giggling when you walked in the door of 369 Lex?

13   Were you giggling with Mr. Monteverde?

14   "A   No.

15   "Q   Were you hugging Mr. Monteverde when you walked in?

16   "A   No.

17   "Q   You knew at the time that he was a married man with a

18   child on the way, right?

19   "A   I did.

20   "Q   And that makes it more embarrassing for you, isn't that

21   true?

22   "A   I think that reflects more on him than me.

23   "Q   And there is no one else that heard Mr. Monteverde

24   question your loyalty, just you?

25   "A   I don't know what anyone else heard, but I don't think

f25emar1                         Deliberations

1    anyone else heard."

2          That completes the reading on one.

3          Point two, direct testimony about why she left Ginger

4    Man to go to Lex Bar with Juan Monteverde.  And that's page

5    158.

6          MR. LIPMAN:  Your Honor, I don't think we heard the

7    direct in response to number one.

8          THE COURT:  Here's the whole pile.

9          MR. BURSOR:  No.

10          THE COURT:  Come up.

11          (Discussion off the record at side bar).

12          THE COURT:  Point two, and I'm reading page 158 of the

13    transcript from line 2.

14    "Q    How many times have you been to Ginger Man?

15    "A    That's the only time.

16    "Q    When you walk in, is the bar to the left or the right?

17    "A    The bar is to the left.  The seating is to the right.

18    "Q    What happened next?

19    "A    I walked in with Mr. Monteverde and Mr. Bower.

20    Mr. Monteverde said that he didn't like the bar, that he wanted

21    to go to Lex Bar.  I wanted to continue our conversation.  I

22    had received an e-mail earlier that night from Emily Komlossy,

23    the partner in Florida, that she was in the Lex Bar.  I didn't

24    think I was just going with Mr. Bower and Mr. Monteverde.  The

25    three of us got in a cab and we went to Lex Bar."

2017

f25emar1                         Deliberations

```
 1              Does that complete the reading on point two?
 2              MR. BURSOR:  Yes, sir.
 3              MR. LIPMAN:  Yes, sir.
 4              THE COURT:  Point three:  Ms. Marchuk's testimony
 5   related to motivation or thoughts about going to the office at
 6   3:00 a.m., both direct and cross-examination.  I'll be reading
 7   from page 159 of the transcript.
 8              Correct, gentlemen?
 9              MR. LIPMAN:  Yes.
10              MR. BURSOR:  Yes.
11              THE COURT:  Page 159, line 15.
12   "Q   What happened next?
13   "A   We went to the right.  There are couches in the bar.  I
14   sat down.  I had been thinking about what Mr. Monteverde had
15   said, that the firm didn't have a good year.  I was concerned
16   about it.  I had worried about it since the settlement hearings
17   I had gone to, because everyone was concerned about the fees
18   being reduced.  If that was the way that the firm was going to
19   keep afloat, and those kept getting reduced, I just -- I just
20   didn't -- I was concerned that nothing was going to be viable.
21   But I just -- I didn't understand how they could pull in so
22   much money.  Mr. Monteverde said, Why do you even care about
23   the future of the firm?  You're not going to be with us much
24   longer.  I was --
25   "Q   I'm sorry.  At this point where was David Bower?
```

f25emar1                              Deliberations

1      "A   He was also seated with us.   We had gotten drinks from a

2      cocktail waitress.

3      "Q   Okay.   Go on.

4      "A   Mr. Monteverde's comment stunned me.   He asked me if I

5      thought I even had a future with the firm, and I said, yes,

6      that I did.   He told me that he didn't think so.   He said that

7      he had been testing me, and that I had failed.   He told me that

8      he knew that I had complained to Ms. Komlossy about him after

9      he had kissed me.   I apologized.   I said that I didn't bring it

10     up with Ms. Komlossy; that she brought it up with me because he

11     had said something to her; that I didn't -- I didn't mean to do

12     anything to rock the boat; that he -- I was incredibly sorry.

13     He asked me about my friends that had interviewed, Michelle and

14     Patrick, if they had gotten jobs.   They had not.

15          "Mr. Monteverde told me that he was going to give me a

16     second chance, but that going forward I had to do everything

17     that he said.   I had to be completely loyal to him.   And at

18     this point I was crying.   I was upset.   I didn't expect that

19     night to go that way at all.   I had come in thinking I was

20     going to get a bonus, that I was going to affect the way I

21     could socialize in the coming year, really.   And now all of a

22     sudden it was like my job was on the line.

23     "Q   Did you have anything to drink with Mr. Monteverde at Lex

24     Bar?

25     "A   I did.

f25emar1                    Deliberations

1    "Q    How much did you have to drink with Mr. Monteverde, over

2    how much period of time, approximately, if you can?

3    "A    From the start of the holiday party?

4    "Q    No, from Lex Bar.  At Lex Bar.

5    "A    I think I had at least two mixed drinks.

6    "Q    Did you leave Lex Bar with Mr. Monteverde?

7    "A    I did.

8    "Q    Why?

9    "A    I think the bar was closing down.  It was just like in

10   September.  To get to Grand Central I had to walk down

11   Lexington, or I guess north up Lexington.

12   "Q    North on Lexington?

13   "A    North on Lexington.

14   "Q    What happened next?

15   "A    Mr. Monteverde's hand was on my back.  He moved it up to

16   my shoulder.  He asked me if I wanted to go up to the office

17   with him.  He asked me if I wanted to go up to the office with

18   him when we passed by the office.  And I went with him.

19   "Q    Why didn't you go home?

20   "A    I felt like the conversation that we had all night, that

21   he had been testing me; that he wanted me to be loyal; that it

22   was my last chance.  I thought that to walk away would be to

23   quit.

24   "Q    Do you remember what you were thinking in terms of what

25   might happen in the office?

1  "A   I had -- I mean, I didn't have, like I said, a set plan.

2  I thought it would be like in September.  I thought he would

3  want to kiss.  I thought he might want to grab my breasts.  I

4  didn't -- it was not my idea.  I didn't have a plan."

5          That completes the reading in relationship to point

6  three.

7          Point four, my questioning Ms. Marchuk about whether

8  she ever told him to stop, and Ms. Marchuk's response.

9          Before I read this, I want to caution you:  It doesn't

10  make a difference who asks the questions.  It's the answers

11  that are in evidence.  And in reading the questions so far, I

12  have not identified who was the questioner.  It doesn't make a

13  difference --

14          MR. BURSOR:  May we approach?

15          THE COURT:  Yes.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

f25emar1                      Deliberations

1              (At side bar)

2          MR. BURSOR:  Your Honor --

3          MR. LIPMAN:  You have to keep your voice down.

4          MR. BURSOR:  The excerpt that is responsive to four is

5     subsumed within the excerpt that is responsive to five.  So if

6     you read this, you're going to repeat it again when you read

7     this.

8          THE COURT:  I don't think we should repeat.  Why don't

9     I combine them.

10         MR. BURSOR:  Yes.

11         MR. LIPMAN:  I agree with that.

12         THE COURT:  Let me just check.  So I'll combine the

13    two bottom ones.

14         MR. BURSOR:  It should be if you just read this one,

15    this one is in the middle of it.

16         THE COURT:  I don't have those numbers.

17         MR. LIPMAN:  But I think it's important, Judge --

18         THE COURT:  I'm not identifying.  I'm reading it once.

19    I don't care what point.  I'll mix the two points together.

20         MR. LIPMAN:  I think it's important that the jury

21    knows that what you're reading is responsive to which one of

22    their questions.

23         THE COURT:  No.

24         MR. LIPMAN:  So it would be both of the questions.

25         THE COURT:  You'll see what I do.

f25emar1                    Deliberations

         1      MR. LIPMAN:  They ask the questions.

         2      MR. BURSOR:  Okay, Judge.  This one right here.

         3      THE COURT:  I start with this?

         4      MR. BURSOR:  No.  It's in the middle of here, so you

don't even need this.  If you read this one, you'll read

everything that's on here.

         7      MR. LIPMAN:  Let me just check that.  Confirmed.

         8      MR. BURSOR:  These are your copies of the later ones.

         9      THE COURT:  Okay.

        10      (In open court; jury present)

        11      THE COURT:  To avoid duplication, I'm going to read

the fifth question you had, because the testimony I'm going to

read to you relates both to four and five.

        14      So four, again, is my question of Ms. Marchuk about

whether she ever told Mr. Monteverde to stop.  And the fifth

question is Ms. Marchuk's direct testimony related to the

completion and direct aftermath after the sexual activity in

the office.

        19      We'll start with 163, line 7.

        20  "Q   What happened next?

        21  "A   Mr. Monteverde undressed me.  He pushed down on my

shoulders.  I was on my back on the floor.  I was naked.  And

he -- he penetrated me.  But my whole body was clenched.  I

was -- I -- he had pushed me.  And I didn't get past it.  It

was not like any sexual experience I had ever had.  It hurt.  I

f25emar1                          Deliberations

1   screamed.  And I told him to stop.

2   "Q    Did you remember the whole thing?

3   "A    No.

4   "Q    Now, do you know how long it took for him to finish?

5   "A    No.

6   "Q    Did he finish?

7   "A    Yes.

8   "Q    Was he clothed?

9   "A    No.

10  "Q    He undressed you and then undressed himself, or vice

11  versa?

12  "A    He undressed me first.  He pushed me to the ground.  And

13  then he took off his clothes.

14  "Q    Were the lights on or off?

15  "A    They were off.

16  "Q    Were you on a carpet?

17  "A    Yes.

18  "Q    When you told him to stop, what did he do?

19  "A    He didn't.

20  "Q    Mr. Monteverde testified it was a beautiful, intimate time

21  up in the office.  Is that at all correct?

22  "A    No.

23  "Q    What did you do next?

24  "A    He finished.  I stood up.  I put on my clothes.

25  Mr. Monteverde pushed me up against the wall.  He said that he

f25emar1                    Deliberations

1    couldn't tell anyone what had happened.  He made me promise

2    that I wouldn't say anything.  He said that something was

3    terrible, if I said anything.  He told me not to tell my

4    cousin, who I lived with, not to tell my mom.  And I agreed.

5    And we left.

6    "Q    So you took the elevator down?

7    "A    Yes.

8    "Q    You walked across the lobby with him?

9    "A    I did.

10   "Q    And you went through the doors?

11   "A    Yes.

12   "Q    What did you do then?

13   "A    I was walking in a subway and Mr. Monteverde followed me.

14   He was reminding me that I couldn't say anything, that terrible

15   things would happen.  He said that you can't say anything to

16   anyone about this.  I tried to walk as quickly as I could.

17   When we got to the entrance of the subway, I just went down the

18   entrance on my own.

19   "Q    At that late hour, why did you take the subway and not a

20   cab?

21   "A    I just wanted to go home.  That was the way that I always

22   went home.

23   "Q    What did you do when you got home?

24   "A    I took a shower.

25   "Q    What did you do with your clothes?

f25emar1                    Deliberations

1    "A    Put them in the garbage.

2    "Q    Did you have any jewelry?

3    "A    I was wearing a necklace.  I threw it away.  I had taken

4    off all my clothes in a pile.  I just -- I threw it all away."

5              Continue at page --

6              MR. BURSOR:  Your Honor, the next excerpt is

7    responsive to the following note from the jury.

8              THE COURT:  Right.  And that finishes the reading on

9    the first note?

10             MR. BURSOR:  Yes, sir.

11             THE COURT:  So I've read everything you've asked for

12   in the note you gave me at 3:00 yesterday that I marked Court

13   Exhibit 13.  I'm looking at you to see if there's anything that

14   you want more.

15             I'm now going to the last note you left yesterday:  We

16   request Ms. Marchuk's testimony about leaving Lex Bar at

17   8:00 p.m. after the first Delaware transcript through the end

18   of that encounter.  Page 106 of the transcript, line 4.

19   "Q    After arriving in New York what happened?

20   "A    We went back to the office to the tenth floor.  We told

21   Mr. Faruqi what had happened, and then Mr. Monteverde told me

22   we were going to Lex Bar.

23   "Q    Did you know what Lex Bar was at that point in time?

24   "A    No.  It's a bar a few blocks from the office on Lexington

25   Avenue.

f25emar1                          Deliberations

1    "Q    Had you ever been to Lex Bar before?

2    "A    No.

3    "Q    Did you go to Lex Bar with Mr. Monteverde?

4    "A    I did.

5    "Q    Who went with you?

6    "A    It was just Mr. Monteverde and me.

7    "Q    Why did you go?

8    "A    He told me after the hearings that that is what he did;

9    that he would go out with the people that he had gone to the

10   hearing with.

11   "Q    And what happened at Lex Bar?

12   "A    Mr. Monteverde told me I was lucky to be working for him,

13   and I agreed.  He told me that he had specifically chosen me to

14   work for him; that he had requested it from Mr. Faruqi.  I

15   thanked him.  I explained that, you know, a lot of really smart

16   people that I went to school with didn't have jobs; that I had

17   student loans; that I didn't have that option.  After you

18   graduate, there is a few months of deferment, and then you have

19   to start paying them.  Mr. Monteverde asked me, well, what are

20   your student loans?  I'm not proud of how much money I took

21   out.  Obviously it was not -- I shouldn't have done it, so I

22   didn't even tell my friends how much I owed.  I just told

23   Mr. Monteverde that they were significant.  But he pressed me.

24   He wanted to know the exact amount.  He said that he wouldn't

25   be able to help me if I didn't tell him how much, but I

f25emar1                          Deliberations

1    refused.

2    "Q    What did you drink, if anything, at Lex Bar?

3    "A    I had two drinks, cocktails.

4    "Q    Did Mr. Monteverde drink?

5    "A    Yes.

6    "Q    How late did it get?

7    "A    I think we left around 8:00 p.m.

8    "Q    What happened after you left the bar?

9    "A    Lex Bar is south of Grand Central.  I was walking back.  I

10   lived off of Sixth.  On the sidewalk Mr. Monteverde stopped me.

11   He grabbed me.  He kissed me.  He grabbed my breasts.  I pulled

12   away from him, and then he said, Do you want to go back up to

13   the office?

14   "Q    What did you understand him to have meant by that?

15   "A    Sexual connotation.

16   "Q    What did you say?

17   "A    I said no.

18   "Q    What did you do?

19   "A    I was going to walk towards Grand Central.  Mr. Monteverde

20   offered to get me a cab.  I said no.  I just want -- went to

21   the subway and I went home.

22   "Q    Why did you take the subway, not a cab?

23   "A    I always take the subway.  At that time, between my rent,

24   my loan payments, utilities, I didn't have a lot of disposable

25   income so I had the Metro Card.  That's what I took.

```
1    "Q   At that point in time in your life how did you feel?

2    "A   I couldn't believe it was my third day of work.  I had

3    felt so lucky to have a job, to be getting paid.  It looked

4    like everything was coming together.  And then I was panicked.

5    I mean, my boss had kissed me on my third day.  I didn't know

6    what to do.  Leaving didn't seem like an option.  If I quit, I

7    certainly wasn't qualified for unemployment.  I had friends

8    looking for jobs.  Mr. Monteverde had asked me that, and I --

9    to recommend a friend.  I had been asked a few times.  While I

10   was seated next to him, he asked me to e-mail Mr. Faruqi a

11   recommendation of one of my friends who didn't have a job.  I

12   thought it was all falling apart.  If really smart people were

13   still looking for jobs, if I left after three days, I didn't

14   know how I would explain it.  I didn't sleep well.  I thought

15   about it all night, but I went into work on time the next day."

16            Next page is page 286 of the trial transcript.

17   "Q   Now I want to ask you about drinking in Lex Bar after the

18   hearing in Delaware on September 8.  Do you remember this?

19   "A   I do.

20   "Q   This is the date that hearing occurred, right?

21   "A   Yes.

22   "Q   And afterwards you went to Lex Bar with Mr. Monteverde?

23   "A   I did.

24   "Q   And that's when Mr. Monteverde -- that was the first time

25   you and he kissed, right?
```

f25emar1                         Deliberations

1   "A    He kissed me outside of Lex Bar on the sidewalk.

2   "Q    How long was the kiss?

3   "A    It was short.  He kissed me.  I pushed him away.

4   "Q    Did you kiss him more than once?

5   "A    I don't think so.

6   "Q    Did you kiss him enough to form a judgment that he was a

7   bad kisser?

8   "A    I don't think so.

9   "Q    Do you recall telling Emily Komlossy that he was a bad

10  kisser and laughing about it?

11  "A    No."

12          That completes the reading of the questions you had,

13  members of the jury.  Please retire to the jury room and

14  continue your deliberations

15          (Jury retired to deliberate.  Time noted:  11:29 a.m.)

16          MR. LIPMAN:  Judge, you want us to clear the decks for

17  the next case?

18          THE COURT:  Hold on.  Everyone can sit.

19          Josh just made the point, do the jury know that they

20  continue their deliberations on Fridays, since we haven't been

21  working on Fridays?  I think last week we did.

22          MR. LIPMAN:  Last week we did not.

23          THE COURT:  When they come out, I'll tell them that if

24  their deliberations are not completed today, they should plan

25  to come in tomorrow.

f25emar1                    Deliberations

1           I need the tables.

2           MR. LIPMAN:  No problem, Judge.  Thank you.

3           (Recess pending verdict)

4           (In open court; not jury present.  Time noted:

5    2:08 p.m.)

6           THE COURT:  We have a note:  1:48 p.m.  We have

7    reached a verdict.  Signed by Mr. Knight.

8           We'll mark this Court Exhibit 15.  Mr. Cardona, --

9    actually, the court security officer, bring out the jury.

10          Audience, when the verdict is announced, I have some

11   other business after that.  I'm going to ask everyone here to

12   remain in their seat and not go out until the door is opened.

13          Mr. Cardona and security officer, people are not to be

14   going out when the verdict is announced.  They either have to

15   go out now or they have to stay until I say it's okay to leave.

16          (In open court; jury present.  Time noted: 2:13 p.m.)

17          THE COURT:  Good afternoon, ladies and gentlemen.

18   Please be seated, everyone.

19          THE DEPUTY CLERK:  As I call out your name, please

20   answer here to your presence.

21          (Roll call was taken.  All jurors present)

22          THE COURT:  All jurors are here.

23          I have a note, members of the jury, that you've

24   reached a verdict.  Gilbert?

25          The verdict has been passed from Mr. Knight to

f25emar1                    Deliberations

1   Mr. Cardona.

2            Mr. Cardona, will you please return the jury verdict

3   form to Mr. Knight.

4            THE DEPUTY CLERK:  Will the foreperson please stand.

5            It is our understanding that the jury has agreed upon

6   a verdict in the case of Alexandra Marchuk vs. Faruqi & Faruqi,

7   LLP.

8            Question number one, under federal law, has the

9   plaintiff, Alexandra Marchuk, proved her case by a

10  preponderance of the evidence against the defendant Faruqi &

11  Faruqi?  The jury's answer?

12           THE FOREPERSON:  No.

13           THE DEPUTY CLERK:  Under New York State law, has

14  plaintiff Alexandra Marchuk proved her case by a preponderance

15  of the evidence against defendant Juan Monteverde?

16           THE FOREPERSON:  No.

17           THE DEPUTY CLERK:  Question three, under New York City

18  law, has plaintiff, Alexandra Marchuk, proved her case by a

19  preponderance of the evidence against, A, defendant Juan

20  Monteverde?

21           THE FOREPERSON:  Yes.

22           THE DEPUTY CLERK:  B, defendant Faruqi & Faruqi LLP?

23           THE FOREPERSON:  Yes.

24           THE DEPUTY CLERK:  Question four, has plaintiff,

25  Alexandra Marchuk, proved by a preponderance of the evidence

f25emar1                         Deliberations

1   that she is entitled to recover, A, back pay?

2           THE FOREPERSON:  Yes.

3           THE DEPUTY CLERK:  B, if yes, how much back pay?

4           THE FOREPERSON:  $70,000.

5           THE DEPUTY CLERK:  That number again, please?

6           THE FOREPERSON:  Seven-zero, $70,000.

7           THE DEPUTY CLERK:  And C, front pay?

8           THE FOREPERSON:  Yes, 20.

9           THE DEPUTY CLERK:  D, if yes, how much front pay?

10          THE FOREPERSON:  $20,000.

11          THE DEPUTY CLERK:  And question E, emotional damage?

12          THE FOREPERSON:  No.

13          THE DEPUTY CLERK:  Please go on to question number

14  five.

15          Should plaintiff Alexandra Marchuk be entitled to

16  recover punitive damages?  Your answer?

17          THE FOREPERSON:  Yes.

18          THE COURT:  May we have the verdict form, Mr. Knight.

19          Please show the verdict to counsel, please.

20          Members of the jury, I'd like you to retire to the

21  jury room.  And I have to discuss a few things with counsel,

22  and I'll call you back very soon.  Close up your books and keep

23  them on your chairs.

24          (In open court; jury not present)

25          THE COURT:  I'll take issues of motions later on.  But

f25emar1                    Deliberations

 1   one aspect may have to detain us for a while, and that's the

 2   answer to number five.  Should plaintiff, Alexandra Marchuk, be

 3   entitled to recover punitive damages.  And the jury answered

 4   yes.

 5          Mr. Lipman, what do you propose we do now?

 6          MR. LIPMAN:  Your Honor, I would like the Court to ask

 7   defendants whether or not they have supplied the information to

 8   my accountant, Bruce Pritikin, that your Honor had asked me to

 9   supply them the name of and contact information of earlier this

10   week.  I did so timely.  I did so that night.  I am not sure as

11   I stand here whether or not defendants have complied with your

12   Honor's directive to --

13          THE COURT:  What's the answer?

14          MR. LIPMAN:  -- give Mr. Pritikin that information.

15          THE COURT:  Mr. Bursor?

16          MR. BURSOR:  Your Honor, my understanding was I was to

17   hold the material in my possession, and I have it here in the

18   courtroom.

19          THE COURT:  Can you deliver it to Mr. Lipman?

20          MR. BURSOR:  Yes.

21          MR. LIPMAN:  Your Honor, I believe your direction is

22   clear on the record, is that whatever Mr. Pritikin -- so we

23   have immediate opportunity to review it with our accountant.

24          THE COURT:  Review it now, Mr. Lipman.  Review it now.

25          MR. LIPMAN:  At this very moment?

f25emar1                         Deliberations

1          THE COURT:  At this very moment.  (Pause)  So it's one

2     folder of papers.  Can you describe for the record what you're

3     producing.

4          MR. BURSOR:  Your Honor, I'm going to produce to

5     Mr. Lipman for his inspection the 2011, 2012 and 2013 tax

6     returns of Faruqi & Faruqi, LLP, and of Mr. Monteverde, and

7     also Mr. Monteverde's W-2 form for 2014 for his inspection.

8          And, your Honor, I'd like to be heard on a few things.

9          THE COURT:  There are a few things I will need to hear

10    you on.  So I need you to go through that and give me a

11    proposal, Mr. Lipman, what I should tell the jury in terms of

12    time and what it is you want me to instruct the jury about.

13    You can be seated.

14          Mr. Bursor?

15          MR. BURSOR:  Your Honor, number one, I want to poll

16    the jury when they come back out.

17          THE COURT:  We'll do that.

18          MR. BURSOR:  Number two, I'm renewing our motion for

19    JMOL on front pay.

20          THE COURT:  We'll take the motions after we poll the

21    jury.

22          MR. BURSOR:  You're going to take the motions?

23          THE COURT:  After.  We don't need the jury present for

24    that.

25          MR. BURSOR:  We don't need the jury present for that,

f25emar1                    Deliberations

 1    but if the jury is going to consider punitive damages, there's

 2    a limit on the amount of punitive damages that can be awarded,

 3    based on the total amount of the award of compensatory --

 4              THE COURT:  We're not charging the jury.  I need to

 5    know really before I bring the jury back what we want of them

 6    in terms of time.  So I want to wait to see what Mr. Lipman

 7    tells me after looking at what he has.  (Pause)  So, counsel?

 8              MR. LIPMAN:  Yes, your Honor.

 9              THE COURT:  The jury has to come back to be polled.

10    At that time I want to tell them what's ahead of them.  I'd

11    like to call them back at 3:30, an hour from now, to hear

12    whatever submissions you want to make and Mr. Bursor wants to

13    make.  I think 15 minutes would be adequate for the both of

14    you.  I'll then give them a short charge on punitive damages,

15    and they can deliberate and finish today.

16              Your alternative is to call them back tomorrow

17    morning.  I don't think that's helpful.

18              MR. LIPMAN:  Well, your Honor, we've just been given

19    this financial information.

20              THE COURT:  I know.

21              MR. LIPMAN:  We preliminarily reviewed it, and it's --

22    from my layman's viewpoint -- I'm not a business accountant --

23    it's incomplete.  There is not full asset disclosure of either

24    the firm or the --

25              THE COURT:  I anticipated there would not be full

f25emar1                    Deliberations

 1   asset disclosure because a law firm doesn't include its assets

 2   in its accounting return, and no law firm tends to have much in

 3   the way of assets.  Income is sufficient.

 4          Do you have the income records of the firm for the

 5   last three years they filed?

 6          MR. LIPMAN:  Well, with regard to the firm, Mr. Rowley

 7   testified to a large pipeline of cases.  I think that that is

 8   relevant to the firm's wealth to understand what its valuation,

 9   if any --

10          THE COURT:  You have three years of records.  That's

11   sufficient.  Firms always have inventory and expectations.  A

12   lot of it is not subject to quantification because it's subject

13   to the amount of work that's still to be done, and in their

14   business awards of fees by the court, which are not

15   predictable.

16          I rule you have sufficient information.  There's not

17   going to be any more discovery.

18          MR. LIPMAN:  Your Honor, perhaps with regard to the

19   firm, we would be willing to grant that issue, but with regard

20   to Mr. Monteverde, we do not have full asset disclosure.  This

21   is an individual where there's been testimony that he's got a

22   boat.  We don't see a boat.  We don't have a net worth

23   statement.  We don't have any kind of sense of Mr. Monteverde's

24   assets.  We have his tax returns, which indicate -- and I won't

25   say any numbers, but they indicate a number of brokerage

f25emar1                          Deliberations

1    accounts and other sources of income that's reported.  But

2    there's no way from looking at the tax return to discern what

3    the value of those underlying assets are that are producing the

4    income that's on the return.

5              THE COURT:  How do you get that?

6              MR. LIPMAN:  Sorry?

7              THE COURT:  How are you going to get that?

8              MR. LIPMAN:  The only way I could get that is if

9    Mr. Monteverde gives it to me.

10             THE COURT:  Mr. Bursor?

11             MR. BURSOR:  Your Honor, we produced what you ordered

12   us to produce.  Mr. Monteverde --

13             THE COURT:  Say it again?

14             MR. BURSOR:  I said we produced what your Honor

15   ordered us to produce, which was the tax returns.

16   Mr. Monteverde did not have a copy of any loan application

17   within the time frame your Honor ordered.

18             THE COURT:  Did he make any?  Did he apply for any

19   loans?

20             MR. BURSOR:  Yes, he did.

21             THE COURT:  I don't find credible that he doesn't have

22   a copy.  If he doesn't have it, his accountant has it.

23             MR. BURSOR:  He does not have an accountant.  He does

24   his own taxes.  He did not save records from the loan

25   application.

f25emar1                    Deliberations

1                THE COURT:  I just don't find that credible.  What

2      bank?

3                MR. MONTEVERDE:  Citibank.  They send you a copy, your

4      Honor.  I threw it away.  I don't keep it.

5                THE COURT:  We'll have Mr. Monteverde take the witness

6      stand here, and you can inquire about what he had and I'll

7      preside.

8                So I'm thinking to ask the jury to come back at 3:30.

9      Okay?

10               MR. BURSOR:  Yes, sir.

11               THE COURT:  Make it 3:45.

12               MR. LIPMAN:  To inquire what, your Honor?

13               THE COURT:  You'll make arguments to the jury for

14     punitive damages.  You'll submit them the information, and then

15     you'll make your arguments, each of you.

16               MR. LIPMAN:  Your Honor, we have incomplete

17     information with regard to Mr. Monteverde's assets.

18               THE COURT:  You'll do your best.

19               MR. LIPMAN:  We would object to putting in evidence

20     for the jury to consider punitive damages when we have not been

21     given full disclosure as to Mr. Monteverde's financial

22     condition.

23               THE COURT:  Your objection is noted.

24               Anything else?

25               MR. BURSOR:  Your Honor, we do not wish private

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

f25emar1                          Deliberations

1    financial information of the defendants to become public.  We'd

2    ask the Court either be sealed or --

3              THE COURT:  It's not going to be sealed.  The jury has

4    indicated that punitive damages is available against both

5    defendants, and there's no reason to have privacy on that

6    issue.

7              MR. BURSOR:  Your Honor, the defendants would like to

8    renew their motion for JMOL on punitive damages and also on

9    back pay and front pay before the jury considers punitive

10   damages.

11             THE COURT:  Not on front pay.  Not on back pay.

12   What's the point you want to make on punitive damages, any

13   limitation?

14             MR. BURSOR:  That the firm cannot be held liable for

15   punitive damages based on the record, which is that they

16   implemented an antidiscrimination policy; that they enforced it

17   in good faith; and that they took appropriate measures to

18   respond to whatever information was provided them about any

19   issue Ms. Marchuk had.

20             And I think the jury's verdict, particularly in

21   response to questions one and two, confirms that.

22             THE COURT:  Decision is reserved.  Question number one

23   is only against the firm and it has to do with federal law, and

24   there are many issues which could have supported that verdict.

25   Similarly with question two.  And specifically, when they said

f25emar1                          Deliberations

1    plaintiff is entitled to recover punitive damages, we didn't

2    ask against which defendant.  But the same instructions stated

3    that the criteria against each defendant, and presumably the

4    jury found itself satisfied by those criteria, that they will

5    be embellished in respect to the fixing of punitive damages

6    when this comes to that.

7            Decision reserved.  Bring out the jury, please.

8            MR. CHASE:  Can I ask one --

9            THE COURT:  Anybody wants to leave, they can leave.

10           MR. LIPMAN:  You're bringing in the jury to just tell

11   them the procedure; we're not starting the hearing?

12           THE COURT:  Yes.

13           (In open court; jury present.  Time noted:  2:39 p.m.)

14           THE COURT:  I brought you back for two purposes.  Each

15   of you is going to be asked whether it's your verdict or not,

16   and then I'm going to ask you to come back at 3:45, an hour

17   from now approximately, to conclude the case with regard to

18   punitive damages.  There will be very short submissions and

19   arguments, and then your deliberation on the point.  You should

20   be able to -- well, you take what time you need to deliberate

21   on those issues.

22           So now the jury will be polled.

23           THE DEPUTY CLERK:  Ladies and gentlemen of the jury,

24   please listen to your verdict as it stands recorded:  In the

25   case of Alexandra Marchuk vs. Faruqi & Faruqi, question number

one, the jury answers no.  Question number two --

          THE COURT:  Do each one, one.

          THE DEPUTY CLERK:  Yes, your Honor.

          Question number one, under federal law has plaintiff,

Alexandra Marchuk, proved her case by a preponderance of the

evidence against defendant Faruqi & Faruqi?  Answer no.

          THE COURT:  Poll the jury.

          (The jury was polled; each juror answered in the

affirmative)

          THE DEPUTY CLERK:  Question number two under New York

State law has plaintiff, Alexandra Marchuk, proved her case by

a preponderance of the evidence against defendant Juan

Monteverde?  The jury's answer, no.

          (The jury was polled; each juror answered in the

affirmative)

          THE DEPUTY CLERK:  Question three:  Under New York

City law has plaintiff, Alexandra Marchuk, proved her case by a

preponderance of the evidence against, A, defendant Juan

Monteverde?

          (The jury was polled; each juror answered in the

affirmative)

          THE DEPUTY CLERK:  And question B of that same number

three question, under New York City law has plaintiff,

Alexandra Marchuk, proved her case by a preponderance of the

evidence against B, defendant Faruqi & Faruqi?  The jury

f25emar1                          Deliberations

1   answered yes.

2              (The jury was polled; each juror answered in the

3   affirmative)

4              THE DEPUTY CLERK:  Question four, has plaintiff,

5   Alexandra Marchuk, proved by a preponderance of the evidence

6   that she is entitled to recover, A, back pay?  The jury's

7   answer was yes.

8              (The jury was polled; each juror answered in the

9   affirmative)

10             THE DEPUTY CLERK:  Question B of four, if yes, how

11  much back pay?  The jury's answer was $70,000.

12             (The jury was polled; each juror answered in the

13  affirmative)

14             THE DEPUTY CLERK:  Question C of number four, front

15  pay, the jury answers yes.

16             (The jury was polled; each juror answered in the

17  affirmative)

18             THE DEPUTY CLERK:  Question D of number four, if yes,

19  how much front pay?  Jury's answer was $20,000.

20             (The jury was polled; each juror answered in the

21  affirmative)

22             THE DEPUTY CLERK:  Question F -- question E, actually,

23  emotional damages.  The jury's answer was no.

24             (The jury was polled; each juror answered in the

25  affirmative)

f25emar1                        Deliberations

1              THE DEPUTY CLERK:  We now move on to question F, which

2       was not answered because the answer to letter E was no.

3              We move on to question five.  Should plaintiff,

4       Alexandra Marchuk, be entitled to recover punitive damages?

5       The jury's answer was yes.

6              (The jury was polled; each juror answered in the

7       affirmative)

8              THE DEPUTY CLERK:  Jury polled, verdict unanimous,

9       your Honor.

10             THE COURT:  Anything further for the jury before I

11      give them an hour's recess?

12             MR. BURSOR:  No, your Honor.

13             THE COURT:  Mr. Lipman?

14             MR. LIPMAN:  Yes?

15             THE COURT:  Anything further?

16             MR. LIPMAN:  Not at this time, your Honor.

17             THE COURT:  Members of the jury, we're going to ask

18      you to retire.  Close up the books.  You can take them with you

19      into the jury room.  And I'll call you out in approximately an

20      hour.

21             JUROR:  Your Honor, could we get some water, please.

22             THE COURT:  Yes.  Yes.

23             JUROR:  Do we have to stay in the room?

24             THE COURT:  Yes.  Sorry.

25             JUROR:  Could we get a newspaper?

f25emar1                    Deliberations

1              MR. BURSOR:  Your Honor, can we approach?

2              THE COURT:  One minute.  You can address those needs

3    to Mr. Cardona.  One minute.  Counsel?

4              (At side bar)

5              MR. BURSOR:  Do we really need an hour break?  We're

6    torturing these people.  If we give them a shorter break, we

7    get going, maybe we can wrap this up today.

8              THE COURT:  Mr. Lipman is going to have the

9    opportunity to examine Mr. Monteverde here on the issue of

10   assets.  I don't know how long that will take.  I'll tell them

11   if we need them, that I will be in the room so we can get them

12   out earlier.  I'll tell them if we can do it faster, we'll do

13   it faster.

14             MR. LIPMAN:  Your Honor, I think giving us one hour to

15   review all of these financial statements and ask meaningful

16   questions is unreasonable.  I think we need more time.

17             THE COURT:  You'll make an application, if you need

18   it.

19             MR. LIPMAN:  Thank you.

20             (In open court)

21             THE COURT:  All right, members of the jury.  You may

22   retire.  Please don't speculate on what remaining issues will

23   be.  I'll instruct you when you come back, and we'll try to be

24   as efficient as possible.  If we can do it in less than an

25   hour, we'll do it.  If it takes more, I'll deal with that issue

f25emar1                          Deliberations

1    then.

2              (Jury excused)

3              THE COURT:  Mr. Lipman is going to examine you under

4    oath on your issue of assets.  I remind you that you remain

5    under your original oath.

6              MR. MONTEVERDE:  Yes, sir.

7              THE COURT:  Mr. Lipman, please inquire.

8              MR. BURSOR:  Does this need to be public, your Honor?

9              THE COURT:  Yes.

10    JUAN MONTEVERDE,

11       called as a witness by the Plaintiff,

12       having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MR. LIPMAN:

15   Q.  Good afternoon, Mr. Monteverde.

16   A.  Good afternoon.

17   Q.  Did you sell your apartment on 45th Street in 2012?

18   A.  Yes, at a loss.

19   Q.  At that time did you purchase an apartment for $895,000 on

20   49th Street?

21   A.  That's a joint tenant with my wife, yes.

22   Q.  Is there a mortgage on that property?

23   A.  That is correct.

24   Q.  How much is the mortgage?

25   A.  I don't have the exact figure, but it's probably -- there's

F25EMAR1                    Monteverde - direct

1   a mortgage and there is a line of credit.  The line of credit

2   is half a million, and the mortgage is probably 300,000.

3   Q.  The line of credit you took out in August of 2014, right?

4   A.  That's correct.

5   Q.  And when you applied for that line of credit, you had to

6   fill out a loan application form, is that correct?

7   A.  That is correct.

8   Q.  You did that with Citibank?

9   A.  Yes, my wife and I did.

10  Q.  So the person with whom you dealt with at Citibank would

11  likely have a copy of that loan application, right?

12          THE COURT:  You don't have to ask that question.  It

13  is or is not.  He's not privy to that.

14          What was the purpose of taking out a line of credit

15  secured by your apartment?

16          THE WITNESS:  Jut to be able to have cashflow, if

17  necessary.  For personal --

18          THE COURT:  Is the apartment a condo or a co-op?

19          THE WITNESS:  It's a condo.

20  BY MR. LIPMAN:

21  Q.  How much is that apartment worth today, do you know?

22  A.  I don't know.

23  Q.  Do you think it's worth more than $895,000?

24  A.  I would be speculating, but I don't know.

25          THE COURT:  When was it bought?

F25EMAR1                        Monteverde - direct

1              THE WITNESS:  It was bought two years, two years ago.

2   So I'm sure it's -- whatever the market has done, I'm sure the

3   apartment has done.

4              THE COURT:  In 2013?

5              THE WITNESS:  No.  It was with my first -- it was when

6   my first son was born in 2012.

7              THE COURT:  What month?

8              THE WITNESS:  We purchased it, I believe it was

9   March 2012.

10  BY MR. LIPMAN:

11  Q.  Our information says it was on February 2, 2012.  Is

12  that --

13             THE COURT:  So let's not --

14  Q.  Does that refresh your recollection?

15  A.  I thought it was March but -- we moved in in March.

16             THE COURT:  So the contract could have been in

17  February?

18             THE WITNESS:  It could have been signed in February,

19  but I believe we closed in March as well.

20  Q.  Other than your condo, do you own any other real estate or

21  other real property?

22  A.  No real estate or real property, no.  I mean, I have the

23  boat.  I don't know if you're including that.

24  Q.  I was about to get to the boat.

25  A.  Okay.

F25EMAR1                          Monteverde - direct

1    Q.   You own a boat?

2    A.   Yes, which -- there's a loan on the boat as well.

3    Q.   How much is the boat worth?

4    A.   Probably half of what the loan is.  Boats depreciate fast.

5           THE COURT:  When did you buy the boat?

6           THE WITNESS:  2011.

7           THE COURT:  What did you pay?

8           THE WITNESS:  475,000 probably, 450,000.

9    BY MR. LIPMAN:

10   Q.   And what's the mortgage on the boat, the loan on the boat?

11   A.   Probably 375,000.

12          THE COURT:  Where is the boat docked?

13          THE WITNESS:  The Brewer Yacht Club in Port

14   Washington.

15   Q.   Sorry.  What was the loan on the boat?

16          THE COURT:  He said 375.

17          THE WITNESS:  Roughly, I think it's an 80/20, so I

18   think I put down 20 or 25 percent down.  So the balance, high

19   threes, and the boat was bought low fours.

20   Q.   So your net ownership value of the boat is about $100,000?

21   A.   No.  No.  The boat is probably worth 200,000 today, so the

22   note is probably more than the boat is worth.  Boats depreciate

23   very fast.

24   Q.   Who's the lender?

25   A.   To be honest, I don't know.

F25EMAR1                    Monteverde - direct

1   Q.  So if the lender had to foreclose on your boat?

2   A.  They'd lose.

3   Q.  You'd lose money?

4   A.  Certainly.  With every boat that happens.

5   Q.  What other assets do you own, Mr. Monteverde?  Any

6   brokerage accounts?

7   A.  Yeah, I do have brokerage accounts, both two with my wife.

8   Q.  What institutions do you have brokerage accounts?

9   A.  TD Ameritrade and Morgan Stanley.

10  Q.  And TD Ameritrade, how many accounts do you have?

11  A.  I'm not certain.  I think I have two, but one is an IRA,

12  which I don't know if it has money.  I don't think so,

13  actually.  I think it's -- no, I'm sorry.  It was closed ten

14  years ago, so it's only one account.  It's a joint account with

15  my wife.

16  Q.  What is the current market value of that account?

17  A.  Roughly 140,000.

18  Q.  And at Morgan Stanley how many accounts do you have?

19  A.  I have one account.  It's a joint account with my wife.

20  Q.  What is the current market value of that account?

21  A.  Probably around 300,000.

22  Q.  Is that a retirement account?

23  A.  They're both retirement accounts, yes.

24          THE COURT:  I thought you said the IRA was closed.

25          THE WITNESS:  Well, they're not the IRAs because they

F25EMAR1                        Monteverde - direct

1   don't qualify.

2            THE COURT:  So they're nonqualifying accounts?

3            THE WITNESS:  They're nonqualifying retirement

4   accounts.

5            THE COURT:  You can reach into them at any time?

6            THE WITNESS:  Yes.

7   BY MR. LIPMAN:

8   Q.  Other than Morgan Stanley and TD Ameritrade, do you have

9   any other brokerage accounts?

10  A.  No.

11  Q.  You mentioned that both of those accounts are joint

12  accounts.  For how long have you had them jointly with your

13  wife?

14  A.  All my assets have been joint accounts since I married my

15  wife.

16  Q.  When did you marry your wife?

17  A.  2002.

18  Q.  In your 2013 tax return you list a number of purchases in

19  sales of stock.  Who holds that stock for you?

20  A.  Either Morgan Stanley or TD Ameritrade.

21  Q.  What other assets do you have, Mr. Monteverde?

22  A.  No other assets but the checking account.  But no other

23  assets.

24  Q.  How much is in your checking account?

25  A.  I don't know.  Maybe 10,000.

 1              THE COURT:  Any major liabilities?

 2              THE WITNESS:  Yes.  I have student loans, probably

 3    close to 100,000.

 4              THE COURT:  Are those the loans you mentioned before?

 5              THE WITNESS:  No, no, student.  Law school.

 6              THE COURT:  Student loans of $100,000?

 7              THE WITNESS:  And credit cards, whatever credit card

 8    balance I probably run roughly.

 9              THE COURT:  Do you pay cash in each cycle?

10              THE WITNESS:  Pay cash?

11              THE COURT:  Do you pay off --

12              THE WITNESS:  I try to pay every month my card.

13              THE COURT:  So any balance, then, is something that

14    you clear up at the end of the month?

15              THE WITNESS:  Yes, sir.

16    BY MR. LIPMAN:

17    Q.  Do you have any other investments?

18    A.  No.

19    Q.  Do you own any partnership interests, any partnerships?

20    A.  No.

21    Q.  Do you own any shares of stock directly?

22    A.  No.

23    Q.  In 2011 what was your compensation at the Faruqi & Faruqi

24    firm?

25    A.  You're asking overall or you're asking my salary?

1          THE COURT:  You have that in documents, right?

2    A.  I don't remember.

3          THE COURT:  You don't need testimony on this.

4    A.  Whatever --

5          THE COURT:  Just stop.

6          Mr. Lipman, you have this all in documents.

7          MR. LIPMAN:  Okay.

8    Q.  Mr. Monteverde, based upon the current caseload that you

9    are responsible for, either in terms of your origination or

10   other cases that you would be entitled to a percentage of their

11   revenue stream, what is your anticipated income for 2015?

12         THE COURT:  We'll do it this way:  You produced your

13   net income figures for 2013, right?

14         THE WITNESS:  That's right.

15         THE COURT:  Is 2014 significantly worse, better or

16   about the same?

17         THE WITNESS:  About the same.

18   BY MR. LIPMAN:

19   Q.  Mr. Monteverde, in your 2013 tax return you list a number

20   of stocks that you've traded in --

21   A.  Yes.

22   Q.  -- as to which you have gains and losses, is that right?

23   A.  Sounds correct.

24   Q.  What is your form of ownership of these stocks?

25   A.  We went over it.  It's in my Morgan Stanley, my TD

F25EMAR1                      Monteverde - direct

1    Ameritrade.

2              THE COURT:  He said he owns them joint with his wife.

3              THE WITNESS:  With my wife, yes.  We're both equal,

4    joint tenants.

5    Q.  If you own them through accounts with Morgan Stanley and TD

6    Ameritrade -- strike that.

7              THE COURT:  You have his income figure for capital

8    gains and losses, don't you, Mr. Lipman?

9              MR. LIPMAN:  Yes.

10             THE COURT:  Is there anything different in 2014,

11   significantly better, significantly worse or about the same, in

12   terms of your trading of securities?

13             THE WITNESS:  I wouldn't know but it's not much.  It's

14   insignificant.

15             THE COURT:  It's not significantly different?

16             THE WITNESS:  Yeah, and it's very low.  It's going to

17   be 10,000, 20 -- it's very low, the gains.

18             THE COURT:  Are you an active trader or --

19             THE WITNESS:  No.

20             THE COURT:   -- do you tend to hold for some time?

21             THE WITNESS:  I don't even know what I own.  I have a

22   broker.  And he's a conservative, so they don't trade a lot.

23   BY MR. LIPMAN:

24   Q.  Mr. Monteverde, on your 2011 tax return what was the amount

25   that your wife contributed to the total income?

1    A.  Roughly close to 100,000 for every year.

2    Q.  So that would be true as well for 2012?

3    A.  Yeah, right.  Yeah.

4    Q.  That's her annual compensation approximately?

5    A.  Yes.

6    Q.  Do you hold any assets offshore?

7    A.  No.

8    Q.  Do you have any accounts in Spain?

9    A.  No.

10   Q.  Are there any trust funds in your family to which you're

11   the beneficiary?

12   A.  No.

13   Q.  So based upon your testimony as to what your wife's annual

14   compensation is and contribution to your total income, would it

15   be fair to say that in 2014, your wages were approximately

16   $1,560,000?

17         MR. BURSOR:  Your Honor, it's in the documents.  I

18   don't know what --

19         THE COURT:  Mr. Lipman, if it's in the document, you

20   don't have to ask.

21         MR. LIPMAN:  Could we put the document in?

22         THE COURT:  What you'll do is create a schedule, net

23   income for 2011, net income for 2012, net income for 2013, and

24   then you'll be able to comment on any of his assets.  And that

25   should finish your case.  No need for documents.

1          MR. LIPMAN:  How would you like us to prepare that --

2     you want us to --

3          THE COURT:  Sit down, take a piece of scrap paper,

4     write down the numbers and you'll relate them to the jury.

5          MR. LIPMAN:  Through testimony?

6          THE COURT:  Through your statement.  Your statement.

7     You'll tell the jury, members of the jury, in 2011 Juan

8     Monteverde had net income as shown by his tax forms of dollar

9     sign blank.  You'll do that for his assets.  You'll do it for

10    everything else.  Do the same thing for Faruqi & Faruqi, and

11    we're finished.

12         MR. LIPMAN:  Your Honor, if there's no admission by

13    the defendants that those are the facts, then --

14         THE COURT:  He signed his tax return.

15         Is there any objection to this procedure, Mr. Bursor?

16         MR. BURSOR:  No, sir.

17         THE COURT:  That's the procedure you use.

18         MR. LIPMAN:  Your Honor, we would like a recognition

19    by the defendants that the facts are correct, that they're

20    true.

21         THE COURT:  Are those your tax returns?

22         THE WITNESS:  Yeah, and I prepared them myself.

23         THE COURT:  To the best of your knowledge and

24    information and belief, those are the correct numbers?

25         THE WITNESS:  They are.

1           THE COURT:  Okay.  You got it.

2           Next?

3           MR. LIPMAN:  So the schedule that we create, your

4   Honor, I would like to introduce it as an exhibit and have

5   Mr. Monteverde verify --

6           THE COURT:  No exhibits.  You relate it to the jury.

7   Don't argue.  That's the way it's going to be.  Okay?

8           Mr. Bursor, cross-examination?

9           MR. BURSOR:  No, sir.

10          THE COURT:  Okay.  What do you have -- the information

11  against Faruqi.  Take ten minutes, write out what you want and

12  call the jury, and we'll finish this.

13          MR. LIPMAN:  Your Honor, may we have a recess?

14          THE COURT:  You have a ten-minute recess.  Step down.

15          THE WITNESS:  Thank you.

16          (Witness excused)

17          THE COURT:  Mr. Lipman, Mr. Bursor, prepare the

18  numbers.  Show them to Mr. Bursor.  There should be no argument

19  on this sort of thing.

20          (Recess)

21          THE COURT:  On the record.  Here's an outline of the

22  proposed instruction.

23          Members of the jury, I instructed you before as to the

24  outlines of punitive damages.  I told you that if you find that

25  the defendants are liable, etc., on page 20 of the proposed

F25EMAR1                         Monteverde - direct

1    instructions.  You have found that defendants Juan Monteverde

2    and defendant Faruqi & Faruqi violated New York City human

3    relations law and caused injury to plaintiff, Alexandra

4    Marchuk.  You have awarded compensatory damages against each to

5    compensate plaintiff for her loss.  You also found that

6    punitive damages are appropriate.  However, I did not ask you,

7    and you did not say, if punitive damages are appropriate

8    against both defendants or only against one.

9            You will now have to apply these rules and some more

10   that I give you to determine against which or both defendants

11   to fix punitive damages.  Remember, you may but are not

12   required to assess punitive damages.  And you make that

13   determination against each defendant.  The purposes of punitive

14   damages are to punish a defendant for his conduct and to serve

15   as an example or warning to defendant and others not to engage

16   in similar conduct in the future.

17           Plaintiff has the burden, as with all issues in the

18   case, to prove by a preponderance of the evidence that punitive

19   damages should be assessed against defendant Juan Monteverde

20   and against defendant Faruqi & Faruqi, or as to either of them.

21   If you find that punitive damages are appropriate against that

22   particular defendant, then you must use sound reason in setting

23   the amount of those damages.

24           Punitive damages, if any, should be in an amount

25   sufficient to fulfill the purposes that I've described to you,

F25EMAR1                    Monteverde - direct

1    but should not reflect bias, prejudice or sympathy toward

2    either party.  In determining the amount of any punitive

3    damages, you should consider the following:  The degree of

4    reprehensibility of each defendants' conduct; the impact of

5    that conduct on plaintiff; the likelihood that defendant would

6    repeat the conduct if an award against that defendant of

7    punitive damages is not made; the financial condition, terms of

8    net income and assets of each defendant; the appropriateness of

9    an award of punitive damages in relation to the amount of

10   actual harm plaintiff proved that she suffered and for which

11   she was compensated.

12           These are, generally speaking, the factors to use.

13   You'll remember that you may but are not required to assess

14   punitive damages against defendant, in addition to compensatory

15   damages, not to compensate the plaintiff but to punish a

16   defendant and to warn others not to engage in similar conduct

17   in the future.

18           I have not written that out.  These are from notes,

19   but that's essentially what I propose to say.

20           Mr. Lipman?

21           MR. LIPMAN:  There are a couple of things there,

22   Judge.  I was trying to take some notes.

23           Early in what you said, you referred to his conduct.

24   I think it should be his or its conduct.  Obviously we're

25   dealing with an entity here.

1          Among the factors, I think you ought to add the

2     deterrent effect as well.  I don't think you had those in the

3     factors as you listed them, when you began with degree of

4     reprehensibility.

5          THE COURT:  I say the likelihood that defendant will

6     repeat the conduct, but I think you're right.

7          MR. LIPMAN:  Deterrence to others.

8          THE COURT:  Okay.

9          MR. LIPMAN:  And we take issue with the Court's

10    language "if you find," because the jury has already found that

11    punitive damages are appropriate.  So I think it's

12    inappropriate to ask them, in effect, to reconsider, because

13    they have already found.

14         THE COURT:  But they haven't found against each

15    particular defendant?  I should have asked.  You should have

16    asked me to ask, but I didn't.  So it's appropriate, but I take

17    your point.

18         MR. LIPMAN:  I think it needs to be phrased in terms

19    of --

20         THE COURT:  I take your point.

21         MR. LIPMAN:  And that's how you'll instruct them?

22         THE COURT:  Mr. Bursor?

23         MR. BURSOR:  Defendants object to the instruction,

24    your Honor.  And one basis for our objection is that New York

25    City Administrative Code, Section 8-107.13(b), specifically

1   provides that a factor to be considered in determining whether

2   and the amount of punitive damages to award is whether the

3   employer has established and complied with policies, programs

4   and procedures for the prevention and detection of unlawful

5   discriminatory practices by employees, and whether the employer

6   has a meaningful and responsive procedure for investigating

7   complaints of discriminatory practices by employees, and

8   whether the firm has a policy against such practices, which is

9   effectively communicated to employees, and whether the firm has

10   a program to educate employees and agents about unlawful

11   discriminatory practices of local, state and federal law and

12   provisions for the supervision of such employees with regard to

13   such matters.

14          I think your Honor should review New York City

15   Administrative Code Section 8-107.13(d) and the factors listed

16   thereunder and should include each of those as factors to be

17   considered by the jury in determining punitive damages.

18               MR. LIPMAN:  Your Honor, plaintiff --

19               THE COURT:  Good point.

20               MR. LIPMAN:  Well, your Honor, plaintiff objects to

21   that, because that was already discussed in view of the jury

22   charge.  It's not a matter of whether.  I think Mr. Bursor says

23   whether punitive damages ought to be awarded should be

24   contingent upon whether or not the firm used good faith or good

25   faith procedures in place.  That's not the law.  The jury has

1    already decided that punitive damages are appropriate.

2             THE COURT:  Noted.

3             Okay.  Are you ready with your schedule, Mr. Lipman?

4             MR. LIPMAN:  We have two schedules.  I need to show

5    them to Mr. Bursor.

6             THE COURT:  Please do.

7             MR. BURSOR:  Your Honor, we also request a verdict

8    form that separately breaks out any award of punitive damages

9    against the defendant Faruqi & Faruqi, on the one hand, and

10   defendant Juan Monteverde on the other hand.  And we request

11   that the verdict form have three lines such that it indicates a

12   total amount of punitive damages awarded and how much are

13   awarded against each defendant so there's no confusion about

14   whether they're added or -- whether they're cumulative or

15   additive.

16            THE COURT:  Can punitive damages be joint as well as

17   several?

18            MR. BURSOR:  I don't think so, your Honor.

19            THE COURT:  Either do I.  So there's no reason for

20   three lines.

21            MR. BURSOR:  The reason --

22            THE COURT:  There's only reason for two lines plus an

23   instruction that they are the disjunctive and not in the

24   conjunctive.

25            MR. BURSOR:  If they say $5 and $5 on the two lines,

1   we don't know if that means five dollars total or --

2              THE COURT:  I'll instruct them.  (Pause)

3         Folks, I think I've overheard some of the comments.

4   Here's what I envision.  As to defendant Faruqi & Faruqi and

5   according to their -- whatever the number of the federal form

6   is, net income in 2011 was reported as dollar sign blank.  Same

7   in 2012.  Same in 2013.

8         As to defendant Juan Monteverde, net income was

9   reported at, same format.  In addition, assets of -- I'm sorry.

10  You can then in summation and argument or in submission recount

11  what he said about his assets.

12             MR. LIPMAN:  Your Honor, I think it's important also

13  with regard to Faruqi & Faruqi to talk about their total

14  income.

15             THE COURT:  No.

16             MR. LIPMAN:  The revenue of the firm.

17             THE COURT:  No.  Unless you do it -- you can do

18  revenue, total adjusted costs, net income.

19             MR. LIPMAN:  Yes.  That's fine.

20             THE COURT:  Okay.  Do that for each.

21             MR. LIPMAN:  We need to redo our schedules.

22             THE COURT:  Do it.

23             MR. BURSOR:  Your Honor, can I ask for some

24  clarification on that.

25             THE COURT:  Yes.

 1                MR. BURSOR:  You're going to allow the gross revenue

 2       of the firm, as opposed to the income to be shown to the jury?

 3                THE COURT:  Gross income -- not shown, related.

 4                MR. BURSOR:  Gross revenue, so every dollar that came

 5       in the door?

 6                THE COURT:  Less total costs, yields net income.

 7                MR. BURSOR:  And then with respect to assets, I would

 8       request that we simply total up the assets and say, this is the

 9       total amount, as opposed to a house and a boat and so forth.

10                THE COURT:  No.

11                MR. BURSOR:  It's irrelevant.

12                THE COURT:  He can do both.  But if he does assets, he

13       has to do liabilities.

14                MR. BURSOR:  Your Honor, the plaintiffs are attempting

15       to segregate Mr. Monteverde's earnings from his wife's earnings

16       when they're reported jointly on the tax form.  We object to

17       that.  It should just be the income on the tax form.  It was

18       what it was.

19                THE COURT:  You prefer joint?

20                MR. BURSOR:  Joint.

21                THE COURT:  Rather than several?

22                MR. BURSOR:  Yeah.

23                THE COURT:  That's the nature of a joint claim or

24       tendency in common, or tendency by the entirety.  Each party

25       has claim against the total assets.  So I think Mr. Bursor is

F25EMAR1                        Monteverde - direct

1   correct.  Just add up the total.

2              MR. LIPMAN:  Judge, that's fine as far as it goes, but

3   if Mr. Bursor and Mr. Monteverde are going to argue that that's

4   their family income so the jury doesn't know what

5   Mr. Monteverde's contribution is --

6              THE COURT:  No, they're not.  There's not going to be

7   any argument here.  You're just going to do this in a

8   submission.  We don't need any argument.

9              MR. BURSOR:  Your Honor, can I ask, is there going to

10  be any testimony provided during this phase of the trial?

11             THE COURT:  I'll be back in a second. (Pause)

12             What were you saying, Mr. Bursor?

13             MR. BURSOR:  Your Honor, may we have a side bar?

14             THE COURT:  There's no jury here.

15             MR. BURSOR:  I know, but there are a bunch of

16  reporters in the back of the courtroom.

17             THE COURT:  Yes, you may.

18             (Discussion held off the record at side bar)

19             THE COURT:  I'm going to call in the jury.

20             MR. LIPMAN:  We're not ready with the schedules,

21  Judge.  I'm working on them.  (Pause)

22             THE COURT:  Are we ready for the jury?

23             MR. LIPMAN:  Five minutes.

24             MR. BURSOR:  Your Honor, can we ask that you read the

25  schedule?

1        THE COURT:  I'll do it, if it's legible.  (Pause)

2        THE COURT:  In 2014, gentlemen, when Mr. Monteverde is

3   called Monteverde total wages from Faruqi & Faruqi, is that a

4   different number from reported net income?

5        MR. LIPMAN:  Yes, because that's all we had for that

6   year, your Honor, was the W-2.  So we don't have the tax

7   returns.  So that's solely his comp from the firm.

8        THE COURT:  Got it.  Okay.  I have this.

9        MR. BURSOR:  Your Honor, can I ask that you explain to

10  the jury that the reason they're being provided with that

11  information is solely to consider the financial condition of

12  the defendants in making the determination of punitive damages.

13       THE COURT:  Yes.

14       MR. LIPMAN:  Your Honor, after you're finished reading

15  that to the jury, may we have those pieces of paper to use for

16  the summations.

17       THE COURT:  Yes.

18       MR. LIPMAN:  And, your Honor, are you going to present

19  it to the jury in the form of a --

20       THE COURT:  Here's the procedure.  I will present this

21  information to the jury.  I'll tell them.  I'll then give you

22  back the pieces of paper.  And you will argue what you want to

23  argue, five minutes each.  You can do three and two if you

24  want, Mr. Lipman, but I'll be strict.  And then I will give the

25  charge, and then they'll deliberate.

1             MR. LIPMAN:  Will you present that information to the

2    jury as a stipulation between the parties as to what it is?

3             THE COURT:  As to what the documents say.

4             Let's get the jury.

5             (In open court; jury present.  Time noted:  3:49 p.m.)

6             THE COURT:  Members of the jury, thank you for your

7    patience.  Here's what we will be doing.  Rather than

8    complicate these proceedings with confusion of records, we've

9    distilled the information to one consideration in relationship

10   to punitive damages, and that is financial income and net worth

11   of the particular defendant against whom you'll consider

12   punitive damages.  I'll give you those numbers.

13            Then each side will have five minutes of argument

14   relevant to the issue of punitive damages.  Mr. Lipman will

15   probably divide his five minutes into something like three and

16   two or four and one.  I'll be strict.  And then I will give you

17   the law, and then you'll retire and deliberate, and we'll have

18   a jury form for this issue as well.

19            So let me give you.

20            (Continued on next page)

21

22

23

24

25

F250MAR2                    Deliberations

1           THE COURT:  All right.  So let me give you the

2     numbers.  One of the considerations I'll charge you relate to

3     punitive damages.  It has to do with incoming net worth.

4           One consideration, not to load up against people who

5     may have some money, not to show sympathy or bias in that way,

6     because we are living under the equal protection of the laws.

7     And there shall be no favor or disfavor because one side has

8     more money than another.  But it is a consideration.  In fixing

9     punitive damages, and in that connection, I want to give you

10    the numbers.

11          So first, for Faruqi & Faruqi, as a law, firm.  Taken

12    from their tax returns for the year calendar year 2011, the

13    firm showed a total income, that's revenues, of $12,979,591,

14    approximately 13 million.  Less total deductions of

15    $14,825,492, yielding a loss, a net income loss, of $1,845,901,

16    approximately $1.9 million.  Have in mind, that law firm

17    partnership distributes a good part, and maybe all, of its

18    revenues and income to employees and partners.

19          For the year 2012, gross revenues $15,500,105,

20    Approximately $15.5 million.  Total deductions, $15,371,267,

21    yielding net income of $128,838, or approximately net income of

22    $129,000.

23          The calendar year 2013, total revenues were

24    $16,485,729, approximately $16.5 million.  Less total

25    deductions of $15,458,540, approximately $15 and a half

F250MAR2                      Deliberations

1    million.  Total net income $1,027,189, or approximately a

2    million dollars.

3             Those are the numbers of Faruqi & Faruqi.

4             As to Juan Monteverde, also from his tax returns for

5    the same years of 2011, 2012 and 2013 --

6             I should say, with Faruqi & Faruqi, those are the most

7    recent tax returns.  As is customary with business, the 2014

8    tax return has not yet been filed.  Which is normal.

9             As to Juan Monteverde, who reported joint income with

10   his wife, the figures are as follows:

11            Taxable income 2011, $904,146.

12            Taxable income 2012, $1,371,005.

13            Taxable income 2013, $1,228,844.

14            In addition, according to Mr. Monteverde's W-2 from

15   Faruqi & Faruqi, his total wages, for the year 2014, were

16   $1,661,481.

17            The lawyers will now argue five minutes each.  And

18   I'll give these figures to the lawyers for argument.

19            Mr. Lipman, step up, please.

20            How much time?

21            MR. LIPMAN:  Four minutes, please.  And one minute for

22   rebuttal.

23            THE COURT:  Exactly four minutes.  Start.

24            MR. LIPMAN:  Thank you, ladies and gentlemen of the

25   jury.

1         Discipline, I think, is very important here in the

2    form of punitive damages against Mr. Monteverde and the firm.

3    The sanction that you will place upon the firm and

4    Mr. Monteverde will be the only punitive steps taken against

5    either the firm, or Mr. Monteverde, since all of these events

6    happened.

7         The firm, you will recall, testified through

8    Mr. Faruqi that they disciplined Mr. Monteverde.  But we now

9    see that that is not true.  They said they didn't give him a

10   bonus in 2013 and 2014.  Well, if they didn't give him a bonus,

11   it didn't really matter, because he made much more money each

12   year as you just saw the judge tell you.  As a matter of fact,

13   he just made, in 2014, almost twice what he made in 2011.  So,

14   hand over fist, he is making money.  He made 30 percent more in

15   this past year than he made in the year before that.  So from

16   2013 to 2014, he increased 30 percent.

17        If you extrapolate that same percentage to the firm

18   with regard to its gross revenues of $16.5 million for 2013,

19   you can easily calculate what the firm made for 2014.  It's

20   gonna be approximately 30 percent more than that.  Because

21   Mr. Monteverde, I think we can all assume, is still the top

22   rainmaker in the firm, so if his revenues are moving up that

23   much, so are the firm's.

24        So getting back to how the firm didn't really

25   discipline Mr. Monteverde when they found out about what had

F250MAR2                    Deliberations

1  happened the night of the holiday party.  Remember, Mr. Faruqi

2  testified to you that after the September 8 kiss and grope that

3  we heard about, he told Mr. Monteverde, you never do that again

4  or you're going to lose your job.  He did it again.  And he did

5  it a lot worse.  He didn't loose his job.  He got paid more,

6  and more, and more.  And we saw that.  So you be the judge of

7  what it takes to discipline and award punitive damages on a

8  firm that makes probably, in 2014, well over $20 million a

9  year.  Yes, they have expenses against that.  So their net

10  income is gonna be small, but that's only because their

11  expenses go to pay themselves.  Most law firms will spend up

12  to, you know, 90 percent of their gross revenues paying their

13  employees, including Mr. Monteverde.  He is a big piece of

14  that.

15          So what will it take to punish a law firm that makes

16  over $20 million a year.  And with Mr. Monteverde, you need to

17  think to yourself what is it gonna take to punish

18  Mr. Monteverde, given his income, which I think you can judge

19  for yourselves how high that is, obviously.

20          And I think it is also really important, in a case

21  like this, to send a message to employers in New York City and

22  beyond, that this kind of behavior should not be tolerated.

23  And that is within your power, to award punitive damages that

24  will send a message, in effect, to tell employers and

25  supervisors that women should be treated equally as men, and

1    not discriminated against in this country.

2            Thank you.

3            THE COURT:  Mr. Bursor.  Five minutes.  Five.

4            MR. BURSOR:  Ladies and gentlemen of the jury, your

5    verdict is very interesting.  I went back through the

6    instructions the judge gave you before you retired to render

7    your verdict.  And I think it is significant.  Because one of

8    the things you have to consider in determining whether to

9    assess punitive damages is the degree of reprehensibility of

10   the violation that you found.

11           And when you look at Title VII, and when you looked

12   at -- that's the federal law.  And when you looked at the state

13   law, you found no liability.  And the judge instructed you on

14   those laws, that if the conduct was welcome, you should not

15   find liability.  And if it was unwelcome, and if it was severe

16   and pervasive, then you should.

17           So you must have either found that it was welcome or

18   that it was not severe and pervasive.  And then on the lower

19   standard for the New York City law, where you were not

20   instructed on that, you found liability.

21           It sounds like you have already concluded, based on

22   the verdicts rendered, that the conduct here either was welcome

23   or was not sufficiently severe and pervasive to trigger

24   liability under federal law.  And that seems very significant

25   when determining the reprehensibility for awarding punitive

F250MAR2                    Deliberations

1    damages.  It seems pretty mitigating.  You found liability only

2    on the law that had the lowest threshold, treated less well.

3    And it's really hard to understand what that means, and I'm

4    sure you struggled with that.

5         The other factor that is particularly relevant, and I

6    believe the judge is going to instruct you on, is that with

7    regard to the firm Faruqi & Faruqi, if you find that the firm

8    had established policies and procedures for dealing with claims

9    of discrimination, and followed them in good faith, that should

10   be a mitigating factor when you are considering whether to

11   award punitive damages against the firm and, if so, how much.

12        And so I want to make the argument that you heard

13   evidence -- and the plaintiff admitted when she testified that

14   the firm had a handbook.  That they communicated the handbook

15   to her.  The handbook had policies and procedures.  She knew

16   that.  She testified she had the handbook in her desk.  And the

17   plaintiff, herself, did not follow those procedures.

18        So you have now awarded her $90,000 in back pay and

19   front pay, after finding that the conduct she complained about

20   either was welcome, or was not severe and pervasive, or finding

21   that she didn't follow the procedures.

22        And I think the testimony was undisputed that the

23   plaintiff did everything she could to prevent the Faruqis, the

24   authorities at the firm, and Olive Alston, from finding out

25   about the relationship with Mr. Monteverde.  So she never

1    really gave them a fair chance to address it.  And that sort of

2    weighs, in my mind, makes the plaintiff more culpable, or at

3    least complicit, and not worthy of an award of punitive damages

4    against the firm.

5         So you're gonna get a verdict form that is going to

6    ask you, is Faruqi & Faruqi, LLP liable for punitive damages

7    yes or no.  I want you to check the no box there.  I don't

8    think it would be fair to hold the firm liable for punitive

9    damages when they were given no notice of any complaint by Ms.

10   Marchuk against Mr. Monteverde.

11        And with respect to Mr. Monteverde, you found him not

12   liable under New York State law.  And there are a few different

13   reasons why you might have done that; whether not severe or

14   pervasive, welcome.  Only you guys know.  We don't get to go in

15   the jury room.  But I think that also mitigates against an

16   award of punitive damages for Mr. Monteverde.  So I would like

17   you to check no on that line, too.  If you don't check no, I

18   would like you to award a very small -- a very, very small

19   number for punitive damages.  He has been punished enough.  And

20   the Faruqis have been punished enough already.

21        And the plaintiff has been complicit every step of the

22   way.  You obviously didn't believe her tale of rape.  She

23   should not be rewarded for conduct in which she was complicit,

24   and in which I believe you found she came in here and falsely

25   testified about what happened at 3:00 a.m.

F250MAR2                    Deliberations

1                Thank you, your Honor.

2                THE COURT:  Members of the jury -- sorry, Mr. Lipman,

3        one minute.

4                MR. LIPMAN:  I think this is the first time in the

5        entire trial, Judge, where I stood up and you sat down and you

6        apologized to me.  Just for record.  Thank you.

7                Couple of things.  I think I have a minute and a half,

8        actually, right, because I stopped at 3:30.

9                The handbook is a reason, not for smaller punitive

10       damages in the case, but for higher punitive damages.  Just

11       about every firm out there in the city and the state and

12       country of any size, has a firm handbook.  Some abide by it,

13       others don't.

14               The firm handbook at the Faruqi firm was, literally, a

15       joke.  Mr. Faruqi would hold it up and say handbook when

16       Mr. Monteverde would say disgusting things that were demeaning

17       to women.  The handbook, itself, should not be used as an

18       excuse for lower punitive damages in this case.

19               Mr. Bursor said that Ms. Marchuk never gave the

20       Faruqis a chance to do anything.  They had a great chance to do

21       something.  They had that e-mail from Emily Komlossy,

22       exhibit 23, the big blow-up that I showed you, where

23       Ms. Komlossy told Nadeem Faruqi essentially that Mr. Monteverde

24       was sexually harassing Ms. Marchuk.  Mr. Faruqi never asked Ms.

25       Marchuk about that.  He didn't send Ms. Komlossy to ask Ms.

F250MAR2                    Deliberations

1   Marchuk about that.  He left her to her own.  And employers

2   should not do that.

3         Punitive damages in this case will send a message to

4   employers, when you hear a cry for help, listen.

5         Mr. Monteverde's behavior in this case is even more

6   reprehensible than the Faruqi firm.  He's, we all see what he

7   has done.  We heard Mr. Rowley testify about how he conducted

8   himself in the officeplace.  And we heard Ms. Marchuk testify,

9   at length, the way he conducted himself towards her.  He has

10  never been punished, he should be punished.

11        And the last thing I'll say is -- and I found it

12  telling --

13        THE COURT:  Okay, stop.

14        MR. LIPMAN:  That --

15        THE COURT:  Mr. Lipman, you're finished.

16        MR. LIPMAN:  That I am finished.  That's the last

17  thing I'm going to say.

18        Thank you very much.

19        THE COURT:  Members of the jury, as I told you in my

20  jury instructions, in the section dealing with punitive

21  damages, you may, but you are not required, to assess punitive

22  damages.  And you make that assessment against each defendant,

23  individually.

24        The purpose of punitive damages is to punish a

25  defendant for that defendant's conduct, to serve as an example

or a warning to that defendant and to the others, that this is

conduct that should not be engaged in in the future.

You found that it was appropriate to assess punitive

damages for the violations by defendant Juan Monteverde and

defendant Faruqi & Faruqi of provisions of the New York City

Human Relations laws.  You found that violations of those

provisions caused injury to the plaintiff, Alexandra Marchuk.

And you awarded compensatory damages to compensate Ms. Marchuk

for her proved loss.

You also found that it was appropriate to assess

punitive damages.  But I did not ask you, and you did not say,

if punitive damages are appropriate against both of those two

defendants, or merely against one.

Here are the rules to apply.

If you find that Mr. Monteverde was liable for sexual

harrassment, and you so found under New York City law, but not

under federal or New York State law, you may award punitive

damages against him, but only if you determine that he

subjectively knew there was a substantial risk that his conduct

was illegal, and in conscious disregard of Ms. Marchuk's

rights.  It's his mental state, that's the issue.

Against Faruqi & Faruqi, the law firm, the firm can be

liable for sexual harrassment.  And you may award punitive

damages, as you found.  And you may award punitive damages

against the firm.  But only if you find that the firm was aware

F250MAR2                         Deliberations

1    that Ms. Marchuk was subjected to a sexually hostile work

2    environment, and it did not do anything to remedy the

3    situation.

4           Like everything else in this case, it is plaintiff

5    that has the burden to prove, by a preponderance of the

6    evidence, that punitive damages should be assessed against one

7    or both of the defendants.  If you found, as you did, that

8    punitive damages are appropriate, you must find that same

9    appropriateness by a preponderance of the evidence against the

10   particular defendant.

11          You must use sound reason in setting the amount of the

12   damages.  Punitive damages, if any, should be in an amount

13   sufficient to fulfill the purposes that I described to you,

14   that is to punish and to serve as an example.  But it should

15   not reflect bias, prejudice, or sympathy toward either or both

16   parties.  And it should be in relationship to factors, like the

17   following, that you consider against each defendant.

18          The degree of responsibility of the particular

19   defendant, Mr. Monteverde and Faruqi & Faruqi.  The degree of

20   responsibility each had.  The impact of the conduct of each on

21   the plaintiff, Ms. Marchuk.  The need to deter others.  The

22   likelihood that the particular defendant would repeat the

23   conduct that you found to be liable, if an award of punitive

24   damages were not to be made.  The financial condition of each

25   defendant, as has been shown to you in these abbreviated

F250MAR2                      Deliberations

1    proceedings.  The appropriateness of an award of punitive

2    damages in relation to the amount of actual harm the plaintiff

3    suffered from the conduct of each, and from which the plaintiff

4    was compensated according to the proofs of loss that she set

5    out.

6           Furthermore, as to Faruqi & Faruqi, whether or not the

7    firm had procedures which reasonably could be used by

8    employees, like Ms. Marchuk, to deal with discrimination in the

9    workplace, and concerning the workplace.  Whether these

10   procedures were known and reasonably available to the employees

11   suffering such conduct.  And whether or not these employees

12   were given reasonable confidence that these procedures could

13   fairly be used without harm to themselves.

14          These are not precise factors.  Proof of loss has a

15   precision to it.  Punitive damages do not.  They are

16   discretionary.  If you think that it's appropriate, using these

17   factors and others that come to mind to award punitive damages,

18   then you do so, but taking these factors into application with

19   respect to each defendant.

20          You will have a verdict form.

21          Question one:  Is Faruqi & Faruqi, LLP liable for

22   punitive damages.  There is yes and no box.  Again, your

23   verdict must be unanimous.  And when it is unanimous, the

24   foreperson will put a check next to the appropriate box.  And,

25   if it's yes, then you award punitive damages in the amount you

F250MAR2                        Deliberations

1    think appropriate against Faruqi & Faruqi.  There is a space

2    for that.  I didn't provide a line, but there is a lot of

3    space.

4            Question two:  Is Juan Monteverde liable for punitive

5    damages.  Again, there is a yes or no box.  Check the

6    appropriate one.  If yes, you put down how much punitive

7    damages.

8            Mind you, these are either/or.  Don't put down amounts

9    for one, and the same amounts for another.  They will not be

10   added up.  They will be amounts fixed against Faruqi & Faruqi,

11   if any, you don't have to award it.  And amounts against

12   Monteverde, if any, you don't have to award it.

13           It's in your discretion.  It's in your discretion.

14           Counsel?

15           MR. BURSOR:  Your Honor, I think you misspoke.

16           THE COURT:  Step up, please --

17           MR. BURSOR:  Sorry.

18           THE COURT:  At the sidebar.

19           (Continued on next page)

20

21

22

23

24

25

F250MAR2                    Deliberations

1              (At the side bar)

2              MR. BURSOR:  You said that they won't be added

3      together, but they will be added together.

4              THE COURT:  You're right.

5              I said they wouldn't be added together.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F250MAR2                    Deliberations

1            (In open court)

2            THE COURT:  They wouldn't be added together against

3    each of the defendants.  In other words, if you put down an

4    amount against Monteverde, and an amount against Faruqi &

5    Faruqi, Monteverde's amount won't be added to Faruqis' amount,

6    and Faruqis' amount won't be added to Monteverde's amount.

7            JUROR:  We got that.

8            THE COURT:  Got it.  Okay.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F250MAR2                     Deliberations

1              (At the side bar)

2              THE COURT:  Anything else?

3              MR. BURSOR:  That's it.

4              THE COURT:  Mr. Lipman?

5              MR. LIPMAN:  No, we're good.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F250MAR2                    Deliberations

1                (In open court)

2                THE COURT:  I said there is a lot of space, but I

3       didn't mean to suggest anything by the space, except that there

4       is space for you to write.  That is also discretional.

5                All right, we'll give the jury the form and we'll mark

6       this the next court exhibit.  And the jury can retire.

7                (Jury retires to deliberate on its verdict)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F250MAR2                        Deliberations

1          (In open court)

2          THE COURT:  Nothing for me now?

3          MR. LIPMAN:  My only concern is --

4          THE COURT:  Be seated.

5          MR. LIPMAN:  My only concern is that there is no

6     record of any evidence of the numbers that you recited to the

7     jury.

8          THE COURT:  We'll deem the submission of this

9     financial information that I related to the jury, and about

10    which counsel argued, as evidentiary, submitted as a summary

11    under FRE 1001 of documents that were produced, and which were

12    used by counsel.

13         MR. LIPMAN:  So is it marked as an exhibit?

14         THE COURT:  Doesn't have to be marked.  It is in

15    evidence.  Stipulations are exhibits.  And this is 1001.

16         MR. LIPMAN:  Thank you, your Honor.

17         (Recess)

18         THE DEPUTY CLERK:  Jurors entering.

19         (In open court)

20         (Jury present)

21         THE COURT:  Be seated, everyone.

22         I have your note, 4:26 p.m., that you have reached a

23    decision.

24         Mr. Cardona, please take attendance.

25         THE DEPUTY CLERK:  Hold to that.  You may be seated.

F250mar2a                    Verdict

1            When I call your name, please answer to your presence.

2            Trevor Knight?

3            JUROR:  Here.

4            THE DEPUTY CLERK:  Robert Fields?

5            JUROR:  Here.

6            THE DEPUTY CLERK:  Jonathan Kreiness?

7            JUROR:  Here.

8            THE DEPUTY CLERK:  Jeffrey Cordero?

9            JUROR:  Here.

10           THE DEPUTY CLERK:  Eliana Mera?

11           JUROR:  Here.

12           THE DEPUTY CLERK:  Brian Gitler?

13           JUROR:  Here.

14           THE DEPUTY CLERK:  Geraldine Crary?

15           JUROR:  Here.

16           THE DEPUTY CLERK:  And Estela Bido Campusano?

17           JUROR:  Here.

18           THE DEPUTY CLERK:  Thank you.

19           THE COURT:  Mr. Cardona, please obtain the verdict

20  form.

21           THE DEPUTY CLERK:  Yes, sir.

22           THE COURT:  From Mr. Knight.

23           THE DEPUTY CLERK:  Thank you.

24           THE COURT:  Return it, please, to Mr. Knight.

25           THE DEPUTY CLERK:  Proceed, your Honor?

F250mar2a                    Verdict

1           THE COURT:  Yes.

2           THE DEPUTY CLERK:  In the case off Alexandra Marchuk

3      vs. Faruqi & Faruqi, foreperson, question number one: Is Faruqi

4      & Faruqi, LLP liable for punitive damages, yes or no.

5           Jury's answer?

6           JUROR:  Yes.

7           THE DEPUTY CLERK:  If yes, how much in punitive

8      damages?

9           JUROR:  $5,000.

10          THE DEPUTY CLERK:  Question two, is Juan Monteverde

11     liable for punitive damages.

12          Jury's answer?

13          THE DEPUTY CLERK:  Yes.

14          JUROR:  Yes.

15          THE DEPUTY CLERK:  If yes, how much in punitive

16     damages?

17          JUROR:  $45,000.

18          THE COURT:  Does counsel wish the jury to be polled.

19          Mr. Lipman?

20          MR. LIPMAN:  Yes, please.

21          THE COURT:  Mr. Bursor?

22          MR. BURSOR:  No, your Honor.

23          THE COURT:  Please poll the jury.

24          THE DEPUTY CLERK:  Ladies and gentlemen of the jury,

25     please listen to your verdict as it stands recorded.

F250mar2a                    Verdict

1              (Jury polled, unanimous)

2              THE DEPUTY CLERK:  Jury polled, verdict unanimous,

3       your Honor.

4              THE COURT:  Thank you.

5              Is there anything further for the jury, Mr. Lipman?

6              MR. LIPMAN:  No, your Honor.

7              THE COURT:  Mr. Bursor?

8              MR. BURSOR:  No, your Honor.

9              THE COURT:  Members of the jury, I want to thank you.

10      There was a great judge of this court who never thanked jurors,

11      he never thanked them.  Not because he didn't appreciate their

12      work, but because he felt that it was their work as a citizen,

13      and if you doing the job that you are asked to do, you don't

14      deserve that.  I don't subscribe to that school.  I think that

15      when we perform our work as we're supposed to, it is time for

16      thanks.  It's thanks when you do your job right.

17             I don't know what your answer should be.  I have

18      trained myself not to participate in trying to guess results.

19      I don't care what result you come up with, just that there be a

20      result, and it be fairly derived and honestly felt.  And that's

21      the way I feel about you. I have watched you throughout.  You

22      paid attention to the evidence from the very beginning to the

23      very end.  I could tell by the questions you asked in

24      deliberations and the evidence that you wanted reviewed, that

25      there was intense and honest debate.  I could tell that you

F250mar2a                    Verdict

1    paid attention to the evidence, and the issues, and you

2    resolved them, one with the other in the way that should be

3    done in this great country in a Democratic way.  Everyone

4    having an equal position.

5                 I congratulate you.  I am in awe of you.

6                 Thank you for your service.  You are retired, you're

7    excused, you're discharged.

8                 Mr. Cardona will talk to you for a moment in the back.

9    You'll take your books, we shall destroy your notes.

10                One thing more.  I have told you, throughout the case,

11   don't discuss the case, keep an open mind.  Well, now that you

12   have declared your minds, they needn't be open for other

13   possibilities.  You have finished your work.  But in doing your

14   work, you respected one another.  You, in effect, took a pledge

15   to respect the integrity and the autonomy of the jury room.

16   What's been said is only your business, nobody else's.  You

17   don't have to tell anyone else how you decided, or what you

18   thought, or what you did.  If someone asks you, you can say,

19   excuse me, but I would rather keep it to myself, it's my pledge

20   to my colleagues.  I think that's a good pledge.  It's up to

21   you, whether you keep it or not and what you do with it.  But

22   this is a unique experience in society.  Treasure it and

23   respect it.

24                Thank you.

25                JURORS:  Thank you, your Honor.

F250mar2a                    Verdict

1              THE DEPUTY CLERK:  All rise.

2              (Jury excused)

3              (In open court)

4              THE COURT:  Be seated, everyone.

5         Mr. Lipman and Mr. Bursor, what's your pleasure in

6    making motions.

7              MR. LIPMAN:  Plaintiff has no motion at this time,

8    your Honor.

9              THE COURT:  Pardon?

10             MR. LIPMAN:  Plaintiff has no motion at this time.

11             MR. BURSOR:  Mr. Bursor.

12        Your Honor, defendants renew their motion for JMOL on

13   front pay.  The jury awarded $20,000 in front pay.  There was

14   no basis, whatsoever, for that award.  Your Honor observed that

15   Mr. Lord's testimony could not possibly be used to calculate

16   front pay.  The $20,000 awarded in front pay is completely

17   speculative, indefensible.  JMOL should have been granted,

18   never should have gone to the jury.  We want that JMOL granted

19   now.

20             THE COURT:  Denied.

21             MR. BURSOR:  We renew the motion on punitive damages

22   with respect to the law firm Faruqi & Faruqi.  We want that

23   JMOL motion granted.

24             THE COURT:  Denied.

25             MR. BURSOR:  We renew our JMOL on back pay, your

F250mar2a                          Verdict

```
 1   Honor.
 2            THE COURT:  Denied.
 3            MR. BURSOR:  We renew JMOL with respect to New York
 4   City law on behalf of both Faruqi & Faruqi and Juan Monteverde.
 5            THE COURT:  Denied.
 6            MR. BURSOR:  I just want to make sure I have covered
 7   everything that's gone against us.
 8            THE COURT:  If you have not, you have -- I forget what
 9   number of days --
10            MR. LIPMAN:  Ten, I think.
11            THE COURT:  -- to do it.  And you can do it within
12   those days.  Otherwise, judgment will be entered, and go forth
13   accordingly.
14            Thank you all very much.
15            MR. BURSOR:  Thank you, your Honor.
16            MR. LIPMAN:  Thank you, your Honor.
17            MR. HERSHBERG:  Thank you, your Honor.
18                          (Adjourned)
19                             o0o
20
21
22
23
24
25
```